## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

RESTAURANT LAW CENTER, a non-profit District of Columbia corporation; and TEXAS RESTAURANT ASSOCIATION, a non-profit Texas corporation,

        Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF LABOR; HON. MARTIN J. WALSH, Secretary of the United States Department of Labor, in his official capacity; and JESSICA LOOMAN, Acting Administrator of the Department of Labor's Wage and Hour Division, in her official capacity,

        Defendants.

Civil Action No. \_\_21-1106_____

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ANGELO I. AMADOR (motion for admission
   *pro hac vice* forthcoming)
RESTAURANT LAW CENTER
2100 L Street, N.W., Suite 700
Washington, D.C.  20036
Tel:  202.331.5913
Fax: 202.973.3952
AAmador@restaurant.org

GRETA RAVITSKY
EPSTEIN, BECKER & GREEN, P.C.
Two Houston Center
909 Fannin, Suite 3838
Houston, Texas  77010
Tel:  713.300.3215
Fax: 713.300.3235
GRavitsky@ebglaw.com

PAUL DECAMP (motion for admission
   *pro hac vice* forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com

BRIAN SPANG (motion for admission
   *pro hac vice* forthcoming)
KATHLEEN BARRETT (motion for admission
   *pro hac vice* forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
227 West Monroe, Suite 3250
Chicago, Illinois 60606
Tel:  312.499.1400
Fax: 312.827.9562
BSpang@ebglaw.com
KBarrett@ebglaw.com

*Counsel for Plaintiffs*

## PRELIMINARY STATEMENT

The United States Department of Labor (the "Department") has claimed for itself regulatory authority well beyond what Congress has conferred by statute.  Congress legislatively created the "tip credit" exception to the minimum wage requirement for any employee "engaged in an occupation" that "customarily and regularly" receives a sufficient amount of tips each month. Congress legislatively defined such employees as "tipped employees."  The Department has promulgated a rule that directly conflicts with the statute.  Specifically, the Department has (a) created a new and different term not found in the statute—"tipped occupation"—and (b) declared, without any authority, that employees who indisputably qualify as "tipped employees" under the statute, such as waiters and bartenders, will not be considered working in a (non-statutory) "tipped occupation" if (c) those employees spend less than 20% of their working time or 30 continuous minutes on certain tasks the Department deems unrelated to their occupation.

The Department is impermissibly attempting to re-write the statute via a regulation.  The statute is neither silent nor ambiguous on the material point, so there is no gap to fill nor ambiguity to clarity to be made.  The Department does not ground its attempt to legislate on any factual data about the real-world operations of business that employ people in tipped occupations.  The Department even acknowledges that it failed to account for the real-world impact and continuing effect of the COVID-19 pandemic on the affected businesses.  The Department is simply making an end-run around the statute because it does not like Congress's legislative choice.  The Department's action is therefore *ultra vires*, contrary to the pertinent statute, and illegal.

Under the Fair Labor Standards Act (the "FLSA"), employers may pay a "tipped employee"—i.e., "any employee engaged in an **occupation** in which he customarily and regularly receives more than $30 a month in tips"—a cash wage of $2.13 per hour (or more) so long as the

employer satisfies certain statutory criteria, including that the employee's tips plus the cash wage equal the minimum wage.  *See* 29 U.S.C. §§ 203(m), 203(t) (emphasis added).  The phrase "occupation" is clear and unambiguous:  "occupation" means "the principal business of one's life:  a craft, trade, profession or other means of earning a living."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1560 (1981).  Since 1967 the Department has long defined the phrase "customarily and regularly" with regard to the tip credit to mean "greater than occasional, but which may be less than constant."  29 C.F.R. § 531.57.  Accordingly, for more than 54 years, the Department's formally-expressed interpretation of the statute in terms of its 1967 regulation has aligned with the plain language of the statute.

Specifically, the statute speaks in terms of a "tipped employee."  29 U.S.C. § 203(m)(2)(a).  The statute defines "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  *Id.* § 203(t).  And since 1967, the Department recognized that "[i]f an employee is in an occupation in which he normally and recurrently receives more than $30 a month in tips, he will be considered a tipped employee . . . ."  29 C.F.R. § 531.57.  Nothing in the statute or the Department's 1967 regulation suggests, or even hints at, an intent to dissect a tipped employee's "occupation" into job duties which directly result in tips (such as serving food or a drink) and job duties which may not result directly in tips (such as preparing a plate of food or washing a beer mug).  Indeed, the Department specifically observed Congressional intent since at least 1974 recognizing that certain specified *occupations* "customarily and regularly receive tips," including "waiters," "waitresses," "busboys," and "service bartenders."  86 Fed. Reg. 60,114, 60,116 (Oct. 29, 2021) (quoting S. Rep. No. 93-690, at 43 (Feb. 22, 1974)).

Accordingly, engaging in the occupation of server, or waiter, or bartender, or busser, qualifies the employee for the tip credit under the plain language of the FLSA—regardless of whether *all* the job duties of such specified occupations generate tips.  Tasks such as getting the restaurant ready for customers, restocking various items during meal service, cleaning, and closing down the restaurant at the end of the day—known in the industry as "side work"—have long been an integral part of the tipped occupations commonly found in restaurants.  The Department acknowledges that these activities are a normal part of these occupations.  But the Department is now attempting to re-write the tip credit provision of the FLSA to dissect these occupations into different categories of job duties, and dictate that the tip credit is available for certain of an occupation's duties but not for others.  Congress presumably could have decided to dissect "occupations" into different categories of job duties, and provided the tip credit for certain duties but not others.  But Congress chose not to do so.  Congress chose to define the tip credit according to an entire "occupation." The Department's Final Rule is really a new statute in disguise, one that directly conflicts with the plain language of the statutory provision it is purporting to "interpret."  The Department's Final Rule should therefore be enjoined and then vacated because it is arbitrary, capricious, contrary to the FLSA, promulgated in violation of the Administrative Procedure Act (the "APA"), and a violation of separation of powers.

## THE PARTIES

1.     Plaintiff Restaurant Law Center ("Law Center") is an independent public policy organization, headquartered at 2055 L Street, N.W., Suite 700, Washington, D.C.  20036, and affiliated with the National Restaurant Association, the largest trade association representing the restaurant and foodservice industry (the "Industry") in the world.  The Law Center was created in 2015 to represent its members and the Industry before the judiciary and regulatory agencies.  The

Industry is comprised of over one million restaurants and other foodservice outlets employing almost 14.7 million people—approximately 10 percent of the U.S. workforce.  Law Center members have locations that operate within the Western District of Texas, including corporate-owned food service establishments, franchisees, and independent operators.  The Law Center routinely advocates on matters of labor relations policy and represents the interests of its members in labor and workforce matters before the courts.  In addition, the Law Center provides industry-specific guidance for owners, operators, and legal operators through webinar and through its Compliance Library.  Many Law Center members that operate in Texas, including within this District, employ tipped employees who perform varying amounts of side work, as that term is explained below, thereby directly subjecting them to claims under the Department's 80% standard as well as its disallowance of a tip credit for any time spent on supposed work "not part of the employee's tipped occupation."

