**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| RESTAURANT LAW CENTER, a non-profit District of Columbia corporation; and TEXAS RESTAURANT ASSOCIATION, a non-profit Texas corporation,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF LABOR; HON. MARTIN J. WALSH, Secretary of the United States Department of Labor, in his official capacity; and JESSICA LOOMAN, Acting Administrator of the Department of Labor's Wage and Hour Division, in her official capacity,<br><br>        Defendants. | Civil Action No. 1:21-cv-01106 |

**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
AND REQUEST FOR EXPEDITED CONSIDERATION AND ORAL ARGUMENT**

ANGELO I. AMADOR (motion for admission *pro hac vice* pending)
RESTAURANT LAW CENTER
2100 L Street, N.W., Suite 700
Washington, D.C.  20036
Tel:  202.331.5913
Fax: 202.973.3952
AAmador@restaurant.org

GRETA RAVITSKY
EPSTEIN, BECKER & GREEN, P.C.
Two Houston Center
909 Fannin, Suite 3838
Houston, Texas  77010
Tel:  713.300.3215
Fax: 713.300.3235
GRavitsky@ebglaw.com

PAUL DECAMP (motion for admission *pro hac vice* pending)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com

BRIAN SPANG (motion for admission *pro hac vice* pending)
KATHLEEN BARRETT (motion for admission *pro hac vice* pending)
EPSTEIN, BECKER & GREEN, P.C.
227 West Monroe, Suite 3250
Chicago, Illinois 60606
Tel:  312.499.1400
Fax: 312.827.9562
BSpang@ebglaw.com
KBarrett@ebglaw.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 1

I.      Congress Defined The Tip Credit In Terms Of The Employee's Total Tips Received From The Employee's "Occupation," Not Whether Specific Tasks Within An Occupation Produce Tips. ............................................................................................... 1

II.     Occupations Within The Restaurant Industry In Which Employees Customarily And Regularly Receive Tips In Excess Of $30 Per Month Include "Side Work" Among The Various Duties. ......................................................................................... 4

III.    The 1967 "Dual Jobs" Regulation:  The Department Recognized And Accepted That The Statutory Tip Credit Applies To All Duties Of A "Tipped Employee," Including Side Work. ................................................................................................... 6

IV.    The Final Rule Conflicts With The FLSA's Text. ............................................... 8

      A.      The Final Rule sweepingly amends the 1967 "dual jobs" regulation, including deleting the Department's prior understanding that the duties of a "tipped employee" need not be "directed toward producing tips." ................................... 9

      B.      The Final Rule replaces the 1967 dual jobs regulation with a conflicting and completely different "tip-producing" standard, based on the Department's subjective belief of what duties actually produce tips, what other duties merely "directly support" tip production, and what other duties do not produce or support tip production. ...................................................................................... 9

V.      The Final Rule Fails To Consider Relevant Data For Cost Estimates And For Its Decision Points ............................................................................................... 12

VI.     The Final Rule Will Have Devastating Effects On Restaurants. ....................................... 14

VII.    Plaintiffs Have Standing, And The Matter Is Ripe For Adjudication .............................. 16

THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION. ....................................... 18

I.      Preliminary Injunction Standard .................................................................... 18

II.     Plaintiffs Have A Substantial Likelihood Of Success On The Merits. .............................. 18

      A.      Governing legal principles ................................................................... 19

            1.     *Chevron* Step One ................................................................... 19

            2.     *Chevron* Step Two ................................................................... 21

      B.      The Final Rule fails at *Chevron* "Step Zero" because the Department did not promulgate the Final Rule within the exercise of the authority it claims Congress granted to it. ............................................................................................. 21

      C.      The Final Rule fails *Chevron* Step One. ....................................................... 23

　　　　1.　　Congress directly spoke to the issue of tip credit application by defining "tipped employee" using the unambiguous term "engaged in an occupation." ............................................................................................ 23

　　　　2.　　The Final Rule impermissibly supplants the statutory definition of "tipped employee" with a different approach based solely on whether specific job duties directly and immediately produce tips. .......................................... 28

　　D.　　The Final Rule fails *Chevron* Step Two. ............................................................. 29

　　　　1.　　Limiting the tip credit based on whether duties directly and immediately produce tips is not a permissible construction of the FLSA. ................... 29

　　　　2.　　The Final Rule is arbitrary and capricious because it is cut from whole cloth................................................................................................................. 30

III.　Plaintiffs Will Suffer Irreparable Harm Without An Injunction....................................... 36

IV.　The Balance Of Hardships And The Public Interest Weigh In Favor Of An Injunction... 38

V.　The Court Should Issue A Nationwide Injunction............................................................ 39

CONCLUSION........................................................................................................................ 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Barr*,
951 F.3d 275 (5th Cir. 2020) ...................................................22

*Barnhart v. Sigmon Coal Co., Inc.*,
534 U.S. 438 (2002)...................................................32

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ...................................................36

*Califano v. Yamaski*,
442 U.S. 682 (1979)...................................................39

*Chamber of Commerce v. United States*,
885 F.3d 360 (5th Cir. 2018) ...................................................28

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
468 U.S. 837 (1984)................................................... *passim*

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
779 F.3d 258 (5th Cir. 2015) ...................................................19, 20, 21

*Fast v. Applebee's Int'l, Inc.*,
636 F.3d 872 (8th Cir. 2011) ...................................................8

*Garcia v. U.S.*,
469 70, 76...................................................4

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010)...................................................25

*INS v. Cardoza-Fonseca*,
489 U.S. 421 (1987)...................................................21

*Intel Corporation v. Rais*,
2019 WL 164958 (W.D.Tex. 2019)...................................................37

*Janvey v. Aleguire*,
647 F.3d 585 (5th Cir. 2011) ...................................................36

*Maralex Res., Inc. v. Barnhardt*,
913 F.3d 1189 (10th Cir. 2019) ...................................................20

*Marsh v. J. Alexander's LLC*,
    905 F.3d 610 (9th Cir. 2018) (en banc) (Ikuta, J., dissenting)...................................3, 8, 29, 30

*Montano v. Montrose Rest. Assocs., Inc.*,
    800 F.3d 186 (5th Cir. 2015) .............................................................................................1, 2

*Nevada v. United States Dep't of Labor*,
    275 F. Supp. 3d 795 (W.D. Tex. 2017).......................................................................16, 17

*Nevada v. United States Department of Labor*,
    218 F. Supp. 3d 520 (W.D. Tex. 2016)........................................................................ *passim*

*Pool Co. v. Cooper*,
    274 F.3d 173 (5th Cir. 2001) .................................................................................................22

*Rafferty v. Denny's, Inc.*,
    13 F.4th 1166 (11th Cir. 2021) ...............................................................................................8

*Sierra Club v. U.S. Fish and Wildlife Serv.*,
    245 F.3d 434 (5th Cir. 2001) .................................................................................................21

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) .............................................................................19, 20, 21, 28

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
    566 U.S. 560 (2012)...................................................................................................20, 23

*Texas v. Alabama-Coushatta Tribe of Texas*,
    918 F.3d 440 (5th Cir. 2019) .................................................................................................21

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ..................................................................................... *passim*

*Texas v. U.S.*,
    809 F.3d 134 (5th Cir. 2015) ........................................................................................38, 39

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) ...........................................................................20, 21, 29, 30

*United States v. Castro-Gomez*,
    365 F. Supp. 3d 801 (W.D. Tex. 2019) (Pitman, J.)...................................................19, 21, 30

*Winter v. Natural Resources Defense Council, Inc.*,
    129 U.S. 365 (2008)....................................................................................................36, 38

**Statutes**

26 U.S.C. § 6053(a) ......................................................................................................27

29 U.S.C. § 203(m)(2) ..............................................................................................38

29 U.S.C. § 203(m)(2)(A) and (B)..............................................................................2

29 U.S.C. § 203(t) ........................................................................................3, 5, 7, 18

29 U.S.C. § 206(a)(1)(c) ..............................................................................................1

Administrative Procedures Act, 5 U.S.C. § 706(2)(A) ............................................19

FLSA section 3(m)(2)(A) ............................................................................................2

FLSA section 3(t) ........................................................................................................23

Pub. L. No. 89-97, 79 Stat. 384-85 ..........................................................................27

Social Security Act of 1965 ......................................................................................26

**Other Authorities**

29 C.F.R. § 531.50-60 ..................................................................................................6

29 C.F.R.§ 531.56(e) ............................................................................................7, 8, 9

29 C.F.R. § 531.56(f) ................................................................................................10

29 C.F.R. § 531.56(f)(2) ............................................................................................10

29 C.F.R. § 531.56(f)(3) (effective Dec. 28, 2021) ................................................10

29 C.F.R. § 531.56(f)(4) (effective December 28, 2021) ........................................11

29 C.F.R § 531.56(f)(5)(i) (effective December 28, 2021) ......................................11

29 C.F.R. § 531.57 ..................................................................................................6, 7

29 CFR § 531.59 ........................................................................................................38

86 Fed. Reg. at 60, 119 ..............................................................................................38

86 Fed. Reg. at 60, 123 ..............................................................................................13

86 Fed. Reg. at 60, 150 ........................................................................................13, 33

86 Fed. Reg. at 60,114 ..............................................................................................22

86 Fed. Reg. 60,114, 60,116 (Oct. 29, 2021)............................................................4

86 Fed. Reg. at 60,115 ..............................................................................................23

86 Fed. Reg. at 60,116 ...............................................................................................8, 18

86 Fed. Reg. at 60,121 ........................................................................................................18

86 Fed. Reg. at 60,127 ...................................................................................................31, 32

86 Fed. Reg. at 60,128 ...................................................................................................34, 35

86 Fed. Reg. at 60,128 n.28 ................................................................................................35

86 Fed. Reg. at 60,129 n. 30 ...............................................................................................34

86 Fed. Reg. at 60,131 ........................................................................................................36

86 Fed. Reg. at 60,133 ..........................................................................................................5

86 Fed. Reg. at 60,143 ........................................................................................................14

BLACK'S at 1230 .................................................................................................................24

BLACK'S LAW DICTIONARY 622 (4th ed. 1957) ...................................................................24

https://www.dol.gov/agencies/eta/onet (last visited Dec. 16, 2021, emphasis
    added)...............................................................................................................................3

https://www.onetcenter.org/overview.html (emphasis added, last visited Dec. 16,
    2021) ........................................................................................................................31, 32

https://www.onetcenter.org/overview.html (last visited Dec. 16, 2021, emphasis
    added)...............................................................................................................................3

https://www.onetcenter.org/overview.html (last visited Dec. 16, 2021) ......................................12

Oxford English Dictionary Online, Oxford University Press, December 2021,
    Web...................................................................................................................................24

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 473 (1967 ed.) ...................................24

S. Rep. No. 89-1487.............................................................................................................27

S. Rep. No. 89-1487 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3002............................................26

S. Rep. No. 93-690......................................................................................................25, 26, 27

S. Rep. No. 93-690 (Feb. 22, 1974) ...........................................................................................4

2 WEBSTER'S THIRD NEW INT'L DICTIONARY 751 (1961 ed.) ...............................................24, 26

## INTRODUCTION

Apparently dissatisfied with the words Congress used in the Fair Labor Standards Act to allow a tip credit to satisfy certain employers' minimum wage obligations, the Department of Labor has chosen to issue regulations untethered to the statutory text.  As discussed below, Congress allows a tip credit for "tipped employees" working in an "occupation" in which they customarily and regularly receive at least $30 a month in tips.  Under the statute, when a tipped employee meets those conditions, the law allows the employer to count some or all of the employee's tips as wages for purposes of minimum wage compliance.

