UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

RESTAURANT LAW CENTER, *et al.*,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF LABOR, *et al.*,

*Defendants.*

Civil Action No. 21-1106 (RP)

# DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**CONTENTS**

*Page*

*Table of Authorities* ..................................................................................................... ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 3

    A.    Statutory Background ........................................................................ 3

    B.    Regulatory Background ...................................................................... 5

STANDARDS ............................................................................................................. 12

    A.    Preliminary Injunction ...................................................................... 12

    B.    The Administrative Procedure Act ................................................... 13

ARGUMENT .............................................................................................................. 15

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ........................... 15

    A.    The rule is not contrary to law. ....................................................... 15

    B.    The rule is not arbitrary and capricious. .......................................... 29

II.    PLAINTIFFS HAVE NOT PROVEN IRREPARABLE HARM ...................................... 36

III.   THE BALANCE OF HARMS DISFAVORS AN INJUNCTION ................................. 40

IV.   THERE IS NO BASIS FOR A NATIONWIDE INJUNCTION ..................................... 42

CONCLUSION ........................................................................................................... 44

# AUTHORITIES

*Page(s)*

## Cases

*Am. Petroleum Inst. v. EPA*,
  661 F.2d 340 (5th Cir. 1981) ................................................................ 36

*Anderson v. Jackson*,
  556 F.3d 351 (5th Cir. 2009) ................................................................ 13

*Bellum v. PCE Constructors, Inc.*,
  407 F.3d 734 (5th Cir. 2005) ................................................................ 18

*Belt v. P.F. Chang's China Bistro, Inc.*,
  401 F. Supp. 3d 512 (E.D. Pa. 2019) ................................................ 19, 20

*BNSF Ry. Co. v. United States*,
  775 F.3d 743 (5th Cir. 2015) ............................................................ 14, 19

*Camp v. Pitts*,
  411 U.S. 138 (1973) ............................................................................. 14

*Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................... 13, 14, 17, 18, 25

*Citizens Coal Council v. Norton*,
  330 F.3d 478 (D.C. Cir. 2003) .............................................................. 14

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ......................................................................... 14, 25

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ............................................................................. 36

*Exelon Wind 1, LLC v. Nelson*,
  766 F.3d 380 (5th Cir. 2014) ................................................................ 13

*Fast v. Applebee's Int'l, Inc.*,
  638 F.3d 872 (8th Cir. 2011) ........................................ 7, 19, 26, 28, 43

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ....................................................................... 34, 35

*Gonannies, Inc. v. Goupair.Com, Inc.*,
  464 F. Supp. 2d 603 (N.D. Tex. 2006) ................................................... 37

*House the Homeless, Inc. v. Widnall*,
  94 F.3d 176 (5th Cir. 1996) ................................................................. 13

*Janvey v. Alguire,*
  647 F.3d 585 (5th Cir. 2011) ................................................................ 13, 36, 41

*Jones v. Cain,*
  600 F.3d 527 (5th Cir. 2010) ................................................................ 34

*Lakedreams v. Taylor,*
  932 F.2d 1103 (5th Cir. 1991) .............................................................. 40

*Lewis v. Casey,*
  518 U.S. 343 (1996) .............................................................................. 42

*Long Island Care at Home, Ltd. v. Coke,*
  551 U.S. 158 (2007) ............................................................................. 18, 21

*Madsen v. Women's Health Ctr.,*
  512 U.S. 753 (1994) ............................................................................. 42

*Marsh v. J. Alexander's LLC,*
  905 F.3d 610 (9th Cir. 2018) .................................. 7, 17, 18, 19, 20, 24, 25, 27, 28, 29, 43

*Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.,*
  602 F.3d 687 (5th Cir. 2010) ................................................................ 34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................... 14, 20, 28, 29, 33

*Mylan Pharm., Inc. v. Shalala,*
  81 F. Supp. 2d 30 (D.D.C. 2000) ......................................................... 37, 38

*Nat'l Ass'n of Home Builders v. EPA,*
  682 F.3d 1032 (D.C. Cir. 2012) ........................................................... 32, 33

*Nat'l Propane Gas Ass'n v. Dep't of Homeland Sec.,*
  534 F. Supp. 2d 16 (D.D.C. 2008) ....................................................... 41

*Nevada v. Dep't of Labor,*
  218 F. Supp. 3d 520 (E.D. Tex. 2016) ................................................. 28

*Off. of Commc'n of United Church of Christ v. FCC,*
  707 F.2d 1413 (D.C. Cir. 1983) ........................................................... 29

*O'Neal v. Denn-Ohio, LLC,*
  Civ. A. No. 19-0280, 2020 WL 210801 (N.D. Ohio Jan. 14, 2020) ......................... 31

*Roberson v. Texas Roadhouse Mgmt. Corp.,*
  Civ. A. No. 19-0628, 2020 WL 7265860 (W.D. Ky. Dec. 10, 2020) ...................... 8, 19

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ........................................................................................ 18

*Rorie v. WSP2, LLC,*
   485 F. Supp. 3d 1037 (W.D. Ark. 2020)........................................................ 39

*Scott v. City of Austin*,
   Civ. A. No. 16-1287, 2019 WL 122055 (W.D. Tex. Jan. 7, 2019) ........... 34

*Superior Oil Co. v. FERC*,
   563 F.2d 191 (5th Cir. 1977) ......................................................................... 29

*Tex. Oil & Gas Ass'n v. EPA*,
   161 F.3d 923 (5th Cir. 1998) ......................................................... 14, 29, 30, 31

*United Servs. Auto Ass'n v. Perry*,
   102 F.3d 144 (5th Cir. 1996) ......................................................................... 18

*United States v. AMC Ent., Inc.*,
   549 F.3d 760 (9th Cir. 2008) ......................................................................... 43

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................................................. 13, 17

*Urban Areas v. Fed. Highway Admin.*,
   779 F. Supp. 2d 542 (W.D. Tex. 2011).......................................................... 40

*W. Tex. LTC Partners, Inc. v. Dep't of Health & Human Servs.,*
   843 F.3d 1043 (5th Cir. 2016) ......................................................... 13, 27, 28

*Winter v. NRDC*,
   555 U.S. 7 (2008).............................................................................. 12, 17, 37

## Statutes

5 U.S.C. § 706(2)(A)...................................................................................... 13

29 U.S.C. § 203(m) ........................................................... 4, 5, 15, 22, 24, 26

29 U.S.C. § 203(t)..................................... 1, 2, 7, 15, 18, 19, 20, 21, 23, 25, 26, 28

29 U.S.C. § 206(a) ........................................................................................... 3

29 U.S.C. § 213(a)(1)..................................................................................... 28

42 U.S.C. § 409(a)(10)(B) ............................................................................. 25

Pub. L. No. 75-718, 52 Stat. 1060 (1938)................................................... 3, 4

Pub. L. No. 89-97, 79 Stat. 286 (1965) .................................................................. 25

Pub L. No. 89-601, 80 Stat. 830 (1966) ................................................. 4, 16, 18, 25

Pub. L. No. 93-259, 88 Stat. 55 (1974) .................................................................. 24

Pub. L. No. 115-141, 132 Stat. 348 (2018) ....................................................... 22, 24

**Regulations**

29 C.F.R. § 531.56 ................................................. 5, 9, 10, 11, 12, 17, 19

32 Fed. Reg. 13575 (Sept. 28, 1967) ....................................................................... 5

85 Fed. Reg. 86756 (Dec. 30, 2020) ....................................................................... 9

86 Fed. Reg. 11632 (Feb. 26, 2021) ....................................................................... 9

86 Fed. Reg. 22597 (Apr. 29, 2021) ....................................................................... 9

86 Fed. Reg. 32818 (June 23, 2021) ....................................................................... 9

86 Fed. Reg. 60114 (Oct. 29, 2021) ........................................................ 8, 9, 12, 30, 37

**Other Authorities**

Exec. Order No. 12866, 58 Fed Reg. 51735 (Oct. 4, 1993) ....................................... 32

Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) ...................................... 32

**INTRODUCTION**

The Fair Labor Standards Act ("FLSA") charges the Department of Labor with ensuring that America's workers receive the wages to which they are lawfully entitled. Tipped workers, such as restaurant servers and bartenders, are among the most vulnerable workers that the Department protects, in large part because of the manner in which they may be paid. Employers may pay tipped workers a reduced direct wage of as little as $2.13 per hour and use a portion of the workers' tips as a credit towards the minimum wage. This common practice is referred to as an employer taking a "tip credit." This credit is available to employers only when certain requirements are met, including that the employee for whom the credit must be "engaged in an occupation" in which the employee customarily and regularly earns a significant amount of tips. 29 U.S.C. § 203(t).

When employers assign tipped employees non-tipped work that is not part of their tipped occupation—such as having a server prepare food or clean bathrooms—those employees do not have the opportunity to earn tips during that time. Permitting a tip credit for the time tipped employees engage in such non-tipped work would effectively allow employers to appropriate the tips that those workers earn to subsidize other activities. Rather than paying the full minimum wage to a janitor, an employer could instead pay a server $2.13 per hour to clean bathrooms by relying on the tips that the server earns when they are waiting tables.

In response to this potential abuse, the Department of Labor issued guidance three decades ago explaining that employers could take a tip credit only when tipped employees perform duties that are part of their tipped occupation. That guidance created a tolerance—limited to twenty percent of the workweek—for the amount of non-tipped duties related to their occupation that tipped employees could perform before the employer would lose the ability to take a tip credit. The guidance, which became known as the 80/20 Rule (even though it was not actually

promulgated as a regulation), was overwhelmingly upheld by courts as an appropriate implementation of the FLSA. Then, in 2018, the Department of Labor issued updated guidance rescinding the 80/20 guidance, which met with near-universal rejection by federal courts. In 2020, the Department finalized a rule codifying its rescission of the 80/20 guidance. In 2021, however, the Department delayed the effectiveness of that rule and ultimately withdrew it. In its place, the Department finalized a new rule that essentially reestablishes by regulation the 80/20 guidance, but clarifies the prior guidance and adds additional protections. This rule went into effect on December 28, 2021. Plaintiffs now seek to preliminarily enjoin it.

Plaintiffs do not meet their burden to obtain the extraordinary remedy they seek. For one thing, they cannot show that they are likely to succeed on their claims that the new rule is contrary to law or arbitrary and capricious. Like the 80/20 guidance, the current rule—this time promulgated after notice and the consideration of extensive comments—is a sound exercise of the Department of Labor's authority and discretion to establish when an employee is "engaged in an occupation" in which one receives significant tips, which is the only time an employer may take a tip credit. 29 U.S.C. § 203(t). The rule also comports with the overall purpose of the FLSA, particularly its more recent protections ensuring that employers do not appropriate their employees' tips. *Id.* § 203(m). The Department provided rational reasons for the rule. Plaintiffs' argument that the rule is arbitrary ignores rather than confronts those reasons and fails as a result.

Plaintiffs also fail to show the irreparable harm necessary for injunctive relief. They claim that some (largely unidentified) restaurants will incur costs to prepare for the rule. Plaintiffs are too late. The rule has already gone into effect, costs to prepare for it have already been incurred, and enjoining it now would only serve to sow confusion. Plaintiffs also overstate the ongoing monitoring and compliance costs associated with the rule and fail to acknowledge that, even before

2

this rule went into effect, significantly similar monitoring and compliance costs were already necessary to comply with the longstanding 80/20 guidance, as previously enforced by the Department and later applied by the courts. The declarations are also not sufficiently detailed or specific to warrant the dramatic remedy of a preliminary injunction.

Even if Plaintiffs could show likely success and irreparable harm, the Court should still decline to issue an injunction because of the outsized harm that an injunction would inflict upon restaurant workers, who would lose a significant amount of earnings and who are already being asked to perform increased amounts of non-tipped work at reduced direct wages as a result of the ongoing pandemic.

Finally, even were an injunction appropriate, the "nationwide" injunction that Plaintiffs seek clearly is not. Injunctive relief should be tailored to the parties and harm demonstrated in support thereof, and Plaintiffs' cited harm does not come close to justifying such an expansive measure. Indeed, a nationwide injunction of the rule would be particularly inappropriate here because it would conflict with precedents in three other circuit courts of appeals that have endorsed the highly similar approach to implementation of the FLSA that the Department of Labor adopted in the 80/20 guidance.

For these reasons, the motion for a preliminary injunction should be denied.

## BACKGROUND

### A.    Statutory Background

Congress passed the FLSA in 1938 to correct and eliminate what it found to be "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general wellbeing of workers." Pub. L. No. 75-718, § 2, 52 Stat. 1060, 1060 (1938). A key provision of the FLSA requires employers to pay their employees a minimum wage. *Id.* § 6(a), 52 Stat. at 1062 (codified as amended at 29 U.S.C. § 206(a)).

The original version of the FLSA exempted several industries from its minimum-wage requirements. Pub. L. No. 75-718, § 13, 52 Stat. at 1067. In 1966, however, Congress amended the FLSA to substantially extend its protections to additional employees, including many in the restaurant industry. Pub L. No. 89-601, § 201, 80 Stat. 830, 833 (1966). In doing so, Congress confronted the question of whether tips received by certain restaurant workers from a source other than their employers (i.e., from customers) should be counted as wages and credited toward the employers' minimum-wage obligation. *See* S. Rep. No. 89-1487, at 12–13 (1966); H.R. Rep. No. 89-1366, at 19–20 (1966).

Congress's answer to this question was to permit employers to take only a partial credit toward the minimum-wage requirement based on the amount of tips received by tipped employees. Thus, the amended version of the FLSA allows an employer to pay a "tipped employee" a direct wage of only $2.13 per hour and take a credit of up to $5.12 per hour if the employee's tips are sufficient to fulfill the remainder of the current $7.25 minimum wage. *See* 29 U.S.C. § 203(m)(2)(A). The statute defines a "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." *Id.* § 203(t). The statute does not define the term "occupation," nor does it specify what it means to be "engaged" in an occupation. Congress authorized the Department of Labor to implement these amendments through regulations. Pub L. No. 89-601, § 602, 80 Stat. at 844.

Since 1966, the FLSA has been further amended with protections to ensure that tipped employees receive the value of the tips they earn. In order to take the tip credit, an employer must inform its tipped employees of the FLSA's applicable wage provisions and ensure that "all tips received by such employee have been retained by the employee" (except where there is a permissible pooling arrangement among tipped employees). 29 U.S.C. § 203(m)(2)(A)(ii). Further,

since 2018, whether taking a tip credit or not, an employer of tipped employees "may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips." *Id.* § 203(m)(2)(B).