      2.     Plaintiff Texas Restaurant Association ("TRA") is a non-profit organization, headquartered at 3300 N. IH-35, Suite 610, Austin, Texas  78705, with thousands of members statewide.  The TRA regularly counsels and advises member restaurants about legal issues, legislation, labor and employment law, and other issues relating to the regulation of the restaurant industry.  The TRA is the leading business association for Texas' $52.4 billion restaurant and foodservice industry, which spans over 43,000 locations throughout the state, employing a workforce of 1.2 million—12% of the state's employment.  The TRA works to improve the business climate for its members.  Its diverse network of members ranges from restaurant owners, operators, staff and suppliers, to educators and students.  They include seasoned veterans and industry leaders, as well as those just entering the workforce for the first time.  Many TRA members, including members doing business within this District, employ tipped employees who perform varying amounts

of side work, thereby directly subjecting them to claims under the Department's 80% standard as well as its disallowance of a tip credit for any time spent on supposed work "not part of the employee's tipped occupation."

3.      Defendant United States Department of Labor is the federal department charged with administering and enforcing the FLSA.  *See* 29 U.S.C. § 204.

4.      Defendant Martin J. Walsh (the "Secretary") is the Secretary of Labor, the cabinet-level officer who leads the Department.  Congress has granted the Secretary the power to administer and to enforce the FLSA.  The Office of the Secretary of Labor is located in the Department of Labor in Washington, D.C.  Plaintiffs sue the Secretary in his official capacity.

5.      Defendant Jessica Looman (the "Acting Administrator") is the Acting Administrator of the Department's Wage and Hour Division.  The FLSA authorizes the creation within the Department of a Wage and Hour Division under the direction of an Administrator.  *See* 29 U.S.C. § 204.  The Acting Administrator leads the Wage and Hour Division, the agency that promulgated the regulation at issue in this case, in an acting capacity while the President's nominee for Administrator awaits Senate confirmation.  Plaintiffs sue the Acting Administrator in her official capacity.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action under the APA, 5 U.S.C. §§ 500-706, and under Article I, section 1 of the United States Constitution.

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

8.      Venue is proper under 28 U.S.C. § 1391(e) in that (a) the Defendants include an agency of the United States and employees of that agency acting in their official capacity; (b) Plaintiff TRA resides in this judicial district; and (c) no real property is involved in this action.

9.     This Court can grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief), as well as 5 U.S.C. §§ 701, et seq., for violations of, *inter alia*, the APA, 5 U.S.C. § 706.

10.    This Court is authorized to grant Plaintiffs' prayer for relief and to award costs, including a reasonable attorney's fee, under 28 U.S.C. § 2412 and 5 U.S.C. § 504.

## STANDING

11.    The Law Center and the TRA have standing to bring this litigation.

12.    The Law Center's members and the TRA's members have restaurants subject to the FLSA.  Many of these members employ tipped employees who perform varying amounts of side work in the course of their job duties.  As a result, these practices render these members subject to an investigation or a public or private lawsuit premised on the Department's 80% standard regarding the amount of time tipped employees must spend on tip-producing tasks in order for their employer to be able to pay them at a tipped rate for all of their working time.  These members are also subject to an investigation or a public or private lawsuit premised on the Department's zero tolerance policy regarding work the Final Rule classifies as "not part of" a "tipped occupation."

13.    Accordingly, many of the Law Center's members and many of the TRA's members have standing to bring this suit in their own right.  Therefore, the Law Center and the TRA may bring this action on behalf of those members.

14.    None of the claims asserted through this lawsuit, or the relief requested, requires direct participation of the members of the Law Center or the TRA.

## THE STATUTORY FRAMEWORK

15.    Section 6(a) of the FLSA requires employers to pay their covered employees a minimum wage of at least $7.25 per hour.  29 U.S.C. § 206(a).

16.     Section 3(m) of the FLSA, which defines the term "[w]age" under the statute, al-lows an employer to satisfy its minimum wage obligation to a "tipped employee" in part by taking a "credit" toward the minimum wage based on tips an employee receives.  29 U.S.C. § 203(m).

17.     Section 3(t) of the FLSA defines "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. § 203(t).

18.     Section 3(m) requires an employer who elects to take the tip credit to pay the em-ployee a cash wage of at least $2.13 per hour, and then the law defines the employee's tips as constituting a "wage" that counts toward the minimum wage, up to the point where the cash wage plus the employee's tips equal the minimum wage.  29 U.S.C. § 203(m).

19.     If the employee does not earn sufficient tips to bring his or her earnings up to the full minimum wage, then the employer must pay additional wages to make up the difference.  29 U.S.C. § 203(m).

20.     Before 1966, the FLSA generally did not apply to employees in restaurants and hotels.

21.     In 1966, as part of the legislative compromise struck in extending the coverage of the FLSA to these industries, Congress enacted the tip credit provision, modifying section 3(m) and adding section 3(t) to allow the tips received by employees to satisfy a portion of the minimum wage obligation.

22.     This change accommodated, in part, the long-standing practice in these industries whereby workers received most or even all of their income from customer tips.

23.     At the time Congress amended the FLSA to include the tip credit, the occupations of waiters and waitresses (using the terminology of 1966) and servers (modern terminology) regularly engaged in job duties commonly referred to as "side work."  Such "side work" included then, and still includes now, for just some examples:

- Removing dishes and glasses from tables or counters and taking them to the kitchen for cleaning;

- Cleaning tables or counters after patrons have finished dining;

- Preparing tables for meals, including setting up items such as linens, silverware, and glassware;

- Assisting the host or hostess by answering phones to take reservations or to-go orders;

- Performing cleaning duties, such as weeping or mopping floors, vacuuming carpets, taking out trash, and checking and cleaning bathrooms;

- Performing food preparation duties such as preparing salads, appetizers, and cold dishes, portioning desserts, and brewing coffee;

- Garnishing and decorating dishes in preparation for serving;

- Preparing foods for cooking or serving; and

- Adding garnishes to food.

24.     At the time Congress amended the FLSA to include the tip credit, the occupations of bartender regularly engaged in job duties commonly referred to as "side work."  Such "side work" included then, and still includes now, for just some examples:

- Cleaning bars, work areas, and tables;

- Stocking the bar with beer, wine, liquor, and related supplies such as ice, glassware, napkins, or straws;

- Preparing appetizers such as pickles, cheese, and cold meats;

- Cleaning food service areas;

- Preparing foods for cooking or serving; and

- Adding garnishes to food.

## THE DEPARTMENT'S ORIGINAL 1967 TIP CREDIT REGULATIONS

25.     In 1967, after the enactment of the statutory tip credit, the Department issued regulations addressing tipped employment, codified at 29 C.F.R. §§ 531.50-.60.  Those 1967 regulations, consistent with the statute, provide that the tip credit applies based on the "occupation" of the employee.

26.     Like the text of the FLSA itself, the 1967 regulations do not contain any distinction between duties that are "directed toward producing tips" and duties that are "not by themselves directed toward producing tips."