The Department, however, has eschewed that statutory framework, electing instead to create from whole cloth an entirely new term—"tipped occupation"—found nowhere in the statute. The Department then defines that made-up term in such a way as to deny employers access to the tip credit even where tipped employees spend 100% of their working time performing tasks long recognized as part and parcel of these occupations.  The Department simply lacks the authority to do this, and as a result its recent Final Rule is unlawful.

## BACKGROUND

### I.   CONGRESS DEFINED THE TIP CREDIT IN TERMS OF THE EMPLOYEE'S TOTAL TIPS RECEIVED FROM THE EMPLOYEE'S "OCCUPATION," NOT WHETHER SPECIFIC TASKS WITHIN AN OCCUPATION PRODUCE TIPS.

The Fair Labor Standards Act ("FLSA") generally requires payment of a minimum wage, currently $7.25 per hour.  29 U.S.C. § 206(a)(1)(c).  In 1966, Congress amended the FLSA's coverage of employees in the hotel and restaurant industries by creating what is "commonly referred to as a 'tip credit.'"  *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 188 (5th Cir. 2015). The "tip credit" is "an exception that permits employers to pay less than the general minimum

wage—$2.13 per hour—to a 'tipped employee' as long as the employee's tips make up the differ-

ence between the $2.13 minimum wage and the general minimum wage." *Id.* (citing 29 U.S.C.

§ 203(m)).  The tip credit thus does not operate to reduce an employee's pay below minimum

wage, but instead recognizes as "wages" certain tips that employees earn for their work and credits

those tips toward the minimum wage those employees must receive.  The FLSA still requires em-

ployees for whom an employer takes a tip credit to receive at least minimum wage for all hours

worked.

Unsurprisingly, the central phrase in the tip credit amendment is "tipped employee."[1]  Con-

gress specifically defined "tipped employee" in terms of the "**occupation**" in which the employee

engaged:

> "Tipped employee" means any employee **engaged in an occupation** in
> which he **customarily and regularly receives more than $30 a month in
> tips**.

---

[1]    The pertinent language of FLSA section 3(m)(2)(A) setting forth the tip credit is as follows:

(A)  In determining the wage an employer is required to pay a ***tipped employee***, the amount
paid such employee by the employee's employer shall be an amount equal to—

(i)   The cash wage paid such employee for which purposes of such determination
shall be not less than the cash wage required to be paid such an employee in Au-
gust 20, 1996; and

(ii)  an additional amount on account of the tips received by such employee which
amount is equal to the difference between the wage specified in clause (i) and the
wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually
received by the employee.  The preceding two sentence shall not apply with respect to
any ***tipped employee*** unless such employee has been informed by the employer of the
provisions of this subsection, and all tips received by such employee have been re-
tained by the employee, except that this subsection shall not be construed to prohibit
the pooling of tips among the employees who customarily and regularly receive tips.

(B)  An employer may not keep tips received by its employees for any purposes, including
allowing managers or supervisors to keep any portion of employees' tips, regardless
of whether or not the employer takes a tip credit.

29 U.S.C. § 203(m)(2)(A) and (B) (emphasis added).

29 U.S.C. § 203(t) (emphasis added).  "Occupation" is not ambiguous.  "Occupation" is a broad word that means "the principal business of one's life:  a craft, trade, profession or other means of earning a living."  *See infra* at 23-25, nn. 17-22.

The Department certainly understands the plain meaning of the term "occupation," because it sponsors the "O*NET Program, which is "the nation's primary source of *occupational* information."[2]  "Every *occupation*," the Department explains, requires a different mix of knowledge, skills and abilities, and *is performed using a variety of activities and tasks*."[3]  Congress's choice to define "tipped employee" in terms of "occupation" therefore demonstrates Congress's intent for the tip credit to apply on an *occupation* basis, not on a *task* basis.  So long as the employee is "engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips," the employee is eligible for the tip credit.

Congress could have chosen a different approach.  For example, Congress could have focused on job duties, and limited application of the tip credit to job duties that directly and immediately produce tips.  For example, Congress could have limited the tip credit to only those duties requiring direct interaction with the customer who pays tips.  Congress could have similarly legislated a time component for the tip credit, such as by mandating that the tip credit only be available if the employee engaged in job duties that directly and immediately produce tips for more than

---

[2]     *See* https://www.onetcenter.org/overview.html (last visited Dec. 16, 2021, emphasis added).

[3]     *See* https://www.dol.gov/agencies/eta/onet (last visited Dec. 16, 2021, emphasis added).  For example, an employee engaged in the occupation of attorney sometimes has to engage in duties and responsibilities that do not require a law school degree, such as using the photocopier.  The employee remains an attorney, even if sometimes she must use the photocopier, even for significant periods of time.  So too, for one example, with a waitress.  *See Marsh v. J. Alexander's LLC*, 905 F.3d 610, 645 (9th Cir. 2018) (en banc) (Ikuta, J., dissenting) ("a waitress doing typical waitress duties remains a waitress, even if (in five-minute increments throughout he workweek) she spends 60 percent of her time waiting tables, 10 percent cleaning tables, 10 percent toasting bread, 10 percent making coffee, and 10 percent washing dishes …. Common sense tells us that the waitress is 100 percent engaged in the single tipped occupation of waitressing—she is not 60 percent a waitress, 10 percent a janitor, 10 percent a baker, 10 percent a barista, and 10 percent a dishwasher.").

50% of the working time per day or per workweek.  But, Congress did not choose to define the tip credit according to job duties that produce tips or the time spent on such tasks.

Instead, Congress chose to focus on the entirety of the employee's "occupation."  Congress specified that the tip credit applies to a "tipped employee," and defined "tipped employee" in terms of the occupation in which the employee is engaged.  Congress thus determined that the tip credit applies regardless of whether or how much of the time an employee performed duties that directly and immediately produce tips.  So long as the employee is engaged in an occupation that customarily and regularly receives tips in excess of $30 a month, the tip credit is available.  Indeed, Congress itself recognized that entire occupations can be listed by occupational title and recognized as occupations that "customarily and regularly receive tips—*e.g.*, waiters, bellhops, waitresses, countermen, busboys, service bartenders, etc."—without regard to the amount of time spent on duties that directly and immediately produce tips.  S. Rep. No. 93-690, at 43 (Feb. 22, 1974) (legislative history to the 1974 amendments to the FLSA's tip credit, quoted in Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 60,114, 60,116 (Oct. 29, 2021) (hereafter, the "Final Rule").[4]

## II.    OCCUPATIONS WITHIN THE RESTAURANT INDUSTRY IN WHICH EMPLOYEES CUSTOMARILY AND REGULARLY RECEIVE TIPS IN EXCESS OF $30 PER MONTH INCLUDE "SIDE WORK" AMONG THE VARIOUS DUTIES.

In 1966, when Congress amended the FLSA to create the tip credit, as well as before and since, occupations in the restaurant industry such as waiters, waitresses, servers, bartenders, and

---

[4]    Committee Reports like this one "represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation," and therefore represent "the authoritative source for finding the Legislature's intent" among legislative history materials.  *Garcia v. U.S.*, 469 70, 76 (1984) (cleaned up, citation omitted).  The Final Rule's citation to this Committee Report demonstrates this point.

service bartenders, regularly engaged in and continue to regularly engage in, duties and responsibilities referred to as "side work."  *See* Declaration of Emily Knight ("Knight Decl.") ¶ 8.[5]  There is no dispute that side work is part and parcel of occupations within the restaurant industry that customarily and regularly receive tips in the requisite amount.  And there is no dispute that side work duties do not directly and immediately produce tips.  The Department's own Final Rule commentary provides some examples of "side work" within the occupations of "server" and "bartender."[6]  The Department's own O*NET Program—"the nation's primary source of occupational information," which presents "Real-world information" collected "from the working public" in order "to provide up-to-date information on occupations"—likewise lists numerous actual and real-world duties of waiters, waitresses, and bartenders properly considered side work.[7]  These side work examples do not involve customer interaction and therefore do not directly and immediately produce tips.

The real question this case presents is thus not whether side work is or is not part of the regular duties and activities of occupations in the restaurant industry that customarily and regularly receive tips in the requisite amount, such as waiters, waitresses, and bartenders.  The real question is whether side work is relevant in any way to the statutory definition of "tipped employee" in 29

---

[5]    Plaintiffs submit their supporting Appendix of Evidence ("Pls.' App.") with this Motion.  The Declaration of Emily Knight ("Decl. Knight") is contained in Pls.' App. as Ex. 1.

[6]    *See* Final Rule, 86 Fed. Reg. at 60,133 (describing the following duties as "side work":  "if a server folds napkins for the dinner rush after her lunch customers leave, or rolls silverware for 15 minutes at the end of the night while waiting for their last table to pay their bill, or if a bartender is assigned to stock the bar generally between serving customers (as opposed to more specifically retrieving a particular bottle of alcohol to fulfill a customer's order)").

[7]    *See generally* ECF No. 1, ¶¶ 41-50 and Exs. 1 & 2 (the Complaint, quoting and attaching O*NET reports for the occupations of "Waiters and Waitresses" and "Bartenders").  These reports are contained in Pls.' App. as Exs. 2 & 3.  These reports list numerous side work duties for Waiters and Waitresses (including "Perform food preparation duties such as preparing salads, appetizers, and cold dishes, portioning desserts and brewing coffee"; "Perform cleaning duties, such as sweeping and mopping floors, vacuuming carpet, tidying up server station, taking out trash, or checking and cleaning bathroom"; and "Roll silverware, set up food stations, or set up dining areas to prepare for the next shift or for large parties"), and for Bartenders (including "Clean bars, work areas and tables, "Clean food service areas," "Prepare foods for cooking or serving," and "Cook foods").  *See* Pls.' App., Exs. 2 & 3.