### B.     Regulatory Background

#### 1.     *The 1967 Rule*

The Department of Labor's Wage and Hour Division first promulgated regulations implementing the FLSA's tip provisions the year after they were enacted. 32 Fed. Reg. 13575 (Sept. 28, 1967). As early as that first rulemaking, the Department sought to address the problem of an employee who is "employed in a dual job"—in other words, the employee does work for which they do not receive tips (such as maintenance) and work for which they do receive tips (such as waiting tables). *Id.* at 13580. The Department's initial regulation stated that such an employee "is a tipped employee only with respect to his employment as a waiter" and that "no tip credit may be taken for his hours of employment in his occupation as a maintenance man." *Id.* at 13580–81. The Department distinguished this situation from that where a server "spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes and glasses," concluding that such "related duties" a tipped occupation need not themselves be "directed toward producing tips." *Id.* at 13581 (codified at 29 C.F.R. § 531.56(e) (2020)).

Between 1979 and 1985, the Department of Labor issued three opinion letters interpreting and applying the 1967 dual jobs regulation. First, in 1979, it considered whether a restaurant employer could take a tip credit for time that a server spent preparing vegetables for a salad bar. Ex. 1, WHD Opinion Letter FLSA-895 (Aug. 8, 1979). The Department opined that, although servers are generally employees who customarily and regularly receive tips, the employer could

not take a tip credit for the specific hours when the server performed "salad preparation activities" because those activities "are essentially the activities performed by chefs." *Id.*

Second, in 1980, the Department of Labor addressed a situation in which servers performed non-tipped duties such as storing condiments in a cooler, cleaning and resetting tables (including filling salt and pepper shakers), cleaning and stocking a server station, and vacuuming the carpet after the restaurant closed. Ex. 2, WHD Opinion Letter WH-502 (Mar. 28, 1980). The Department concluded that, "[i]nsofar as the after-hours cleanup [described] are assigned generally to the waitress/waiter staff, we believe that such duties constitute tipped employment within the meaning of the regulation." *Id.* The Department noted, however, that it "might have a different opinion if the facts indicated that specific employees were routinely assigned, for example, maintenance-type work such as floor vacuuming." *Id.*

Finally, in 1985, the Department of Labor issued an opinion letter addressing whether an employer could take a tip credit for various "salad bar and dining room set-up duties" assigned to one of two to four servers on a daily shift. Ex. 3, WHD Opinion Letter FLSA-854 (Dec. 20, 1985). Citing its 1979 letter, the Department reiterated that "salad preparation activities are essentially the activities performed by chefs and no tip credit may be taken for the time spent in preparing vegetables for the salad bar." *Id.* It also reiterated, as indicated by the 1980 letter, that the "tip credit could be taken for non-salad bar preparatory work or after-hours clean-up if such duties are incidental to the waiter or waitress regular duties and are assigned generally to the waiter/waitress staff." *Id.* Under the facts presented, however, the Department determined that the employer could not take a tip credit for the time spent setting up the dining room because (1) "only one waiter or waitress is assigned to perform all preparatory activities," (2) the "opening waiter or waitress' responsibilities extend to the entire restaurant rather than to the specific area or customers which

they serve," and (3) "the activities performed prior to the opening of the restaurant consume a substantial portion of the waiter or waitress' workday." *Id.*

In 1988, the Department of Labor's Wage and Hour Division updated its Field Operations Handbook to incorporate and refine the policy established by these three opinion letters. As revised, the Handbook permitted a tip credit "for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips," so long as those duties are "incidental" and "generally assigned." Ex. 4, WHD Field Operations Handbook ("FOH") Rev. 563 § 30d00(e). Critically, however, the Handbook stated that where "tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties." *Id.* This policy, though not a regulation, became known as the "80/20 Rule" and established a substantial but limited tolerance for related, non-tipped work, recognizing that if a tipped employee performs too much of this work, the employee is no longer engaged in a tipped occupation.

Courts of appeals in both the Eighth and the Ninth Circuits have deferred to the Department of Labor's 80/20 guidance, rejecting arguments that the twenty percent tolerance was contrary to the dual jobs regulation and the underlying statute. *See Marsh v. J. Alexander's LLC*, 905 F.3d 610, 625 (9th Cir. 2018) (en banc) ("The [Department of Labor's] interpretation is consistent with nearly four decades of interpretive guidance and with the statute and the regulation itself."); *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 879–81 (8th Cir. 2011) (concluding that Congress had granted the Department of Labor discretion to implement 29 U.S.C. § 203(t) by regulation and that "the 20 percent threshold used by the [Department of Labor] in its Handbook is not inconsistent with § 531.56(e) and is a reasonable interpretation of the terms 'part of [the] time' and 'occasionally' used in that regulation.").

Then, in 2018 and 2019, the Department of Labor (under the prior administration) issued an opinion letter and updated handbook rescinding its longstanding 80/20 guidance. Ex. 5, WHD Opinion Letter FLSA2018-27 (Nov. 8, 2018); Ex. 6, WHD FOH Rev. 767 (Feb. 15, 2019). Under this guidance, any duties listed in the Occupational Information Network ("O*NET")—a database of descriptive occupational information published by the Department of Labor's Employment and Training Administration—would be considered "directly related to the tip-producing duties" of an occupation, and no limitation would be placed on the amount of time employees spent performing those potentially non-tipped duties, so long as they were performed "contemporaneously with" or "for a reasonable time immediately before or after" the employee's duties involving direct service to customers. Ex. 5, WHD Opinion Letter FLSA2018-27 at 4.[1] The opinion letter did not specify what would constitute a "reasonable time."

In private litigation by employees, courts largely refused to defer to the 2018 and 2019 guidance. Instead, they continued to apply a twenty-percent tolerance to related duties, as set forth in the 80/20 guidance. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (concluding that the 2018 opinion letter is not a reasonable interpretation of the 1967 regulation, declining to defer to it, and instead applying a twenty-percent limitation on the hours that a tipped employee may perform non-tipped related tasks); *Roberson v. Texas Roadhouse Mgmt. Corp.*, Civ. A. No. 19-0628, 2020 WL 7265860, at *6 (W.D. Ky. Dec. 10, 2020) (joining "the majority of other district courts in refusing to afford any deference" to the 2018 opinion letter); *see also* Ex. 7, Nat'l Rest. Ass'n, *Tips on Tipping* (May 13, 2021) (noting that, even prior to the challenged rule, the

---

[1]    The 2018 opinion letter reissued an opinion letter originally dated on January 16, 2009, which had briefly rescinded the 80/20 guidance. 86 Fed. Reg. 60114, 60117 (Oct. 29, 2021). The 2009 opinion letter was soon withdrawn on March 2, 2009, and the Department of Labor returned to the 80/20 guidance until 2018. *Id.*

"80/20 Rule" was applied to "prohibit[] restaurants from taking a tip credit for time an employee spends on side work tasks—such as rolling silverware or setting up for a shift—if that time exceeds 20% of the employee's working time").

2. *The 2020 Rule*

In late 2020, and in the face of courts almost without exception refusing to defer to the 2018 and 2019 guidance, the Department of Labor finalized a regulation that would largely codify its opinion letter rescinding the 80/20 guidance. 85 Fed. Reg. 86756 (Dec. 30, 2020). This 2020 final rule amended 29 C.F.R. § 531.56(e) to provide that

> an employer may take a tip credit for all non-tipped duties an employee performs that meet two requirements. First, the duties must be related to the employee's tipped occupation; second, the employee must perform the related duties contemporaneously with the tip-producing activities or within a reasonable time immediately before or after the tipped activities.

*Id.* at 86767. The final rule also stated that a non-tipped duty would be presumed to be related to a tip-producing occupation if it is listed as a task of that occupation in O*NET. *Id.* at 86771. The effective date for the final rule was March 1, 2021. *Id.* at 86756.

3. *The 2021 Rule*

After the change in the administration, the Department of Labor extended the effective date of the 2020 rule to December 31, 2021. 86 Fed. Reg. 11632 (Feb. 26, 2021) (extending the effective date to April 30, 2021); 86 Fed. Reg. 22597 (Apr. 29, 2021) (extending the effective date for the dual jobs part of the rule again to December 31, 2021). On June 23, 2021, the Department issued a notice of proposed rulemaking to withdraw the 2020 rule and reaffirm quantitative limits on non-tipped work, with improvements to the 80/20 guidance. 86 Fed. Reg. 32818 (June 23, 2021). The Department finalized that rule on October 29, 2021, after making some significant adjustments in response to comments from the restaurant industry and others. 86 Fed. Reg. 60114 (Oct. 29, 2021).

The 2021 final rule essentially reinstates and adds to the 80/20 guidance and clarifies its application through new examples. Prior to the 2021 rule, § 531.56(e) read in full as follows:

> **Dual jobs**. In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

29 C.F.R. § 531.56 (2020). The final rule retains the longstanding requirement that, when an individual is employed in both a tipped occupation and a non-tipped occupation, the tip credit is available only for the hours the employee spends working in the tipped occupation. The final rule also removes the exemplary tasks from subsection (e); revised examples are now included in and conform to a new subsection (f). The revised subsection reads in full as follows:

> **Dual jobs**. In some situations an employee is employed in dual jobs, as, for example, where a maintenance person in a hotel also works as a server. In such a situation if the employee customarily and regularly received at least $30 a month in tips, for the employee's work as a server, the employee is engaged in a tipped occupation only when employed as a server. The employee is employed in two occupations, and no tip credit can be taken for the employee's hours of employment in the occupation of a maintenance person.

86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(e)).

The final rule also adds a new subsection (f), which largely codifies the 80/20 guidance, adds a new 30-minute limitation, and clarifies the application of these provisions through examples. Subsection (f) states that an employee is "engaged in a tipped occupation when the

10

employee performs work that is part of the tipped occupation" and that an employer "may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation." 86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(f)). The subsection then defines "work that is part of the tipped occupation" as (1) work that "produces tips" and (2) work that "directly supports tip-producing work, if the directly supporting work is not performed for a substantial amount of time." 86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(f)(1)).

The regulation broadly defines work that "produces tips" as "[a]ny work performed by a tipped employee that provides service to customers for which the tipped employee receives tips," and includes as examples a server "providing table service, such as taking orders, making recommendations, and serving food and drink" and a bartender "making and serving drinks, talking to customers at the bar and, if the bar includes food service, serving food to customers." 86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(f)(2)).

The regulation defines "directly supporting work" as work "performed by a tipped employee in preparation of or to otherwise assist tip-producing customer service work," and includes as examples the following tasks, "when they are performed in preparation of or to otherwise assist tip-producing customer service work and when they do not provide service to customers": a server's "dining room prep work, such as refilling salt and pepper shakers and ketchup bottles, rolling silverware, folding napkins, sweeping or vacuuming under tables in the dining area, and setting and bussing tables" and a bartender "slicing and pitting fruit for drinks, wiping down the bar or tables in the bar area, cleaning bar glasses, arranging bottles in the bar, fetching liquor and supplies, vacuuming under tables in the bar area, cleaning ice coolers and bar mats, making drink mixes, and filling up dispensers with drink mixes." 86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(f)(3)). As noted, an employer can take a tip credit for time spent

on such directly supporting work so long as it is not performed for a substantial amount of time. The final rule defines a substantial amount of time as work that "exceeds 20 percent of the hours worked during the employee's workweek" or that "[f]or any continuous period of time . . . exceeds 30 minutes." 86 Fed. Reg. at 60158 (codified at 29 C.F.R. § 531.56(f)(4)).

Finally, the rule states that work which is not part of a tipped occupation includes "any work that does not provide service to customers for which tipped employees receive tips, and does not directly support tip-producing work," including, for example, a server "[p]reparing food, including salads, and cleaning the kitchen or bathrooms" and a bartender "[c]leaning the dining room or bathroom." 86 Fed. Reg. at 60158 (codified at 29 C.F.R. § 531.56(f)(5)). The final rule specifies that an employer may not take a tip credit for any time spent on work that is not part of the tipped occupation. *Id.*

The final rule took effect on December 28, 2021. 86 Fed. Reg. at 60114.

### C.      Procedural History

The final rule was published on October 29, 2021. 86 Fed. Reg. 60114. Plaintiffs brought this action more than one month later, on December 3, 2021. ECF No. 1. Several weeks after that, on December 20, 2021, Plaintiffs moved for a preliminary injunction. ECF No. 12. The Court has allowed Defendants until January 19, 2021, to file this opposition. ECF No. 16. Plaintiffs are scheduled to file a reply on or before January 26, 2022, and the matter is set for oral argument on February 9, 2022. *Id.*; *see also* ECF No. 18.

## STANDARDS

### A.      Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). The Fifth Circuit "frequently cautions" that "the decision to grant a preliminary injunction is to be

treated as the exception rather than the rule." *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996).

To obtain a preliminary injunction, a movant must demonstrate

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Relief "should only be granted when the movant has clearly carried the burden of persuasion" on all four requirements. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).

### B.    The Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), agency "actions, findings, and conclusions" must be sustained unless they are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law' or 'unsupported by substantial evidence.'" *W. Tex. LTC Partners, Inc. v. Dep't of Health & Human Servs.,* 843 F.3d 1043, 1046 (5th Cir. 2016) (citation omitted); *see also* 5 U.S.C. § 706(2)(A)–(E)).

#### 1.    *Contrary to Law*

Courts review an agency's interpretation of a statute that it administers under the two-step process set forth in *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). In some cases, courts begin with what is called "step zero," which "asks whether Congress delegated authority to make interpretations carrying the force of law." *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 406 n.3 (5th Cir. 2014) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)).

At *Chevron* step one, a court must first "ask 'whether Congress has directly spoken to the precise question at issue,'" applying the "'traditional tools of statutory interpretation,' including

'text, structure, purpose and legislative history.'" *BNSF Ry. Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015) (first quoting *Chevron*, 467 U.S. at 842 n.8, then *Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003)). If Congress's intent is clear, "that is the end of the matter" and the Court "must give effect to the unambiguously expressed intent of Congress." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842–43). "But 'if the statute is silent or ambiguous with respect to the specific issue," the analysis proceeds to step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).

2.    *Arbitrary and Capricious*

"An agency rule is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Tex. Oil & Gas Ass'n*, 161 F.3d at 934. The reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

## ARGUMENT

### I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Plaintiffs argue that the rule is both contrary to the FLSA and arbitrary and capricious. They have not established a substantial likelihood of success on either of these claims.