27.     Nor did the 1967 regulations impose any specific limitation, 20% or otherwise, on the amount of time an employee may spend on certain tasks within his or her occupation before the employer loses the statutory right to take a tip credit for all of the employee's working time.

28.     The 1967 regulations explain, consistent with the text of the FLSA, that if restaurant employees are "in an occupation in which he [or she] normally and recurrently receives more than $30 a month in tips, he [or she] will be considered a tipped employee, even though occasionally, because of sickness, vacations, seasonal fluctuations or the like, he [or she] fails to receive more than $30 in tips in a particular month.  29 C.F.R. § 531.57.

29.     The 1967 regulations contrast that circumstance with an employee who only occasionally receives tips, such as an employee who receives tips only at Christmas or New Year's, "when customers may be more generous than usual."  29 C.F.R. § 531.57.

30.     The 1967 regulations also address employees who may be employed in two differ-
ent occupations.  *See* 29 C.F.R. § 531.56(e).

31.     Under this regulation, known as the "dual jobs" regulation, when an employee
works in two separate occupations for the same employer, one tipped and one not tipped, the em-
ployer may take a tip credit only for the tipped occupation.

32.     In the 1967 regulation the Department used examples in the regulation to illustrate
that there is a difference between an employee in two distinct, non-overlapping jobs and an em-
ployee who works in a single tipped job but whose duties may also include both activities that
directly generate tips and activities that do not:

> In some situations an employee is employed in a dual job, as for example,
> where a maintenance man in a hotel also serves as a waiter.  In such a situ-
> ation the employee, if he customarily and regularly receives at least $30 a
> month in tips for his work as a waiter, is a tipped employee only with respect
> to his employment as a waiter.  He is employed in two occupations, and no
> tip credit can be taken for his hours of employment in his occupation of
> maintenance man.  ***Such a situation is distinguishable from that of a wait-***
> ***ress who spends part of her time cleaning and setting tables, toasting***
> ***bread, making coffee and occasionally washing dishes or glasses.  It is***
> ***likewise distinguishable from the counterman who also prepares his or***
> ***her own short orders or who, as part of a group of countermen, takes a***
> ***turn as a short order cook for the group.  Such related duties in an occu-***
> ***pation that is a tipped occupation need not by themselves be directed to-***
> ***ward producing tips.***

29 C.F.R. § 531.56(e) (emphasis added).

33.     The last three make clear that the Department knew and understood that side work
was part and parcel of "engaging" in an "occupation" that "customarily and regularly receives
more than $30 a month in tips," as Congress defined "tipped employee" in 29 U.S.C. § 203(t).
This is so because "cleaning and setting tables, toasting bread, making coffee and occasionally
washing dishes or glasses" is side work performed by a waitress, and "prepar[ing] his or her own
short order" is side work for a counterman, and both Congress and the Department have long

recognized employees working as a "waitress" and as a "counterman" to be "tipped employees" because they are "engaged in an occupation" that "customarily and regularly" receives the requisite amount of tips.

34.     Indeed, the final sentence of 29 C.F.R. § 531.56(e) makes explicit the Department's recognition and understanding that performing side work is an integral part of being a "tipped employee" under the FLSA—*i.e.*, "engaging in an occupation" that "customarily and regularly" receives" the requisite amount of tips.  This is so because the final sentence of § 531.56(e) specifies that "such related duties"—*i.e.*, side work—"need not by themselves be directed toward producing tips" in order for the tip credit to apply.

### SUBREGULATORY GUIDANCE BETWEEN 1967 AND 2018 AND A 2019 PROPOSED NEW RULE THAT NEVER BECAME EFFECTIVE

35.     On several occasions between 1975 and 2018 the Department issued informal sub-regulatory guidance in the form of Opinion Letters and amendments to its Field Handbook with regard to the dual jobs regulation in 29 C.F.R. § 531.56.  None of that informal sub-regulatory guidance involved the promulgation of a formal regulation through the notice and comment process required by the Administrative Procedures Act.

36.      In October 2019 the Department began the process of promulgating a formal regulation through the notice and comment process with regard to the dual jobs regulation.  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA), 84 Fed. Reg. 53,956, 2019 WL 4932754 (proposed Oct. 8, 2019).

37.     On December 30, 2020, the Department issued a final rule and set it to go into effect on March 1, 2021 (the "2020 Tip Rule").  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA), 85 Fed. Reg. 86,756 (Dec. 30, 2020).  But the 2020 Tip Rule never became effective.

38.     On February 26, 2021, after the Department conducted notice-and-comment rule-making and considered the comments filed, the Department published a final rule extending the effective date of the 2020 Tip Rule until April 30, 2021.  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA): Delay of Effective Date, 86 Fed. Reg. 11,632, 2021 WL 736574 (Feb. 26, 2021).

39.     The day before the 2020 Tip Rule was set to go into effect, the Department issued another new rule that delayed the 2020 Tip Rule's implementation.  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA): Delay of Effective Date, 86 Fed. Reg. 22,597, 2021 WL 1664281 (Apr. 29, 2021) (delaying effective date of 85 Fed. Reg. 86,756 until December 31, 2021).

## SIDE WORK IN THE RESTAURANT INDUSTRY

40.     The Wage and Hour Division has never conducted a study to identify the types of job duties that are commonly associated with various tipped occupations.

41.     Another agency at the Department, the Employment and Training Administration, sponsors a database that specifically collects exactly that type of information:  the Occupational Information Network, which the Department refers to by the acronym "O*NET."  *See generally* https://www.onetcenter.org/overview.html (last visited December 2, 2021).

42.     The O*NET is "the nation's *primary source* of *occupational* information":



[https://www.onetcenter.org/overview.html](https://www.onetcenter.org/overview.html) (emphasis added, last visited December 2, 2021).  The

Department likewise touts the O*NET as "valid data," which is "continually updated from input

by a broad range of workers in each occupation."  *Id.*

43.      "The O*NET system is maintained by a regularly updated database of occupational

characteristics and worker requirements information across the U.S. economy.  It describes ***occu-

pations*** in terms of the knowledge, skills, and abilities required as well as ***how the work is per-

formed*** in terms of tasks, work activities, and other descriptors":



[https://www.dol.gov/agencies/eta/onet](https://www.dol.gov/agencies/eta/onet) (emphasis added, last visited December 2, 2021).

44.     The Department's O*NET web site recognizes that "every occupation . . . is performed using a variety of activities and tasks":

> Every occupation requires a different mix of knowledge, skills, and abilities, and is performed using a variety of activities and tasks. These distinguishing characteristics, or "descriptors", of an occupation are collected, codified, and described by the **O*NET Content Model** . This hierarchical model starts with six domains (or categories), describing the day-to-day aspects of the job and the qualifications and interests of the typical worker. The model includes nearly 277 descriptors collected by the O*NET program, along with other occupational data collected by other federal agencies such as the Bureau of Labor Statistics .

https://www.dol.gov/agencies/eta/onet (last visited December 2, 2021).