U.S.C. § 203(t).  The previous section explains that the answer is "No," based on the plain language of the statute, specifically, the unambiguous word "occupation."  We now turn to the Department's initial 1967 regulation relating to side work and the tip credit.  Then, we explain the substance of the Final Rule and how it's a completely different and brand new approach to side work and the tip credit conflicts with, and completely contradicts, the FLSA's statutory language.

### III. THE 1967 "DUAL JOBS" REGULATION:  THE DEPARTMENT RECOGNIZED AND ACCEPTED THAT THE STATUTORY TIP CREDIT APPLIES TO ALL DUTIES OF A "TIPPED EMPLOYEE," INCLUDING SIDE WORK.

In 1967, the year following Congress' creation of the tip credit in the FLSA, the Department issued regulations addressing tipped employment, codified at 29 C.F.R. § 531.50-60.  Those regulations, consistent with the statute, provide that the tip credit applies based on the "occupation" of the employee.  For example, in discussing the "customarily and regularly" requirement, 29 C.F.R. § 531.57 explains, consistent with the text of the FLSA, that if employees are "in an occupation in which he normally and regularly receives more than $30 a month in tips, he will be considered a tipped employee even though occasionally because of sickness, vacation, seasonal fluctuations or the like, he fails to receive more than $30 in tips in a particular month."  Like the statutory text, this regulation focuses on the "occupation" as a whole.  This regulation does not make any distinction between duties directed toward directly and immediately producing tips, and other duties that are not.  Nor does this regulation speak to any time limitations or percentages of the amount of time the tipped employee spends on any particular duties.  This regulation confirms that the only relevant consideration for the tip credit's application is whether "an employee is in an occupation in which he normally and recurrently receives" the requisite amount in tips per month.  29 C.F.R. § 531.57.

Another 1967 regulation—29 C.F.R. § 531.56(e)—known as the "dual jobs" regulation, is consistent with § 531.57 and the statutory text.  This original version of the dual jobs regulation addresses situations in which an employee works in two separate occupations for the same employer, one that results in tips one that does not, and specifies the tip credit may be taken for only the occupation in which the employee customarily and regularly receives tips.  The dual jobs regulation used an example of an employee working in two separate and distinct occupations: "maintenance man" and "waiter":

> In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter.  In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter.  He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man.  ***Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses.  It is likewise distinguishable from the counterman who also prepares his or her own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group.  Such related duties*** in an occupation that is a tipped occupation ***need not by themselves be directed toward producing tips.***

29 C.F.R. § 531.56(e) (1967-2020) (emphasis added).

The emphasized sentences make clear that the Department knew and understood that side work—*i.e.*, duties that do <u>not</u> directly and immediately produce tips—was part and parcel of "engaging" in an "occupation" that "customarily and regularly receives more than $30 a month in tips," as Congress defined "tipped employee" in 29 U.S.C. § 203(t).  This is so because "cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses" is side work performed by a waitress, and "prepar[ing] his or her own short order" is side work for a counterman.  Both Congress and the Department have long recognized employees working as a

"waitress" and as a "counterman" to be "tipped employees" because they are "engaged in an occupation" that "customarily and regularly" receives the requisite amount of tips.[8]  Indeed, the final sentence of 29 C.F.R. § 531.56(e) makes explicit the Department's recognition and understanding that performing side work duties is an integral part of being a "tipped employee" under the FLSA—*i.e.*, "engaging in an occupation" that "customarily and regularly receives" the requisite amount of tips.  This is so because the final sentence of § 531.56(e) specifies that "such related duties"—*i.e.*, side work—"**need not by themselves be directed toward producing tips**" in order for the tip credit to apply.  *Id*. (emphasis added).

## IV.   THE FINAL RULE CONFLICTS WITH THE FLSA'S TEXT.

On several occasions between 1975 and 2018 the Department issued informal subregulatory guidance in the form of opinion letters and amendments to its Field Operations Handbook with regard to the dual jobs regulation.  The Department's informal subregulatory views vacillated, often depending on the political party of the then-current Administration.[9]  The Department issued the Final Rule after a notice and comment period.  The Final Rule dramatically changes the Department's prior regulations, creates a new term by which to consider application of the tip credit— "tipped occupation"—that does not appear in, and finds no support in, the statute, and imposes a regulatory regime in conflict and completely inconsistent with the plain language of the statute.

---

[8]   *See supra*, p. 4 (quoting S. Rep. No. 93-690, at 43 (Feb. 22, 1974) (legislative history to the 1974 amendments to the FLSA's tip credit, quoted in the Final Rule, 86 Fed. Reg. at 60,116).

[9]   The Department's various different subregulatory guidance has been the subject of numerous court challenges throughout the years.  *See, e.g.*, *Rafferty v. Denny's, Inc.*, 13 F.4th 1166 (11th Cir. 2021); *Marsh v. J. Alexander's LLC*, 905 F.3d 610 (9th Cir. 2018) (en banc); and *Fast v. Applebee's Int'l, Inc.*, 636 F.3d 872 (8th Cir. 2011).  The legal questions presented in those cases focused on whether deference should be given to the Department's interpretation of its own regulations and, if so, the appropriate level of deference.  None of those decisions addressed the question presented in this case:  whether the Department's regulation conflicts with the FLSA.  And of course none of those decisions addressed the Final Rule.  Accordingly, none of the rulings or holdings in those decisions are binding or controlling here.

**A.** **The Final Rule sweepingly amends the 1967 "dual jobs" regulation, including deleting the Department's prior understanding that the duties of a "tipped employee" need not be "directed toward producing tips."**

The Final Rule sweepingly amends 29 C.F.R. § 531.56(e) by creating a brand new term not found or supported by the statute—"tipped occupation"—and by deleting the last three sentences of the regulation, which, as explained above, explicitly recognized that side work is an integral part of being a "tipped employee" under the FLSA:

> In some situations an employee is employed in ~~a~~ dual ~~job~~ **jobs**, as**,** for example, where a maintenance ~~man~~ **person** in a hotel also ~~serves as a waiter~~ **works as a server**.  In such a situation **if** the employee~~, if he~~ customarily and regularly receives at least $30 a month in tips for ~~his~~ **the employee's** work as a ~~waiter~~ **server**, **the employee** is **engaged in a** <mark>tipped</mark> ~~employee~~ <mark>**occupation**</mark> only ~~with respect to his employment as a waiter~~ **when employed as a server**.  ~~He~~ **The employee** is employed in two occupations, and no tip credit can be taken for ~~his~~ **the employee's** hours of employment in ~~his~~ **the** occupation of maintenance ~~man.  Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses.  It is likewise distinguishable from the counterman who also prepares his or her own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group.  Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips~~ **person**.

29 C.F.R. § 531.56(e) (effective Dec. 28, 2021) (additions shown in **bold**, deletions shown in ~~strike through~~, new non-statutory term <mark>tipped occupation</mark> highlighted in yellow).

**B.** **The Final Rule replaces the 1967 dual jobs regulation with a conflicting and completely different "tip-producing" standard, based on the Department's subjective belief of what duties actually produce tips, what other duties merely "directly support" tip production, and what other duties do not produce or support tip production.**

The Final Rule adds new subsection (f) to § 531.56, which creates a multi-layered definition of a term not contained in the statute:  "tipped occupation."  The Final Rule defines "tipped occupation" in an entirely circular manner:  "An employee is engaged in a tipped occupation when

9

the employee performs work that is part of the tipped occupation."[10]  That allows the Department to create a brand new standard for what it views as "performing work that is part of the tipped occupation," and to decree that "An employee may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation."  29 C.F.R. § 531.56(f).  The Department then proceeds to devise three different categories of "work" that it deems to fall within (or outside of) the non-statutory term "tipped occupation."

*First*, the Final Rule refers to "tip-producing work."  29 C.F.R. § 531.56(f)(2).  According to the Final Rule, this is work that actually "produces tips," and "includes all aspects of the service to customers for which the tipped employee receives tips," such as a server "providing table service" and a bartender "making and serving drinks."  *Id.* § 531.56(f)(1)(i), (2)(i)-(ii).  The Final Rule limits the tip credit to time spent in "tip-producing work."  *Id.* § 531.56(f).

*Second*, the Final Rule refers to "directly supporting work."  29 C.F.R. § 531.56(f)(3) (effective Dec. 28, 2021).  According to the Final Rule, this is work "performed by a tipped employee in preparation of or to otherwise assist tip-producing customer service work," such as a server "refilling salt and pepper shakers and ketchup bottles, rolling silverware, folding napkins, sweeping or vacuuming under tables in the dining area, and setting and bussing tables."  *Id.* § 531.56(f)(3)(i), (ii) (effective Dec. 28, 2021).  This is plainly "side work" that the 1967 dual jobs regulation expressly recognized was part of the server's occupational "related duties"—duties that "need not by themselves be directed toward producing tips" in order for the employee to still fully qualify for the tip credit.  But the Final Rule deletes that language from the 1967 dual jobs regulation, and replaces it with a multi-part "substantial amount of time" limitation:

> An employer can take a tip credit for the time a tipped employee spends performing work that is not tip-producing, but directly supports tip-produc-

---

[10]  All references to § 531.56(f) refer to the version scheduled to become effective on December 28, 2021.

ing work, provided that the employee does not perform that work for a sub-
stantial amount of time.  For the purposes of this section, an employee has
performed work for a substantial amount of time it:

(i)  The directly supporting work exceeds a 20 percent workweek tolerance,
which is calculated by determining 20 percent of the hours in the workweek
for which the employer has taken a tip credit.  The employer cannot take a
top credit for any time spend on directly supporting work that exceeds the
20 percent tolerance.  Time for which an employer does not take a tip credit
is excluded in calculating the 20 percent tolerance; or;

(ii) For any continuous period of time, the directly supporting work exceeds
30 minutes.  If a tipped employee performs directly supporting work for a
continuous period of time that exceeds 30 minutes, the employer cannot
take a tip credit for any time that exceeds 30 minutes.  Time in excess of the
30 minutes, for which an employer may not take a tip credit, is excluded in
calculating the 20 percent tolerance in paragraph (f)(4)(i) of this section.