#### A.   The rule is not contrary to law.

Plaintiffs contend that the Department of Labor's 2021 final rule is "in conflict with and completely inconsistent with the plain language of the statute" because its "application of the tip credit depends upon whether specific job duties directly and immediately produce tips." Pls.' Br. at 8, 23–25.[2] According to Plaintiffs' reading of the FLSA, so long as an employee generally receives more than $30 a month in tips, then the employer must be permitted to use that employee's tips to take a credit to the wages it pays that employee "regardless of whether or how much of the time [the] employee perform[s] duties that directly and immediately produce tips." *Id.* at 3–4. This reading would, for example, entitle a restaurant to take a tip credit for a server—paying the employee a direct cash wage as low as $2.13 an hour—even when the server works an entire shift cleaning bathrooms, mowing the lawn, and washing dishes, without performing any tipped work at all, so long as the server waits tables during some portion of the workweek.

The plain text of the statute dictates no such thing. It broadly describes a "tipped employee" for whom an employer may take a tip credit as one who is "engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). The statute then permits employers to take a tip credit for employees engaged in such a tipped occupation. *Id.* § 203(m). Congress did not specify what it means to be "engaged in" the requisite "occupation."

---

[2]      Page references to Plaintiffs' brief refer to the numbers at the bottom center of the pages, not to the page numbers generated in the top-right corner by the ECF system.

Instead, it provided the Department of Labor the authority and discretion to promulgate regulations interpreting when an employee is engaged in a tipped occupation in a way that prevents abuse of that provision. Pub. L. No. 89-601, § 602, 80 Stat. at 844.

The Court should therefore reach step two of the *Chevron* analysis of the statutory text. The rule survives at that step because the Department of Labor acted well within the FLSA's terms—and in fulfillment of its purposes—in generally prohibiting employers from taking a tip credit for work that is not part of the tipped occupation and defining work that is part of the tipped occupation to include work that produces tips and work that directly supports tip-producing work so long as it is not substantial. It would defy any understanding of what it means to be "engaged in" an "occupation" that receives tips to construe that language in a way that would, as Plaintiffs' formulation does, deem a server to be so engages when the server spends an entire shift cleaning, mowing, and dishwashing, while performing no duties that actually produce tips. Plaintiffs are therefore unlikely to be successful on this claim.

### 1.    *The Secretary of Labor has authority to regulate tipped employment.*

Plaintiffs lead with the contention that Congress has not authorized the Secretary of Labor to promulgate any regulations whatsoever regarding the FLSA's provisions on tipped employees, which they primarily characterize as a *Chevron* "step zero" question. Pls.' Br. at 21–23. This argument is contradicted by clear statutory language authorizing the Secretary to do exactly that.

When Congress passed the FLSA amendments about tipped employees in 1966, it explicitly "authorized [the Secretary] to promulgate necessary rules, regulations, or orders with regard to [those] amendments." Pub. L. No. 89-601, § 602, 80 Stat. at 844. The Department of Labor cited this clearly applicable authority (among others) in promulgating the final rule at issue here. 86 Fed. Reg. at 60157. Thus, Congress clearly "delegated authority to the agency generally

to make rules carrying the force of law" and the final rule "was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27; *see also Marsh*, 905 F.3d at 621 (noting that "it is beyond question that the [Department of Labor] promulgated the dual jobs regulation, 29 C.F.R. § 531.56, in the exercise of its congressionally delegated authority" and citing Public Law No. 89-601). Plaintiffs inexplicably ignore this obvious source of authority, which directly forecloses their argument.

Plaintiffs' argument also confuses a so-called *Chevron* step zero question for what is actually a *Chevron* step-two question. Plaintiffs highlight the Department of Labor's contention in the preamble of the final rule that Congress, by providing no specific definition, authorized the agency to determine what it means to be "engaged in an occupation" that customarily and regularly receives significant tips. Pls.' Br. at 22 (citing 86 Fed. Reg. at 60114). Plaintiffs argue that the final rule does not in fact determine what it means to be "engaged in an occupation" that customarily and regularly receives significant tips, but instead determines what it means to be "engaged in a tipped occupation," which Plaintiffs inexplicably believe to be a materially different concept. *Id.* at 22–23. At bottom, however, this simply amounts to an assertion that the final rule is not "based on a permissible construction of the statute," which is a question properly addressed at the second step of the *Chevron* analysis, where deference is due to the agency. *See* 467 U.S. at 843.

Plaintiffs' argument is also textually untenable. The Department of Labor's use of the term "tipped occupation" in the regulation does not "supplant" the statutory definition with a "completely different term." Pls.' Br. at 22–23, 28. In fact, there is no material difference in meaning between the clause modifying the word "occupation" in the statute ("in which [an employee] regularly and customarily receives more than $30 a month in tips") and the participle adjective modifying the word "occupation" in the regulation ("tipped"). They are simply two

different grammatical ways of expressing essentially the same general concept—an occupation that involves the receipt of significant tips. Thus, Plaintiffs' cursory insistence—without any reasoned analysis—that the statute's grant of authority to regulate occupations "in which [an employee] customarily and regularly receives more than $30 a month in tips" somehow implicitly deprives the Department of any authority to regulate "tipped" occupations is baseless.

2.     *The FLSA does not speak directly to the precise question of what it means to be engaged in a tipped occupation.*

Proceeding to step one of the *Chevron* analysis, the Court should first ask "whether Congress has directly spoken to the precise question at issue" or whether the statute is ambiguous. *Chevron*, 467 U.S. at 842. A statute is ambiguous if it is susceptible to more than one reasonable interpretation or more than one accepted meaning. *United Servs. Auto Ass'n v. Perry*, 102 F.3d 144, 146 (5th Cir. 1996). Statutory construction begins with the language of the statute, "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The Court may also consider the statute's purpose and its legislative history to ascertain Congress's intent. *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005).

As noted, there is no question that Congress has directly authorized the Department of Labor to promulgate regulations implementing the 1966 FLSA amendments regarding tipped employees. *See* Pub. L. No. 89-601, § 602, 80 Stat. at 844; *see also Marsh*, 905 F.3d at 621. In doing so, Congress empowered the Department to "work out the details" of the amendment's broad terms. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (interpreting effectively identical authorizing language in amendments made to the FLSA in 1974). Congress did not, however, speak directly to what it means to be "engaged in an occupation" that customarily and regularly receives the threshold amount of tips. 29 U.S.C. § 203(t). This conclusion stems from

the FLSA's "text, structure, purpose and legislative history.'" *BNSF Ry.*, 775 F.3d at 751 (quotation marks omitted).

a.      Text

The text of the statute contains ambiguities that the Department of Labor is entrusted to clarify through regulation. It broadly defines a "tipped employee" as one who is "engaged in an occupation" that customarily and regularly receives the threshold amount of tips. 29 U.S.C. § 203(t). As numerous courts have recognized, the ambiguity in this statutory language requires deference to the Department of Labor's regulations setting boundaries on when an employee is and is not "engaged" in the requisite type of "occupation." *See Marsh*, 905 F.3d at 621–23 ("Neither the plain language of the statute nor its legislative history suggest—much less clearly demonstrate—that section 203(t) is unambiguous."); *Fast*, 638 F.3d at 876–77 (noting that "occupation" is not defined in 29 U.S.C. § 203(t) and deferring to the Department of Labor's implementation of that provision in the prior version of 29 C.F.R. § 531.56(e)); *Roberson*, 2020 WL 7265860, at \*4 ("Congress explicitly invited further regulation as to its new definition of the term 'tipped employee.'"); *Belt v. P.F. Chang's China Bistro, Inc.*, 401 F. Supp. 3d 512, 527 (E.D. Pa. 2019) ("Because the statute does not define 'engaged in an occupation,' Congress has not spoken to the precise question at issue and the statutory language is ambiguous.").

Notwithstanding the breadth of the statutory language and against the weight of this authority, Plaintiffs insist that the words "engaged" and "occupation" in the statute unambiguously dictate that the Department of Labor must permit employers to take a tip credit and pay an employee a reduced direct wage based solely on the employee's "field of work," while totally ignoring the "relative mix of specific tasks" performed by the employee. Pls.' Br. at 23–25.

The dictionary definitions offered by Plaintiffs do not come close to dictating that result. In fact, they fully support the Department of Labor's approach. The most applicable parts of the definitions of the word "occupation" that Plaintiffs have highlighted are "the principal business of one's life," ECF No. 12-1 at 83,[3] "one's usual or principal work or business," *id.* at 88, "that which principally takes up one's time, thought, and energies; especially one's regular business or employment," *id.* at 93, and the "particular business, profession, trade, or calling which engages [an] individual's time and efforts, employment which one regularly engages or vocation of his life," *id.* These definitions establish the uncontroversial propositions that occupations are distinct—i.e., "particular"—and involve different sets of associated activities—i.e., "usual," "principal," or "regular" "work" or "business." Thus, contrary to Plaintiffs' argument, a specific "mix of tasks" (i.e., the "work" or "business") is key to defining an occupation. The en banc Ninth Circuit recognized as much in rejecting an argument highly similar to the one advanced by Plaintiffs here. *See Marsh*, 905 F.3d at 629 ("We find similarly unpersuasive Defendants' contention that the Guidance's focus on duties is 'patently inconsistent' with the dual jobs regulation's 'occupation-based analysis.' Defendants' argument rests on an artificial distinction between occupations and duties. One cannot define the former without some reference to the latter.") (citing Black's Law Dictionary (10th ed. 2014) (defining "occupation" to mean "an activity or pursuit in which a person engages")).

The statute refers to one distinct type of "occupation": an occupation in which the employee customarily and regularly receives a significant amount of tips. 29 U.S.C. § 203(t). And it specifies that an employee is not a "tipped employee" for which an employer may take a tip

---

[3]     Page numbers following an ECF docket number are to the page numbers generated in the top-right corners by the ECF system.

credit unless the employee is "engaged" in (i.e., "busy or occupied" with, ECF No. 12-1 at 87) such a tipped occupation. 29 U.S.C. § 203(t). The statute does not specify, however, the particular work associated with such an occupation. Nor does it clarify how to tell whether an employee is "engaged in" such work. Thus, the statute leaves it to the Department of Labor to "work out [these] details" of precisely what it means to be "engaged in an occupation" where one receives significant tips. *See Long Island Care at Home*, 551 U.S. at 165.

In the final rule, the Department of Labor reasonably determined that the "principal work," ECF No. 12-1 at 88, of someone engaged in an occupation in which the employee customarily and regularly receives tips is work that produces tips and work that directly supports tip-producing work, so long as the directly supporting work is not performed for a substantial amount of time. 86 Fed. Reg. at 60157–58. Defining a tipped occupation in terms of the actual work associated with that occupation is fully in line with the dictionary definitions of "occupation" presented by Plaintiffs. And the Department acted pursuant to clear statutory requirements by specifying that an employer may take a tip credit only when an employee is "engaged in" such an occupation by performing that work.

b.      Structure and Purpose

The structure and purpose of the FLSA also contradict Plaintiffs' reading of the statute and support the Department of Labor's approach in the final rule. Under Plaintiffs' reading, the FLSA unambiguously entitles a restaurant employer to take a tip credit for any and all work that it instructs an employee whom it labels a server or bartender to perform, regardless of whether or not that work produces tips or directly supports tip-producing work. This would mean that a restaurant could use the tips earned by a server during one shift to subsidize a reduced direct cash wage to that server of as low as $2.13 an hour for a separate shift in which the employee works

the entire time cleaning bathrooms, mowing the lawn, and washing dishes, without performing any tip-producing work at all.

Such a result would undermine a key purpose of the FLSA's tip provisions as a whole, which is to ensure that tipped employees who are paid a reduced direct wage receive the value of the tips they earn from tip-producing work and to forbid employers from appropriating tipped employees' tips for themselves. The FLSA specifically prohibits employers from relying upon a tip credit for a tipped employee "unless . . . all tips received by such employee have been retained by the employee," except where those tips are pooled with other traditionally tipped employees. 29 U.S.C. § 203(m)(2)(A). In other words, when an employer takes a tip credit for and therefore pays a reduced cash wage to an employee engaged in a tipped occupation, the employer cannot use the employee's tips to subsidize work performed by employees in non-tipped occupations. This provision was added in 1974 upon a finding that "the tipped employee should have greater protection to ensure the fair operation" of the tip-credit provision and to "make clear the original Congressional intent that an employer could not use the tips of a 'tipped employee' to satisfy more than" the permitted amount of the FLSA's minimum wage. S. Rep. No. 93-690, at 43 (1974).

Expanding these protections even further, a 2018 amendment to the FLSA provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." Pub. L. No. 115-141, § 1201(a), 132 Stat. 348, 1148 (2018) (codified at 29 U.S.C. § 203(m)(2)(B)).

Plaintiffs' reading of the "tipped" employee definition would undermine the purpose of these protections by allowing employers effectively to use the tips an employee earns while performing tip-producing work to subsidize reduced direct cash wages to that employee while

performing extended work that neither produces tips nor directly supports tip-producing work. The Department of Labor's approach, by contrast, ensures that the FLSA's protections for tipped employees are fulfilled and that tipped employees do not have the value of their tips diluted by being paid a reduced direct wage while performing substantial work that does not produce tips.

Plaintiffs contend that the rule runs afoul of the FLSA's "structure and overall statutory scheme" because it would effectively eliminate the phrase "in which he customarily and regularly receives more than $30 a month in tips." Pls.' Br. at 25 (quoting 29 U.S.C. § 203(t)). To the contrary, the Department of Labor's approach does not discard, but is consistent with the tip-related modification of the term "occupation." As explained above, the rule explains what it means to be "engaged" in an "occupation" that receives a significant amount of tips. The rule provides that being engaged in a tipped occupation means performing work that is part of the tipped occupation, including tip-producing work, which provides service to customers for which the tipped employee receives tips, and work that directly supports tip-producing work so long as it is not performed for a substantial amount of time. Plaintiffs' own insistence that the phrase "in which he customarily and regularly receives at least $30 a month in tips" somehow demands a "binary" approach whereby a server, simply by virtue of sometimes working as a server, must always be deemed to be engaged in a tipped occupation—regardless whether they are actually performing the work of a tipped employee—finds no support in the statutory structure.

c.      Legislative History

In an attempt to buttress their position, Plaintiffs rely on Senate committee reports written in connection with the 1966 amendments to the FLSA, which added the definition of "tipped employee," and legislative history concerning the 1974 amendments, which made no changes to the definition of "tipped employee" whatsoever. Notwithstanding Plaintiffs' arguments, and as one

23

court has already held, "the FLSA's legislative history does not evince an unambiguous congressional intention to treat employees as tipped employees, regardless of their tasks or time spent on untipped tasks." *Marsh*, 905 F.3d at 622.