45.     The Department's O*NET web site also explains that the occupational information collected is "Real-world information," collected "from the working public."  Specifically, "The O*NET database is collected and updated through ongoing surveys of workers in each occupation supplemented in some cases by occupation experts.  These data are incorporated into new versions of the database on an annual schedule, to provide up-to-date information on occupations":

> **Data Collection Real-world information**
>
> The Data Collection program brings the Content Model frameworks to life with results from the working public.
>
> The O*NET database is collected and updated through ongoing surveys of workers in each occupation supplemented in some cases by occupation experts. These data are incorporated into new versions of the database on an annual schedule , to provide up-to-date information on occupations.. The latest database releases are available from the O*NET Resource Center.

https://www.dol.gov/agencies/eta/onet (last visited December 2, 2021).

46.     O*NET provides a great deal of detailed information about a number of occupations within the "accommodation and food services" industry, specifically "Waiters and Waitresses" as well as "Bartenders."  The report for waiters and waitresses lists 25 "Tasks" identified as "Important" to those occupations, expressly including the following side work duties:

- "**Perform food preparation duties** such as **preparing salads**, appetizers, and cold dishes, portioning desserts, and brewing coffee";

- "Perform cleaning duties, such as seeping and mopping floors, vacuuming carpet, tidying up server station, taking out trash, or checking and **cleaning bathroom**."

(Exhibit 1 at 1-2 (copy of printout from www.onetonline.org/link/summary/35-3031.00) (emphasis added, last visited December 3, 2021).)

47.    The 25 "Tasks" listed as "Important" for the occupation of "Waiters and Waitresses" also include:

- "Remove dishes and glasses from tables or counters and take them to kitchen for cleaning";

- "Prepare tables for meals, including setting up items such as linens, silverware, and glassware";

- "Roll silverware, set up food stations, or set up dining areas to prepare for the next shift or for large parties";

- "Fill salt, pepper, sugar cream, condiment, and napkin containers"; and

- "Garnish and decorate dishes in preparation for serving."

(Exhibit 1 at 1-2 (copy of printout from www.onetonline.org/link/summary/35-3031.00) (last visited December 3, 2021).)

48.    The same report also lists 19 "Detailed Work Activities" for the occupation of "Waiter" and "Waitress," expressly including the following side work duties:

- "Collect dirty dishes or other tableware";

- "Cook foods";

- "Clean food service areas";

15

- "Clean food preparation areas, facilities, or equipment," a work activity that necessarily takes place in the kitchen";

- "Stock serving stations or dining areas with food or supplies";

- "Prepare foods for cooking or serving"; and

- "Add garnishes to food."

(Exhibit 1 at 4-5 (copy of printout from www.onetonline.org/link/summary/35-3031.00) (last visited December 3, 2021).)

49.     The O*NET data for the occupation of "Bartender" similarly lists 20 "Tasks" identified as "Important," to that occupation including the following side work duties:

- "Clan bars, work areas, and tables";

- Stock bar with beer, wine, liquor, and related supplies such as ice, glassware, napkins or straws"; and

- "Prepare appetizers such as pickles, cheese, and cold meats."

(Exhibit 2 at 1 (copy of printout from www.onetonline.org/link/summary/35-3011.00) (emphasis added, last visited December 3, 2021).)

50.     The same report also lists 18 "Detailed Work Activities" for the occupation of "Bartender," expressly including the following side work duties:

- "Clean tableware";

- "Clean food service areas";

- "Stock serving stations or dining areas with food or supplies";

- "Prepare foods for cooking or serving"; and

- "Cook foods."

(Exhibit 2 at 4-5 (copy of printout from www.onetonline.org/link/summary/35-3011.00) (emphasis added, last visited December 3, 2021).)

51.    Despite the O*NET data's status as "the nation's primary source of occupational information," neither the Wage and Hour Division nor the Employment and Training Administration has undertaken a study regarding how much time tipped employees generally spend on specific tasks within their occupations, including the proportion of time spent on tasks that generate tips versus tasks that do not directly generate tips.

52.    Side work is a normal and customary part of the tipped occupations found in restaurants, and it has been so since before the FLSA applied to restaurant employees.

53.    There is no accepted standard within the restaurant industry regarding how much time a tipped employee should spend on side work versus other tasks.

54.    It is common in restaurants for certain side work tasks, such as cleaning, preparing various work areas, bringing dirty dishes from the dining area to the kitchen, loading dirty dishes into a dishwasher, preparing salads, putting the final touches such as garnishes on a plate before delivering it to customers, or rolling silverware into napkins to be performed by more than one category of employee.  There are overlapping side work tasks sets in restaurants that cut across job titles, with the emphasis being on teamwork and using the slower times to prepare the restaurant for the busier times.

55.    Because restaurant employees often move rapidly from one task to another throughout a shift, there is no practical way for an employer to keep an accurate record of how much time an employee spends on tip-producing versus non-tip-producing tasks throughout a workweek.

56.    The O*NET data set forth above and in Exhibits 1 and 2—which the Department explains is "the nation's primary source of occupational information," because it is "Real-world

information" collected and updated "from the working public"—demonstrates that side work is not only integral to the occupations of Waiter and waitress and Bartender, but also reflects that side work is a substantial portion of the job duties and work activities of these occupations.

57.     As explained above, the Departments 1967 dual jobs regulation is consistent with actual "real-world information" the Department so laboriously and accurately compiles through the O*NET system, in that the 1967 dual jobs regulation acknowledges that side work is part and parcel of the tipped employee occupations in the restaurant industry such as waiter, waitress, server, bartender, and service bartender.

## THE DEPARTMENT'S 2021 FINAL RULE ELIMINATES SIDE WORK FROM THE OCCUPATIONS LONG RECOGNIZED BY BOTH CONGRESS AND THE DEPARTMENT AS OCCUPATIONS OF TIPPED EMPLOYEES, AND SUBSTITUTES A NEW TERM—"TIPPED OCCUPATION"—THAT FINDS NO SUPPORT IN THE FLSA.

58.     On June 23, 2021, the Department issued another Notice of Proposed Rulemaking regarding the tip credit (the "2021 NPRM").  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 32,818 (June 23, 2021).  This 2021 NPRM proposed the withdrawal of and a new proposal concerning the part of the 2020 Tip Rule concerning when a tipped employee is employed in dual-jobs under the FLSA.  *See id.*

59.     On August 23, 2021, public comments closed for the 2021 NPRM.  In response to the 2021 NPRM, commenters raised serious concerns with the Department's sweeping amendments to the dual-jobs regulation, including the slicing and dicing of a single occupation into numerous different occupations and the inclusion of a new 20% and 30-minute rules.