29 C.F.R. § 531.56(f)(4) (effective December 28, 2021).

*Third*, the Final Rule refers to work "that is not part of the tipped occupation."  According
to the Final Rule this is work the Department has deemed "work that does not provide service to
customers for which tipped employees receive tips, and does not directly support tip-producing
work."  29 C.F.R. § 531.56(f)(5)(i) (effective December 28, 2021).  The Department deems "[p]re-
paring food, including salads," to be "not part of the tipped occupation" of a server, and "[c]leaning
the dining room" to be "not part of the tipped occupation" of a bartender.  *Id.* § 531.56(f)(5)(ii).
The Final Rule provides zero tolerance for "not part of the tipped occupation" work:  "If a tipped
employee is required to perform work that is not part of the employee's tipped occupation, the
employer may not take a top credit for that time."  *Id.* § 531.56(f)(5)(i).  The Final Rule carves all
work the Department deems "not part of the tipped occupation" from the tip credit even though
there is no dispute that employees falling within the statute's definition of "tipped employee"—
*i.e.*, "engaged in an occupation that customarily and regularly" receives the requisite amount in

tips—indisputably perform such duties and activities.  Indeed, the Department's own O*NET pro-

gram, touted as "the nation's primary source of occupational information," expressly recognizes

these tasks as part of these occupations.  *See* https://www.onetcenter.org/overview.html (last vis-

ited Dec. 16, 2021); *see supra*, p. 5 at n. 7 and, *e.g.*, Pls.' App., Ex. 2 at 2 (listing "Perform food

preparation duties such as preparing salads" as a "Core" "Task" for Waiters and Waitresses).

    In short, the FLSA's definition of "tipped employee" asks a simple and straightforward

question:  is the employee engaged in an "occupation"—such as waiter, bellhop, waitress, coun-

terman, busboy, or service bartender—that customarily and regularly receives the requisite amount

of tips per month?  The Final Rule takes those same occupations and asks a completely different

question:  is the employee engaged in a "tipped occupation," which leads in turn to multi-layered

questions about specific job duties within the recognized occupation.  Do the duties directly pro-

duce tips?  If not, do the duties at least directly support the production of tips?  And if so, for how

long are they performed, both continuously and across the entire workweek?  Simply stated, the

Final Rule creates a brand new, and completely different, regulatory regime utterly untethered to

Congress's definition of "tipped employee."

## V.   THE FINAL RULE FAILS TO CONSIDER RELEVANT DATA FOR COST ESTIMATES AND FOR ITS DECISION POINTS.

    The Department failed to consider accurate costs or studies for its decision points in the

Final Rule.  First, the Department fails to accurately measure the costs to small businesses.[11]  A

separate federal agency, the SBA Office of Advocacy, submitted comments to the proposed ver-

sion of the Final Rule expressing the "concern[] that the DOL's certification that the rule will not

have significant economic impact on a substantial number of small entities **lacks an adequate**

---

[11]   *See generally* ECF No. 1, ¶¶ 81-86 & Ex. 3 (the Complaint, quoting and U.S. Small Business Administra-
tion's Office of Advocacy ("SBA Office of Advocacy") comments).  The SBA Office of Advocacy comments are
contained in Pls.' App. as Ex. 4.

**factual basis.**"  *See* Pls.' App. Ex. 4 at 1 (emphasis added).  The SBA Office of Advocacy observed that the "DOL improperly certified the proposed rule because it **omitted some and underesti-mated other compliance costs of this rule for small employers**."  *Id.* at 1-2 (emphasis added). Specifically, the SBA Office of Advocacy detailed its concerns, focusing on several areas, includ-ing assessing changes to wage costs, the costs of regulatory familiarization, adjustment costs, and management costs.  *Id*. at 4-9.  The SBA Office of Advocacy further "believes that DOL's certifi-cation is flawed because it **fails to estimate small business compliance for increased wages under this regulation**."  *Id*. at 5 (emphasis added).

Second, the Department acknowledged that labor markets and economic circumstances materially changed due to the COVID-19 pandemic, but then acknowledged the Final Rule's cost estimates were based on pre-COVID-19 pandemic data.  *See* Final Rule, 86 Fed. Reg. at 60, 150. Specifically, "[t]he Department notes that this [cost analysis] relies on data from 2018 and 2019, which is prior to the COVID-19 pandemic."  *Id.*  However, the Department acknowledged that "[b]ecause many businesses were shut down during 2020 or had to change their business model, especially restaurants, *the economic situation for tipped workers likely changed due to the pan-demic*."  *Id*. (emphasis added).  The Department further acknowledged that "[*t]he labor market has likely changed for tipped workers during the pandemic, and could continue to change fol-lowing recovery from the pandemic especially in the restaurant business*."  *Id*. (emphasis added). Therefore, the Department's cost estimates for the Final Rule—by the Department's own acknowl-edgement and admissions—have no relation to the current labor market or economic situation of tipped employees.  *Id*.

Finally, the Department failed to conduct any studies of any type to determine how affected occupations operate in the real world.  *See* Final Rule, 86 Fed. Reg. at 60, 123.

VI.     THE FINAL RULE WILL HAVE DEVASTATING EFFECTS ON RESTAURANTS.

Plaintiffs' affected members, who have used the tip credit provided for by the FLSA for decades, are attempting to comply with the Final Rule, at great cost to the livelihood of their business.[12]  Complying with the Final Rule has forced countless Restaurant Law Center ("RLC") and Texas Restaurant Association ("TRA") members to endure regulatory familiarization costs, preparation costs, increased wage costs, adjustment costs, staffing costs, management costs, and recordkeeping costs, which will force many RLC and TRA impacted members to expend substantial financial resources, terminate staff, or permanently shut their doors. *See* Declaration of Amador ("Amador Decl.")  ¶¶ 19-21; Knight Decl. ¶¶ 10-12; Declaration of Tracy Vaught ("Vaught Decl.") ¶¶ 5-9.[13]  For example, affected RLC and TRA members have begun conducting a "time intensive analysis of the tasks performed by these employees, the minutes each task is performed, as well as projection of staff for each job position and gross profits."  *See* Amador Decl. ¶ 19(b); Knight Decl. ¶ 10(b).  The analysis must be done on a case-by-case basis for every single of the restaurant's impacted tipped employees, which is a substantial cost that will result in lost productivity or additional actual expenses.  *See id.*

As a result of the costs of complying with Final Rule, many RLC and TRA members will no longer use the tip credit at all, "which will result in substantial costs that will wipe out their profit margins."  *See* Amador Decl. ¶ 10(c); Knight Decl. ¶ 10(c); Vaught Decl. ¶ 5.  For example, a TRA member with 20 tipped workers will not be able to use the tip credit under the Final Rule and "will have to spend an extra $163,840 per year, which drastically decreases the restaurant's

---

[12]     The Department grossly underestimates the financial impact on restaurants.  It predicts that the first year cost to businesses totals only $224,882,399.  *See* Final Rule, 86 Fed. Reg. at 60,143. The Department also anticipates businesses will suffer an additional $183.6 million annual cost over the next ten years.  *Id.*  While these figures certainly amount to irreparable financial harm, they are far less than the actual shock that restaurants are bracing for.

[13]     The declaration of Angelo Amador ("Amador Decl.") is contained in Pls.' App. at Ex. 5.  The declaration of Tracy Vaught ("Vaught Decl.") is contained in Pls.' App. at Ex. 6.

profit margin and threatens the restaurant's ability to keep its doors open." *See* Knight Decl. ¶ 10(c).  In order to comply with the Final Rule, a RLC member will no longer be able to use the tip credit and instead, "the restaurant will have to spend an extra $286,720 per year—eating at an already thin profit." *See* Amador Decl. ¶ 10(c).  Another TRA restaurant group member, who may no longer use the tip credit due to the Final Rule, "will spend close to one million dollars extra per year on labor, which drastically decreases our restaurants' profit margins and threatens the ability to keep our doors open and staff employed." *See* Vaught Decl. ¶ 5.  In addition, "once the restaurant group spend these monies, they cannot recoup the million dollars back."  *Id*.

RLC and TRA members seeking to continue to use the tip credit under the Final Rule have separate, ongoing, substantial costs to comply with the Final Rule.  *See* Amador Decl. ¶ 19; Knight Decl. ¶ 10; Vaught Decl. ¶ 7.  Affected RLC and TRA members are expending resources, time, and money to create new policies and procedures, new job descriptions, purchase new technology, redesign business and staffing models, hire new staff, train staff, and will perform ongoing monitoring of employees' activity to comply with the Final Rule.  *See id*.; *see also* Pls.' App. Ex. 4 at 7 ("Small businesses at [SBA Office of] Advocacy's roundtable have commented that the cost to adjust their business practices will be in the thousands of dollars.").  Some RLC and TRA members are also preparing to terminate tip credit eligible employees due to the financial constraints imposed by the Final Rule.  *See* Amador Decl. ¶ 19(e); Knight Decl. ¶ 10(e); Vaught Decl. ¶ 9.

In addition, to prepare for the new costs necessitated by the Final Rule, some impacted members will need to increase menu prices.  Vaught Decl. ¶¶ 8, 10.  Restaurants' menu prices are their competitive advantage and "taking away our [restaurants'] ability to compete with the prices of other businesses, right now in this pandemic-stricken environment, is a harm that our restaurants will not be able to recover from."  *Id*.

It is an impossible time to add these additional substantial costs and burdens to many RLC and TRA members as their operations are just barely surviving from COVID-19 pandemic financial losses. *See* Amador Decl. ¶¶ 20-21; Knight Decl. ¶¶ 11-12; Vaught Decl. ¶¶ 8-10. The steady inflation in food costs, ongoing labor shortages, supply chain shortages have reversed the restaurant industry's recovery and further placed impacted members in a precarious position. *See* Amador Decl. ¶¶ 20-21 & Ex. A; Knight Decl. ¶ 12 & Ex. A; Vaught Decl. ¶¶ 8-10. Thus, the increase in wages, staff, management, technology, and other compliance costs necessitated by the Final Rule will result in the reduction of jobs or closing of the restaurant altogether due to the financially fragile state of many of RLC and TRA impacted members. *See* Amador Decl. ¶¶ 10-21; Knight Decl. ¶¶ 11-12; Vaught Decl. ¶¶ 5, 8-9. Affected RLC and TRA members with pandemic-stricken financial constraints have relatively few options to comply with the Final Rule—all of which have a detrimental effect on the restaurant's ability to serve and employ members of the public. *See id.*

## VII.   PLAINTIFFS HAVE STANDING, AND THE MATTER IS RIPE FOR ADJUDICATION.

"Standing requires a plaintiff to show the following elements:  (1) an 'injury in fact' that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely the injury will be redressed by a favorable decision. *Nevada v. United States Dep't of Labor*, 275 F. Supp. 3d 795, 800 (W.D. Tex. 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (hereafter "*Nevada v. DOL II*"). "An association has standing to bring suit on behalf of its members when: '"(a) its members would otherwise have standing to sue in their own right; (b) the interests at stake are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Nevada v. DOL II*, 275 F. Supp. 3d at 800

(quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)) (hereafter "*Nevada v. DOL II*").