Plaintiffs first note that the Senate report accompanying the 1966 amendments states that the tip-credit provisions are "sufficiently flexible to permit the continuance of existing practices with respect to tips" and "provide enough flexibility to account for a practice as inconsistent as tipping." Pls.' Br. at 26 (citing S. Rep. No. 89-1487, at 12–13 (1966)). But Plaintiffs ignore the context of these statements. The "existing practices" referred to in the report concern the actual handling of tips, as shown by the examples, not the payment of a reduced wage for work that is not part of a tipped occupation. Moreover, the sentiments expressed are antiquated. The report states that the amendments would sustain the practice of an employer confiscating all of an employee's tips as receipts and paying that employee a full minimum wage. But that is no longer permissible following the 2018 amendments, which prohibit an employer from keeping an employee's tips regardless of whether or not the employer takes a tip credit. Pub. L. No. 115 141, § 1201, 132 Stat. 348, 1148 (2018) (codified at 29 U.S.C. § 203(m)(2)(B)). The report also states that the 1966 amendment would broadly permit tipped employees to pool tips with other employees. S. Rep. No. 89-1487, at 12. But subsequent amendments require employers who take a tip credit to limit tip pools to employees who traditionally receive tips. *See* Pub. L. No. 93-259, § 13, 88 Stat. 55 (1974). And the "flexibility" mentioned does not refer to flexibility for an employer to take a tip credit for work outside the tipped occupation, but rather for an employee to receive the full minimum wage from an employer during periods where the employee's tips are insufficient to equal or exceed the full minimum wage. S. Rep. No. 89-1487, at 13.

Plaintiffs also note that the Senate report for the 1966 amendments describes the definition of a "tipped employee" as "analogous to the reporting requirement for a tipped employee under the provisions of the Social Security Act of 1965." Pls.' Br. at 26 (quoting S. Rep. No. 89-1487, at 12). Plaintiffs imagine that this cross-reference somehow demands a "binary" approach whereby employees with certain job titles must be deemed to be always "engaged" in a tipped "occupation," regardless of whether or not they are performing the work of a tipped occupation. But the reference to the Social Security Act does not support this conclusion; it simply acknowledges that the $20 monthly minimum tip threshold in the original definition of "tipped employee" is the same as the $20 monthly threshold for reportable cash tips in the Social Security Act. *Compare* Pub. L. No. 89-601, § 101(b), 80 Stat. 830, 830 (1966) (codified as amended at 29 U.S.C. § 203(t)) *with* Pub. L. No. 89-97, § 313, 79 Stat. 286, 382 (1965) (codified at 42 U.S.C. § 409(a)(10)(B)).

The legislative history surrounding the 1974 amendments also fails to advance Plaintiffs' position. Plaintiffs first appear to claim that a Senate committee report defines an "occupation" in terms of a job title and not in terms of regular work or business activities. Pls.' Br. at 26. But the passage cited by Plaintiffs' addresses which employees may participate in a traditional tip pool under provisions added to the FLSA in connection with that report, not how to determine whether an employee is a tipped employee for purposes of the tip credit. S. Rep. No. 93-690, at 43 (1974). For this reason, the Ninth Circuit has rejected Plaintiffs' distorted reading of this committee report. *See Marsh*, 905 F.3d at 622 (noting that "the legislation accompanying the 1974 report did not make any changes to [29 U.S.C. §] 203(t)").

### 3.    *The rule is a permissible construction of the FLSA.*

At the second step of the *Chevron* analysis, the Court considers whether the rule "is based on a permissible construction of the statute.'" *City of Arlington*, 569 U.S. at 296 (quoting *Chevron*,

467 U.S. at 843). For all the reasons detailed above, it clearly is: It gives content to the statutory ambiguity about what it means to be "engaged in an occupation" in which one receives a significant number of tips. *See supra* pp. 19–21 (citing 29 U.S.C. § 203(t)). As the final rule recognizes, when a tipped employee performs a substantial amount of directly supporting work that does not itself produce tips, they cease to be "engaged" in a tipped "occupation." *See, e.g.,* 86 Fed. Reg. at 60115. It also fits with the statutory purpose of ensuring that tipped employees who are paid a reduced direct wage receive the value of their tips and that employers do not keep an employee's tips "for any purposes." *See supra* pp. 21–23 (citing 29 U.S.C. § 203(m)(2)(B)).

Indeed, in case after case, courts of appeals have concluded that the Department of Labor's prior 80/20 guidance—which, similar to the 2021 rule, is based on the idea that employers may only take a tip credit for work that is directed towards producing tips and for a quantitatively limited amount of other work related to the tipped occupation—is based on a permissible reading of the statute's definition of a "tipped employee." First, in *Fast v. Applebee's International, Inc.*, the Eighth Circuit considered "whether servers and bartenders are 'engaged' in [tipped] occupations when Applebee's requires them to perform duties that do not directly result in a tip." 638 F.3d 872, 876 (8th Cir. 2011). Similar to Plaintiffs here, Applebee's argued that "the statute is focused on the occupation, not the specific duties performed, such that it can take the tip credit for the entirety of a server's or bartender's shift, as long as the employee received sufficient tips during the shift to make up the difference between $2.13 per hour and $7.25 per hour, regardless of how much time the employee spends performing tip-producing duties." *Id.* The court roundly rejected that argument, concluding instead that the twenty-percent tolerance on related duties was a permissible construction of what it means to be "engaged in an occupation" that customarily and regularly receives tips. *Id.* at 879.

Next, *Marsh v. J. Alexander's LLC* was a group of fourteen consolidated cases in which servers and bartenders alleged that their respective employers "abused the tip credit provision by paying them the reduced tip credit wage and treating them as tipped employees when they were engaged in either (1) non-tipped tasks unrelated to serving or bartending, such as cleaning toilets; or (2) non-incidental tasks related to serving or bartending, such as hours spent cleaning and maintaining soft drink dispensers in excess of 20% of the workweek." 905 F.3d 610, 615 (9th Cir. 2018) (en banc). Like the Eighth Circuit in *Fast*, the en banc Ninth Circuit concluded that the Department of Labor's 80/20 guidance permissibly implemented the ambiguous term "occupation" in the definition of "tipped employee." *Id.* at 624. The court also observed that allowing employers to use the tip credit as the Plaintiffs here seek to do "effectively makes tips—intended as gifts to servers for their service—payments to employers instead, who use these tips to minimize their obligations to pay employees the full minimum wage for time spent working in a non-tipped occupation." *Id.* at 615–16. That is precisely what the 2021 rule prevents.

Finally, in the recent case *Raffery v. Denny's, Inc.*, a server claimed that her employer required her to perform duties unrelated to serving customers, like cleaning refrigerators and mopping, and duties related to serving tables but that do not produce tips, such as cleaning and stocking drink stations. 13 F.4th 1166, 1170 (11th Cir. 2021). At the time of the court's opinion, the Department of Labor had rescinded the 80/20 guidance through the 2018 opinion letter. *Id.* at 1176. The court declined to defer to the opinion letter, however, concluding that it conflicted with the version of the dual jobs regulation then in effect and that its dependence on O*NET—which simply "asks employees what duties their employers are requiring them to perform"— to ascertain duties related to tipped occupations "creates a risk that unlawful practices will become entrenched in high-violation industries." *Id.* at 1185. The court then concluded that a twenty-percent tolerance

on related, non-tipped duties was the most appropriate application of the statute and regulation, adding that "the dividing line between related and unrelated duties falls where untipped duties no longer directly support tipped duties," and applied this limitation to the case at hand. *Id.* at 1188–90.[4]

Against this tide of authority, Plaintiffs rely primarily on a district court case that has nothing to do with tipped employees. Pls.' Br. at 29–30 (citing *Nevada v. Dep't of Labor*, 218 F. Supp. 3d 520 (E.D. Tex. 2016)). The *Nevada* case dealt with an overtime-pay provision in the FLSA, which exempts "any employee employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor])." 29 U.S.C. § 213(a)(1). The district court preliminarily enjoined a Department of Labor rule that it said defined such a capacity in a way that gave too much weight to the employee's salary level, concluding that the words "executive, administrative, or professional" demanded principally a duties-based inquiry. 218 F. Supp. 3d at 529. But whether the distinct rule in that case comported with the distinct statutory language at issue says essentially nothing about the propriety of the rule challenged in this case.

Plaintiffs also rely on a two-judge dissent from the en banc opinion in *Marsh*, which they say sheds light on the definition of "tipped employee" in 29 U.S.C. § 203(t). Pls.' Br. at 29–30. To the contrary, Judge Ikuta was not considering "the statutory term 'occupation,'" *id.* at 29; rather,

---

[4]     Plaintiffs limit their discussion of the highly relevant decisions in *Rafferty*, *Marsh*, and *Fast* to a single footnote in which they dismiss these cases as addressing only whether the Department of Labor had properly interpreted its prior dual jobs regulation, and not "whether the Department's regulation conflicts with the FLSA." Pls.' Br. at 8 n.9. Plaintiffs are incorrect. The FLSA itself was at issue in all three cases. The *Rafferty* court concluded that the 80/20 approach was indicated by both the dual jobs regulation and "the text of the FLSA." 13 F.4th at 1188. The *Marsh* court held that the 80/20 guidance was "consistent . . . with the statute . . . itself." 905 F.3d at 625. And the *Fast* court rejected Applebee's argument that the 80/20 guidance was "contrary to the express language of the statute." 638 F.3d at 875–76.

she was discussing the term "occupation" as used in the prior dual jobs regulation and considering whether the Department of Labor's twenty-percent tolerance, set forth in subregulatory guidance, was an interpretive rule based on that regulation or a legislative rule requiring notice and comment, *Marsh*, 905 F.3d at 645 (Ikuta, J., dissenting). In any event, the two-judge dissent is not persuasive, and its reasoning was properly rejected by the eleven-judge en banc majority, which—like every other circuit court to have considered the issue—concluded that the 80/20 guidance is an appropriate implementation of the FLSA. *Id.* at 624.

     **B.**    **The rule is not arbitrary and capricious.**

     Plaintiffs also argue that the rule is arbitrary and capricious in several respects. Pls.' Br. at 30–36. *First*, they accuse the Department of failing to conduct "fact finding" regarding the "real-world duties" of occupations in which employees receive tips and whether or not the "the supposed problem" set forth in comments by employees "actually exists." *Id.* at 30–31. Plaintiffs cite no legal authority associated with this argument and, indeed, it is flawed as a matter of law. The Fifth Circuit has recognized that an agency "need not make findings of fact in the conventional sense in an [informal rulemaking]." *Superior Oil Co. v. FERC*, 563 F.2d 191, 200 (5th Cir. 1977); *see also Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) ("In an informal rulemaking proceeding the Commission is not required to justify its cost-benefit analysis by citing to findings of fact in the record. The decision is more in the nature of a policy judgment that does not require, and indeed is not susceptible of, complete factual support."). Instead, the question for the Court is whether the "agency's reasons and policy choices conform to minimal standards of rationality," in which case they "must be upheld." *Tex. Oil & Gas Ass'n*, 161 F.3d at 934.

The Department of Labor's reasons and choices for this rule are eminently rational and are explained in detail in the preamble to the final rule, 86 Fed. Reg. 60126, which Plaintiffs largely ignore. In summary, the Department noted that because tipped employees can receive as little as $2.13 per hour in direct cash wages, they earn relatively low wages and "are among the most vulnerable workers that the Department protects." 86 Fed. Reg. at 60120–21; *see also id.* at 60124 ("[P]articularly where the FLSA permits employers to compensate their tipped employees as little as $2.13 an hour directly, providing protections to ensure that this reduced direct wage is only available to employers when employees are actually engaged in a tipped occupation within the meaning of section 3(t) of that statute is essential to prevent abuse."). The Department also explained that it received several comments from individuals who worked as tipped employees, who explained that they were required to perform non-tipped work for hours at a time while receiving reduced direct cash wages, despite being unable to earn tips during that time. *Id.* at 60120, 60122.

In light of the "need to ensure that workers do not receive a reduced direct cash wage when they are not engaged in a tipped occupation, as well as the practical concerns of employers," *id.* at 60121, the Department of Labor adopted a "functional test" to determine when an employee is performing the work of a tipped occupation. *Id.* at 60126. This test "applies to all manner of tipped occupations, a feat that would be difficult, if not impossible, to achieve with a fixed list of duties for particular tipped occupations," and it "allows for better flexibility and adaptability to categorize" new duties as they arise. *Id.* at 60126. This, along with the additional explanation set forth in the preamble to the final rule, serves as a more than rational basis for the agency's policy choices. *See Tex. Oil & Gas Ass'n*, 161 F.3d at 934.

*Second*, Plaintiffs criticize the Department of Labor for not employing O*NET as a definitive source of tasks the performance of which constitutes being "engaged in an occupation" in which one receives significant tips. Pls.' Br. at 31–32. Here again, the Department's policy choice easily surpasses "minimal standards of rationality." *Tex. Oil & Gas Ass'n*, 161 F.3d at 934. As the Department explained, O*NET "only reflects what tipped employees are required to do for their employers, not the tasks that actually make up part of their tipped occupation, and is consequently not a helpful tool to use in determining whether an employee is engaged in their tipped occupation." 86 Fed. Reg. at 60127. Multiple courts expressed this same concern in response to the 2018 opinion letter replacing the 80/20 guidance with an approach based on O*NET. *See Rafferty*, 13 F.4th at 1185 (concluding that use of the O*NET "creates a risk that unlawful practices will become entrenched in high-violation industries by setting up a fox-guarding-the-henhouse situation: simply by requiring tipped employees to perform untipped duties—whether those duties are, in fact, related or not to their tipped duties—employers effectively render the untipped duties 'related.'"); *O'Neal v. Denn-Ohio, LLC*, Civ. A. No. 19-0280, 2020 WL 210801, at *7 (N.D. Ohio Jan. 14, 2020) ("If employers assign tipped employees duties traditionally performed by non-tipped employees, the O*NET definitions will reflect this and the protections established by the dual jobs regulation will erode. An interpretation of the dual jobs regulation that would allow employers to re-write the regulation without going through the normal rule-making process cannot be a reasonable one."). The Department of Labor also noted that its functional test would more quickly adapt to new and emerging duties in changing industries, whereas there would be a delay in updating O*NET. 86 Fed. Reg. at 60126. Because the Department has offered a rational explanation for favoring its functional test over O*NET, that decision survives arbitrary-and-capricious review. *See Tex. Oil & Gas Ass'n*, 161 F.3d at 934.

*Third*, Plaintiffs fault the Department of Labor for relying on economic data from 2018 and 2019, prior to the COVID-19 pandemic. Pls.' Br. at 33–34. The Department used that data as part of the cost-benefit analysis it conducted pursuant to Executive Orders 12866 and 13563, which direct agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs. 86 Fed. Reg. at 60140 (citing Exec. Order No. 12866, 58 Fed Reg. 51735 (Oct. 4, 1993) and Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011)). Notably, courts in the Fifth Circuit "afford agencies considerable discretion in conducting 'the complex . . . economic analysis typical in the regulation promulgation process.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). The Department acted well within that discretion here.