60.     On October 28, 2021, the Department issued the Final Rule on "Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal" (the "Final Rule"), which implements the 2021 NPRM with minor changes.  86 Fed. Reg. 60,114-01 (Oct. 28, 2021).  In responding to comments, the Department determined to maintain each challenged provision of the

rule, including its unilateral addition of a new standard defining what it means to be "engaged in a tipped occupation" that parses a single restaurant job into multiple different occupations and the addition of the new 20% and 30-minute caps on certain work performed by tipped employees. *Id.*

61. The Final Rule sweepingly amends the 1967 "dual jobs" regulation in § 531.56(e):

(e) Dual jobs. In some situations an employee is employed in ~~a~~ dual ~~job~~ **jobs**, as ~~,~~ for example, where a maintenance ~~man~~ **person** in a hotel also ~~serves as a waiter~~ **works as a server**. In such a situation **if** the employee~~, if he~~ customarily and regularly receives at least $30 a month in tips for ~~his~~ **the employee's** work as a ~~waiter~~ **server**, **the employee** is **engaged in** a tipped ~~employee~~ **occupation** only ~~with respect to his employment as a waiter~~ **when employed as a server**. ~~He~~ **The employee** is employed in two occupations, and no tip credit can be taken for ~~his~~ **the employee's** hours of employment in ~~his~~ **the** occupation of maintenance ~~man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips~~ **person**.

29 C.F.R. § 531.56(e) (effective Dec. 28, 2021) (additions shown in **bold**, deletions shown in ~~strike-through~~).

62. Importantly, the Final Rule completely removes the last three sentences. As explained above, those sentences make clear that in 1967 the Department knew and understood that side work was part and parcel of "engaging" in an "occupation" that "customarily and regularly receives more than $30 a month in tips," as Congress defined "tipped employee" in 29 U.S.C. § 203(t).

63. As explained above, side work is still part and parcel of "engaging" in an "occupation" that "customarily and regularly receives more than $30 a month in tips," as Congress defined "tipped employee" in 29 U.S.C. § 203(t).

64. The Final Rule thus: (a) ignores the reality that side work is still part and parcel of "engaging" in many "occupation[s]" that "customarily and regularly receive[] more than $30 a month in tips," as Congress defined "tipped employee in 29 U.S.C. § 203(t); and (b) ignores *the Department's own* "primary source of occupational information"—*i.e.*, the O*NET data that the

Department keeps "continually updated" by collecting "Real-world information" about the *actual job duties* of occupations like servers and bartenders, by completely reversing its position with regard to side work; and (c) completely reverses the Department's prior position in the 1967 regulation with regard to side work.

65.     The Final Rule accomplishes this result through the guise of creating a brand new term that does not exist in the FLSA:  "tipped occupation."  29 C.F.R. § 531.56(f) (effective December 28, 2021).  The Final Rule then defines "tipped occupation" in an entirely circular manner by defining the term according to the term itself:  "An employee is engaged in a tipped occupation when the employee performs work that is part of the tipped occupation."  *Id.*  That circular and meaningless definition allows the Department to re-define the FLSA's definition of "tipped employee" and the scope of the tip credit as Congress provided in the FLSA with the Department's brand new standard for what it views as "engaged in a tipped occupation":  "An employer may only take a tip credit for **work performed by a tipped employee that is part of the employee's tipped occupation**."  *Id.* (emphasis added).

66.     The Final Rule then devises two categories of "**work that is part of the tipped occupation**" in the final portion of § 531.56(f): (i) work that produces tips ("Tip-producing work") and (ii) work that directly supports the tip-producing work, if the directly supporting work is not performed for a substantial amount of time ("Directly supporting work").  29 C.F.R. § 531.56(f)(1) (effective Dec. 28, 2021).

67.     The Final Rule, in final section § 531.56(f)(2), defines "**Tip-producing work**" and contains examples that purport to illustrate specific tasks that qualify as tip-producing work:

> (i)  Tip-producing work is any work performed by a tipped employee that provides service to customers for which the tipped employee receives tips.

(ii) Examples:  The following examples illustrate tip-producing work per-
formed by a tipped employee that provides service to customers for which
the tipped employee receives tips.  A tipped employee's tip-producing work
includes all aspects of the service to customers for which the tipped em-
ployee receives tips; this list is illustrative and is not exhaustive.  A server's
tip-producing work includes providing table service, such as taking orders,
making recommendations, and serving food and drink.  A bartender's tip-
producing work includes making and serving drinks, talking to customers
at the bar and, if the bar includes food service, serving food to customers
. . . . A busser's tip-producing work includes assisting servers with their tip-
producing work for customers, such as table service, including filling water
glasses, clearing dishes from tables, fetching and delivering items to and
from tables, and bussing tables, including changing linens and setting tables
. . . . A service bartender's tip-producing work includes preparing drinks for
table service . . . . The tip-producing work of a tipped employee who both
prepares and serves food to customers, such as a counterperson, includes
preparing and serving food.

29 C.F.R. § 531.56 (f)(2)(i), (ii) (effective Dec. 28, 2021).

68.     The Final Rule, in final section § 531.56(f)(3), defines "**Directly supporting**

**work**" and contains examples of tasks that purport to illustrate tasks that are directly supporting

work:

(i)  Directly supporting work is work performed by a tipped employee in
preparation of or to otherwise assist tip-producing customer service work.

(ii) Examples:  The following examples illustrate tasks that are directly sup-
porting work when they are performed in preparation of or to otherwise as-
sist tip-producing customer service work and when they do not provide ser-
vice to customers.  This list is illustrative and is not exhaustive:  A server's
directly supporting work includes dining room prep work, such as refilling
salt and pepper shakers and ketchup bottles, rolling silverware, folding nap-
kins, sweeping or vacuuming under tables in the dining area, and setting
and bussing tables.  A busser's directly supporting work includes pre- and
post-table service prep work such as folding napkins and rolling silverware,
stocking the busser station, and vacuuming the dining room, as well as wip-
ing down soda machines, ice dispensers, food warmers, and other equip-
ment in the service alley.  A bartender's directly supporting work includes
work such as slicing and pitting fruit for drinks, wiping down the bar or
tables in the bar area, cleaning bar glasses, arranging bottles in the bar,
fetching liquor and supplies, vacuuming under tables in the bar area, clean-
ing ice coolers and bar mats, making drink mixes, and filling up dispensers

> with drink mixes . . . . A service bartender's directly supporting work in-
> cludes slicing and pitting fruit for drinks, cleaning bar glasses, arranging
> bottles, and fetching liquor or supplies . . . .

29 C.F.R. § 531.56 (f)(3)(i), (ii) (effective Dec. 28, 2021).

69.     The examples for servers of "dining room prep work, such as refilling salt and pep-

per shakers and ketchup bottles, rolling silverware, folding napkins, sweeping or vacuuming under

tables in the dining area, and setting and bussing tables" are substantively similar to the side work

duty examples provided in the 1967 version of § 531.56(e) of "cleaning and setting tables, toasting

bread, making coffee, and occasionally washing dishes and glasses."