Both Plaintiffs meet the standing requirements. *First*, Plaintiffs are national and state trade associations, respectively, representing thousands of employers in Texas and throughout the country with workers customarily and regularly compensated by tips in excess of $30 per month. *See* Amador Decl. ¶¶ 3, 4, 14, 17, 18; Knight Decl. ¶¶ 3, 4, 10; Vaught Decl. ¶¶ 1, 3-5. Plaintiffs' members therefore have standing to sue in their own right. *Second*, Plaintiffs and their members would incur significant payroll, accounting, and legal costs to comply with the Final Rule, and the interests at stake are germane to each Plaintiff's purpose. *See* Amador Decl. ¶¶ 9-19, 21-22; Knight Decl. ¶¶ 9, 10, 13-16. *Third*, the claims assert legal arguments that do not require participation of any individual members of Plaintiffs. Plaintiffs therefore both have standing. *See generally Nevada v. DOL II*, 275 F. Supp. 3d at 801.

"A challenge to administrative regulations is fit for review if (1) the questions presented are purely legal ones, (2) the challenged regulations constitute final agency action, and (3) further factual development would not significantly advance the Court's ability to deal with the legal issues presented. *Nevada v. United States Department of Labor*, 218 F. Supp. 3d 520, 526 (W.D. Tex. 2016) (quoting *Texas v. United States*, 497 F.3d 491, 498-99 (5th Cir. 2007) (cleaned up, and other citation omitted) (hereafter "*Nevada v. DOL I*"). Plaintiffs make only legal arguments; the Final Rule will go into effect on December 28, 2021 if not enjoined; and the material facts regarding legislative and regulatory history are sufficiently developed to address the Final Rule's legality. The matter is therefore ripe for review. *See Nevada v. DOL I*, 218 F. Supp. 3d at 526.

**THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION.**

## I.   PRELIMINARY INJUNCTION STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause; and (4) that the injunction will not disserve the public interest." *Nevada v. DOL I*, 218 F. Supp. 3d at 526 (citation omitted). The plaintiff "is not required to prove its case in full at a preliminary injunction hearing." *Id*. (citations omitted). The plaintiff must "present a prima facie case," but "prima facie case does not mean [Plaintiffs] must prove they are entitled to summary judgment." *Id*. at 526-27 (citations omitted).

## II.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

As explained above, Congress specifically defined "tipped employee" in the FLSA to mean "any employee *engaged in an **occupation*** in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t) (emphasis added). The Final Rule observes that Congress authorized the Department "to promulgate necessary rules, regulations or orders with regard to the" 1966 FLSA amendments that created the tip credit. Final Rule, 86 Fed. Reg. at 60,121 (citing Public Law 89-601, § 602, 80 Stat. at 844). The Final Rule observes that "Congress left 'occupation,' and what it means to be 'engaged in an occupation,' in section 3(t) undefined." Final Rule, 86 Fed. Reg. at 60,116. The Department therefore believes that "Congress delegated to the Department the authority to determine what it means to be 'engaged in an occupation' that customarily and regularly receives tips." Final Rule, 86 Fed. Reg. at 60,116.

In other words, the Department believes it is authorized to define terms in the statute simply because Congress did not specifically define those terms. But even "a broad grant of general

rulemaking authority does not allow an agency to make amendments to statutory provisions." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 273 (5th Cir. 2015). The Department overlooks a fundamental question: whether the statutory term it wants to [re-]define is clear and unambiguous. *See United States v. Castro-Gomez*, 365 F. Supp. 3d 801, 812 (W.D. Tex. 2019) (Pitman, J.) ("[a]s a general rule of statutory interpretation, a regulatory definition does not displace a statutory definition where the statute is clear and unambiguous"; ruling that unambiguous statutory definition controlled over conflicting regulatory definition). For all the reasons that follow, the Final Rule is unlawful because it fails the "*Chevron* Two-Step." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1023 (5th Cir. 2019) (vacating final administrative regulation promulgated after full notice and comment because it was unlawful under "the *Chevron* test for reviewing agency interpretations of statutes") (citation omitted); *see generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 468 U.S. 837 (1984).[14]

### A.     Governing legal principles

#### 1.     *Chevron* Step One

> At step one, the court considers whether Congress has directly spoken to the precise question at issue. If Congress has directly spoken on an issue, that settles the matter: the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. Only if the statutory text is ambiguous can the court proceed to step two, asking whether the agency's construction of the statute is permissible.

*Sw. Elec. Power*, 920 F.3d at 1014 (cleaned up, citations omitted). More simply stated, "[t]he authority of administrative agencies is constrained by the language of the statute they administer,"

---

[14]     Plaintiffs also challenge the Final Rule as arbitrary and capricious and unlawful abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). "Because *Chevron* step two and the APA share the 'arbitrary and capricious standard, the APA reflects the principles of *Chevron*, and analysis under the two standards proceeds similarly." *Sw. Elec. Power*, 920 F.3d at 1028 (cleaned up, citation omitted). Plaintiffs will augment their analysis explaining why the Final Rule is arbitrary and capricious with their *Chevron* step two arguments below.

*Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (citation omitted), so "[w]here Congress has established a clear line, the agency cannot go beyond it." *Contender Farms*, 779 F.3d at 269 (quoting *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013)).  Courts answer the Step One question of "whether Congress has directly spoken to the precise question at issue" by relying on "the conventional standards of statutory construction—*i.e.*, text, structure, and the overall statutory scheme[.]" *Sw. Elec. Power*, 920 F.3d at 1023 (cleaned up, citations omitted).  Courts "are not to focus myopically on a particular statutory provision in isolation because the meaning—or ambiguity—of certain words or phrases may only become evidence when placed in context." *Id.* at 1023 (cleaned up, citations omitted).

"Canons of statutory interpretation further assist [courts] in assessing the meaning of a statute" at Step One.  *Contender Farms*, 779 F.3d at 269.  "Several basic considerations guide [the court's] inquiry under these canons:  (1) we begin with the statute's language; (2) **we give undefined words their ordinary, contemporary, and common meaning**; (3) we read the statute's words in proper context and consider them based on the statute as whole, and (4) we consider a statute's terms in the light of the statute's purposes." *Contender Farms*, 779 F.3d at 269 (cleaned up, emphasis added, citations omitted).  *Accord Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning"); *Nevada v. United States I*, 218 F. Supp. 3d at 529 ("The Court assumes Congress's intent from the plain meaning of a word when the statute does not define the term") (citation omitted); *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, n.4 (10th Cir. 2019) ("At the first step of the *Chevron* analysis, we must give all undefined terms their ordinary meaning") (cleaned up, citation omitted).  And "[l]egislative history" is also a "traditional tool of statutory interpretation" to be

utilized at Step One.  *Contender Farms*, 779 F.3d at 269 (cleaned up, emphasis added, citations omitted).[15]

### 2.     *Chevron* **Step Two**

Step Two also "compels a judicial evaluation of congressional intent."  *Texas v. United States*, 497 F.3d at 506.  The court asks whether the regulation "is based on a *permissible* construction of the statute."  *Sw. Elec. Power*, 920 F.3d at 1028 (emphasis in original, citation omitted).  "While this is a highly deferential standard, an agency interpretation can fail *Chevron* step two if it is contrary to clear congressional intent or frustrates the policy Congress sought to implement."  *Sw. Elec. Power*, 920 F.3d at 1028 (cleaned up, citation omitted).  For example:

> In the process of considering a regulation in relation to specific factual situations, a court may conclude the regulation is inconsistent with the statutory language or is an unreasonable implementation of it.  In those instances, the regulation will not control.

*Castro-Gomez*, 365 F. Supp. 3d at 812-13 (quoting *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999)).  "Agency action that is arbitrary, capricious, or manifestly contrary to the statute also fails step two."  *Sw. Elec. Power*, 920 F.3d at 1028 (cleaned up, citation omitted).

### B.     **The Final Rule fails at *Chevron* "Step Zero" because the Department did not promulgate the Final Rule within the exercise of the authority it claims Congress granted to it.**

As an initial matter, this Court must determine whether the FLSA even authorizes the Department to have promulgated the Final Rule at all, which is sometimes referred to as the "*Chevron*

---

[15]     *See also Texas v. Alabama-Coushatta Tribe of Texas*, 918 F.3d 440, 449 (5th Cir. 2019) ("*Chevron* step one … requires the reviewing court to apply 'the traditional tools of statutory interpretation'—like the canons and legislative history—to determine whether Congress has spoken to the precise issue") (quoting *Chevron*, 467 U.S. at 843); *Sierra Club v. U.S. Fish and Wildlife Serv.*, 245 F.3d 434, 442 & n.51 (5th Cir. 2001) (finding a regulation's definition "to be facially invalid" because it was inconsistent with the Endangered Species Act, observing that "[t]he legislative history of the ESA affirms the inconsistency of [the regulation] with the statute," and noting that in *INS v. Cardoza-Fonseca*, 489 U.S. 421, 449 (1987), the Supreme Court affirmed "that legislative history may be consulting in determining the Congressional intent under the first step of *Chevron* analysis").

Step Zero" inquiry.  *See Ali v. Barr*, 951 F.3d 275, 278-79 (5th Cir. 2020) ("*Chevron* Step Zero is

the initial inquiry whether the *Chevron* framework applies at all") (cleaned up, citing *United States*

*v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), other citation omitted).  As relevant here, *Mead*

imposes two requirements:  (1) Congress must have delegated authority to promulgate the Final

Rule, and (2) the Final Rule must have been "promulgated in the exercise of that authority."  *Mead*,

533 U.S. at 226-27; *see Pool Co. v. Cooper*, 274 F.3d 173, 177 n.3 (5th Cir. 2001) (noting that

*Mead* imposes both requirements).  The second requirement is applicable here, because it high-

lights that a regulation promulgated outside Congress's delegated authority is unlawful.  *E.g.*, *Ne-*

*vada v. United States*, 218 F. Supp. 3d at 530 ("With the Final Rule, the Department exceeds its

delegated authority and ignores Congress's intent … Consequently, the Final Rule … is unlaw-

ful").[16]

        As set forth above, the Final Rule contends that Congress, by leaving the terms "occupa-

tion" and "engaged in an occupation" undefined, "delegated the Department the authority to de-

termine what it means to be 'engaged in an occupation' that customarily and regularly receives

tips."  Final Rule, 86 Fed. Reg. at 60,114.  Plaintiffs do not concede this claimed delegation, but

need not debate it now, because the Final Rule does not in fact determine, or even purport to

determine, what it means to be "engaged in an occupation that customarily and regularly receives

tips."  Rather, and to the contrary, the Final Rule explains that it defines a completely different

term:

> The final rule amends § 531.56 to define when an employee is performing
> the work of a ***tipped occupation***, and is therefore ***engaged in a tipped oc-***
> ***cupation*** for purposes of section 3(t) of the FLSA.