Plaintiffs fail to acknowledge that the Department of Labor's decision not to use pandemic cost data was a conscious, reasonable, and explained choice. As part of its cost-benefit analysis, the Department conducted a retrospective evaluation of changes in wages following the 2018 and 2019 guidance (which withdrew the 80/20 guidance) to help inform whether changes would occur in the other direction—from employers to employees rather than from employees to employers—following the reinstatement of the modified version of that rule. 86 Fed. Reg. at 60143–44. As part of this analysis, the Department "chose not to examine data from 2020, as average hourly wages during that year increased as low-wage workers in the leisure and hospitality industry were out of work due to the COVID-19 pandemic, making meaningful comparisons difficult." *Id.* In other words, the Department's goal was to examine changes in wages from the 2018 to 2019 guidance, whereas wage data from 2020 would obviously be distorted with the much more impactful changes associated with the pandemic. The Court should defer to this sound reasoning, *see Huawei*, 2 F.4th

at 452, particularly where Plaintiffs have failed to even acknowledge—much less substantively dispute—the Department's stated reasons for using data from 2018 to 2019.[5]

Plaintiffs also highlight comments from the Small Business Administration's Office of Advocacy ("SBA Advocacy"), which took the position that the Department of Labor had underestimated compliance costs of small employers in the notice of proposed rulemaking. Pls.' Br. at 33–34. Plaintiffs make the conclusory assertion that the Department "ignored" these comments, *id.* at 34, but that is not true. As the Department clearly explained, it made substantive adjustments to the content of the final rule that mitigated SBA Advocacy's cost concerns. 86 Fed. Reg. at 60154. In particular, the Department clarified that its definition of tip-producing work is intended to be broadly construed. *Id.* at 60143. It also provided additional examples, amended the definition of directly supporting work to clarify its scope and provided additional examples, and modified the application of the 30-minute limitation for directly supporting work to make it easier to comply with. *Id.* at 60143.

The Department of Labor also established that the "minute to minute" tracking about which SBA Advocacy expressed concern, ECF No. 12-1 at 46, "is not required by the rule, and will also not be necessary to comply with the rule," 86 Fed. Reg. at 60154; *see also id* at 60142 (noting that "if employers stop assigning work to tipped employees that will no longer be considered part of the tipped occupation under this rule, this will be a one-time change that does not necessitate ongoing monitoring"). In addition, the Department noted that some monitoring of duties would already have been in place as a result of the 2018 to 2019 guidance to ensure that employees did

---

[5]     Plaintiffs also insist that Congress "would never have intended" the Department of Labor to consider pre-pandemic data in estimating the rule's costs. Pls.' Br. at 34. But Plaintiffs cite no statutory source supporting this supposition of what Congress "would" have intended. *Id.* Indeed, unlike some statutes, the FLSA imposes no obligation on the Secretary of Labor to conduct a cost-benefit analysis when regulating in this area.

not perform duties unrelated to their tipped occupation as defined by that guidance. *Id.* at 60142, 60154.

Plaintiffs dispute none of this reasoning, instead falsely asserting that SBA Advocacy's concerns were simply ignored. This falls far short of meeting the burden to show that the Department's rule is arbitrary and capricious. *Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) (noting that the party challenging a rule "has the burden of proving that the agency's determination was arbitrary and capricious").[6]

Further, while SBA Advocacy indeed took the position that the Department of Labor's estimated costs for the proposed (but not the final) rule should be higher, neither SBA Advocacy nor any other commentator provided any information or analysis on exactly how much time should be used to calculate one-time adjustment and continuing managerial costs. 86 Fed. Reg. at 60143. In such circumstances, an agency is permitted to make estimates using the information available to it. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021) (upholding agency action where the agency "made a reasonable predictive judgment based on the evidence it had").

*Finally*, Plaintiffs argue that the rule is "internally inconsistent" in two ways. First, they contend that it improperly treats bussers and service bartenders as engaging in tip-producing work, even though they generally do not provide direct service to customers the way servers do. Pls.' Br. at 34–35. As the Department of Labor explained, this treatment is not arbitrary; it recognizes that bussers and service bartenders "receive tips from other tipped employees such as servers because they are supporting their customer service, tip-producing work." 86 Fed. Reg. at 60128. Contrary

---

[6]      Plaintiffs may not attempt to argue against the Department of Labor's published and clearly stated reasoning for the first time on reply. *See Scott v. City of Austin*, Civ. A. No. 16-1287, 2019 WL 122055, at *3 n.2 (W.D. Tex. Jan. 7, 2019) ("arguments raised for the first time in a reply brief are waived") (Pitman, J.) (citing *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010)).

to Plaintiffs' characterization, this is not "ipse dixit." Pls.' Br. at 35. It is a reasoned explanation that is supported by the undisputed nature of the work that bussers and service bartenders perform and the means by which they receive tips. *See* S. Rep. 93-690, at 43 (recognizing "busboys" and "service bartenders" at "employees who customarily and regularly receive tips").

Plaintiffs next argue that the rule is inconsistent because it treats the "same duties" differently "depending on context." Pls.' Br. at 35–36. Plaintiffs give the example of a bartender retrieving a particular beer for a customer, which would be tip-producing work, and the same bartender retrieving beer from a storeroom to restock the bar, which would be directly supporting work. *Id.* They also give the example of a server cleaning a spill for a customer, which would be tip-producing, and the same server cleaning a table between customers, which Plaintiffs believe would be directly supporting. *Id.* But the Department's distinctions are sound. It is entirely reasonable to treat "service to customers for which the tipped employee receives tips" differently from duties performed "in preparation for serving customers," for which employees do not receive tips. *See* 86 Fed. Reg. at 60128. In the first task of each of Plaintiffs' examples—when a bartender retrieves a particular beer from the storeroom at the request of a customer sitting at the bar or when a server wipes down a spill on a customer's table—the employee is performing a task directly for a customer for which they will receive a tip. It makes sense for the Department to categorize these tasks as "tip-producing." When an employee performs work that does not produce tips but simply supports their direct customer service work—such as when a bartender retrieves a case of beer from the storeroom to stock the bar in preparation for serving customers or a server cleans a table

during a lull in service—it makes sense for the Department to categorize those tasks as "directly supporting."[7]

Defendants note that Plaintiffs, in their background section, describe the ways in which they view the instant rule as inconsistent with the dual jobs rule that was promulgated in 1967. Pls.' Br. at 9–10. But the 2021 dual jobs rule is currently in effect, not the 1967 rule. In any event, "[n]othing in the [APA] prohibits an agency from changing its mind, if that change aids it in its appointed task." *Am. Petroleum Inst. v. EPA*, 661 F.2d 340, 355 (5th Cir. 1981). And here, the Department properly provided "a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also* 86 Fed. Reg. at 60134.

For these reasons, Plaintiffs have failed to demonstrate that the rule is arbitrary and capricious.

## II.   PLAINTIFFS HAVE NOT PROVEN IRREPARABLE HARM.

To obtain an injunction, a plaintiff must show "a substantial threat of irreparable injury if the injunction is not issued." *Janvey*, 647 F.3d at 595. Plaintiffs here argue that, absent an injunction, restaurants will have to either abandon the tip credit or spend so much money to comply with the 2021 rule that it will "financially devastate their business." Pls.' Br. at 36. The declarations submitted in support of this assertion are deficient in several respects.

---

[7]   Plaintiffs also accuse the Department of Labor of incoherently categorizing toasting bread as "***not*** 'food preparation' for purposes of the Final Rule." Pls.' Br. at 35–36 (emphasis in original). That is not a fair characterization. The Department made a rational distinction between "general food preparation," such as assembling a salad or slicing fruits and vegetables, and kitchen work "performed as part of the customer service work for which the employee receives tips," which includes "toasting bread to accompany prepared eggs, adding dressing to pre-made salad, scooping ice cream to add to pre-made dessert, ladling pre-made soup, placing coffee into the coffee pot for brewing, and assembling bread and chip baskets." 86 Fed. Reg. at 60128.

First, Plaintiffs' attempt to obtain an injunction comes too late. The rule has already gone into effect, and, as a result, the one-time preparation costs described in the declarations would seem to have already been incurred (or substantially incurred).[8] *See Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) ("Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43–44 (D.D.C. 2000) (noting that an over two-month delay "further militates against a finding of irreparable harm"). For example, both Emily Knight of the Texas Restaurant Association and Angelo Amador of the Restaurant Law Center describe costs to prepare for the rule that would generally be spent prior to the rule's implementation, including costs associated with reading and understanding the rule, ECF No. 12-1 at 10, 61 (Knight Decl. ¶ 10.a; Amador Decl. ¶ 19.a); conducting a cost analysis, *id.* at 10, 61–62 (Knight Decl. ¶ 10.b; Amador Decl. ¶ 19.b); and establishing upfront policies and procedures to ensure compliance, *id.* at 11, 63 (Knight Decl. ¶ 10.d; Amador Decl. ¶ 19.d). Similarly, Tracy Vaught, the owner of a company that operates five restaurants in Texas (the only identified restaurants alleging irreparable harm), describes purported costs to "prepare for" the rule, including consultations to "figure out how it is even possible to comply with the Final Rule." ECF No. 12-1 at 74 (Vaught Decl. ¶¶ 4, 6). As these preparation costs would have already been incurred, they cannot serve as a basis for ongoing irreparable harm.[9]

---

[8]     The final rule was published on October 29, 2021. 86 Fed. Reg. 60114. Plaintiffs did not file this lawsuit until December 3, 2021, and their motion for a preliminary injunction was not docketed until December 20, 2021. They did not seek expedited briefing. Under the Court's local rules, which permit fourteen days for an opposition and seven days for a reply, Plaintiffs' timing made it inevitable that the rule would go into effect on December 28, 2021.

[9]     Alternatively, it may be that the restaurants referred to in the declarations have made a conscious decision not to comply with the regulation at all or for some significant period following its effective date. A restaurant that has determined to neither comply with an effective regulation nor to timely seek an injunction preventing the regulation from taking effect cannot claim irreparable harm.

Indeed, entering a preliminary injunction now—after the rule has already taken effect and after restaurants have already taken steps to comply with it—will only result in confusion in the restaurant industry. By belatedly seeking relief, the Restaurant Law Center will create the very injury that it purportedly wants to avoid.

The declarations also overstate the ongoing compliance costs associated with the rule. Ms. Knight describes one unidentified member of the Texas Restaurant Association who estimates that managers would need to spend eight hours per week monitoring employee's tasks to comply with the rule. ECF No. 12-1 at 13 (Knight Decl. ¶ 10.f). And Mr. Amador describes an unidentified restaurant attorney who estimates that a manager would need to spend ten hours per week monitoring tasks, performing audits, and correcting pay. ECF No. 12-1 at 64 (Amador Decl. ¶ 19.f). But as the Department of Labor made clear in the final rule, there is less need for close monitoring if restaurants simply "stop assigning work to tipped employees that will no longer be considered part of the tipped occupation." 86 Fed. Reg. at 60142; *see also id.* ("The Department does not believe that [ongoing management costs] will be substantial, because if employers are able to make the upfront adjustments to scheduling, there is less of a need for ongoing monitoring."); *id.* at 60122 (noting that "employers can assign directly supporting work so that employees do not perform this work for more than a substantial amount of time"). The declarations do not explain why this would not be an option. Further, in response to comments from the restaurant industry, the Department of Labor made substantial changes to the proposed rule to clarify that many of the tasks that commenters understood as "directly supporting" tasks that would require close monitoring are in fact tip-producing when performed for a customer and therefore do not count toward the quantitative limits. *Id.* at 60133.

The declarations also fail to account for the degree to which restaurants were already monitoring employee's tasks prior to promulgation of the rule. The declarations characterize the requirements of the rule—including the twenty-percent limitation on directly supporting work—as new and state that additional resources will need to be brought to bear to ensure that employees do not spend too much time performing directly supporting work.  ECF No. 12-1 at 12, 63, 74–75 (Knight Decl. ¶ 10.e; Amador Decl. ¶ 19.d; Vaught Decl. ¶ 7). In fact, the rule's obligations are not altogether novel. The Department of Labor had imposed, through the 80/20 guidance, a twenty-percent limitation on supporting work for decades prior to 2018. *See* 86 Fed. Reg. at 60141 (noting that rule familiarization costs are reduced by the fact that "[m]any employers are familiar with a 20 percent tolerance, which is part of what is being put forth in this rule, since the Department enforced a 20 percent tolerance for 30 years prior to the 2018–2019 guidance"). And even after the 2018 and 2019 guidance rescinded the 80/20 guidance, courts in private litigation have almost universally refused to recognize that rescission and have continued to hold restaurant employers to the twenty-percent tolerance. *See Rafferty*, 13 F.4th at 1179; *Rorie v. WSP2, LLC,* 485 F. Supp. 3d 1037, 1041 (W.D. Ark. 2020) (collecting seven other district court cases and observing that "[w]ith one lone exception, all courts that have examined the issue have declined to extend the agency's new guidance any deference at all"). In fact, in May 2021, two months before the instant rule was proposed, the National Restaurant Association and its outside counsel Paul DeCamp offered three "strategies" for restaurants to "comply with the 80/20 rule" (which, notably, involve making upfront adjustments to assignments and not devoting ongoing management time to rigorous monitoring). Ex. 7, Nat'l Rest. Ass'n, *Tips on Tipping* (May 13, 2021). Thus, the declarations do not describe any significant new harm resulting from the rule when they complain of purported costs associated with the need to keep records of employees' tasks to defend against

private litigation. ECF No. 12-1 at 13, 64–65, 74–75 (Knight ¶ 10.g, Amador Decl. ¶ 19.g, Vaught Decl. ¶ 7). That need, to the extent it exists,[10] predates the rule.

Moreover, the declarations are vague and unconvincing. The Amador and Knight declarations rely exclusively on hearsay and for the most part only vaguely refer to situations purportedly faced by some unspecified "members" of their respective trade associations. *See Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991) (conclusory allegations of irreparable harm do not entitled movant to injunctive relief). In the rare instances when a specific restaurant is described, the identity of that member is withheld and insufficient details are provided about its specific situation. *See, e.g.,* ECF No. 12-1 at 10–11 (Knight Decl. ¶ 10.c) (describing one unidentified restaurant that has apparently informed her that it will not be able to take a tip credit at all but providing no explanation as to why); ECF No. 12-1 at 62 (Amador Decl. ¶ 19.c) (describing an unidentified Virginia restaurant that will purportedly no longer use the tip credit at all, but not explaining why). Similarly, the Vaught declaration speculates that the restaurant group "may" not take the tip credit at all, without stating definitively that it will not or explaining the basis for that possible decision. ECF No. 12-1 at 73 (Vaught Decl. ¶ 5). *See Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011) (stating that a plaintiff must "demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence").