70.     As explained above, the 1967 regulation did not set forth any time limit on appli-

cation of the tip credit for such side work.  In direct conflict with the deleted portions of the 1967

regulation, the Final Rule, in § 531.56(f)(4), imposes time limits on when an employer is allowed

to take a tip credit for the time a tipped employee spends performing work that it categorizes as

directly supporting work.  Pursuant to final § 531.56(f)(4), "[a]n employer can take a tip credit for

the time a tipped employee spends performing work that . . . directly supports tip-producing work,

**provided that the employee does not perform that work for a substantial amount of time**."

(Emphasis added.)  An employee performs work for a "**substantial amount of time**" if:

> (i)  The directly supporting work exceeds a 20 percent workweek tolerance,
> which is calculated by determining 20 percent of the hours in the workweek
> for which the employer has taken a tip credit.  The employer cannot take a
> tip credit for any time spent on directly supporting work that exceeds the 20
> percent tolerance.  Time for which an employer does not take a tip credit is
> excluded in calculating the 20 percent tolerance; or
>
> (ii) For any continuous period of time, the directly supporting work exceeds
> 30 minutes.  If a tipped employee performs directly supporting work for a
> continuous period of time that exceeds 30 minutes, the employer cannot
> take a tip credit for any time that exceeds 30 minutes.  Time in excess of the
> 30 minutes, for which an employer may not take a tip credit, is excluded in
> calculating the 20 percent tolerance in paragraph (f)(4)(i) of this section.

29 C.F.R. § 531.56 (f)(4)(i), (ii) (effective Dec. 28, 2021, emphasis added).

71.    The Final Rule, in final section § 531.56(f)(5) sets forth a third category of activity

for tipped employees, "**work that is not part of the tipped occupation**," which it defines as:

> (i)  Work that is not part of the tipped occupation is any work that does not
> provide service to customers for which tipped employees receive tips, and
> does not directly support tip-producing work.  If a tipped employee is re-
> quired to perform work that is not part of the employee's tipped occupation,
> the employer may not take a tip credit for that time.
>
> (ii) Examples:  The following examples illustrate work that is not part of
> the tipped occupation because the work does not provide service to custom-
> ers for which tipped employees receive tips, and does not directly support
> tip-producing work.  This list is illustrative and is not exhaustive.  Preparing
> food, including salads, and cleaning the kitchen or bathrooms, is not part of
> the tipped occupation of a server.  Cleaning the dining room or bathroom is
> not part of the tipped occupation of a bartender . . . . Cleaning the dining
> room and bathrooms is not part of the tipped occupation of a service bar-
> tender . . . . Cleaning the kitchen or bathrooms is not part of the tipped oc-
> cupation of a busser.  Retrieving room service trays from guest rooms is not
> part of the tipped occupation of a hotel bellhop.

29 C.F.R. § 531.56 (f)(5)(i), (ii) (effective Dec. 28, 2021, emphasis added).

72.    Again, the side work duties listed in § 531.56 (f)(5)(ii) such as "preparing food,

including salads, and cleaning the kitchen or bathrooms" are not materially or substantively dif-

ferent from the side work duty examples provided in the 1967 version of § 531.56(e) of "cleaning

and setting tables, toasting bread, making coffee, and occasionally washing dishes and glasses."

None of these examples of side work are customer-facing.  None of these examples of side work

by themselves directly generate tips.  But in the 1967 regulation such side work did not affect

application of the tip credit.  The Final Rule, in direct contradistinction, prohibits application of

the tip credit for such side work.

73.    The Department departs from the statutory language of the FLSA and instead relies

on one of its prior *amicus* briefs to support its definition of "work that is not part of the tipped

occupation" set forth in final § 531.56(f)(5).  For example, the Department claims without expla-

nation or data that "the Department's position for many years was that cleaning bathrooms is not

part of the tipped occupation of a server, and it reaffirms that position here."  86 Fed. Reg. at

60,131.

74.     The Department also applauds itself in the Final Rule for making clarifications to

its definitions of "tip-producing work" and "directly supporting work," stating that its definitions

make "it easier to distinguish between tip-producing and directly supporting work, and it is easier

for employers to keep track of work included in the 20 percent and 30-minute limits," though the

Department does not provide any data establishing that monitoring these new time limits is feasible

or any data that would quantify the effect on employers for implementing the new 20% and 30-

minute time limits.  86 Fed. Reg. at 60,129.

75.     The Final Rule contains numerous examples that purport to tout the ease of distin-

guishing between "tip-producing work" and "directly supporting work," which in actuality high-

light the Department's unauthorized parsing of a single occupation into multiple jobs.  For exam-

ple, the Final Rule states, "an employer may take a tip credit when a worker is performing tip

producing work even if the worker is also performing directly supporting work.  This situation is

in contrast to a tipped employee who performs directly supporting work while there is a lull in

services, such as a server who folds napkins while waiting for her last table to pay their bill.  In

this situation, the server is not actively engaged in tip producing work, and thus the time is properly

categorized as directly supporting.  86 Fed. Reg. at 60,128 (discussing final § 531.56(f)(2)).  In

addition, the Final Rules states "[a] server adding a garnish to a plate of food in the kitchen before

serving the prepared food to the customer, or wiping down a spill on a customer's table, is per-

forming the tip-producing customer service work of serving tables.  In contrast, a server assigned

to clean around the beverage station is performing work in preparation of or otherwise assisting tip-producing work and thus is performing directly supporting work." *Id*.  And, "a server being assigned to perform general food preparation work in the kitchen, such as slicing fruits and vege-tables . . . is not part of the tipped occupation of a server." *Id*.  The server in these examples is performing the exact same occupation (server), but the Department has without factual or legal support determined that in 2021 the server somehow exits this occupation and enters into a new, as-yet unidentified occupation, when under the 1967 dual jobs regulation the server remained a tipped employee engaged in the same occupation.

76.   The Final Rule further divides tasks of bartenders into tip producing and non-tip producing work without factual or legal support.  For example, the Final Rule states, "a bartender who retrieves a particular beer from the storeroom at the request of a customer sitting at the bar, is performing tip-producing work, even though a bartender who retrieves a case of beer from the storeroom to stock the bar in preparation for serving customers, would be performing directly supporting work[.]"  86 Fed. Reg. at 60,128 (discussing final § 531.56(f)(2)). In addition, "a bar-tender who in the course of providing tip-producing service to customers, wipes down the surface of the bar and tables in the bar area where customers are sitting, and cleans bar glasses and imple-ments used to make drinks for those customers is performing tip-producing work . . . . If the bar-tender performs these same tasks before or after the restaurant is open these same tasks would be directly supporting work . . . ."  86 Fed. Reg. at 60,130 (discussing final § 531.56(f)(2)).  The bartender in these examples are performing the exact same occupation (bartender), but the Depart-ment has without factual or legal support determined that the bartender exits this occupation and enters into a new, as-yet unidentified occupation, when under the 1967 dual jobs regulation the bartender remained a tipped employee engaged in the same occupation.

77.     The Final Rule slices and dices the occupation of a busser as well without factual or legal support. The Final Rule states:

> "[a] busser's tip-producing work includes assisting servers with their customer service work that produces tips, such as providing table service, just as a bar-back's tip-producing work includes assisting bartenders with their customer work that produces tips, such as making and serving drinks.  As revised, the definition of tip-producing work clarifies that this category applies to work, such as bussing tables, performed by tipped employees like bussers who do not directly receive tips from customers, because this work provides service to customers for which the tipped employee (i.e., the busser) receives tips, even though they usually receive the tips from other tipped employees (i.e., servers.). The tip-producing work of a busser would include, for example, resetting tables during table service in between customers, because this work is not done in preparation of the tip-producing work but is the busser's tip-producing work, as compared to the busser's work of setting tables, folding napkins and rolling silverware before the restaurant is open to customers, which is done in reparation of the tip producing work of resetting tables during table service."