---

[16]    The Court made this statement in the context of analyzing *Chevron* Step One, but the point applies equally
to the second *Mead* requirement where, as here, the agency promulgates a regulation entirely outside its delegated
authority.

Final Rule, 86 Fed. Reg. at 60,115 (emphasis added).  **But section 3(t) of the FLSA does not contain the terms "tipped occupation" or "engaged in a tipped occupation."**  The Final Rule is thus a *non sequitur*, because the end result (defining the term "tipped occupation") does not logically follow its premise (Congress delegated the Department authority to define "engaged in an occupation").  *A fortiori*, the Final Rule is unlawful because the Department acted outside of its claimed delegated authority in promulgating it.  *Mead*, 533 U.S. at 226-27; *Nevada v. United States*, 218 F. Supp. 3d at 530.

>        **C.      The Final Rule fails *Chevron* Step One.**

Even if the Department had authority to promulgate the Final Rule, it founders at Step One because (1) the ordinary meaning of the statutory definition speaks directly to the issue at hand, and (2) the non-statutory definition the Final Rule creates—a multi-layered regime under which application of the tip credit depends upon whether specific job duties directly and immediately produce tips—conflicts with the ordinary meaning of the statutory definition.

>                **1.      Congress directly spoke to the issue of tip credit application by defining "tipped employee" using the unambiguous term "engaged in an occupation."**

>                        **a.      Ordinary Meaning**

The ordinary meaning of the term "engaged in an occupation" is clear and unambiguous. The Supreme Court refers to dictionaries in use around the time Congress enacted the statute at issue to determine the ordinary meaning of undefined terms.  *Taniguchi*, 566 U.S. at 566-569 (engaging in a "survey of the relevant dictionaries" to determine "ordinary or common meaning" of an undefined statutory term).  Dictionaries contemporaneous with the tip credit's 1966 statutory enactment are consistent in defining "engaged" and "occupation":

- "Engaged" means "occupied; employed";[17] "busy or occupied; involved";[18] and "to employ or involve one's self."[19]

- "Occupation" means "the principal business of one's life: a craft, trade, profession, or other means of earning a living: employment; vocation <his occupation is farming> …";[20] "one's usual or principal work or business, esp. as a means of earning a living: *his occupation was dentistry*";[21] and "Vocation. That which principally takes up one's time, thought, and energies, especially, one's regular business or employment; also, whatever one follows as the means of making a livelihood."[22]

Occupied. Employed. Principal business. Principal work. Profession. Whatever one follows as the means of making a livelihood. All exemplified by: "Her occupation is [fill in the blank]—Waiter … Waitress … Server … Counterman … Busboy … Bartender …." The plain and ordinary meaning of "engaged in an occupation" focuses on the field of work and the job as a whole. Nothing about the plain and ordinary meaning of "engaged in an occupation" suggests or

---

[17]   2 WEBSTER'S THIRD NEW INT'L DICTIONARY 751 (1961 ed.) ("WEBSTER'S"). Copies of the cited WEBSTER'S definitions are contained in Pls.' App. at Ex. 7.

[18]   THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 473 (1967 ed.) ("RANDOM HOUSE"). Copies of the cited RANDOM HOUSE definitions are continued in Pls.' App. at Ex. 8.

[19]   BLACK'S LAW DICTIONARY 622 (4th ed. 1957) ("BLACK'S"). Copies of the cited BLACK'S definitions are contained in Pls.' App. at Ex.9.

[20]   WEBSTER'S at 1560; *accord* "Occupation," Oxford English Dictionary Online, Oxford University Press, December 2021, Web. ("A particular action or course of action in which a person is engaged, esp. habitually; a particular job or profession; a particular pursuit or activity").

[21]   RANDOM HOUSE at 996 (italics in original).

[22]   BLACK'S at 1230.

indicates a focus on the relative mix of specific tasks within a job, much less elimination of the tip credit based on side duties that by definition are not the principal duties of the job.[23]

### b.   The Statutory Definition's Structure and Overall Statutory Scheme

The Final Rule myopically—and, thus, improperly—focuses on "engaged in an occupation" without considering the whole of the statutory definition of "tipped employee":  "any employed in an occupation *in which he customarily and regularly receives more than $30 a month in tips*."  The Final Rule's erroneous focus on whether specific job duties directly and immediately produce tips or not effectively writes the rest of the text out of the statutory definition.  This is illustrated by applying the statutory definition to the question it is designed to answer—whether the tip credit applies to a particular employee:  Does Employee X engage in an occupation—*e.g.*, waiter or waitress or server or counterman or busboy or bartender—in which he or she customarily and regularly receives the requisite amount of tips per month?  The answer is binary: it's either "Yes" or "No."  The statute does not call for, permit, or in any way support the answer the Final Rule demands, which amounts to the following:

> Yes, but only if the employee's duties produce tips, and even then only if the employee does not perform duties more than 20% of the time that merely support the duties that directly produce tips, and not for any time over 30 minutes if the employee performs those supporting duties for 30 consecutive minutes at any time during the week, and absolutely not for any time spend on duties the Department has decreed are not worthy of the tip credit.

---

[23]   Putting an even finer point on the point, "principal" means "main, prominent" or "leading."  *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (quoting 12 Oxford English Dictionary 495 (2d ed. 1989)).  By choosing the word "occupation," Congress intended for the tip credit to apply when the employee's main, prominent, or leading work customarily and regularly resulted in the requisite amount of monthly tip income.  *See* S. Rep. No. 93-690 at 43 ("In establishments where the employee performs a variety of different jobs, the employee's status as one who 'customarily and regularly receives tips' will be determined on the basis of the employee's activities over the entire workweek").  The Final Rule turns Congressional intent on its head by *eliminating* the tip credit based on duties the Department characterizes as *not* directly and immediately producing tips—*i.e.*, *not* the employee's principal, main, prominent, or leading duties.

c.      **The FLSA's legislative history**

The legislative history supports the foregoing ordinary meaning analysis in multiple ways.

*First*, as the Department itself recognizes, the legislative history identifies occupations in which employees customarily and regularly receive the requisite amount of tips just like the dictionary definitions do: in their ordinary, colloquial sense.  *Compare* "his occupation is farming" (WEBSTER'S at 1560)," *with* "employees who customarily and regularly receive tips—*e.g*, waiters, bellhops, waitresses, countermen, busboys, service bartenders, etc."  S. Rep. No. 93-690 at 43 (quoted in Final Rule, 86 Fed. Reg. at 60,116).

*Second*, the legislative history explains that the tip credit provisions were intended to be "sufficiently flexible to **permit the continuance of existing practices** with respect to tips," and "provide enough flexibility to account for **a practice as inconsistent as tipping**."  S. Rep. No. 89-1487 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3002, 3014, 3015 (emphasis added).  This supports an understanding that the tip credit would apply to tipped employees based on their existing duties within their jobs, which has always included side work.  Nothing in any of the tip credit legislative history suggests a congressional intent to allow the tip credit for only certain duties, disallow the tip credit for certain side work duties if performed more than 20% of the workweek or for 30 continuous minutes, and disallow the tip credit for yet other side work duties.

*Third*, the legislative history specifically refers to the definition of "tipped employee," and analogizes it to the reporting requirements for tipped employees under the Social Security Act of 1965:

> A 'tipped' employee is defined in the bill as any employee engaged an occupation in which he customarily and regularly receives more than $20 a month in tips.  *This is analogous to the reporting requirements for a tipped employee under the provision of the Social Security Act of 1965.*

S. Rep. No. 89-1487 at 1966 U.S.C.C.A.N. 3014 (emphasis added).  Those Social Security Act reporting requirements require every employees who receive tips in a calendar month to report them:

> Reports by Employees.  Every employee who, in the course of his employment by an employer, receives in any calendar month tips which are wages (as defined in section 3121(a) or section 3401(a)) shall report all such tips in one or more written statements furnished to his employer on or before the 10th day following such month.  Such statements shall be furnished by the employee under such regulations, at such other times before such 10th day, in such form and manner, as may be prescribed by the Secretary or his delegate.

Pub. L. No. 89-97, 79 Stat. 384-85, codified at 26 U.S.C. § 6053(a).  Again, the inquiry is binary: the employee either received tips in a calendar month, and thus has to report them, or the employee did not.  The reporting requirements do not permit, much less require, consideration of how much time the employee spent on job duties that produced tips, or supported the production of tips, or did not produce tips.  By specifically analogizing the "tipped employee" definition to this reporting requirement, the legislative history demonstrates congressional intent for the "tipped employee" definition to be interpreted in the same way.

*Fourth*, as noted above, the legislative history cited in the Final Rule demonstrates, consistent with the meaning of "occupation," an intent for the tip credit analysis to focus in the principal duties performed "over the entire workweek." S. Rep. No. 93-690 at 43 ("In establishments where the employee performs a variety of different jobs, the employee's status as one who 'customarily and regularly receives tips' will be determined on the basis of the employee's activities over the entire workweek").  Thus, when someone employed in an occupation the Department acknowledges qualifies for the tip credit—waiter, counterman, service bartender—principally performs the duties of a waiter, counterman or service bartender over the entire workweek, that person is a "tipped employee" to which the tip credit applies.  The Final Rule creates a conflicting and

directly opposing analysis eliminating the tip credit based on side work duties that are by definition not the principal duties engaged in over the workweek.[24]

   2.   **The Final Rule impermissibly supplants the statutory definition of "tipped employee" with a different approach based solely on whether specific job duties directly and immediately produce tips.**

   For all the reasons explained above, the Final Rule's approach to the tip credit—limiting the tip credit based on whether duties directly and immediately produce tips—directly conflicts with the approach required by the ordinary meaning of the statutory definition of "tipped employee."  It should not be surprising that the Final Rule imposes a completely different and conflicting regulatory regime, given that the Final Rule is based its definitions of a term ("tipped occupation") that does not appear in the statute.  But conflict it plainly does, so the Final Rule fails *Chevron* Step One and is unlawful.  *E.g.*, *Sw. Elec. Power*, 920 F.3d at 1025-28 (regulation failed Step One because it "contravenes the plain text and structure of the [statute]"); *Chamber of Commerce v. United States*, 885 F.3d 360, 379 (5th Cir. 2018) (Department regulation failed Step One because it "conflicts with the plain text" and "is inconsistent with the entirety of ERISA's [statutory] definition"); *Nevada v. United States I*, 218 F. Supp. at 530-31 & n.5 (noting that the "Fifth Circuit and the Supreme Court routinely strike down agency interpretations that clearly exceed a permissible interpretation based on the plain language of the statute," and ruling that a Department FLSA regulation "does not meet *Chevron* Step One and is unlawful" because it was "[d]irectly in conflict with Congress's intent").