## III. THE BALANCE OF HARMS DISFAVORS AN INJUNCTION.

Any harm that Plaintiffs may suffer from the continued effectiveness of the rule is outweighed by the harm that an injunction would cause the government and restaurant employees,

---

[10]     The Department of Labor has made clear that the final rule itself does not impose any new recordkeeping requirements. 86 Fed. Reg. at 60140.

and the grant of an injunction would disserve the public interest. *See Janvey*, 647 F.3d at 595. As described above, the alleged injuries described in the declarations submitted with Plaintiffs' motion are vague, overstated, and contradicted by the fact that the rule is already in effect and that restaurants have long faced a similar obligations under the 80/20 guidance.

In addition, the alleged injuries are outweighed by the injury that restaurant employees would suffer if the rule were enjoined. An analysis by the Economic Policy Institute showed that rescinding the 80/20 guidance and allowing restaurants to assign unlimited non-tipped work to their employees could lead to a $700 million loss of employee income. 86 Fed. Reg. at 60139. And while Plaintiffs complain of the effects of the COVID-19 pandemic on restaurants, the effect on restaurant employees has been worse. Many commenters noted that, as a result of the pandemic, employees are being asked by their employers to perform significantly more work for which they do not receive tips and for which they are paid a reduced direct cash wage. 86 Fed. Reg. at 60121; *see also* Ex. 8, Comments by Economic Policy Institute at 2–3 (Aug. 23, 2021) (noting that, as a result of the COVID-19 pandemic, "non-tipped work now makes up a much greater share of work being done in establishments that employ tipped workers"). This means that employees are being forced to perform an increasing amount of work for which they are paid direct cash wages as low as only $2.13 per hour, without the opportunity to earn tips, thereby resulting in an overall reduction to their wages.

On top of that, "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce." *Nat'l Propane Gas Ass'n v. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008). These harms weigh heavily against an injunction.

## IV.   THERE IS NO BASIS FOR A NATIONWIDE INJUNCTION.

Even if Plaintiffs could satisfy the standards for a preliminary injunction, the "nationwide injunction" they seek is overbroad. Constitutional and equitable principles require that injunctive relief be limited to redressing a Plaintiffs' own cognizable injuries. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And equitable principles require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994). Thus, any injunction should be limited to relieving the specific injury of only those Plaintiffs whom the Court determines have a cognizable claim and will suffer irreparable harm without an injunction.

Here, the only injury cited in support of Plaintiffs' cursory request for a nationwide injunction, Pls.' Br. at 39, is the Restaurant Law Center's alleged "diversion of resources," which is based on Mr. Amador's expectation that the Center will "continue to have to provide educational and information services to our members to navigate questions regarding how to monitor and reclassify the types of tasks that restaurant workers perform, as well as how to change their business models, staffing models, and operations to comply with the Final Rule," ECF No. 12-1 at 60 (Amador Decl. ¶ 17). Critically, however, this is not the alleged injury presented by Plaintiffs as irreparable harm justifying an injunction. *See* Pls.' Br. at 36–37. Nor would it be adequate to justify injunctive relief—much less nationwide injunctive relief. Even before the instant rule was proposed, Mr. Amador, as head of the Restaurant Law Center, and the Restaurant Law Center's outside counsel, Mr. DeCamp, provided "educational and information services" to the association's members about how to "change their business models, staffing models, and operations" to comply with the highly similar 80/20 guidance. Ex. 7, Nat'l Rest. Ass'n, *Tips on*

*Tipping* (May 13, 2021). The Center's continuation of these activities following the promulgation of the rule does not constitute new irreparable harm.

Further, a nationwide injunction of the rule would be particularly inappropriate given that a highly similar approach—the 80/20 guidance—has been endorsed as an appropriate implementation of the FLSA by three out-of-jurisdiction courts of appeals: the Eighth, Ninth, and Eleventh circuits. *See Rafferty*, 13 F.4th at 1179; *Marsh*, 905 F.3d at 621–23; *Fast*, 638 F.3d at 876–77. A nationwide injunction against the rule as contrary to the FLSA would effectively and improperly supplant those precedents. *See United States v. AMC Ent., Inc.*, 549 F.3d 760, 773 (9th Cir. 2008) ("Principles of comity require that, once a sister circuit has spoken to an issue, that pronouncement is the law of that geographical area. Courts in the Ninth Circuit should not grant relief that would cause substantial interference with the established judicial pronouncements of such sister circuits."). Therefore, even were an injunction appropriate, the Court should exercise its discretion to limit it to this district.

*   *   *

# CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: January 19, 2022

Respectfully submitted,

BRIAN M. BOYTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch

 /s/ Johnny Walker
JOHNNY H. WALKER (D.C. Bar #991325)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Rm. 12304
Washington, D.C. 20530
Tel.: (202) 514-3183 / Fax: (202) 616-8460
Email: johnny.walker@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

---

RESTAURANT LAW CENTER, *et al.*,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF LABOR, *et al.*,

*Defendants.*

Civil Action No. 21-1106 (RP)

## APPENDIX OF EXHIBITS

1.    WHD Opinion Letter FLSA-895 (Aug. 8, 1979)

2.    WHD Opinion Letter WH-502 (Mar. 28, 1980)

3.    WHD Opinion Letter FLSA-854 (Dec. 20, 1985)

4.    WHD Field Operations Handbook Rev. 563 § 30d00(e)

5.    WHD Opinion Letter FLSA2018-27 (Nov. 8, 2018)

6.    WHD Field Operations Handbook Rev. 767 (Feb. 15, 2019)

7.    Nat'l Rest. Ass'n, *Tips on Tipping* (May 13, 2021)

8.    Comments by Economic Policy Institute at 2–3 (Aug. 23, 2021)

## FLSA-895

August 8, 1979

This is in reply to your letter of July 16, 1979, asking if the tip credit provision of the Fair Labor Standards Act may be used when compensating a waitress for time spent performing certain activities in a restaurant.

Regarding the restaurant in question, the waitresses report to work two hours before the doors are opened to the public to prepare the vegetables for the salad bar. You state the time spent by the waitresses in preparing the vegetables constitutes the work of a waitress, even though 10% or less of the vegetables are used in the kitchen for sandwich preparation and meal garnishments. You state this amount of vegetables used in the kitchen should not affect our opinion, as it should be considered de minimis. Also this preparatory work is analogous with the work performed by a barber or beautician before their actual performance of work on a customer. Thus, as the waitresses each receive "customarily and regularly" $30 a month in tips, you believe the time in question may be paid for, in part, by tips.

We disagree. Section 531.56(e) of the enclosed copy of 29 CFR Part 531, deals with tipped employees who are performing dual jobs. As explained in that section, where a maintenance man in a hotel also serves as a waiter, the tip credit is available only for the hours worked as a waiter, if he is a "tipped employee" within the meaning of section 3(t) of the Act. (Part 531 is presently being revised to take into account amendments to the FLSA relating to the tip credit since the interpretations therein were last issued.)

The Congressional Record (in particular page 43 of Senate Report No. 93-960, February 22, 1974) indicates that employees who "customarily and regularly" receive tips are waiters, bellhops, waitresses, countermen, busboys and service bartenders. It also indicates that janitors, dishwashers, chefs and laundry room attendants are not tipped employees. Accordingly, since it is our opinion that salad preparation activities are essentially the activities performed by chefs, no tip credit may be taken for the time spent in preparing vegetables for the salad bar.

Sincerely,

Herbert J. Cohen
Assistant Administrator

Enclosures

EXHIBIT
1

1980 WL 141336 (DOL WAGE-HOUR)

Wage and Hour Division

United States Department of Labor
Opinion LetterFair Labor Standards Act (FLSA)

WH-502
March 28, 1980

\*\*\*

**\*1** This is in reply to your letter of October 30, 1979, asking if certain duties performed by tipped employees in a restaurant after closing hours are considered to be tipped employee duties under the Fair Labor Standards Act.

You state the tipped employees clean the salad bar, place the condiment crocks in the cooler, clean and stock the waitress station, clean and reset the tables (including filling cheese, salt and pepper shakers) and vacuum the dining room carpet, after the restaurant is closed. It is your position that since the dining area is the domain of the waitresses and waiters, they are responsible for the duties described above. Accordingly, you believe the employer may use the tip credit provision when compensating the tipped employees for the time expended performing these duties.

As you know, section 531.56(e) of 29 CFR Part 531, deals with tipped employees who are performing dual jobs. This section explains that a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses is not employed in two occupations. Further, such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips. As indicated, however, where there is a clear dividing line between the types of duties performed by a tipped employee, such as between maintenance duties and waitress duties, no tip credit may be taken for the time spent by a waitress performing maintenance duties.

Insofar as the after-hours clean-up you describe are assigned generally to the waitress/waiter staff, we believe that such duties constitute tipped employment within the meaning of the regulation. We might have a different opinion if the facts indicated that specific employees were routinely assigned, for example, maintenance-type work such as floor vacuuming.
Sincerely,

Henry White
Deputy Administrator

1980 WL 141336 (DOL WAGE-HOUR)

**End of Document**                                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT
2

1985 WL 1259240 (DOL WAGE-HOUR)

Wage and Hour Division

United States Department of Labor
Opinion LetterFair Labor Standards Act (FLSA)

FLSA-854
December 20, 1985

\*\*\*

**\*1** This is in response to your letter of June 20 in which you request an opinion as to whether salad bar and dining room set-up are duties related to a tipped occupation within the meaning of section 3(m) of the Far Labor Standards Act (FLSA). We regret the delay in responding to your inquiry.

As outlined in your letter and in a conversation with a member of my staff on November 26, \*\*\* owns and operates several \*\*\* restaurants throughout the United States. \*\*\* regularly open to the public at 11 a.m. Generally, you state, two to four waiters or waitresses work each day in each restaurant. One waiter or waitress is assigned with opening responsibilities from 9:00 or 9:30 am., to 11:00 am. These opening responsibilities are as follows:
(1) Inspect dining room including windows and sills.

(2) Check dining room lights.

(3) Set thermostat.

(4) Check tables and align table bases.

(5) Check high chairs/booster seats.

(6) Set tables.

(7) Set table arrangers.

(8) Clean and fill shakers.

(9) Clean/replace ashtrays.

(10) Stock waitress station with glasses, cups, mugs, and pitchers.

(11) Check supplies of napkins, sugar, straws, etc.

(12) Check supply and cleanliness of plates, salad plates and silverware.

(13) Set up three (3) compartments, glass washing sink.

(14) Check beverage dispensers.

(15) Prepare tea

(16) At opening, prepare coffee.
1. Cut and clean vegetables for salad bar.

2. Clean and sanitize sneeze shield on salad bar.

EXHIBIT
3

1. (19) Fill salad bar crocks with refrigerated and dry items.

(20) Place vinegar and oil cruets at end of salad bar.

(21) Race parmesan shaker on salad bar.

(22) If iced salad bar, fill ice bin.


You state that typically the water or waitress with opening responsibilities works until 2 p.m. Any other waitresses working the lunch shift do not report until 10:30 or 11:00 am.

You state that a small portion of the 1.5 to 2 hour set-up time is spent in preparing vegetables for the salad bar. You state that the salad bar preparation is a related duty in a tipped occupation. you cited Opinion Letter No. 1554 (WH-502) in which the Administrator of the Wage and Hour Division found that duties such as cleaning and restocking the waitress station, refilling shakers, cleaning and resetting tables and vacuuming the carpet as performed by waitresses after hours constitute tipped employment within the meaning of Regulations 29 CFR Part 531.

In support of your position you also cite section 531.56(e) of 29 CFR Part 531. You compare the preparation of the salad bar to the preparation of short orders as performed by counter persons.

The FLSA is the Federal law of most general application concerning wages and hours of work. Under FLSA all covered and nonexempt employees must be paid not less than the minimum wage rate of $3.35 an hour for all hours worked and not less than one and one-half times their regular rates of pay for all hours worked over 40 in a workweek.

*2 As explained in section 3(m) of FLSA, tips received by tipped employees may be counted by an employer in an amount up to 40% of the applicable minimum wage. A "tipped employee" is defined in section 3(t) of FLSA as an employee engaged in an occupation in which he or she regularly receives not less than $30 a month in tips.

Section 531.56(e) deals with tipped employees who are performing dual jobs. As explained in this section, when an individual is involved in a tipped occupation and a nontipped occupation, the tip credit is available only for the hours spent in the tipped occupation. For example, when a maintenance person in a hotel also serves as a waiter or waitress, the tip credit is available only for the hours worked as a waiter or waitress.

The legislative history of the 1974 amendments of FLSA (in particular, page 43 of Senate Report No. 93-960, February 22, 1974) indicates that employees who "customarily and regularly" receive tips are waters, waitresses, bell persons, counter persons, bus help, and service bartenders. It also indicates that janitors, dishwashers, chefs, and laundry room attendants are not tipped employees. It is our opinion that salad preparation activities are essentially the activities performed by chefs and no tip credit may be taken for the time spent in preparing vegetables for the salad bar. Enclosed is a copy of an opinion letter which contains a detailed discussion of this position.

Also as explained in section 531.56(e), the tip credit may betaken for time spent in duties related to the tipped occupation even though such duties need not by themselves be directed toward producing tips. For example, a waiter or waitress who spends part of his or her time cleaning and setting tables, toasting bread, making coffee, and occasionally washing dishes or glasses may continue to be engaged in a tipped occupation even though the duties listed above are not tip-producing. Therefore, tip credit could be taken for non-salad bar preparatory work or after-hours clean-up if such duties are incidental to the water or waitress regular duties and are assigned generally to the waiter/waitress staff. However, where the facts indicate that specific employees are routinely assigned to maintenance-type work or that tipped employees spend a substantial amount of time in performing general preparation work or maintenance, we would not approve a tip credit for hours spent in such activities.

In the situation you describe, only one waiter or waitress is assigned to perform all preparatory activities. The opening waiter or waitress' responsibilities extend to the entire restaurant rather than to the specif i c area or customers which they serve.

Furthermore, the activities performed prior to the opening of the restaurant consume a substantial portion of the waiter or waitress' workday. Although you have stated that a waiter or waitress may work an eight-hour shift, typically they work a five-hour shift from 9 am. to 2 p.m. The 1.5 to 2 hours of preparatory time constitutes 30% to 40% of the employee's workday.

**\*3** Therefore, based on the information you have provided, it is our opinion that no tip credit may betaken for the hours spent by an assigned waiter or waitress in opening responsibilities.