86 Fed. Reg. at 60,128-29 (discussing final § 531.56(f)(2)).

## THE FINAL RULE WILL SEVERELY AND IRREPARABLY HARM THOUSANDS UPON THOUSANDS OF RESTAURANTS AND THEIR EMPLOYEES.

78.     On December 28, 2021, the Department's Final Rule becomes effective.

79.     If not enjoined, the Final Rule will severely and irreparably harm thousands upon thousands of restaurants and their employees.

80.     The COVID-19 pandemic devastated the restaurant and hospitality industries, which employ millions of workers who engage in occupations that qualify for the tip credit.  The Department recognized that "The full-service restaurant industry lost over 1 million jobs since the beginning of the pandemic, and by the end of 2020, over 110,000 restaurants had closed permanently.  Although employment in the leisure and hospitality industries recovered rapidly in the spring and early summer of 2021, employment in this sector is still below its February 2020 level." 86 Fed. Reg. at 60,150.

81.     A separate federal agency, the U.S. Small Business Administration's Office of Advocacy ("SBA Office of Advocacy"), submitted comments to the proposed version of the Final Rule expressing the "concern[] that the DOL's certification that the rule will not have a significant economic impact on a substantial number of small entities **lacks an adequate factual basis**." (Exhibit 3 at 1 (emphasis added).)

82.     The SBA Office of Advocacy observed that "DOL improperly certified this proposed rule because it **omitted some and underestimated other compliance costs of this rule** for small employers."  (Exhibit 3 at 1-2 (emphasis added).)

83.     Specifically, the SBA Office of Advocacy detailed its concerns, focusing on several areas, including assessing changes to wage costs, the costs of regulatory familiarization, adjustment costs, and management costs.  (Exhibit 3 at 4-9.)

84.     The SBA Office of Advocacy therefore "believes that DOL's certification is flawed because it **fails to estimate small business compliance for increased wages under this regulation**."  (Exhibit 3 at 5 (emphasis added).)

85.     And the SBA Office of Advocacy comments also relay the comments of small businesses with regard to the financial impact the Final Rule would have on small businesses with tipped employees from nail salons to hotels and, of course, restaurants, particularly given the continuation of the COVID-19 pandemic:

> Small businesses have commented that these new restrictions for the use of the tip credit are complex and unworkable for small operations, who are already facing staff shortages and are just recovering from pandemic losses.
> \*\*\*
> Small businesses also commented that this was a difficult time to add these additional costs and burdens, as their operations were just surviving from pandemic financial losses.

(Exhibit 3 at 2, 8.)

86.     The Department completely ignored the real-world comments of the SBA Office of Advocacy and small businesses, contending that in the Final Rule without any basis whatsoever that "it has substantially alleviated employers' concerns about complying with the quantitative limits on directly supporting duties" set forth in final § 531.56(f)(4)."  Specifically, the Department "believes" without basis that "the modifications to this final rule resolve employers' practical concerns about complying with quantitative limits on directly supporting work." 86 Fed. Reg. at 60,133.  The Department also makes the unilateral conclusion without basis that "employers can monitor (or even track, if the employer so chooses) such [directly supporting] tasks with relative ease, and without needing to account for employees' duties minute-by-minute." *Id*.

87.     The Department did in fact estimate costs for implementation of the Final Rule— ***by using data from pre-COVID-19 pandemic 2018 and 2019***:  "The Department notes that this [cost] analysis relies on data from 2018 and 2019, which is prior to the COVID-19 pandemic."  86 Fed. Reg. at 60,150.

88.     The Department thus acknowledged, as it had to, that "Because many businesses were shut down during 2020 or had to change their business model, especially restaurants, ***the economic situation for tipped workers likely changed due to the pandemic***."  86 Fed. Reg. at 60,150 (emphasis added).

89.     The Department further acknowledged that "***The labor market has likely changed for tipped workers during the pandemic, and could continue to change following recovery from the pandemic especially in the restaurant business***."  86 Fed. Reg. at 60,150 (emphasis added).

90.     The Department therefore explicitly acknowledges that (a) the Final Rule was based on pre-COVID-19 pandemic data, even though (b) the labor market for tipped workers likely

28

changed due to the pandemic, so therefore (c) the Department by its own acknowledgement lacks any factual basis whatsoever for its cost analysis for the Final Rule.

91.     The Department likewise (a) acknowledges that both the labor market and the economic situation for tipped workers has changed due to the COVID-19 pandemic, but (b) failed to take into account the changing labor market and/or economic situation for tipped workers in making the sweeping material changes to tip credit in the Final Rule.

92.     Consequently, the Department's cost estimates for the Final Rule—by the Department's own acknowledgement and admissions—have no relation to the current labor market or the economic situation of tipped employees.

93.     As explained above, the Final Rule represents sweeping and material changes to the Department's longstanding formal regulation relating to the tip credit.  And as explained above, those sweeping and material changes will impose devastating financial burdens on industries, and restaurants in particular, that employ tipped employees.  And as explained above, the COVID-19 pandemic has changed both the labor market and economic situation of tipped employees.  But the Final Rule fails to take any of these facts or factors into account.

### THE DEPARTMENT'S 2021 FINAL RULE IS ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION.

94.     The text of the FLSA allows employers to take a tip credit based on an employee's status as a tipped employee, which in turn hinges on the employee's occupation.

95.     In short, if an employee has a job—the common meaning of the otherwise undefined statutory term "occupation"—that customarily and regularly produces at least $30 a month in tips, he or she is a tipped employee.

96.     If an employee has two or more different jobs for an employer, one or more of which is tipped and one or more of which is not tipped, the FLSA's legislative history shows that

for any given workweek, the employer either is or is not a tipped employee, depending on the overall mix of job responsibilities over the entire workweek.

97.     The FLSA does not confer upon the Department the authority to subdivide a single workweek into hours or minutes subject to the tip credit and hours or minutes not subject to the tip credit.

98.     The FLSA does not confer upon the Department the authority to subdivide a tipped occupation into tasks that generate tips and tasks that do not, and to limit the availability of the tip credit based on the relative proportions of those two groups of activities.

99.     The FLSA does not confer upon the Department the authority to categorically deny an employer the right to take a tip credit work for duties that the Department has previously acknowledged to be regular side work of tipped employees simply because the employee might work 31 consecutive minutes on activities that do not directly generate tips, such as for just one example a server chopping vegetables for salads during slow periods in a restaurant.