---

   [24]   The Final Rule expresses concern for alleged situations in which an employer nominally titles an employee a "server" but forces that employee to clean floors, windows, and bathrooms all day.  No one would dispute that an employee assigned to clean floors, windows and bathrooms all day is not tipped employee.  The 1967 dual jobs regulation is sufficient to address this situation, and litigation discovery would expose the server title as a pretext.  The Final Rule is not necessary to solve that alleged problem.

**D.      The Final Rule fails *Chevron* Step Two.**

"The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."  *Texas v. United States*, 497 F.3d at 506 (quoting *Chevron*, 467 U.S. at 843 n.9).  Regulations thus fail at Step Two if "it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned."  *Id*. at 506 (quoting *Chevron*, 467 U.S. at 845).  Even if "engaged in an occupation" could be found ambiguous, the Final Rule's approach to the tip credit is not a permissible interpretation of the FLSA because it is contrary to clear congressional intent.

**1.      Limiting the tip credit based on whether duties directly and immediately produce tips is not a permissible construction of the FLSA.**

*Nevada v. United States* is instructive.  The Department's Final Rule there raised the minimum salary threshold for FLSA's executive, administrative, and professional exemptions to such a degree that it effectively supplanted the duties test Congress provided in the statute.  *Nevada v. United States I*, 218 F. Supp. 3d at 531 ("this significant increase to the salary level creates essentially a de facto salary-only test").  But "Congress did not intend salary to categorically exclude an employee with EAP duties from the exemption."  *Id*.  Consequently, the Final Rule failed *Chevron* Step Two because it was "contrary to the statutory text and Congress's intent."  *Id*.

Just so here.  As explained above, the statutory term "'occupation' does not mean how often a person performs a task.'"  *Marsh*, 905 F.3d at 645 (Ikuta, J., dissenting) (quoting WEB-STER'S THIRD NEW INT'L DICTIONARY 1560 (3d ed. 2002)).  Accordingly, under the statutory definition of "tipped employee":

> [I]f the employer has hired a person for one job (such as a waitress or counterman), but that job includes a range of tasks not necessarily directed towards producing tips, the person is still considered a tipped employee engaged in a single job so long as the person 'customarily and regularly receives at least $30 a month in tips.

*Marsh*, 905 F.3d at 645 (same).  The Final Rule, in contrast, bases the tip credit analysis *entirely* on whether tasks and duties directly and immediately produce tips.  That is "a completely different approach to the tip credit."  *Id*. at 641 (same).  Agencies are not authorized to take completely different approaches than Congress—particularly where, as here, Congress specifically enacted its approach in a statutory definition.  *Castro-Gomez*, 365 F. Supp. 3d at 812 ("a regulatory definition does not displace a statutory definition when the statute is clear and ambiguous").  "[B]ecause it is contrary to the statutory text and Congress's intent," *Nevada v. United States I*, 218 F. Supp. 3d at 531, the Final Rule's tip credit approach is "not one that Congress would have sanctioned," and consequently fails *Chevron* Step Two.  *Texas v. United States*, 497 F.3d at 506 (quoting *Chevron*, 467 U.S. at 845).

### 2.    The Final Rule is arbitrary and capricious because it is cut from whole cloth.

As noted above in footnote 14, arbitrary and capricious agency action in violation of the APA necessary fails at *Chevron* Step Two.  Numerous different types of failings render agency action arbitrary and capricious:  "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Texas v. EPA*, 829 F.3d 405, 425 (5th Cir. 2016) (citations omitted).  The following factors render the Final Rule arbitrary and capricious under this standard.

### a.    The Department conducted no fact finding

*First*, the Department conducted no fact-finding whatsoever to either determine the scope of the supposed problem, or to determine the real-world duties of the occupations Congress and

the Department have historically recognized as qualifying for the tip credit.  The Final Rule demonstrates that the Department accepted at face value the stories told by employee and employee-side commenters, and discounted and/or ignored employer-side commenters, without any fact finding to determine how these occupations actually operate in the real world.  The Department therefore entirely failed to consider an important aspect of the problem, namely, (a) whether the supposed problem actually exists, and (b) the factual basis of and background for the supposed problem. Consequently, the Department's answer to the unknown purported problem is necessarily just baseless *ipse dixit*.

> **b.  The Department deliberately ignored "the nation's primary source of occupational information"—its own.**

The Department's failure to engage in any fact-finding is particularly inexcusable here, because the pertinent wheel has already been invented.  The Department itself sponsors and maintains "the nation's primary source of occupational information": its O*NET Program.[25]  The Department acknowledges, as it must, that the O*NET provides for each occupation a "fixed list of duties that tipped employees are required by their employers to perform as part of their work." Final Rule, 86 Fed. Reg. at 60,127.  There is no dispute that the list of duties for Waiter and Waitress and Bartender contain numerous side work duties that do not directly and immediately produce tips.  *See* Pls.' App. Exs. 2 &3; *see also* ECF. No. 1, ¶¶ 41-57.  Consequently, there is no dispute that these side work duties are part and parcel of those occupations.  The Department just doesn't like the fact that employees qualifying for the tip credit under the statutory definition of "tipped employee" engage in side work.  The Department thus candidly acknowledges that the

---

[25]    *See* https://www.onetcenter.org/overview.html (emphasis added, last visited Dec. 16, 2021), and *see generally* ECF No. 1, ¶¶ 41-57 and Pls.' App. Exs. 2 &3.

Final Rule's "tipped occupation" definition and its tip-producing-or-not test is specifically designed to carve side work out of the tip credit. *See* Final Rule, 86 Fed. Reg. at 60,127 ("Rather, the final rule creates a functional test to measure whether a tipped employee is engaged in their tipped occupation …"). But as explained above, carving side work out of application of the tip credit is contrary to the statutory definition of "tipped employee" and Congressional intent.

Further, and tellingly, the Department acknowledges that it developed its new "tipped occupation" definition tip-producing-or-not test and guidelines to specifically assign FLSA liability based on an employee's specific job duties throughout a day. Final Rule, 86 Fed. Reg. at 60,127 (observing that "O*NET was not created to identify an employer's legal obligations under the FLSA"—the natural corollary of which is that the Final Rule *is* created to do so). "Congress, however, did not delegate authority to the [Department] to develop new guidelines or to assign liability in a manner inconsistent with the statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 562 (2002). The Department's deliberate decisions to ignore its own real-world data showing that "tipped employees" as the FLSA defines them engage in side work, and to carve those side work duties out in order to impose FLSA liability, render the Final Rule arbitrary and capricious.[26]

---

[26]   The Final Rule refers to criticism of the O*NET data based on the potential for manipulation. Specifically, the Department appears to accept as plausible speculating that reliance on O*NET data might result in employers coordinating among themselves to assign tipped employees duties like washing windows to such an extent that nationwide O*NET data would one day reflect that the principal duty of a server is washing windows. This is absurd. *First*, there is no suggestion by anyone that employers have successfully manipulated the O*NET data to this point, so there is no reason to believe the O*NET data the Department refused to consider is anything but the "valid data" the Department represents it to be. *See* https://www.onetcenter.org/overview.html (emphasis added, last visited Dec. 16, 2021). *Second*, the suggestion that employers across industries could somehow act in concert to the degree that would be required to artificially manipulate the O*NET data for specific individual occupations is, in the absence of any factual evidence suggesting that were possible, a paradigm example of something "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Texas*, 829 F.3d at 425.

c.   **The Department relied on labor market and employee economic circumstances data it acknowledged was outdated.**

The Final Rule acknowledges that the Department is required to evaluate the costs of the Final Rule on those affected, by analyzing the relevant labor market and economic situation for tipped employees.  And the Department did analyze the Final Rule's potential effects with regard to the relevant labor market and economic situation for tipped employees.  But the Final Rule relied on pre-COVID-19 pandemic data from 2018 and 2019.  Final Rule, 86 Fed. Reg. at 60,150 ("The Department notes that this [cost] analysis relies on data from 2018 and 2019, which is prior to the COVID-19 pandemic").  And the Department further acknowledged the patently obvious: the COVID-19 pandemic dramatically changed the labor market and economic situation for tipped employees.  *Id.  A fortiori*, the Department's reliance on out-of-date data for its cost estimates represents reliance "on factors which Congress has not intended it to consider." *Texas v. EPA*, 829 F.3d at 425.

A separate federal agency, the SBA Office of Advocacy, emphasized the impact of the Department's failing in this regard.  *See* Pls.' App. Ex. 4 at 1 (SBA's comment to the proposed Final Rule, expressing the "concern[] that the DOL's certification that the rule will not have a significant economic impact on a substantial number of small entities **lacks an adequate factual basis**." (emphasis added).)  The SBA Office of Advocacy observed that, "DOL improperly certified this proposed rule because it **omitted some and underestimated other compliance costs of this rule** for small employers." *Id.* at 1-2 (emphasis added).  Specifically, the SBA Office of Advocacy detailed its concerns, focusing on several areas, including assessing changes to wage costs, the costs of regulatory familiarization, adjustment costs, and management costs. *Id.* at 4-9. The SBA Office of Advocacy therefore "believes that DOL's certification is flawed because it **fails to estimate small business compliance for increased wages under this regulation**." *Id.* at

5 (emphasis added).  And the SBA Office of Advocacy comments also relay the comments of small businesses with regard to the financial impact the Final Rule would have on small businesses with tipped employees from nail salons to hotels and, of course, restaurants, particularly given the continuation of the COVID-19 pandemic:

> Small businesses have commented that these new restrictions for the use of the tip credit are complex and unworkable for small operations, who are already facing staff shortages and are just recovering from pandemic losses.