We trust that the above is responsive to your inquiry.
 Sincerely,

Herbert J. Cohen
Deputy Administrator

1985 WL 1259240 (DOL WAGE-HOUR)

          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

30d   TIPS AND TIPPED EMPLOYEES

30d00   <u>General</u>.

  (a)  A "tipped employee", as defined in section 3(t) of FLSA, is any employee engaged in an occupation in which the individual customarily and regularly receives more than $30.00 a month in tips.

  (b)  Section 3(m) of FLSA makes clear the intent of Congress to place on the employer the burden of proving the amount of tips received by "tipped employees", and the amount of tip credit, if any, which the employer may claim. Since Sec 3(m) is not an exemption from the MW, but merely allows the employer to claim up to 40 percent of the MW as tip credit, the employer is responsible for ascertaining that the MW provisions are complied with in compensating "tipped employees".

  (c)  (1) The tip provision applies on an individual employee basis. Thus, an employer may claim the tip credit for some employees even though the employer cannot meet the requirements for others.

        (2) In establishments where employees perform a variety of different jobs, an employee's status as one who "customarily and regularly receives tips" will depend on the total fact situation and will be determined on the basis of such employee's activities over the entire w/w.

  (d)  When an individual is employed in a tipped occupation and a non-tipped occupation (dual jobs), the tip credit is available only for the hours spent in the tipped occupation. Also, such employee must customarily and regularly receive at least $30 a month in tips.

  (e)  Reg 531.56(e) permits the taking of the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e. maintenance and preparatory or closing activities). For example a waiter/waitress, who spends some time cleaning and setting tables, making coffee, and occasionally washing dishes or glasses may continue to be engaged in a tipped occupation even though these duties are not tip producing, provided such duties are incidental to the regular duties of the server (waiter/waitress) and are generally assigned to the servers. However, where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties.

30d01   <u>Retention of tips by employee</u>.

  (a)  Pursuant to Sec 3(m), all tips received (i.e., given to or designated for the employee by a patron) by a "tipped employee" must be retained by the employee except to the extent that there is a valid pooling arrangement.

EXHIBIT

4

**U.S. Department of Labor**       Wage and Hour Division
                                   Washington, DC 20210



**FLSA2018-27**

November 8, 2018

Dear **Name\***:

This letter responds to your request that the Wage and Hour Division ("WHD") reissue Opinion
Letter FLSA2009-23.  On January 16, 2009, then-Acting WHD Administrator Alexander J.
Passantino signed the opinion letter as an official statement of WHD policy.  On March 2, 2009,
however, WHD withdrew the opinion letter "for further consideration" and stated that it would
"provide a further response in the near future."

We have further analyzed Opinion Letter FLSA2009-23.  From today forward, this letter, which
is designated FLSA2018-27 and reproduces below the verbatim text of Opinion Letter
FLSA2009-23, is an official statement of WHD policy and an official ruling for purposes of the
Portal-to-Portal Act, 29 U.S.C. § 259.  Please note, however, that since the letter was originally
issued in 2009, (1) the applicable federal minimum wage has increased to $7.25 per hour, (2) the
website cited in the letter is now available at https://www.onetonline.org/link/summary/35-
3031.00, and (3) then-section 30d00(e) of the Field Operations Handbook is now section
30d00(f), and the language therein was modified.

I thank you for your inquiry.

Bryan L. Jarrett
Acting Administrator

Dear **Name\***:

This is in response to your request that we clarify our Field Operations Handbook (FOH) section
30d00(e),[1] which explains the Wage and Hour regulation at 29 C.F.R. § 531.56(e) interpreting
the definition of a "tipped employee" in section 3(t) of the Fair Labor Standards Act, 29 U.S.C.

---

[1] Unless otherwise noted, any statutes, regulations, opinion letters, or other interpretive material cited in this letter
can be found at ww.wagehour.dol.gov.

1

**EXHIBIT**

**5**

§ 203(t). We agree that the current FOH sections addressing the tip credit have resulted in some confusion and inconsistent application and, as a result, may require clarification. It is our intent that FOH § 30d00(e) be construed in a manner that ensures not only consistent application of the Act and a level of clarity that will allow employers to determine up front whether their actions are in compliance with the Act, but also the paramount goal that all affected workers receive the full protections of the Act.

The tip credit provision in section 3(m) of the FLSA, 29 C.F.R. § 203(m), permits an employer to pay its tipped employees not less than $2.13 per hour in cash wages and take a "tip credit" equal to the difference between the cash wages paid and the federal minimum wage, which is currently $6.55 per hour. The tip credit may not exceed the amount of tips actually received and under the current minimum wage may not exceed $4.42 per hour ($6.55 − $2.13).[2] A "tipped employee" is defined in FLSA section 3(t) as any employee engaged in an *occupation* in which he or she customarily and regularly receives not less than $30 a month in tips (emphasis added).

Recognizing that there are situations in which employees have more than one occupation, some of which may meet the tip credit requirements and some of which may not, the regulations provide that in such "dual jobs," the tip credit may only be applied with respect to the time spent in the tipped job.

> In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $20 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man.

29 C.F.R. § 531.56. The regulations further recognize that some occupations require both tip-generating and non-tip-generating duties, but do not constitute a dual job that necessitates the allocation of the tip credit to the tipped occupation only.

> Such a situation [i.e. one involving a dual job] is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

*Id*.

The dividing line between "dual job" and "related duties" is not always clear, however. To give enforcement guidance on this issue, we issued FOH § 30d00(e), which states:

---

[2] Section 3(m) also requires that an employer that elects the tip credit (1) inform its tipped employees of the tip credit provisions in FLSA section 3(m), and (2) that all tips received by such employees be retained by the employees.

Reg 531.56(e) permits the taking of the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e. maintenance and preparatory or closing activities).  For example a waiter/waitress, who spends some time cleaning and setting table, making coffee, and occasionally washing dishes or glasses may continue to be engaged in a tipped occupation even though these duties are not tip producing, provided such duties are incidental to the regular duties of the server (waiter/waitress) and are generally assigned to the servers.  However, where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties.

Section 30d00(e) attempts to ensure that employers do not evade the minimum wage requirements of the Act simply by having tipped employees perform a myriad of nontipped work that would otherwise be done by non-tipped employees.  Admittedly, however, it has created some confusion.  For instance, in *Fast v. Applebee's Int'l, Inc*., 502 F.Supp.2d 996 (W.D. Mo. 2007), the court construed § 30d00(e) to not only prohibit the taking of a tip credit for duties unrelated to the tip producing occupation, but also to prohibit the taking of a tip credit for duties related to the tip producing occupation if they exceed 20 percent of the employee's working time.  Moreover, the court determined that what constitutes a related and non-related duty is a jury determination.

In contrast, in *Pellon v. Business Representation Int'l, Inc*., 528 F.Supp.2d 1306 (S.D. Fla. 2007), *aff'd*, 291 Fed. Appx. 310 (11th Cir. 2008), the court rejected the *Fast* court's reading of FOH § 30d00(e), holding, in part, that the 20 percent limitation does not apply to related duties.  The court further held that under the *Fast* ruling, "nearly every person employed in a tipped occupation could claim a cause of action against his employer if the employer did not keep perpetual surveillance or require them to maintain precise time logs accounting for every minute of their shifts."  *Pellon*, at 1314.  Such a situation benefits neither employees nor employers.

We do not intend to place a limitation on the amount of duties related to a tip-producing occupation that may be performed, so long as they are performed contemporaneously with direct customer-service duties and all other requirements of the Act are met.  We also believe that guidance is necessary for an employer to determine on the front end which duties are related and unrelated to a tip-producing occupation so that it can take necessary steps to comply with the Act.  Accordingly, we believe that the determination that a particular duty is part of a tipped occupation should be made based on the following principles:

- Duties listed as core or supplemental for the appropriate tip-producing occupation in the in the Tasks section of the Details report in the Occupational Information Network (O*NET) http://online.onetcenter.org or 29 C.F.R. § 531.56(e) shall be considered directly related to the tip-producing duties of that occupation.[3]  No limitation shall be

---

[3] WHD recognizes that there will be certain unique or newly emerging occupations that qualify as tipped occupations under the Act, but for which there is no O*NET description.  *See e.g*., Wage and Hour Opinion Letter FLSA2008-18 (Dec. 19, 2009) (itamae-sushi chefs and teppanyaki chefs).  For such tipped occupations for which

placed on the amount of these duties that may be performed, whether or not they involve direct customer service, as long as they are performed contemporaneously with the duties involving direct service to customers or for a reasonable time immediately before or after performing such direct-service duties.[4]

- Employers may not take a tip credit for time spent performing any tasks not contained in the O*NET task list.  We note, however, that some of the time spent by a tipped employee performing tasks that are not listed in O*NET may be subject to the de minimis rule contained in Wage and Hour's general FLSA regulations at 29 C.F.R. § 785.47.

These principles supersede our statements in FOH § 30d00(e).  A revised FOH statement will be forthcoming.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented.  Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein.  You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein.  You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that this letter is responsive to your inquiry.

Sincerely,



Alexander J. Passantino
Acting Administrator

**\*Note: The actual name(s) was removed to protect privacy in accordance with 5 U.S.C. § 552(b)(7).**

---

there is no O*NET description, the duties usually and customarily performed by employees in that specific occupation shall be considered "related duties" so long as they are consistent with the duties performed in similar O*NET occupations.  For example, in the case of unique occupations such as teppanyaki chefs, the related duties would be those that are included in the tasks set out in O*NET for counter attendants in the restaurant industry.

[4] *See* Wage and Hour Opinion Letter WH-502 (Mar. 28, 1980) (concluding that a waitperson's time spent performing related duties (vacuuming) after restaurant was closed was subject to tip credit).

  b. <u>Non-3(m) deductions when the employer does not claim an FLSA 3(m) tip credit</u>

    Non-3(m) deductions may only be made from a tipped employee's wages when the employer does not claim an FLSA 3(m) tip credit *and* pays a direct wage in excess of the minimum wage.  For example, if an employee receives $10.00 per hour in cash wages, the employer cannot claim an FLSA 3(m) tip credit, and the employer may take up to $2.75 ($10.00 - $7.25 = $2.75) in non-3(m) deductions from the employee's hourly wage.  *See* 29 CFR 531.37.

 (5) *Other laws*

   Where the FLSA and a state or local law regulating wages for tipped employees are concurrently applicable, it is the employer's responsibility to comply with the more protective wage standard.

**(f)** **Dual jobs**

 (1) When an individual is employed in a tipped occupation and a non-tipped occupation—for example, as a server and janitor (*i.e.*, dual jobs)—the tip credit is available only for the hours the employee spends working in the tipped occupation, provided the employee customarily and regularly receives more than $30.00 a month in tips.  *See* 29 CFR 531.56(e).

 (2) 29 CFR 531.56(e) permits the employer to take a tip credit for any time the employee spends in duties related to the tipped occupation, even though such duties are not themselves directed toward producing tips.

 (3) WHD staff will consult the Occupational Information Network (O*NET), an online source of occupational information, and 29 CFR 531.56(e) to determine whether duties are related or unrelated to the tip-producing occupation.  Duties will be considered related to the tipped occupation when listed as "core" or "supplemental" under the "Tasks" section of the "Details" tab for the appropriate tip-producing occupation in O*NET.

  a. An employer may take a tip credit for any amount of time that an employee spends on related, non-tipped duties performed contemporaneously with the tipped duties—or for a reasonable time immediately before or after performing the tipped duties—regardless whether those duties involve direct customer service.  *See* WHD Opinion Letter WH-502 (March 28, 1980), which concludes that a server's time spent performing related duties (*e.g.*, vacuuming) after restaurant closing is subject to a tip credit.  For example, the core tasks currently listed in O*NET for waiters and waitresses (*see the O*NET Summary Report for waiters and waitresses*) include: cleaning tables or counters after patrons have finished dining; preparing tables for meals, which encompasses setting up items such as linens, silverware, and glassware; and stocking service areas with supplies such as coffee, food, tableware, and linens.  In addition, O*NET lists garnishing and decorating dishes in preparation for serving as a supplemental task for waiters and waitresses.  An employer may take a tip credit for any amount of time a

**EXHIBIT**

**6**

waiter or waitress who is a tipped employee spends performing these related duties.

b.      The WHD recognizes that there will be unique or newly emerging occupations that qualify as tipped occupations under the FLSA for which there is no O*NET description.  *See, e.g.,* WHD Opinion Letter FLSA2008-18 (December 19, 2008) regarding itamae-sushi chefs and teppanyaki chefs. For such tipped occupations, the duties usually and customarily performed by employees in that specific occupation shall be considered related duties as long as they are consistent with the related duties performed in similar O*NET occupations.  For example, in the case of unique occupations such as teppanyaki chefs, the related duties would be those that are included in the tasks set out in O*NET for counter attendants in the restaurant industry.

(4)      An employer may not take a tip credit for the time an employee spends performing any tasks not contained in 29 CFR 531.56(e), or in the O*NET task list for the employee's tipped occupation, or—for a new occupation without an O*NET description—in the O*NET task list for a similar occupation.  Some of the time spent by a tipped employee performing tasks that are not related to a tipped occupation, however, may be subject to the *de minimis* rule in 29 CFR 785.47.

*See* WHD Opinion Letter FLSA2018-27 (November 8, 2018).

[12/15/2016, 02/15/2019]

**30d01      Retention of tips by employee.**

**(a)      General**

As noted above, tips are the property of the tipped employee who receives them, regardless of whether or not the employer claims a tip credit.  All tips received (*i.e.*, given to or designated for the employee by a patron) by a tipped employee must be retained by the employee, and the employer may only utilize the employee's tips as a partial credit against its wage payment obligations or in furtherance of a valid pooling arrangement.  An employer and employee cannot agree to waive such employee's right to retain all tips received.  An employer's use of an employee's tips for any other purpose will be treated as a deduction from the employee's wages and would be an FLSA violation to the extent that it reduces total compensation below what the Act requires.  *See* WHD Opinion Letter FLSA (October 26, 1989).

Tips in excess of the FLSA 3(m) tip credit may not be credited toward an employer's minimum wage obligations.  Where an employer has claimed an FLSA 3(m) tip credit, it has paid the employee only the federal minimum wage for any hours in a non-overtime workweek, regardless of the amount of tips received by the employee in excess of the tip credit amount.

**(b)      3(m) requirements not observed**

Where an employer does not strictly observe the provisions of section 3(m) (the employer fails to provide adequate notice of the use of the tip credit, the employer does not pay a cash or direct wage of at least $2.13 per hour, the tips received by the employee are less than the amount of tip credit claimed and the employer does not make up the difference during the pay



ARTICLES      May 13, 2021

# Tips on Tipping

**As a new administration hits its first 100 days, what changes can we expect to federal tipping regulations?**

New federal tipping regulations took effect April 30, including rules about tip sharing. Meanwhile, the Department of Labor is considering additional changes to tipping regulations and Congress is debating the Raise the Wage Act, which would eliminate the tip credit.