100.    The FLSA does not confer upon the Department the authority to dictate the appropriate mix of tasks within a tipped occupation.  So long as an employer assigns a tipped employee to perform the core functions of an occupation during a shift (e.g., assigning a server to wait tables, or a bartender to prepare drinks for customers), that employee does not cease to be engaged in the tipped occupation by virtue of performing side work during a shift along with the core functions of the occupation.  Nor does a tipped employee cease to be engaged in the tipped occupation merely because the employer assigns side work during times when the restaurant is slow.

101.    The public policy underlying the FLSA's tip credit provision is to protect employees' minimum wage rights while at the same time accommodating the extensive history of tipping in the restaurant industry, among other industries.

102.     It is not the purpose of the FLSA's tip credit provision to give tipped employees a windfall or to put tipped employees in a better position than other employees in the economy who are not subject to the tip credit.

103.     The public policy underlying the FLSA's minimum wage and tip credit provisions is fully satisfied and vindicated so long as in any given workweek a tipped employee receives sufficient tips, combined with the cash wage, to cover the minimum wage multiplied by the total number of hours worked.

104.     The Department's 20% and 30-minute standards concerning certain tasks that it concludes, without basis, are directly supporting work, as well as its zero tolerance for work that the Department has previously acknowledged to be regular side work of tipped employees, derives from the Department's failure to acknowledge its own data showing how employees perform their jobs in restaurants in the real world.

105.     Congress never intended for the Department to micromanage restaurant employment at the task level, nor did it ever give the Department the authority to do so.

106.     The Department's 20% and 30-minute standards and its prohibition on taking a tip credit for work that the Department has previously acknowledged to be regular side work of tipped employees is contrary to the text of the FLSA, the statute's legislative history, and the public policy underlying the minimum wage and tip credit provisions.

107.     The Department's 20% and 30-minute standards and its prohibition on taking a tip credit for work that the Department has previously acknowledged to be regular side work of tipped employees is arbitrary, capricious, and irrational.

## CLAIMS FOR RELIEF

### COUNT I
**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 706(2)(A) and 706(2)(C) that the Final Rule Exceeded Statutory Authority**

108.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

109.    Defendants' dual jobs Final Rule provisions, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), are not authorized by the FLSA or any other law.

110.    Defendants' dual jobs Final Rule provisions, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), exceed Defendants' statutory jurisdiction and authority.

111.    Accordingly, Defendants' dual jobs Final Rule provisions, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), are in excess of Defendants' statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

112.    Because of Defendants' actions, Plaintiffs and their members will suffer harm as set forth above, including exposure to legal claims for failure to comply with Defendants' guidance.

113.    Plaintiffs have no other adequate remedy in court or administratively for Defendants' unlawful action as described herein, and such action has caused Plaintiffs to suffer undue and actual hardship and irreparable injury.

### COUNT II
**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §706(2)(A) that the Final Rule's Dual Jobs Regulations Are Arbitrary and Capricious, an Abuse of Discretion, and Not In Accordance with the Law**

114.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

115.    Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

116.    The pertinent text of the FLSA is unambiguous, and it precludes the Defendants' dual jobs interpretation in the Final Rule.

117.    In addition, the legislative history of the FLSA demonstrates that Congress has spoken to this issue in a manner that is irreconcilable with the Defendants' approach.

118.    Therefore, the Defendants' dual jobs provisions in the Final Rule, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), are arbitrary and capricious, are an abuse of discretion, and are contrary to the law.

119.    Because of Defendants' actions, Plaintiffs and their members will suffer harm as set forth above, including exposure to legal claims for failure to comply with Defendants' guidance.

120.    Plaintiffs have no other adequate remedy in court or administratively for Defendants' unlawful action as described herein, and such action has caused Plaintiffs to suffer undue and actual hardship and irreparable injury.

## COUNT III
### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202, 5 U.S.C. § 706(2)(B), and Article I, Section I of the United States Constitution that the Final Rule is Contrary to Constitutional Right

121.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

122.    Article I, section I of the United States Constitution vests exclusive legislative authority in the Congress.

123.    In issuing the Final Rule dual jobs provisions, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), Defendants, who are members of the Executive Branch, engaged in prohibited

legislative activity.  Defendants did not merely interpret or administer the statute that Congress enacted.  Instead, they created substantive requirements wholly untethered to the statutory text. They accomplished this through the ruse of issuing an arguably ambiguous dual jobs regulation, 29 C.F.R. § 531.56(e), which itself was the product of an invalid process due to the absence of an opportunity for notice and comment, followed by doubling down on that rule by promulgating the amended dual jobs regulation in the Final Rule.  The end product, however—the amended dual jobs provisions—bear no resemblance or relationship to the FLSA.

124.   By engaging in legislative activity from the Executive Branch, Defendants violated Article I, section I and the separation of powers required therein.

125.   In violating constitutional separation of powers, Defendants also violated the APA, 5 U.S.C. § 706(2)(B).

126.   Because of Defendants' actions, Plaintiffs and their members will suffer harm as set forth above, including exposure to legal claims for failure to comply with Defendants' guidance.

127.   Plaintiffs have no other adequate remedy in court or administratively for Defendants' unlawful action as described herein, and such action has caused Plaintiffs to suffer undue and actual hardship and irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court issue the following relief:

1.   A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the APA;

2.      A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021),  are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA;

3.      A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), are "contrary to constitutional right, power, privilege, or immunity" under the APA;

4.      A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), are unlawful under the Constitution's separation of powers;

5.      A preliminary and permanent injunctive relief barring Defendants from enforcing, publicizing, or otherwise encouraging any person or court to follow or to defer to the challenged provisions of the Final Rule, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021);

6.      A preliminary and permanent injunctive relief ordering Defendants to rescind the challenged provisions of the Final Rule, 29 C.F.R. §§ 531.56 (e), (f) (effective Dec. 28, 2021), forthwith;

7.      In the alternative, an order directing Defendants to prepare a proper analysis of the economic impact of the Final Rule with regulatory alternatives that comply with the FLSA while minimizing the proposed rule's economic impact on small entities; and

8.      All other relief to which the Plaintiffs may show themselves to be entitled, including attorneys' fees and costs of suit.

Respectfully submitted,


By:  /s/ Greta Ravitsky

ANGELO I. AMADOR (motion for admission
    *pro hac vice* forthcoming)
RESTAURANT LAW CENTER
2100 L Street, N.W., Suite 700
Washington, D.C.  20036
Tel:  202.331.5913
Fax: 202.973.3952
AAmador@restaurant.org


GRETA RAVITSKY
EPSTEIN, BECKER & GREEN, P.C.
Two Houston Center
909 Fannin, Suite 3838
Houston, Texas  77010
Tel:  713.300.3215
Fax: 713.300.3235
GRavitsky@ebglaw.com

PAUL DECAMP (motion for admission
    *pro hac vice* forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com


BRIAN SPANG (motion for admission
    *pro hac vice* forthcoming)
KATHLEEN BARRETT (motion for admission
    *pro hac vice* forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
227 West Monroe, Suite 3250
Chicago, Illinois 60606
Tel:  312.499.1400
Fax: 312.827.9562
BSpang@ebglaw.com
KBarrett@ebglaw.com

*Counsel for Plaintiffs*

December 3, 2021