> ***

> Small businesses also commented that this was a difficult time to add these additional costs and burdens, as their operations were just surviving from pandemic financial losses.

*Id*. at 2, 8.  The Final Rule ignored these concerns, apparently in favor of the outdated pre-pandemic data Congress would never have intended for the Department to consider.  *Texas*, 829 F.3d at 425.

### d.    The Final Rule is internally inconsistent.

Given that the Final Rule ignores real-world realities and costs, it should not be surprising that it is so internally inconsistent as to render its artificial distinctions so unworkable as to be implausible.  Two examples illustrate the point.

*First*, the Department recognizes that "busboy," also referred to as busser, and "service bartender," are occupations that "have long been considered to be occupations that customarily and regularly receive tips" and therefore have long fallen under the statutory definition of "tipped employee" and qualified for the tip credit.  *See* Final Rule, 86 Fed. Reg. at 60,129 n. 30.  Bussers and service bartenders, however, do not engage in any of the direct customer servicing work the Final Rule's test would consider to directly and immediately produce tips.  After all, bussers and service bartenders generally do not interact with customers at all.  *See* Final Rule, 86 Fed. Reg. at

60,128.  This puts the Department in a quandary:  how to fit occupations which "have long been considered" as qualifying for the tip credit within the Final Rule's new liability test that now categorically excludes them?  The Department's only solution is to fall back on the *ipse dixit* favored by parents of small children:  "Because I said so":

> To the extent that this is true under the revised test, this categorization of tasks merely reflects the unique nature of some tipped employees' tip-producing work, such as bussers and service bartenders, who receive tips from other tipped employees such as servers because they are supporting their customer, service, tip producing work.

Final Rule, 86 Fed. Reg. at 60,128 n.28.  In other words, the Department is going to allow bussers and service bartenders to remain tipped employees, even though their duties fail the Final Rule's "tipped occupation" definition, because they have always been considered "tipped employees" under the statutory definition.  A regulation that creates a test and then applies that test differently to those affected is the very definition of arbitrary and capricious.

*Second*, under the Final Rule's test the very same duties might automatically qualify for the tip credit, or might not, depending on context.  The Final Rule explains that a bartender who retrieves "a particular beer from the storeroom at the request of a customer sitting at the bar, is performing tip-producing work," but a "bartender who retrieves a case of beer" from the same storeroom is only performing "directly supporting work," the minutes of which must be tracked to comply with the 20% limitation for such work.  *See* Final Rule, 86 Fed. Reg. at 60,128.  But the bartender in both examples is indisputably performing the duties of the bartender occupation.  The Final Rule also suggests that a server wiping down a table to clean a customer's spill would be "tip-producing work," but wiping down that same table in between customers would not.  *Id.* Again, the same duty, and again, that duty is indisputably the duty of a server.  Further, in an apparent attempt to remain consistent with the 1967 dual jobs regulation example, the Final Rule

categorizes "toasting bread" as ***not*** "food preparation" for purposes of the Final Rule. *See* Final Rule, 86 Fed. Reg. at 60,131. This is just more semantic gymnastics so the Department can arbitrarily categorize certain duties as "tip-producing," rather than "directly supporting" based on nothing more than the Department's whim.

In sum, the Final Rule is not the product of reasoned decision-making. The Final Rule is the product of agency legislating, which is in conflict with the plain language of the statute and Congressional intent to boot. The Final Rule fails *Chevron* Step Two because it is not a permissible interpretation of the statutory definition of "tipped employee."

## III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION.

"[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Aleguire*, 647 F.3d 585, 600 (5th Cir. 2011). An injunction is appropriate if the anticipated injury is imminent and not speculative. *Winter v. Natural Resources Defense Council, Inc.,* 129 U.S. 365, 365-67 (2008). Plaintiffs have met this standard.

Absent an injunction, Plaintiffs' impacted members face the untenable position of having to choose between (1) abandoning the tip credit all together, which will increase labor costs and wipe out profit margins; or (2) risk continuing to utilize the tip credit under the Final Rule and expend monies (on regulatory familiarization costs, preparation costs, increased wage costs, adjustment costs, staffing costs, management costs, and recordkeeping costs) to comply with the Final Rule that will financially devastate their business. *See* Amador Decl. ¶¶ 19-22; Knight Decl. ¶¶ 10-12, 16; Vaught Decl. ¶¶ 5-9. Both outcomes would constitute irreparable harm. *See Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring) ("Complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."); *BST Holdings,*

36

*L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (compliance and monitoring costs, diversion of resources, and business and financial effects of a lost employee necessitated by an executive mandate constituted irreparable harm); *Nevada*, 218 F.Supp.3d at 532 (the significant costs plaintiffs needed to expend to comply with the Department's impending final rule was an irreparable harm.).

In addition, the Department admittedly fails to account for the current, financially devastated state of restaurants and ignores the Final Rule's crippling impact on restaurants ability to compete in their industry.  For example, to prepare for the new costs necessitated by the Final Rule, some impacted restaurant owners will need to increase menu prices, which strips away their competitive advantage and destroys their ability to compete with the food prices of their competitors.  *See* Vaught Decl. ¶¶ 8, 10; *see also Intel Corporation v. Rais*, 2019 WL 164958, at *5 (W.D.Tex. 2019) ("A party is at risk of irreparable harm where, for example, they might 'lose a competitive advantage in the industry.'" (citation omitted)).  Furthermore, due to the current financially fragile state of RLC and TRA small restaurant owner members, these members will need to terminate employees or close the restaurant altogether to comply with the Final Rule.  *See* Amador Decl. ¶¶ 19, 21; Knight Decl. ¶¶ 10, 12; Vaught Decl. ¶¶ 5, 8-10.  As a result, these impacted small restaurant owners have relatively few options to comply with the Final Rule, which all have a detrimental effect on restaurants' abilities to employ (and feed) the public.  *See* Amador Decl. ¶ 21; Knight Decl. ¶ 12; Vaught Decl. ¶¶ 5, 8-10.  Should Plaintiffs ultimately prevail on the merits of this suit, this type of injury cannot be redressed through a judicial remedy after a hearing on the merits.  *See e.g. Nevada*, 218 F. Supp. 3d at 532.  Thus, Plaintiffs have shown that they, and their impacted members, will suffer irreparable harm if the preliminary injunction is not granted.

## IV.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN IN-JUNCTION.

When deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 129 U.S.. at 367 (citation omitted).  The balance of hardship and public interest factors substantially overlap.  *See Nevada*, 218 F. Supp. 3d at 533.

On one side of the equation is the certainty that Plaintiffs' affected members will be required to spend substantial sums of unrecoverable funds if the Final Rule goes into effect, together with interference with the financial viability of many of Plaintiffs' members causing employee terminations and disrupting their ability to keep their doors open to the public.  On the other side, the Department cannot point to any injury remotely approaching the enormous harm to Plaintiffs' impacted members and the public.  The Department will simply need to wait a little before its novel rule goes into effect.  The current tip credit provisions have been in place for more than a decade; and, with or without the Final Rule, tipped employees *already* receive the full protection of the federal minimum wage.  If the employee's tips are insufficient, when added to the required cash wage, to satisfy the minimum wage, then the FLSA already requires employers to pay additional wages to make up the difference.  *See* 29 U.S.C. § 203(m)(2); 29 CFR § 531.59.  In addition, the Department itself delayed the prior administration's proposed changes to the dual jobs regulations—for an entire year, "to provide the Department additional opportunity review and consider the questions of law, policy, and fact raised by the [2020 Tip final] rule."  *See* Final Rule, 86 Fed. Reg. at 60, 119.

Thus, the Department and the public will not suffer any harm from maintaining its status quo level while the serious legal issues raised in this litigation are addressed.  *See Texas v. U.S.*, 809 F.3d 134, 186 (5th Cir. 2015).  ("The [plaintiff] states have shown 'that the threatened injury

if the injunction is denied outweighs any harm that will result if the injunction is granted.' … The harms the United States has identified are less substantial[,] … vague, and the principles the government cites are more likely to be affected by the resolution of the case on the merits than by the injunction."); *see also Nevada*, 218 F. Supp. 3d 533 (enjoining the Department from applying a new rule pending a full determination of the matter on the merits).

## V.   THE COURT SHOULD ISSUE A NATIONWIDE INJUNCTION.

The Court's injunction should not be limited to this jurisdiction.  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographic extent of the plaintiff class."  *Califano v. Yamaski*, 442 U.S. 682, 702 (1979).  "[T]he Constitution vests the District Court with the 'judicial Power of the United States.' That power is not limited to the district wherein the court sits but extends across the country.  It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction."  *Texas*, 809 F.3d at 188.  Given the breadth of RLC's membership and the fact that the Final Rule applies to impacted members located all over the country, limiting the relief to only those before the Court would prove unwieldly and would only cause more confusion.  *See* Amador Decl. ¶¶ 3, 17.  The Fifth Circuit has affirmed nationwide injunctions against the Federal Government in similar proceedings.  *See, e.g., id.; Nevada*, 218 F. Supp. 3d at 533 (issuing a nationwide injunction to bar implementation of the Department's new overtime salary threshold final rule).  Thus, in order to truly afford injunctive relief to Plaintiffs, the Court should issue an injunction with nationwide applicability.

## CONCLUSION

For these reasons, the Plaintiffs respectfully request that the Court enjoin the Final Rule from becoming effective pending a full hearing on the merits and any review by higher courts.

Respectfully submitted,

By: /s/ Greta Ravitsky

ANGELO I. AMADOR (motion for admission
  *pro hac vice* pending)
RESTAURANT LAW CENTER
2100 L Street, N.W., Suite 700
Washington, D.C.  20036
Tel:  202.331.5913
Fax: 202.973.3952
AAmador@restaurant.org


GRETA RAVITSKY
EPSTEIN, BECKER & GREEN, P.C.
Two Houston Center
909 Fannin, Suite 3838
Houston, Texas  77010
Tel:  713.300.3215
Fax: 713.300.3235
GRavitsky@ebglaw.com

PAUL DECAMP (motion for admission
  *pro hac vice* pending)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com


BRIAN SPANG (motion for admission
  *pro hac vice* pending)
KATHLEEN BARRETT (motion for admission
  *pro hac vice* pending)
EPSTEIN, BECKER & GREEN, P.C.
227 West Monroe, Suite 3250
Chicago, Illinois 60606
Tel:  312.499.1400
Fax: 312.827.9562
BSpang@ebglaw.com
KBarrett@ebglaw.com

*Counsel for Plaintiffs*

December 17, 2021