Angelo Amador, head of the Restaurant Law Center, hosted Paul DeCamp to outline "The Future of Tipping Under the Biden Administration" in the Restaurant Law Center's recent monthly webinar. A former administrator of DOL's Wage and Hour Division, DeCamp is national co-chair of law firm Epstein Becker Green's wage and hour practice. Here are some of the pressing questions DeCamp and Amador addressed during the recent webinar, which is available to watch on demand.

**What is the "tip credit"?**

The Fair Labor Standards Act requires that restaurant employees earn minimum wage or higher. The tip credit allows restaurants to satisfy a portion of the minimum wage obligation through tips. No tipped employee ever makes less than the required minimum wage. [Tipped restaurant employees on average make between $19-$25/hour, according to National Restaurant Association research.] Seven states disallow the tip credit under state law: Alaska, California, Minnesota, Montana, Nevada, Oregon, and Washington.

**Can tips received by front-of-the-house (FOH) employees be shared with back-of-the house (BOH) employees?**

EXHIBIT
7

A 1974 FLSA amendment clearly states that FOH/BOH tip-sharing is impermissible if the restaurant takes a tip credit for any of the employees involved.

**But what if a tip credit isn't applied?**

As of April 30, DOL regulations now permit tip-sharing with BOH employees, such as dishwashers or line cooks, as long as the restaurant is not taking a tip credit for any of the employees.

**What is the 80/20 rule?**

This DOL rule prohibits restaurants from taking a tip credit for time an employee spends on side work tasks—such as rolling silverware or setting up for a shift—if that time exceeds 20% of the employee's working time.

**Didn't the Trump Administration eliminate the 80/20 rule?**

In December 2020, DOL issued a Final Rule removing any limits on the amount of time a tipped employee may spend on non-tipped duties as long as they are performed "contemporaneously with tipped duties, or for a reasonable time immediately before or after" tipped duties. The change was slated to go into effect March 1. "It looked at that point like the 80/20 rule was gone," explains DeCamp.

But the Biden Administration slammed the brakes on this change and opened the issue up for more comments. The DOL is now reviewing comments and has delayed any changes to the 80/20 rule until December 31, 2021. The Restaurant Law Center submitted comments underscoring that the restaurant industry has faced unique harm during the pandemic, making it important for DOL to finalize the rule and avoid causing further costs and losses for the industry.

**Any advice on how to comply with the 80/20 rule?**

DeCamp offers three strategies:

1) Eliminate or reduce the time tipped employees engage in opening or closing tasks that count toward the 20% of non-tipped time.

2) Require employees to clock in at the full minimum wage rate for shift prep until the restaurant opens. "Then clock out, and clock back in at a tipped wage," DeCamp suggests.

3) Consider assigning side work to designated employees earning minimum wage. "If you can offload the side work from the tipped employees, then in a lot of ways you do away with this 80/20 issue, or at least significantly reduce the risk."

**Can supervisors/managers participate in tip pools?**

Effective April 30, managers and supervisors are prohibited from receiving employees' tips as part of any tip pooling arrangement.

The question is: How do you define "supervisor"? For example, is a "head server" a supervisor? DOL tried to clarify this with its December 2020 Final Rule, which recognized that an hourly employee with a title of "head," "chief," or "lead" might not legally be a supervisor. The Biden Administration halted this part of the rule, leaving the definition nebulous. The matter is now open for comments until May 24.

## How would the Raise the Wage Act impact restaurants?

The Raise the Wage Act would raise the federal minimum wage from $7.25 to $15 per hour over five years. It would also eliminate the tip credit. Currently, federal law requires restaurants to pay tipped employees a minimum of $2.13 per hour, with tips bringing the wage up to—and often beyond—minimum wage. [If the combined wage is not equal to the required hourly minimum wage, the restaurant operator is required by law to make up the difference.]

The Raise the Wage Act would phase out the tip credit by increasing the minimum pre-tip hourly wage to $4.95, with annual increases of $2 per hour each year until reaching the federal minimum wage. Sen. Bernie Sanders (I-VT) introduced the bill in January with 37 co-sponsors. DeCamp does not expect it to garner enough support to pass.

## What's the future of the tip credit?

Be prepared for ongoing attempts to eliminate the tip credit. DeCamp points to efforts in Washington, D.C., Michigan, and Maine. So far, these initiatives have been squashed by local legislatures. "Grassroots groups are going state to state," says DeCamp. "If they can't get it done at the federal level, they're going to try hard on a state-by-state basis to get rid of the tip credit. This is an ongoing issue to be mindful of."

Disclaimer: This content is for informational purposes only, and should not be used as legal, tax, investment, financial, or other advice. This information is of a general nature and does not address the circumstances of any particular individual or entity. The document does not constitute professional and/or financial advice, nor does any information constitute a comprehensive or complete statement of the matters discussed or the law. The reader of the document alone assumes the sole responsibility of evaluating the merits and risks associated with the use of any information before making any decisions based on such information.

## EDUCATION & RESOURCES

## ISSUES & ADVOCACY

## MEMBERSHIP

## EVENTS & COMMUNITY

## RESEARCH & MEDIA

## ABOUT US

    

Our Family of Sites:

 

 

Terms of Use | Sitemap | Privacy Policy | Do Not Sell My Personal Information | Accessibility

© 2021 National Restaurant Association. All rights reserved.

Report website accessibility issues



# Economic
# Policy
# Institute

August 23, 2021

Amy DeBisschop
Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor
Room S-3502
200 Constitution Avenue NW,
Washington, DC 20210

Re: Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal
(RIN 1235-AA21)

Dear Miss. DeBisschop,

The Economic Policy Institute (EPI) is a nonprofit, nonpartisan think tank created in
1986 to include the needs of low- and middle-income workers in economic policy
discussions. EPI conducts research and analysis on the economic status of working
America, proposes public policies that protect and improve the economic conditions
of low- and middle-income workers, and assesses policies with respect to how well
they further those goals. EPI submits these comments on the Department of Labor's
(DOL/Department) request for comment on the proposal to withdraw and re-
propose one portion of the Tip Regulations Under the Fair Labor Standards Act
(2020 Tip Final Rule) related to the determination of when a tipped employee is
employed in dual jobs under the Fair Labor Standards Act (FLSA). [1]

In the notice of proposed rulemaking (NPRM), the Department proposes to
withdraw and re-propose portions of the 2020 Tip Final that amends the
Department's dual jobs regulations to address the application of the FLSA tip credit
to tipped employees who perform both tipped and non-tipped duties. Specifically,
the Department proposes to clarify that an employer may only take a tip credit
when tipped employees perform work that produces tips or work that directly
supports tip-producing work, so long as the employee does not perform the
"directly supporting" work for a substantial amount of time. [2] Further, the
Department strengthens the dual jobs regulation by defining "substantial amount of
time" as either exceeding 20 percent of all the hours worked during the employee's
workweek or exceeding 30 continuous minutes. [3] EPI strongly supports the

---

[1] 86 Fed. Reg. 32818.
[2] 86 Fed. Reg. 32820.
[3] 86 Fed. Reg. 32820.

EXHIBIT
8

Department's withdrawal and re-purpose of the 2020 Tip Final Rule related to the determination of when a tipped employee is employed in dual jobs under the FLSA.

The federal minimum wage for tipped workers has been frozen at a meager $2.13 per hour since 1991, and all but eight states have a subminimum wage for tipped workers.[4] Women—disproportionately women of color—represent nearly 70% of tipped workers nationwide and are more likely to experience poverty than their male counterparts.[5] Further, tipped workers' economic security is precarious given that they are especially vulnerable to discrimination and wage theft.[6] And the Department routinely identifies significant wage violations in industries with large concentrations of tipped workers, where employers have been able to violate rules with near impunity.[7] For these reasons, EPI is encouraged by the Department's commitment to strengthen protections for tipped workers as outlined in the proposed rule.

In the 2020 Tip Final Rule, the Department updated its dual jobs regulations by eliminating the long-standing 80/20 rule, which provided employers guidance on the use of tip credit for non-tipped work. The protection provided by the 80/20 rule is critical for tipped workers, because it places a limit on the amount of non-tipped duties employers can assign to tipped workers at a subminimum wage. However, the 2020 Tip Final Rule allowed tipped workers to be paid the subminimum tipped wage while performing an unlimited amount of non-tipped duties, as long as those non-tipped duties are performed "contemporaneously with tipped duties or for a reasonable time immediately before or after performing the tipped duties."[8] However, the "reasonable time" was not defined in the final rule, and its ambiguity would make it difficult to enforce, providing employers an immense loophole that would be costly to workers. EPI estimated that the elimination of the 80/20 rule would allow employers to capture more than $700 million annually from workers.[9] It should be noted that these estimates were calculated *prior* to the COVID-19 pandemic and the impact of the 2020 Final Tip Rule could be much worse for tipped workers during the COVID-19 pandemic, since non-tipped work now makes up a much greater share of work being done in establishments that employ tipped

---

[4] Economic Policy Institute, "Minimum Wage Tracker" (webpage), last modified on August 3, 2021.

[5] National Women's Law Center, One Fair Wage: Women Fare Better in States with Equal Treatment for Tipped Workers, February 2021.

[6] *See* M. Lynn, M. Sturman, C. Ganley, E. Adams, M. Douglas, and J. McNeil. 2008. "Consumer Racial Discrimination in Tipping: A Replication and Extension." *Journal of Applied Social Psychology* 38, 1045–1060. https://doi.org/10.1111/j.1559-1816.2008.00338.x and David Cooper and Teresa Kroeger, *Employers Steal Billions from Workers' Paychecks Each Year,* Economic Policy Institute, May 2017.

[7] *See generally, e.g.,* David Weil, *Improving Workplace Conditions Through Strategic Enforcement* (May 2010), https://www.dol.gov/whd/resources/strategicEnforcement.pdf.

[8] 85 Fed. Reg. 86756.

[9] Heidi Shierholz and David Cooper, "Workers will lose more than $700 million dollars annually under proposed DOL rule," *Working Economics* (Economic Policy Institute blog), November 30, 2019.

workers (for example, restaurants have shifted their services from dine-in to takeout). Further, this loss would be especially harmful for women and people of color who are both disproportionately represented in the tipped workforce and have borne the brunt of the pandemic's devastating impacts.[10]

Our estimate that the elimination of the 80/20 rule would allow employers to capture more than $700 million annually from workers is very much in line with the Department's estimate that potential transfer from tipped employees to employers would be up to $714 million annually. The Department provided a very thoughtful discussion about whether its estimate is likely an overestimate or an underestimate, describing many factors on both sides. The Department concluded that the reasons their estimate is an overestimate outweigh the reasons the estimate is an underestimate. We agree there are factors on both sides but believe that two additional factors that were not discussed in the NPRM tilt the scales toward the estimate being an underestimate. Most importantly, tips are widely known to be vastly underestimated in the data source used by both EPI and the Department in our respective estimates, the Current Population Survey from the Bureau of Labor Statistics.[11] This data issue makes a large underestimation of the amount of tips that employers would capture likely. Further, these estimates assume that eliminating the 80/20 rule would only have an effect if the employer is *already* taking a tip credit, ignoring the fact that some employers may be incentivized to start using the tip credit if the 80/20 rule were eliminated, knowing that without the rule they would be able to capture more tips.

Under the current proposal, the Department clarifies that employers can only take a tip credit when tipped workers perform work that is part of the worker's tipped occupation. The Department further specifies this as when a tipped employee's work produces tips or when the tipped employee engages in non-tipped work that directly supports tip-producing work, so long as the employee does not perform it for a substantial amount of time. The Department defines the "substantial amount of time" as exceeding 20 percent of all the hours worked during the employee's workweek or exceeding 30 continuous minutes of work. Effectively, the Department's proposal reinstates and codifies the long-standing 80/20 rule, and further strengthens protections for tipped workers by proposing that non-tipped work cannot exceed 30 continuous minutes. We estimate that in doing so, the Department is protecting at least $700 million per year of earnings workers would have lost under the 2020 Tip Final Rule. While we are unable to estimate the impact of limiting non-tipped activities to no more than 30 continuous minutes of work, based on the fact it would limit the amount of non-tipped work paid at a

---

[10] David Cooper, Zane Mokhiber, and Ben Zipperer, *Raising the Federal Minimum Wage to $15 by 2025 Would Lift the Pay of 32 Million Workers*, Economic Policy Institute, March 2021.

[11] Heidi Shierholz and David Cooper, "Workers will lose more than $700 million dollars annually under proposed DOL rule," *Working Economics* (Economic Policy Institute blog), November 30, 2019.

subminimum wage, we assume this language would increase our $700 million estimate and provide further protections for tipped workers' earnings.

EPI strongly supports the Department's proposal to limit the amount of non-tipped work that a tipped employee can perform when an employer is taking a tip credit. These amendments and clarifications of the dual jobs regulations are critical for tipped workers, as they place a limit on the amount of non-tipped duties tipped workers may partake in at a subminimum wage. The proposal would protect at least $700 million per year in earnings that workers would have lost under the 2020 Tip Final Rule. The proposal would largely benefit women and people of color who are both disproportionately represented in the tipped workforce and have borne the brunt of the pandemic's devastating impacts. For these reasons, EPI strongly supports the Department's withdrawal and re-purpose of the 2020 Tip Final Rule related to the determination of when a tipped employee is employed in dual jobs under the FLSA.

Thank you for the opportunity to comment on this important issue.

Sincerely,

Heidi Shierholz
Senior Economist and Director of Policy
Economic Policy Institute

Margaret Poydock
Policy Analyst
Economic Policy Institute

**Economic Policy Institute**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| RESTAURANT LAW CENTER, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR, *et al.*,<br><br>*Defendants.* | Civil Action No. 21-1106 (RP) |

**<u>PROPOSED ORDER</u>**

Upon consideration of Plaintiffs' motion for a preliminary injunction and the memoranda in support thereof and in opposition thereto, it is hereby ORDERED that the motion is DENIED.

Dated: _____

_____
ROBERT PITMAN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| RESTAURANT LAW CENTER, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR, *et al.*,<br><br>*Defendants.* | Civil Action No. 21-1106 (RP) |

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused a true and correct copy of Defendant's opposition to Plaintiffs' motion for a preliminary injunction to be served on counsel of record by filing it with the Court's CM/ECF system.

Dated:  January 19, 2022                             /s/ Johnny Walker

JOHNNY H. WALKER

*Attorney for Defendants*