```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                     AUSTIN DIVISION

 3  RESTAURANT LAW CENTER,    ) Docket No. A 21-CA-1106 RP
    TEXAS RESTAURANT          )
 4  ASSOCIATION               )
                              )
 5  vs.                       ) Austin, Texas
                              )
 6  UNITED STATES DEPARTMENT  )
    OF LABOR; MARTIN J.       )
 7  WALSH, SECRETARY OF THE   )
    UNITED STATES DEPARTMENT  )
 8  OF LABOR, IN HIS OFFICIAL )
    CAPACITY; AND JESSICA     )
 9  LOOMAN, ACTING            )
    ADMINISTRATOR OF THE      )
10  DEPARTMENT OF LABOR WAGE  )
    AND HOUR DIVISION, IN HER )
11  OFFICIAL CAPACITY         ) February 9, 2022

12
                    TRANSCRIPT OF MOTION HEARING
13          BEFORE THE HONORABLE ROBERT L. PITMAN

14  APPEARANCES:

15  For the Plaintiff:        Mr. Paul DeCamp
                              Epstein, Becker & Green, P.C.
16                            1227 25th Street, N.W., Suite 700
                              Washington, D.C. 20037
17

18  For the Defendant:        Mr. Johnny H. Walker, III
                              U.S. Department of Justice
19                            Civil Division,
                              Federal Programs Branch
20                            1100 L Street N.W.
                              Washington, D.C. 20005
21

22  Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
23                            Austin, Texas 78701
                              (512)391-8792
24

25  Proceedings reported by computerized stenography,
    transcript produced by computer-aided transcription.
```

1                          **I N D E X**

2                          <u>Direct</u>    <u>Cross</u>      <u>Redirect</u> <u>Recross</u>
   <u>Witnesses</u>:

3

4    Angelo Amador          30          37

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

| | | |
|---|---|---|
| 08:58:47 | 1 | THE CLERK:  Court calls:  A 21-CV-1106, |
| 08:58:51 | 2 | Restaurant Law Center and Others vs. United States |
| 08:58:56 | 3 | Department of Labor and Others, for preliminary injunction |
| 08:58:58 | 4 | hearing. |
| 08:58:58 | 5 | THE COURT:  For plaintiff. |
| 08:59:03 | 6 | MR. DECAMP:  Good morning, your Honor. |
| 08:59:03 | 7 | Paul DeCamp for the plaintiffs. |
| 08:59:07 | 8 | THE COURT:  Mr. DeCamp. |
| 08:59:07 | 9 | MR. WALKER:  Good morning, your Honor. |
| 08:59:07 | 10 | Johnny Walker representing the government. |
| 08:59:09 | 11 | THE COURT:  Well, thank you all very much.  We're |
| 08:59:12 | 12 | here for the hearing on the plaintiffs' motion for |
| 08:59:15 | 13 | preliminary injunction.  Part of our protocols is, I've |
| 08:59:20 | 14 | asked you to remain masked unless you're speaking, and |
| 08:59:23 | 15 | then, you're welcome to remove your mask.  And if would |
| 08:59:26 | 16 | make your arguments from counsel table, rather than from |
| 08:59:29 | 17 | the podium, just to maximize our distancing. |
| 08:59:31 | 18 | So let me first ask whether or not there's |
| 08:59:33 | 19 | anything that needs to be put into the record that is not |
| 08:59:35 | 20 | already in the record for purposes of this hearing?  Mr. |
| 08:59:39 | 21 | Decamp, anything from your side? |
| 08:59:40 | 22 | MR. DECAMP:  Your Honor, we did submit -- and, |
| 08:59:42 | 23 | actually, would your Honor prefer that I stand or |
| 08:59:44 | 24 | remain -- |
| 08:59:44 | 25 | THE COURT:  You can -- you're fine remaining |

08:59:47  1    seated.  Just make sure the microphone is where it is.

08:59:50  2    That's great.

08:59:51  3              MR. DECAMP:  Yes, your Honor.

08:59:52  4              We did submit as part of our exhibit list a

08:59:55  5    supplemental declaration of a witness.  We've provided

08:59:58  6    that to the clerk last night.  We would ask that that be

09:00:01  7    made a part of the record.

09:00:02  8              THE COURT:  Okay.  Any objection to that

09:00:04  9    supplemental?

09:00:04  10             MR. WALKER:  I do have an objection, your Honor.

09:00:07  11   Part of it as to timing.  Our understanding from

09:00:09  12   plaintiffs' motion for preliminary injunction is, they had

09:00:11  13   requested an oral argument with the Court.  It was not --

09:00:14  14   I was not aware that they intended to conduct an

09:00:16  15   evidentiary proceeding until about 5:30 last night, when

09:00:19  16   they submitted for the first time to me an exhibit list

09:00:24  17   and a witness list.

09:00:25  18             That supplemental declaration is included on the

09:00:28  19   witness list.  I have not seen it.  It was not filed with

09:00:31  20   their preliminary injunction motion nor with their reply.

09:00:34  21   A copy has not yet been provided to me.  So I object to it

09:00:36  22   on that basis.

09:00:37  23             THE COURT:  Okay.  What's the nature of the

09:00:39  24   exhibit?

09:00:40  25             MR. DECAMP:  It's a -- it updates the declaration

| | | |
|---|---|---|
| 09:00:44 | 1 | of a witness, Tracy Vaught, who is a restaurant operator |
| 09:00:47 | 2 | in Texas, who submitted a declaration with the preliminary |
| 09:00:50 | 3 | injunction papers.  We wanted to update the Court as to |
| 09:00:54 | 4 | what has happened since late December.  And so, we got a |
| 09:00:59 | 5 | declaration from her just two days ago that updates as to |
| 09:01:03 | 6 | what has happened in her restaurants with regard to |
| 09:01:05 | 7 | compliance with the regulation and the burdens imposed by |
| 09:01:08 | 8 | it. |
| 09:01:08 | 9 | THE COURT:  Okay.  I'm going to find that that is |
| 09:01:11 | 10 | not a timely submission.  This hearing has been set.  It's |
| 09:01:15 | 11 | kind of, I think, not fair to the defendant to, the night |
| 09:01:20 | 12 | before, sort of reopen the evidence.  And so, I'll sustain |
| 09:01:27 | 13 | the objection and that exhibit will not be a part of the |
| 09:01:30 | 14 | record. |
| 09:01:32 | 15 | All right.  Has there been any conversation |
| 09:01:35 | 16 | between the two of you about how you want to proceed today |
| 09:01:37 | 17 | in terms of who's going to speak and how long and |
| 09:01:40 | 18 | everything?  I'm yours.  So. |
| 09:01:43 | 19 | MR. DECAMP:  No, your Honor. |
| 09:01:44 | 20 | THE COURT:  Okay.  Well, if you'd like to |
| 09:01:46 | 21 | proceed, I'd be happy to hear from you. |
| 09:01:48 | 22 | MR. DECAMP:  Thank you, your Honor.  I'll remove |
| 09:01:51 | 23 | the mask now. |
| 09:01:52 | 24 | THE COURT:  Great. |
| 09:01:53 | 25 | MR. DECAMP:  So I think it's important to remind |

09:02:08    1   the Court of what we're really talking about here today.

09:02:12    2   We understand the Court's familiar with papers.  We won't

09:02:14    3   go over all the background.  But importantly, we're

09:02:16    4   talking about language in the Fair Labor Standards Act.

09:02:21    5   Specifically, Section 6 of the Fair Labor Standards Act

09:02:24    6   requires that employers pay employees at least the federal

09:02:28    7   minimum wage.  Section 3(m) of the Fair Labor Standards

09:02:33    8   Act -- and we have that text on the screen here that's

09:02:35    9   Plaintiffs' Exhibit 1 for purposes of the hearing.  3(m)

09:02:37   10   defines what counts as a wage for purposes of figuring out

09:02:40   11   whether an employer has satisfied the minimum wage.  We've

09:02:43   12   highlighted the pertinent language here.

09:02:45   13        Specifically, Section 3(m)(2)(A) -- that's the

09:02:45   14   second highlighted block there toward the bottom of the

09:02:52   15   right column -- says that in determining the wage an

09:02:54   16   employer is required to pay a tipped employee, then it

09:02:59   17   goes on to say how we determine whether the tipped

09:03:01   18   employee's wages constitute wages and how the tip credit

09:03:06   19   works.  We then go to the next page of this exhibit, which

09:03:11   20   follows through with that language.  Section 3(t) of the

09:03:16   21   Fair Labor Standards Act, also the highlighted language

09:03:19   22   here on the second column, says that tipped employee, in

09:03:22   23   quotes, means any employee engaged in an occupation in

09:03:26   24   which he customarily and regularly receives more than $30

09:03:30   25   a month in tips.

09:03:32  1          The whole basis for the Department of Labor's
09:03:35  2   regulation in this area, beginning in the late 1960s and
09:03:39  3   following through to the final rule that's at issue in
09:03:42  4   this litigation, is the position that the words in the
09:03:46  5   Section 3(t), occupation and engaged in an occupation, are
09:03:51  6   ambiguous and that that, therefore, confers upon the
09:03:57  7   Department of Labor authority to regulate in this space.
09:04:01  8   First and foremost, the problem with that is the
09:04:03  9   department did not, in any respect, define either of those
09:04:06  10  terms.  The regulation doesn't solve the ambiguity that
09:04:10  11  the department contends serves as the basis for its
09:04:12  12  authority to regulate.
09:04:14  13         Nowhere in the final rule does the department
09:04:16  14  attempt to define occupation nor does the department
09:04:20  15  attempt to define what it means to be engaged in an
09:04:23  16  occupation.  The department purports to solve a different
09:04:28  17  problem.  The department purports to define occupations in
09:04:32  18  terms of tipped occupations.
09:04:35  19         And the fundamental problem here, the fundamental
09:04:38  20  challenge, the disconnect between the final rule and the
09:04:41  21  statutory language is that the department doesn't attempt
09:04:44  22  to define those terms but, instead, defines the whole
09:04:48  23  world of employment of tipped employees into two buckets.
09:04:52  24  There is, quote, time spent in a, quote, tipped
09:04:55  25  occupation, close quote, and then, everything else.

09:04:58  1          That's the world that the department sees for its

09:05:02  2   regulation in this space.  It makes the whole focal point

09:05:06  3   and the center of the analysis the tips as opposed to the

09:05:10  4   occupation.  And therefore, we see the department in the

09:05:12  5   final rule accepting, for example, language from the

09:05:17  6   Eleventh Circuit's Rafferty's decision saying that,

09:05:19  7   really, tipped employees should be constantly,

09:05:22  8   consistently earning tips, that that ought to be the main

09:05:24  9   focus of the job.

09:05:27  10          And yet, the language in the FLSA belies that

09:05:29  11  because by authorizing the use of a tip credit, if an

09:05:34  12  employee receives just $30 a month in tips, that's not a

09:05:39  13  lot of money in tips.  It's a gating function in the

09:05:41  14  statute.  But an employee can earn $30 a month in tips or

09:05:44  15  what amounts to on average $7.50 in tips per week, with

09:05:50  16  next to no activity that actually produces tips.  That

09:05:54  17  would be, for example, five instances of a server

09:05:56  18  receiving a 15 percent tip on a $10 bill for a customer.

09:06:01  19  That can happen in less than an hour.

09:06:04  20          So the idea and the premise of the department's

09:06:07  21  regulation that employees ought to be overwhelmingly

09:06:11  22  spending their time on tip-producing activities in order

09:06:14  23  to qualify for this tip credit is flatly inconsistent with

09:06:19  24  the low level of tips required as the threshold for being

09:06:22  25  a tipped employee under the FLSA.  They're solving a

09:06:25  1  different problem.

09:06:26  2       The policy choice that the department embeds in

09:06:29  3  the regulation and what drives the regulation is

09:06:32  4  attempting to maximize tipped employee earnings, which may

09:06:37  5  be a laudable goal, but that's not what the FLSA does.

09:06:39  6  That's not what Section 3(m) does.  It's not what Section

09:06:43  7  3(t) does.  And it's certainly not what Section 6 does.

09:06:48  8  The department is attempting through this final rule to

09:06:49  9  afford tipped employees rights under the minimum wage law,

09:06:53  10  purportedly under the minimum wage law that exceed the

09:06:56  11  minimum wage rights that any other employee in the economy

09:06:59  12  has, minimum wage plus.  That's not what Section 6 is

09:07:02  13  about.  It's not what the tip credit is about.

09:07:04  14       So that's the fundamental disconnect.  The

09:07:07  15  department by not engaging in any effort to determine what

09:07:11  16  does it mean to be in the occupation of a server, what

09:07:13  17  does it mean to be in the occupation of a bartender, what

09:07:16  18  are these occupations historically, what tasks belong in

09:07:20  19  these occupations, and instead, going down an entirely

09:07:22  20  different analytic path of dividing the world into time

09:07:26  21  spent on activities that generate tips, time spent on

09:07:30  22  activities that directly support activities that generate

09:07:34  23  tips, and time spent on activities that do not either

09:07:37  24  generate tips or directly support those activities.

09:07:40  25       That tri-part-type bucket, divorced from any

09:07:43  1  specific occupation, causes this regulation to fail at

09:07:48  2  Chevron step zero, Chevron step one, and Chevron step two.

09:07:52  3  The regulation, in other words, does not flow from the

09:07:56  4  statute.  So whether or not the department would have some

09:07:58  5  theoretical authority to regulate, to define what it means

09:08:01  6  to be in an occupation, engaged in an occupation, what an

09:08:05  7  occupation itself means, they did not do that in this

09:08:08  8  final rule.  They issued a different rule that does

09:08:12  9  something very different.

09:08:13  10          And so, because of that, what we see in the final

09:08:16  11 rule is a disconnect from congressional intent.  We know

09:08:21  12 from the legislative history that Congress, enacting the

09:08:24  13 tip credit in 1966 and amending it in 1974, was intending,

09:08:29  14 by and large, with some modifications to preserve prior

09:08:32  15 practice.  They weren't trying to change.  Congress was

09:08:35  16 not trying to change which roles are tipped; they were not

09:08:38  17 trying to change the mix of duties in those roles.

09:08:41  18 Congress was in 1966 attempting to require at least a

09:08:44  19 minimum cash wage that did not apply before.  That was put

09:08:48  20 in place along with the tip credit.

09:08:50  21          But Congress also was very clear that they

09:08:52  22 reviewed certain positions, like servers, like bussers,

09:08:56  23 like service bartenders, as tipped roles.  But now we come

09:09:01  24 to what the department has done here.  It's important to

09:09:07  25 recognize that the department's regulation is not only

09:09:10  1  disconnected from the notion of what Congress intended

09:09:13  2  here.  It also is internally inconsistent.  It treats

09:09:16  3  bussers and service bartenders, for example, very

09:09:19  4  differently from any other tipped employees.  Whereas the

09:09:22  5  department sets forth this three-part test that we talked

09:09:24  6  about that I mentioned before of activity that directly

09:09:27  7  generates tips, activity that supports tip activity, and

09:09:32  8  then, activity that is other than those two categories,

09:09:35  9  the department here in the final rule -- and this is at 86

09:09:38  10  Federal Register, page 60128 and 60129 -- says that when

09:09:44  11  we're talking about bussers, we're going to apply a

09:09:47  12  different standard.

09:09:48  13         So, for example, bussers clearing tables after a

09:09:51  14  customer has left, so this is not customer facing, that

09:09:55  15  counts as tipped employee -- tip-generating activity.

09:09:58  16  That's that first category.  And yet, for every other

09:10:01  17  tipped employee, the department would say unless it's

09:10:04  18  customer facing and customer service, then that doesn't

09:10:07  19  count.  That would be in the second category of directly

09:10:10  20  supporting.

09:10:10  21         Same with service bartenders.  Service bartenders

09:10:13  22  are individuals -- are also called bar-backs who are

09:10:16  23  preparing drinks outside of the customer's immediate

09:10:19  24  presence so that another person, like the bartender or a

09:10:22  25  server, can bring the drink to the customer.  The

09:10:24 1   department says that service bartenders preparing a drink

09:10:28 2   that somebody else is going to present to the customer,

09:10:30 3   that's tip-producing activity, even though it's not

09:10:33 4   customer facing.

09:10:35 5        Logically, that activity is no different from

09:10:38 6   what a cook is doing in the kitchen, preparing food that

09:10:41 7   somebody else is going to bring to the customer.

09:10:43 8        THE COURT:  But aren't those the sorts of calls

09:10:45 9   that administrative agencies make all the time?

09:10:48 10  Somebody's gotta draw these lines, and isn't that a

09:10:50 11  rational way to have drawn a line?

09:10:53 12       MR. DECAMP:  Agencies do make these calls all the

09:10:55 13  time, and they are frequently irrational as this one is.

09:10:57 14  This is not the type of call that a department is free to

09:11:02 15  make when its own application of its rules is

09:11:07 16  inconsistent.  It sets up a three-part test and then,

09:11:09 17  immediately says, but we're not going to apply it to two

09:11:11 18  of the six categories that Congress has unequivocally told

09:11:15 19  us are tipped employment.

09:11:16 20       The rule goes a step father.  They say that if

09:11:21 21  you're -- forget side work.  We're not talking about now

09:11:23 22  about the concerns about evading and having servers do

09:11:26 23  janitorial work.  The simple act of waiting for customers

09:11:29 24  to arrive.  So a restaurant has a server, it's a slow day.

09:11:32 25  No customers come in or one or two customers come in, and

09:11:36  1  the server is not assigned other tasks, not assigned

09:11:39  2  cleaning, not assigned rolling silverware.  Just stand

09:11:43  3  there and wait for the customers to come and when the

09:11:45  4  customers come in, serve them.  If that takes up more than

09:11:47  5  20 percent of the server's week, the department says that

09:11:50  6  counts -- that time is in that second category of directly

09:11:53  7  supporting tipped activity.

09:11:54  8         So simply by virtue of it being slow, if they're

09:11:58  9  -- for 20 percent of the time during the week, if there

09:12:00  10  are no customers to serve, even if the server is not

09:12:03  11  assigned any other task of any other occupation, the

09:12:06  12  department takes the position in this regulation -- and

09:12:08  13  that is at 86 Federal Register, page 60130.  The

09:12:15  14  department says that downtime is directly supporting

09:12:19  15  tipped activity, but it's not tip-generating activity

09:12:22  16  itself.  It's in that second category.

09:12:23  17         So the department says you lose the ability as an

09:12:26  18  employer to take the tip credit and to pay that person

09:12:29  19  less than the minimum wage, even if the employee is

09:12:32  20  earning more than enough in tips in the times when the

09:12:35  21  customers are in the restaurant.  There's zero indication

09:12:38  22  that the -- that Congress thought this was a problem the

09:12:40  23  department needed to solve, or that the department had the

09:12:42  24  authority to say that you're no longer in the occupation

09:12:46  25  of server simply because you're waiting for customers to

09:12:48  1   arrive.

09:12:49  2          The idea that Congress didn't understand that

09:12:52  3   sometimes restaurants are busy and sometimes they're not,

09:12:54  4   that's silly.  Of course Congress understood that.  This

09:12:57  5   is not a complex industry.  And here, the department has

09:13:01  6   solved many problems that were not part of the statute.  I

09:13:05  7   mean, a lot of this regulation, in fact, the entire

09:13:07  8   regulation is a solution in search of a problem because

09:13:09  9   there is no problem.  Because these employees by

09:13:13  10  hypothesis receive between their tips and their cash wage

09:13:18  11  at least minimum wage over the course of the workweek, and

09:13:19  12  if they do not, but employer has to under the FLSA make up

09:13:23  13  the difference.

09:13:23  14         So the concern about evading, the concern

09:13:26  15  expressed in the government's brief about an employee who

09:13:29  16  is brought in, hired nominally as a server but spends all

09:13:33  17  day mowing the lawn, first of all, there's no indication

09:13:35  18  that in the 55 years since the department issued its dual

09:13:39  19  jobs regulation originally there's been a single instance

09:13:42  20  of a restaurant employee spending all day mowing a lawn.

09:13:45  21  It's kind of a silly example.

09:13:47  22         But the broader point is that to the extent we're

09:13:49  23  dealing with sham situations, an employee is given a

09:13:53  24  nominal title but given job duties that simply doesn't

09:13:56  25  line up with that, somebody who's called a server hired as

```
09:13:58   1   the server, but spending their whole shift in the kitchen,
09:14:01   2   washing dishes or cooking food, that's easily dealt with
09:14:04   3   that.  That's a sham situation that the courts are easily
09:14:07   4   able to sort out.
09:14:08   5        But the regulation doesn't do that.  The
09:14:10   6   regulation doesn't tailor itself to trying to weed out
09:14:12   7   those sham situations.  Instead, the regulation says, in
09:14:16   8   effect, we don't care what tasks these occupations
09:14:22   9   historically have performed.  We don't care whether
09:14:25  10   preparing salads, or cleaning restrooms, or any of the
09:14:29  11   activities that we highlight in the briefing are actually
09:14:33  12   part of these jobs.  We are going to define tipped
09:14:35  13   occupation as a special term and exclude anything that
09:14:38  14   doesn't fit in our world view.
09:14:40  15        So I would go to the next exhibit, if I may, and
09:14:46  16   this is Plaintiffs' Exhibit 2.  This is the O*NET report
09:14:53  17   for waiters and waitresses or servers.  This has been, for
09:14:59  18   example, submitted as an exhibit to our complaint
09:15:01  19   originally.  The highlighting is what we've added.  That
09:15:03  20   was not in the original exhibit.  We've done this for
09:15:05  21   reference.
09:15:06  22        The O*NET database -- and we're not suggesting
09:15:08  23   that O*NET is the be all, end all, or is legally binding.
09:15:12  24   O*NET is historically, though, a database that the
09:15:15  25   Department of Labor itself sponsors.  The department's own
```

09:15:17  1  employment and training administration uses O*NET,

09:15:21  2  sponsors O*NET, and looks to it as a database for what

09:15:24  3  tasks people perform in these various occupational

09:15:28  4  categories.  So to the extent that the department is

09:15:30  5  interested in and is trying in some sense to define what

09:15:33  6  an occupation is, one source of information is, well, what

09:15:37  7  is the occupation?  What tasks do these occupations

09:15:41  8  actually perform?

09:15:41  9       We have this detailed report here, and when we

09:15:44  10  see the highlighted tasks, there are a number on the

09:15:48  11  screen:  Removing dishes and glasses from tables or

09:15:49  12  counters and take them to kitchen for cleaning, prepare

09:15:52  13  tables for meals, including setting up items such as

09:15:55  14  linens, silverware and glassware, perform cleaning duties,

09:15:59  15  roll silverware, and so on.  We get to the next page:

09:16:05  16  Perform food preparation duties, such as preparing salads,

09:16:09  17  appetizers and cold dishes, portioning desserts and

09:16:12  18  brewing coffee, garnish and decorate dishes in preparation

09:16:14  19  for serving.

09:16:15  20       So preparing salads, one of the actual duties

09:16:20  21  that the department says is not part of the server

09:16:22  22  occupation, the data that the department supports says

09:16:25  23  otherwise.  And the list goes on and on.  We have others

09:16:28  24  in this same exhibit in the detailed work activities

09:16:30  25  category.  We see cook foods, clean food service areas.

09:16:35  1   We see prepare foods for cooking or serving, clean food

09:16:38  2   preparation areas, facilities, or equipment.

09:16:41  3        So the point in all this is that these are duties

09:16:45  4   that even though the department says we are not going to

09:16:48  5   accept them, in reality, as a matter of fact, these are

09:16:53  6   normal parts of these occupations.  We pull up Exhibit 3

09:16:56  7   and that is the O*NET report for bartenders.  We see some

09:17:01  8   more things here.  We've highlighted these.  And this also

09:17:03  9   is an exhibit to the complaint, minus the highlighting.

09:17:05  10       When we see the task list, clean bars, work areas

09:17:09  11  and tables.  Stock bar with beer, wine, and liquor, and so

09:17:13  12  on.  We see prepare appetizers such as pickles, cheese and

09:17:16  13  cold meats.  We go into the detailed task report, which is

09:17:20  14  farther down in the exhibit.  Clean tableware, clean food

09:17:25  15  service areas, prepare foods for cooking or serving, cook

09:17:29  16  foods.  So these are things that the Department of Labor

09:17:31  17  has by virtue of ipse dixit said are not part of these

09:17:37  18  occupations, even though the data indicates otherwise.

09:17:39  19  This all began -- and I don't have an exhibit for it, but

09:17:42  20  it was part of the record in terms of it's Exhibit 1 to

09:17:46  21  the government's submission.

09:17:48  22       So the department issued the original dual jobs

09:17:52  23  regulation in 1967.  And by the way, this is ECF 20, at

09:17:56  24  page 52 of the ECF filing.  We heard nothing about the

09:18:01  25  dual jobs issue until 1979, after the department issued

09:18:05  1    its regulation.  In 1979, the Department of Labor issued

09:18:08  2    an opinion letter, and that's Exhibit 1 to the

09:18:11  3    government's opposition to our preliminary injunction

09:18:13  4    motion.

09:18:14  5         And what they said was -- without citing any

09:18:16  6    authority or any analysis, they analyze the situation

09:18:20  7    where a restaurant had a waitress or waitresses who

09:18:24  8    reported to work two hours, and I'm quoting from the

09:18:26  9    opinion letter here, before the doors are opened to the

09:18:29  10   public to prepare the vegetables for the salad bar.  What

09:18:32  11   the department says -- and this is pulled from whole cloth

09:18:34  12   in the last paragraph of this opinion letter, it says,

09:18:38  13   quote, since it is our opinion that salad preparation

09:18:41  14   activities are essentially the activities performed by

09:18:44  15   chefs, no tip credit may be taken for the time spent in

09:18:48  16   preparing vegetables for the salad bar.

09:18:50  17        Made up out of whole cloth, not referencing any

09:18:53  18   provision of the FLSA, and not referencing any factual

09:18:56  19   data, anything -- this is other than Herbert Cohen, the

09:19:02  20   assistant administrator at the time, his own personal

09:19:05  21   opinion of what the work of chefs is.  And yet, when we

09:19:07  22   look at the work that chefs actually do and the work that

09:19:10  23   servers actually do, there's significant overlap in these

09:19:14  24   occupations.  Preparing salads is one of the items

09:19:17  25   specifically called out as a task that servers perform.

| 09:19:21 | 1 | So they began this activity, the Department of |

So they began this activity, the Department of
Labor did, in 1979.  They followed through with further
exhibits that are in the government's filing, Exhibit 2
and so on, the different opinion letters, where they built
on this concept incrementally, dealing with issues of what
about side work after a restaurant is closed, or what
about employees who have 35, or 30, or 40 percent of their
time in the course of a day spent on opening activities
where it was just a particular employee assigned those
tasks and not tasks that were generally assigned to all
the servers.

So the department incrementally built on this.
And then, in 1988 the department issued its field
operations handbook section on this topic where it really,
for the first time, set forth three categories of
activity.  Those are different categories from what is in
the final rule now.  They're different categories from
what had been called the 80/20 rule in the past, even
though it wasn't an administrative rule.  It was really a
sub-regulatory position.

But it was this 1988 handbook provision, and that
appears at Exhibit 4 of ECF 20 of the government's
opposition, and that's at page 57 of the ECF filing.
That's where the department issued for the first time this
notion of a 20 percent cap on related activities.  That's

09:20:38  1  a category that has morphed with some changes into the

09:20:41  2  second category of activity currently seen in the final

09:20:44  3  rule that we're dealing with now, which is activity that

09:20:47  4  directly supports tip-producing activities.

09:20:50  5       So the department made that up without reference

09:20:54  6  to any data, without reference to any factual analysis of

09:20:59  7  how much time on these tasks is typical in these

09:21:02  8  industries.  What do people actually do in these jobs?

09:21:05  9  The department has no expertise in that.  It's conducted

09:21:08  10  no study of those issues.  They don't dispute that fact.

09:21:10  11  They say as a matter of policy, they can set up a 20

09:21:14  12  percent tolerance.

09:21:14  13       But then, that bumps up against what the

09:21:17  14  statutory verbiage is.  We have Congress saying if you

09:21:20  15  make $30 a month or more in the occupation in which you're

09:21:23  16  engaged, you are a tipped employee, and therefore, it is

09:21:27  17  appropriate and fair for the employer to treat the tips

09:21:31  18  that you've received as wages under the FLSA for purposes

09:21:35  19  of satisfying the minimum wage obligation.  There's

09:21:37  20  nothing in that provision in the FLSA that suggests that

09:21:40  21  the Department of Labor has the authority to slice and

09:21:43  22  dice the duties of a position, of an occupation, a single

09:21:47  23  occupation like server, or bartender, or busser, and

09:21:50  24  divide those out and parse them in a way that renders

09:21:53  25  somebody who spends a hundred percent of his or her time

09:21:56  1  doing tasks that are by any measure appropriate for that

09:21:59  2  occupation.  I'm not talking about mowing the lawns or

09:22:02  3  doing anything strange that we would not normally expect a

09:22:05  4  server to do, but tasks that even the department would

09:22:07  5  concede are normal server work.  We'll set aside cleaning

09:22:11  6  the bathrooms for a moment, but everything else, preparing

09:22:13  7  the food and some of the other things that -- even if we

09:22:15  8  forget the preparing the food, because the department

09:22:18  9  takes issue with that, the other activities, the rolling

09:22:21  10  silverware and the other side work activities that the

09:22:23  11  department would agree are part of this position.

09:22:27  12       If an employee spends a hundred percent of his or

09:22:31  13  her time in the workweek doing just those activities and

09:22:33  14  has no shift where he or she is spending time exclusively

09:22:36  15  in the kitchen, washing dishes or doing something outside

09:22:40  16  the occupation, the department would nonetheless say that

09:22:43  17  employee is not subject to the tip credit because of this

09:22:47  18  20 percent standard or this 30-minute rule that the

09:22:49  19  department has if the employee happens to have a mix of

09:22:54  20  tasks that week that exceeds those thresholds.  The

09:22:56  21  department has no authority to do that.  There's no

09:22:58  22  problem under the FLSA relevant to that issue.

09:23:00  23       There's no indication that Congress delegated to

09:23:03  24  DOL the authority to micromanage tasks at the restaurant

09:23:06  25  level.  And to the extent that the department is concerned

| | | |
|---|---|---|
| 09:23:08 | 1 | about sham activities, the employers calling somebody a |
| 09:23:13 | 2 | server and giving them other duties that have nothing to |
| 09:23:15 | 3 | do with being a server, that can be dealt with by a rule |
| 09:23:17 | 4 | that's very different from what we have here that doesn't |
| 09:23:20 | 5 | turn pure server time, pure bartender time, pure busser |
| 09:23:25 | 6 | time into something other than tipped activity. |
| 09:23:27 | 7 | So the regulations sweeps too broadly.  It |
| 09:23:31 | 8 | doesn't tailor itself to the problem that they claim |
| 09:23:34 | 9 | they're solving.  And they don't in any way tether what |
| 09:23:37 | 10 | they're doing to the verbiage of the FLSA.  They claim |
| 09:23:39 | 11 | ambiguity in the verbiage we talked about, but then, the |
| 09:23:41 | 12 | regulation doesn't define those terms and doesn't address |
| 09:23:44 | 13 | the ambiguity.  It's not focused on that ambiguity.  It's |
| 09:23:47 | 14 | focused on something else.  It's focused on the policy |
| 09:23:50 | 15 | rationale of trying to raise the wages and raise the |
| 09:23:53 | 16 | overall earnings of tipped employees.  Again, a laudable |
| 09:23:56 | 17 | goal, but not anything embedded in the FLSA; and, so, the |
| 09:23:59 | 18 | department does not have the authority to do this. |
| 09:24:01 | 19 | At this point, I'd like to turn to the next |
| 09:24:05 | 20 | exhibit, which is the declaration of Angelo Amador.  This |
| 09:24:09 | 21 | is -- this was submitted as ECF 12-1.  We submitted it |
| 09:24:15 | 22 | with our preliminary injunction papers, and his |
| 09:24:18 | 23 | declaration begins at page 54 of that ECF filing.  It's |
| 09:24:22 | 24 | Exhibit 5 to our appendix.  And we have Mr. Amador here |
| 09:24:27 | 25 | today to testify.  And if the Court will hear the |

09:24:31  1   testimony, I would just start by showing the highlighted

09:24:34  2   portions of his declaration to give the background as to

09:24:38  3   who he is and what he does.  We've covered a little bit in

09:24:41  4   the direct.

09:24:41  5        But what he talks about in the declaration is --

09:24:45  6   and we've got the key verbiage highlighted.  The enormous

09:24:49  7   impact of this regulation on his members, the size of the

09:24:53  8   industry, the devastating effects of the pandemic on the

09:24:56  9   industry, and the difficulty of complying with this

09:25:00  10  regulation -- and, more specifically, it's not just the

09:25:03  11  compliance that's the challenge because I think if you

09:25:06  12  were to ask most restaurants today, they'd say our

09:25:08  13  employees spend less than 10 percent of their -- less

09:25:11  14  than, sorry, 20 percent of their time on side work.  Our

09:25:15  15  employees don't typically spend 30 minutes or more in a

09:25:18  16  single block of time on side work.

09:25:20  17       The challenge, though, the practical reality

09:25:24  18  where the rubber meets the road in this issue is, unless

09:25:25  19  an employer maintains detailed records of the time spent

09:25:28  20  in these different categories of tip-producing activity,

09:25:31  21  activity that directly supports tip-producing activity,

09:25:34  22  and then, other, the employer has no defense when an

09:25:37  23  employee files a boilerplate FLSA collective action

09:25:42  24  complaint and says, well, I routinely spent 30 percent of

09:25:45  25  my time, my estimate, on side work.  We see that complaint

| | | |
|---|---|---|
| 09:25:47 | 1 | all the time.  And if you don't have records as an |
| 09:25:50 | 2 | employer that says, well, no.  We maintained a record and |
| 09:25:53 | 3 | we can show you spent only 16 percent of your time, if you |
| 09:25:55 | 4 | don't have that record, and no employer has that record, |
| 09:25:58 | 5 | then technologically, it is either impossible or |
| 09:26:03 | 6 | economically infeasible to maintain that record, then |
| 09:26:07 | 7 | you're off to the races.  Virtually every court in the |
| 09:26:11 | 8 | country, perhaps with the exception of district courts in |
| 09:26:13 | 9 | the Fifth Circuit, will certify that class.  They will say |
| 09:26:16 | 10 | if an employee says this happened to me and I believe it |
| 09:26:19 | 11 | happened to other employees similarly situated, most |
| 09:26:22 | 12 | courts will apply a modest factual showing standard at the |
| 09:26:26 | 13 | first stage of FLSA collective action, notice will go out |
| 09:26:28 | 14 | to all of that employer's tipped employees, and we're off |
| 09:26:31 | 15 | to the races.  I'm sorry. |
| 09:26:32 | 16 | MR. WALKER:  Sorry, your Honor.  I do just want |
| 09:26:34 | 17 | to raise an objection to this particular use of this |
| 09:26:37 | 18 | exhibit.  This is an APA record review case.  So when |
| 09:26:39 | 19 | we're looking at the merits arguments in the case, the |
| 09:26:43 | 20 | likelihood of success on the merits, any review of the |
| 09:26:46 | 21 | Court would be limited to the administrative record that |
| 09:26:48 | 22 | was before the agency at the time that it made the |
| 09:26:50 | 23 | decision.  I understand that Mr. Amador's declaration may |
| 09:26:53 | 24 | be relevant to the issue of irreparable harm, but I don't |
| 09:26:58 | 25 | think it's relevant to the issue of the merits of the APA |

```
09:27:00   1   claim.
09:27:00   2           So we object to the use of this exhibit for that
09:27:02   3   purpose.
09:27:03   4           MR. DECAMP:  Your Honor, if I may, we're
09:27:04   5   introducing this solely -- this exhibit solely for the
09:27:07   6   irreparable harm issue, not for merits of the claim.  We
09:27:10   7   agree that the -- to the scope of the APA record.
09:27:12   8           THE COURT:  Okay.  Thank you.
09:27:13   9           MR. DECAMP:  May I proceed?
09:27:14  10           THE COURT:  Sure.
09:27:15  11           MR. DECAMP:  With the declaration?  Okay.
09:27:17  12           So the practical reality is -- and Mr. Amador
09:27:21  13   will address this in his live testimony -- if an employer,
09:27:25  14   especially a small to medium size restaurant business --
09:27:28  15   we're not talking about the giant restaurants.  They've
09:27:30  16   got inhouse counsel.  They have fairly -- they're fairly
09:27:33  17   well funded, most of them.  But when we're talking about
09:27:36  18   small and medium size restaurant operators who don't have
09:27:39  19   inhouse counsel, as Mr. Amador will indicate, who don't
09:27:42  20   have $500,000 sitting around to pay lawyers to fight an
09:27:46  21   FLSA case, even getting hit with one of these FLSA
09:27:49  22   collective actions that gets certified is enough to
09:27:52  23   bankrupt a lot of businesses, especially now that we're in
09:27:55  24   the pandemic where the restaurant industry is really on
09:27:57  25   the edge.
```

09:27:59  1          You'll hear testimony from Mr. Amador about what

09:28:00  2    the effect of the pandemic has been on this industry and

09:28:02  3    the number of businesses that have gone out of business.

09:28:05  4    This is an industry that's fighting for its life.  And

09:28:07  5    we're not in any way suggesting that the wages of

09:28:10  6    employees are unimportant.  Absolutely not.  Of course

09:28:12  7    they're important.  It's guaranteed by federal law.

09:28:15  8          But when we're talking about harms, we're talking

09:28:18  9    about employees who -- if this regulation continues to go

09:28:21  10   forward, they'll get their minimum wage, arguably plus,

09:28:28  11   but if the regulation gets enjoined, they'll still get at

09:28:31  12   least the minimum wage they're guaranteed.  They will

09:28:33  13   still receive between their tips and their cash wage from

09:28:36  14   the employer, at least federal minimum wage across all the

09:28:40  15   hours that they've worked.  So they are just as well

09:28:42  16   protected in the absence of this regulation as every other

09:28:45  17   minimum wage employee.

09:28:46  18          The only difference between tipped employees

09:28:49  19   under the FLSA and non-tipped employees is that Congress

09:28:51  20   in 1966 and since has recognized that in certain

09:28:57  21   industries, tipping is common, and therefore, employees

09:28:59  22   have two streams of income from that employment.  The

09:29:03  23   direct wages from their employer and customer tips.  And

09:29:06  24   as long as those customer tips exceed the de minimis

09:29:10  25   threshold, the $30 a month, it's appropriate to treat that

09:29:14  1    income from the tips as part of the wage.  That's all that

09:29:17  2    the tip credit does.  It's another way of proving minimum

09:29:21  3    wage.

09:29:21  4            But when we're talking about the harm to the

09:29:23  5    restaurant industry, every day, we see restaurants go

09:29:25  6    bankrupt.  This industry has very tight margins.  They're

09:29:29  7    dealing with a workforce now that is suffering from COVID.

09:29:32  8    They're dealing with shortages, labor shortages, supply

09:29:36  9    chain shortages, inflation, customers that aren't

09:29:40  10   necessarily going to restaurants, the whole mask issue.  A

09:29:43  11   lot of people don't want to go to public places and eating

09:29:46  12   at restaurants.  The industry is already on the ropes.

09:29:48  13           This regulation -- and the information you'll

09:29:51  14   hear from Mr. Amador will confirm this.  This regulation

09:29:54  15   is putting extreme pressure on these businesses because

09:29:57  16   the practical reality is, if they don't maintain the

09:30:01  17   records sufficient to prove the amount of time spent in

09:30:05  18   these different categories of activity, they are

09:30:08  19   subjecting themselves to FLSA litigation where even if

09:30:11  20   they have complied, even if the reality, the objective

09:30:16  21   truth of the situation is that the employees are spending

09:30:18  22   less time on these tasks than the threshold set forth in

09:30:21  23   the final rule, if an employer can't prove that at the

09:30:25  24   outset of the case in a sufficient way to shut down the

09:30:27  25   litigation, the employer will very likely go bankrupt.

09:30:31  1   That is an irreparable harm.

09:30:33  2        The time that an employer has to spend now, the

09:30:35  3   resources they have to devote now to this issue, the

09:30:40  4   paying employees full minimum wage, that's a cash wage

09:30:43  5   rather than taking the tip credit because of the need to

09:30:46  6   avoid this litigation risk, all of that is harm that if

09:30:49  7   this regulation is struck, either in this court or later

09:30:53  8   in the process, that's harm that the restaurant can't get

09:30:57  9   back.  If they go out of business, there's no way to undo

09:31:00  10  that harm.  And the courts have recognized that compliance

09:31:05  11  -- forced compliance with an invalidated rule or a rule

09:31:09  12  that's ultimately invalidated is an irreparable harm.

09:31:12  13       So this is -- in terms of the balance of harms, I

09:31:15  14  think it will be clear that there's no harm to the

09:31:18  15  government in having this regulation preliminarily

09:31:21  16  enjoined.  These workers will be protected by minimum wage

09:31:24  17  throughout this litigation.  And there's extreme harm to

09:31:28  18  these businesses that are fighting for their survival,

09:31:31  19  including fighting to maintain the jobs of the workers

09:31:34  20  that the department says it's trying to protect.

09:31:35  21       So at this point, with the Court's permission,

09:31:38  22  I'd like to call Angelo Amador to testify.

09:31:40  23       MR. WALKER:  This was the subject of my earlier

09:31:42  24  objection, your Honor.  As I said, this witness and I

09:31:45  25  think the fact that there would be witnesses at the

| | | |
|---|---|---|
| 09:31:47 | 1 | hearing today was not disclosed to the government till |
| 09:31:50 | 2 | 5:30 p.m. yesterday.  I would also note that Mr. Amador is |
| 09:31:53 | 3 | a counsel of record, an advocate on behalf of the |
| 09:31:55 | 4 | plaintiff in this case, and it would be inappropriate for |
| 09:31:58 | 5 | him to also serve as a witness. |
| 09:32:03 | 6 | MR. DECAMP:  Your Honor, we believe that Mr. |
| 09:32:04 | 7 | Amador, first of all, is a client, in addition to being -- |
| 09:32:08 | 8 | he's a lawyer, but he's also a client.  He's -- as he'll |
| 09:32:11 | 9 | testify, he's the executive director of the Restaurant Law |
| 09:32:14 | 10 | Center, so he is the client.  He is at the heart of a |
| 09:32:17 | 11 | trade association that deals with members on these issues |
| 09:32:21 | 12 | every day.  He is extremely knowledgeable about these |
| 09:32:23 | 13 | issues and can speak factually on these issues. |
| 09:32:26 | 14 | In addition, he will not be presenting oral |
| 09:32:28 | 15 | argument to the Court.  He is not in the role of the |
| 09:32:33 | 16 | ethically conflicted advocate witness.  That's not going |
| 09:32:35 | 17 | to happen here. |
| 09:32:36 | 18 | THE COURT:  He already is.  He's signed the |
| 09:32:39 | 19 | pleadings.  I mean, he's on the pleadings. |
| 09:32:42 | 20 | MR. DECAMP:  He's on the pleadings, but again, |
| 09:32:43 | 21 | courts have said that that issue of the advocate as |
| 09:32:47 | 22 | witness only becomes a problem if the credibility of the |
| 09:32:52 | 23 | lawyer is likely to present a challenge to the factfinder. |
| 09:32:54 | 24 | Here, we're not dealing with a jury.  Here, we're dealing |
| 09:32:57 | 25 | with the Court.  Certainly the Court is able to |

| | | |
|---|---|---|
| 09:33:00 | 1 | distinguish any issues there and not be confused by the |
| 09:33:02 | 2 | capacity in which Mr. Amador is testifying.  And he has |
| 09:33:06 | 3 | important, relevant factual information regarding the |
| 09:33:10 | 4 | issues that his industry is facing and he is a client. |
| 09:33:14 | 5 | THE COURT:  All right.  I'll allow the testimony |
| 09:33:16 | 6 | and reserve the ruling on whether or not I'll use it. |
| 09:33:19 | 7 | MR. DECAMP:  Thank you, your Honor.  Where would |
| 09:33:21 | 8 | you like Mr. Amador to testify from? |
| 09:33:23 | 9 | THE COURT:  The witness box here would be great. |
| 09:33:25 | 10 | If you'd come forward, sir. |
| 09:33:40 | 11 | THE CLERK:  You do solemnly swear or affirm that |
| 09:33:40 | 12 | the testimony which you may give in the case now before |
| 09:33:40 | 13 | the Court shall be the truth, the whole truth, and nothing |
| 09:33:44 | 14 | but the truth? |
| 09:33:44 | 15 | THE WITNESS:  I do. |
| 09:33:51 | 16 | ANGELO AMADOR, called by the Movant, duly sworn. |
| 09:33:51 | 17 | DIRECT EXAMINATION |
| 09:33:53 | 18 | BY MR. DECAMP: |
| 09:33:53 | 19 | Q.  Good morning, Mr. Amador. |
| 09:33:54 | 20 | A.  Good morning. |
| 09:33:54 | 21 | Q.  Could you please state and spell your full name for |
| 09:33:56 | 22 | the record. |
| 09:33:57 | 23 | A.  My name is Angelo Amador, A-N-G-E-L-O, A-M-A-D-O-R. |
| 09:34:03 | 24 | Q.  What is your current occupation? |
| 09:34:05 | 25 | A.  My current occupation, I'm the Executive Director of |

09:34:08    1    the Restaurant Law Center.

09:34:10    2    Q.   How long have you been in that role?

09:34:12    3    A.   I've been in that role unofficially since 2015 and

09:34:16    4    then, officially when it was incorporated in 2016,

09:34:19    5    September.

09:34:20    6    Q.   What are your job duties in that role?

09:34:22    7    A.   I am the spokesperson for the Restaurant Law Center.

09:34:26    8    I'm the main individual in charge of running the law

09:34:29    9    center, and representing our members, and talking to our

09:34:33   10    members on a daily basis to make sure that they are

09:34:38   11    represented and educated.

09:34:38   12    Q.   How long have you been working with the restaurant

09:34:40   13    industry?

09:34:40   14    A.   I've been working directly with either the National

09:34:45   15    Restaurant Association or the Restaurant Law Center since

09:34:48   16    2010.  So twelve -- going on twelve years now.

09:34:50   17    Q.   And what is the Restaurant Law Center?

09:34:52   18    A.   The Restaurant Law Center is an independent

09:34:57   19    organization, a 501(c)(6) to help members of the

09:35:01   20    restaurant industry be in compliance and be educated on

09:35:05   21    how to avoid the pitfalls of regulatory compliance.

09:35:10   22    Q.   Approximately how many members does the Restaurant

09:35:12   23    Law Center have?

09:35:13   24    A.   Jointly with our state restaurant association, the

09:35:17   25    District of Columbia, the Commonwealth of Puerto Rico,

09:35:20  1   about 500,000.

09:35:21  2   Q.   And what is the average size in terms of employees of

09:35:24  3   your Restaurant Law Center members?

09:35:26  4   A.   Well, we consider them medium to small.  Under the

09:35:30  5   Small Business Administration, almost all of them will be

09:35:33  6   small business but, you know, midrange for the way people

09:35:38  7   view them.

09:35:38  8   Q.   Do most of your members have inhouse counsel, legal

09:35:42  9   counsel to advise them on FLSA compliance?

09:35:43  10  A.   Most of our members do not, and a lot of our members

09:35:47  11  don't even have HR, human resources departments.

09:35:51  12  Q.   What does the Restaurant Law Center do for its

09:35:54  13  members, if anything?

09:35:55  14  A.   We provide a lot of compliance information.  We hold

09:35:59  15  webinars.  We hold in-person meetings.  We have yearly

09:36:04  16  summit and, of course, you know, answering calls and

09:36:06  17  e-mails on a daily basis.

09:36:07  18  Q.   What types of topics does the Restaurant Law Center

09:36:10  19  discuss at meetings with its members?

09:36:13  20  A.   We discuss from state and local to federal laws and

09:36:18  21  regulations whether there is -- you know, be in Chicago,

09:36:24  22  in California.  And then, of course, you know, a lot -- we

09:36:28  23  are very labor-intensive industry, so a lot of regulations

09:36:31  24  from the Department of Labor.

09:36:32  25  Q.   To your, knowledge, do Restaurant Law Center members

09:36:35  1   use the FLSA's tip credit?

09:36:37  2   A.   A lot our members -- not all of them do, but a lot of

09:36:41  3   our members do.

09:36:42  4   Q.   Did the Restaurant Law Center submit comments in

09:36:46  5   connection with the Department of Labor's rulemaking that

09:36:48  6   led to the final rule that's at issue in this litigation?

09:36:50  7   A.   We have been submitting comments to the proposals and

09:36:53  8   others and yes, to the NPRM on this particular rule.

09:36:56  9   Q.   Did the Restaurant Law Center members also submit

09:36:59  10  comments in connection with the same rulemaking

09:37:01  11  proceeding?

09:37:01  12  A.   They did.  I don't know if all of the restaurants

09:37:03  13  have submitted comments are members, but I know that about

09:37:06  14  78 to 80 percent of the comments submitted were from

09:37:10  15  restaurants or, as we call them, food service

09:37:12  16  establishments.

09:37:13  17  Q.   What is your understanding, if any, of how the final

09:37:16  18  rule affects the Restaurant Law Center and its members?

09:37:19  19  A.   It has a direct impact on those that take the tip

09:37:23  20  credit.  You know, we keep getting calls, you know, they

09:37:27  21  find it confusing because, frankly, we think some of the

09:37:31  22  parts are contradictory.  So it has a direct impact on how

09:37:34  23  they run their business, and how they manage the work of

09:37:36  24  the employees, and how they supervise and keep track of

09:37:39  25  hours and others.

| | | |
|--|--|--|
| 09:37:41 | 1 | Q.   How has the COVID-19 pandemic affected the industry? |
| 09:37:45 | 2 | A.   Well, there's a lot of restaurants that wouldn't be |
| 09:37:48 | 3 | -- there's a lot of restaurants that have closed.  A lot |
| 09:37:50 | 4 | of restaurants that have closed permanently.  And we |
| 09:37:54 | 5 | requested and received help from the -- what is called |
| 09:37:59 | 6 | Restaurant Revitalization Fund from Congress to be able to |
| 09:38:02 | 7 | help some stay open, in addition to other federal programs |
| 09:38:05 | 8 | that help keep the doors open. |
| 09:38:10 | 9 | Q.   Does the COVID-19 pandemic affect in any way how the |
| 09:38:14 | 10 | final rule impacts the Restaurant Law Center's members? |
| 09:38:17 | 11 | A.   Well, the COVID-19 has a direct impact on everything, |
| 09:38:21 | 12 | in particular, because a lot of the savings that they had |
| 09:38:25 | 13 | for -- not something like this.  No one expected something |
| 09:38:29 | 14 | like this, but for the bad times ended up coming and they |
| 09:38:34 | 15 | have been depleted.  So they really have no reserves at |
| 09:38:39 | 16 | this point. |
| 09:38:39 | 17 | Q.   As a practical matter, what's so difficult about |
| 09:38:43 | 18 | tracking the time that employees spend on tip-producing |
| 09:38:46 | 19 | activity, activity that directly supports tip-producing |
| 09:38:50 | 20 | activity, and non-tipped activity? |
| 09:38:52 | 21 | A.   It is one of tracking and keeping records.  The most |
| 09:38:57 | 22 | important comment that I often get is when you look at the |
| 09:39:01 | 23 | three categories under the task and the tip occupation as |
| 09:39:05 | 24 | defined in the final rule, restaurants tell me they go |
| 09:39:08 | 25 | from one to the other constantly from, you know, in a span |

09:39:13  1   of six minutes, they would go from serving a table to

09:39:18  2   waiting for customers, and they have to be tracked

09:39:23  3   separately and that becomes very difficult.

09:39:26  4   Q.   To your knowledge, do existing timekeeping systems

09:39:29  5   have the capacity to track those different categories of

09:39:32  6   activity?

09:39:33  7   A.   What my members are telling me is that it does not.

09:39:36  8   That it doesn't exist, particularly because of how quickly

09:39:39  9   you move from one category to the other.

09:39:42  10  Q.   The final rule at issue in this case was issued by

09:39:46  11  the Department of Labor at the end of October 2021.  You

09:39:49  12  didn't file the lawsuit here until beginning of December.

09:39:53  13  So roughly a month later, four or five weeks later.  What

09:39:56  14  is the reason for the delay?

09:39:58  15  A.   Well, we did not view it as a delay.  You know, you

09:40:01  16  have a process that we need to follow.  You know, we were

09:40:04  17  working with co-plaintiff, the Texas Restaurant

09:40:07  18  Association.  But in addition, we had the unprecedented --

09:40:10  19  we were actually not even expecting -- when it came out,

09:40:13  20  we were expecting the OSHA ETS vaccination, and that

09:40:17  21  actually came within a week of this being issued.  So we

09:40:21  22  were looking at the unprecedented action by the Restaurant

09:40:25  23  Law Center to challenging two rules at the same time from

09:40:28  24  the federal government.

09:40:31  25           We ended up seeing that other trade associations

09:40:34  1  filed suit on the ETS, so we refrain from doing that and

09:40:38  2  concentrated on this one.  But, you know, there's several

09:40:41  3  levels of approval by the Restaurant Law Center board, the

09:40:44  4  Texas Restaurant Association, the Executive Committee of

09:40:48  5  the National Restaurant Association.  It's a major

09:40:50  6  endeavor to sue the federal government and, you know, we

09:40:52  7  don't think 30 days is a long time, but I know some

09:40:56  8  disagree.

09:40:58  9  Q.   I have no further questions, your Honor.

09:41:00  10            THE COURT:  Mr. Walker.

09:41:03  11            MR. WALKER:  Thank you, your Honor.  Just to

09:41:05  12  augment my objection before I begin the cross-examination,

09:41:08  13  I would like to note that plaintiffs' counsel has

09:41:12  14  described the way I believe Mr. Amador can testify,

09:41:15  15  notwithstanding his role as counsel of record in this

09:41:17  16  case.  They've provided no explanation for why the

09:41:19  17  disclosure of Mr. Amador as a witness might have been made

09:41:23  18  before 5:30 p.m. last night or why they could not have

09:41:26  19  disclosed that they were going to present a witness before

09:41:26  20  5:30 p.m. last night.

09:41:30  21            Also, I'd just note Mr. Amador has provided new

09:41:32  22  evidence outside the scope of his declaration as part of

09:41:34  23  his testimony today that could have been submitted, but

09:41:36  24  was not submitted, by the plaintiffs' opening brief or the

09:41:39  25  reply brief.

| | | |
|---|---|---|
| 09:41:39 | 1 | THE COURT:  I'll note your objection.  Thank you. |
| 09:41:58 | 2 | CROSS-EXAMINATION |
| 09:42:02 | 3 | BY MR. WALKER: |
| 09:42:02 | 4 | Q.  Mr. Amador, do you have a copy of your declaration |
| 09:42:04 | 5 | handy? |
| 09:42:05 | 6 | A.  No, I do not, but I can -- |
| 09:42:08 | 7 | Q.  I can provide that to you. |
| 09:42:10 | 8 | A.  Thank you. |
| 09:42:10 | 9 | Q.  With the Court's permission. |
| 09:42:12 | 10 | THE COURT:  Sure. |
| 09:42:18 | 11 | MR. WALKER:  I'm happy to provide a copy to the |
| 09:42:20 | 12 | Court, too, ECF 12-1, beginning on page 55.  Would you |
| 09:42:24 | 13 | like a copy or would your Honor -- |
| 09:42:25 | 14 | THE COURT:  That's okay.  I have everything here. |
| 09:42:27 | 15 | Thank you. |
| 09:42:32 | 16 | MR. DECAMP:  I have it up on the screen, if you'd |
| 09:42:35 | 17 | like. |
| 09:42:35 | 18 | THE WITNESS:  Thank you. |
| 09:42:42 | 19 | Q.  (BY MR. WALKER) Mr. Amador, if would you please turn |
| 09:42:58 | 20 | to a paragraph 15 of your declaration that is on page 5 of |
| 09:43:01 | 21 | 12.  I just want to note in this paragraph, you describe a |
| 09:43:11 | 22 | specific call that you had with members on August 3rd, |
| 09:43:14 | 23 | 2021, which discuss certain cost concerns with the final |
| 09:43:18 | 24 | rule, correct? |
| 09:43:19 | 25 | A.  On August -- oh, you mean paragraph 14?  You |

09:43:23   1   mentioned 15.

09:43:23   2   Q.   Correct.

09:43:24   3   A.   Sorry, I read 15.

09:43:25   4   Q.   Paragraph 13, you're describing an August 3rd, 2021

09:43:29   5   call?

09:43:29   6   A.   Uh-huh.

09:43:29   7   Q.   You'll acknowledge, won't you, that August 3rd, 2021

09:43:32   8   is before the final rule was published, correct?

09:43:34   9   A.   Correct.

09:43:37   10   Q.   So what you're actually discussing on this call was

09:43:39   11   the proposed --

09:43:40   12   A.   The NPRM, correct.

09:43:40   13   Q.   And there were changes made to the proposed rule in

09:43:43   14   the final rule; isn't that correct?

09:43:44   15   A.   Minor changes, correct.

09:43:46   16   Q.   If you will, turn to page -- paragraph 16 or direct

09:43:49   17   your attention to paragraph 16 that starts on page 5 and

09:43:52   18   continues to page 6.  You state here that you were unable

09:44:00   19   to attend a meeting to oppose a bill proposed by New York

09:44:04   20   state because of your attention to the final rule; is that

09:44:08   21   correct?

09:44:08   22   A.   Correct.

09:44:09   23   Q.   What was the date of that meeting?

09:44:12   24   A.   I cannot recall right now.

09:44:14   25   Q.   Can you recall --

| | | |
|---|---|---|
| 09:44:15 | 1 | A.   The exact date. |
| 09:44:15 | 2 | Q.   -- if it was before or after the publication of the |
| 09:44:17 | 3 | final rule? |
| 09:44:18 | 4 | A.   I cannot recall right now.   Sorry. |
| 09:44:20 | 5 | Q.   You also say you were unable to oppose natural gas |
| 09:44:24 | 6 | bans proposed by the state of California or to participate |
| 09:44:26 | 7 | in strategic advice on similar bans proposed by other |
| 09:44:30 | 8 | states.   What was the date of that activity? |
| 09:44:32 | 9 | A.   I cannot recall the dates.   No. |
| 09:44:34 | 10 | Q.   Can you recall if it was before or after publication |
| 09:44:37 | 11 | of the final rule? |
| 09:44:38 | 12 | A.   It could have been before, but I cannot recall. |
| 09:44:40 | 13 | Q.   If you'd turn your attention on paragraph 19, and |
| 09:44:43 | 14 | this is where you describe various categories of costs |
| 09:44:46 | 15 | that you say your member restaurants will incur as a |
| 09:44:49 | 16 | result of the final rule, correct? |
| 09:44:50 | 17 | A.   Correct. |
| 09:44:52 | 18 | Q.   Subparagraph A deals with regulatory familiarization, |
| 09:44:56 | 19 | correct? |
| 09:44:57 | 20 | A.   Correct. |
| 09:44:58 | 21 | Q.   And you state here that your members will require |
| 09:45:02 | 22 | significant time to read and become familiar with the |
| 09:45:06 | 23 | final rule, correct? |
| 09:45:07 | 24 | A.   Correct. |
| 09:45:08 | 25 | Q.   You're referring there to the final rule as published |

09:45:11 1  in the Federal Register, correct?

09:45:12 2  A.   Correct.

09:45:13 3  Q.   And you don't take into any account here in your

09:45:17 4  declaration the compliance guidance that's published by

09:45:21 5  the Department of Labor on their website?

09:45:23 6  A.   No.  I take in consideration everything that is being

09:45:27 7  published.  They still have questions on compliance.

09:45:30 8  Q.   You don't mention anything about that compliance

09:45:32 9  guidance in your affidavit, do you?

09:45:34 10 A.   I don't think I did.  No.

09:45:36 11 Q.   Okay.  And you say you've confirmed this with your

09:45:40 12 members?

09:45:41 13 A.   Correct.

09:45:42 14 Q.   Can you identify a specific member that you -- that

09:45:45 15 has told you that they would have to spend significant

09:45:47 16 time reading and becoming familiar with the rule?

09:45:49 17 A.   Absolutely.  I've spoken with the general counsel

09:45:52 18 from Golden Corral.  I've spoken with the general counsel

09:45:55 19 from Lettuce Entertain You, which are differing types of

09:46:01 20 brands that are independent.  I have received feedback --

09:46:05 21 we have a webinar next week on the issue and people get to

09:46:08 22 put the lines, comments, and we have over around 300 right

09:46:15 23 now.  We have people from all over the United States,

09:46:17 24 Cincinnati, Ohio, Montgomery, Alabama, saying the same

09:46:21 25 thing with regards to this rule.

09:46:24  1   Q.   But you declined to mention any specific restaurants

09:46:26  2   in your declaration; is that correct?

09:46:27  3   A.   This -- some of this feedback is still oncoming,

09:46:32  4   which is, you know, one of the reasons we wanted to update

09:46:34  5   the information as to what has happened.   But yeah.   No.

09:46:36  6   There are no names included there.

09:46:39  7   Q.   Have any of the specific restaurants described to you

09:46:41  8   the specific recordkeeping -- or, I'm sorry, the specific

09:46:45  9   rule familiarization efforts and costs that they will have

09:46:48  10  to incur?

09:46:49  11  A.   Yes, they have.

09:46:50  12  Q.   Can you describe those in detail?

09:46:51  13  A.   Yeah.   They have talked to their IT departments,

09:46:56  14  trying to figure out how to keep track of the timing and

09:47:02  15  trying to understand, you know, what happens when the

09:47:05  16  restaurant is slow.   You know, all of those things have

09:47:08  17  been described to them and they describe to me.

09:47:10  18  Q.   We're talking about rule familiarization costs here,

09:47:14  19  correct?

09:47:14  20  A.   Correct.

09:47:14  21  Q.   The IT department is not going to be doing the rule

09:47:18  22  familiarization, correct?

09:47:19  23  A.   With the rule familiarization, I can tell you, you

09:47:21  24  know, the comments are coming from -- people wouldn't be

09:47:23  25  doing a webinar if they understood what the regulation was

09:47:26  1   about.

09:47:26  2   Q.   I'm asking if any specific member has provided you

09:47:29  3   information that you can describe in detail about

09:47:32  4   precisely what they're going to have to do to read and

09:47:35  5   comply with the rule and the costs that that is going to

09:47:37  6   incur.

09:47:37  7   A.   They haven't been able to come up with a cost because

09:47:39  8   they don't really understand the rule yet, which is part

09:47:42  9   of the familiarization cost.

09:47:44  10  Q.   But this rule has been in place for over a month now,

09:47:46  11  correct?

09:47:46  12  A.   Correct.

09:47:47  13  Q.   It's effective, correct?

09:47:48  14  A.   It is effective.

09:47:49  15  Q.   So that means the restaurants are obligated to comply

09:47:52  16  with it now and have been for over a month, correct?

09:47:54  17  A.   Correct.

09:47:54  18  Q.   And so, your testimony today is that your members

09:47:56  19  have not yet incurred any costs to become familiar with

09:47:59  20  the rule?

09:48:00  21  A.   What was the question again?

09:48:03  22  Q.   I said, is it your testimony today that you don't

09:48:05  23  know of any restaurant that has already incurred costs to

09:48:08  24  become familiar with this published and effective rule?

09:48:10  25  A.   No.  That is not my testimony.  My testimony is that

09:48:14  1   they're incurring costs right now to become familiar with

09:48:17  2   the rule.

09:48:18  3   Q.   But you can't right now describe any of those costs

09:48:21  4   in detail and precisely what is being --

09:48:22  5   A.   No.   I can tell you, they are talking to even

09:48:25  6   attorneys, and attorneys are not cheap to try to

09:48:27  7   understand the rule and come into compliance.

09:48:30  8   Q.   Which restaurant are you aware of that has spoken to

09:48:32  9   an attorney?

09:48:32  10  A.   Well, all of them that have contacted me from via

09:48:38  11  e-mail from -- not all of them.   The ones that have

09:48:41  12  mentioned talking to attorneys, I imagine they're paying

09:48:44  13  their attorney for that.

09:48:45  14  Q.   You imagine that yourself.

09:48:47  15  A.   Well, I don't know many attorneys that work for free.

09:48:52  16  Q.   Looking at paragraph C, you describe here -- or, I'm

09:48:55  17  sorry, let's go to paragraph B for preparation costs.

09:49:00  18  These are costs to prepare for the rule, correct?

09:49:02  19  A.   Which one?

09:49:03  20  Q.   Subparagraph B, beginning on page 7.

09:49:06  21  A.   Correct.

09:49:07  22  Q.   And as you said, this rule is currently in effect,

09:49:10  23  correct?

09:49:11  24  A.   Correct.

09:49:11  25  Q.   And has been for over a month.

09:49:13   1   A.   Correct.

09:49:13   2   Q.   So with these preparation costs have been already

09:49:17   3   incurred, wouldn't you agree?

09:49:18   4   A.   They're being incurred.

09:49:20   5   Q.   Are you aware of any specific restaurant that's

09:49:22   6   incurring specific preparation costs that you can describe

09:49:25   7   in detail today?

09:49:26   8   A.   Yes.  I have at least a couple that have commented in

09:49:32   9   -- for the webinar that they are now paying their bussers,

09:49:36   10  for example, the people that clean the tables, the full

09:49:39   11  minimum wage, instead of the tip credit, for that work

09:49:43   12  because they're afraid that they might not be in

09:49:45   13  compliance and might not be able to track the work

09:49:47   14  properly.

09:49:48   15  Q.   I think you'll agree, won't you, that that would fall

09:49:50   16  under subparagraph C, increased wage costs?

09:49:54   17  A.   Well, you can put it in either in my book.  I mean,

09:49:57   18  it's preparation to be in compliance, and it is also

09:50:01   19  increased wage costs.  You also have training that they're

09:50:04   20  giving managers on how to keep track of the work that the

09:50:06   21  servers are doing that would also be preparation costs.

09:50:09   22  Q.   Can you describe any specific training by any

09:50:12   23  specific member here today that's been planned or

09:50:16   24  undertaken?

09:50:16   25  A.   Yes.  I have at least one member that have said that

09:50:18   1    they have to train their managers on keeping track.  The

09:50:22   2    name, I don't have off the top of my head, but I could

09:50:25   3    look it up.

09:50:25   4    Q.   You can't tell us which member that is?

09:50:27   5    A.   I can give it to you afterwards if you want it.

09:50:30   6    Q.   Can you describe in detail the training that they're

09:50:32   7    having to provide?

09:50:33   8    A.   I have not been privy to the training.  I just ask

09:50:36   9    them if they have provided the training.

09:50:40   10   Q.   Looking at the increased wage cost, you describe a

09:50:45   11   particular Virginia member.  Which restaurant is that?

09:50:47   12   A.   I don't know from the top of my head.  I remember it

09:50:51   13   was in Virginia.

09:50:52   14   Q.   But you can't identify that member, specifically?

09:50:54   15   A.   Not right now, no.

09:50:55   16   Q.   Can you identify when you had this discussion with

09:50:57   17   the Virginia member?

09:50:59   18   A.   No.  I would have to go back and look at my calendar.

09:51:03   19   Q.   Can you tell whether it was before or after

09:51:05   20   publication of the final rule?

09:51:07   21   A.   I can't recall.  No.

09:51:10   22   Q.   Turning now to adjustment cost, you refer here

09:51:18   23   specifically to a larger member that you say needs to

09:51:20   24   build a team, correct?

09:51:22   25   A.   Hold on.  Let me read what you're referring to.

| | | |
|---|---|---|
| 09:51:25 | 1 | Q.   Subparagraph D, on page 9. |
| 09:51:34 | 2 | A.   Uh-huh. |
| 09:51:34 | 3 | Q.   And can you identify that larger member that you |
| 09:51:36 | 4 | referred to there? |
| 09:51:38 | 5 | A.   I will have to go back and look it up.  I cannot tell |
| 09:51:41 | 6 | you right now which member it was. |
| 09:51:42 | 7 | Q.   Can you tell when you had this conversation with the |
| 09:51:44 | 8 | larger member? |
| 09:51:45 | 9 | A.   I've had many conversations with large members, but I |
| 09:51:48 | 10 | cannot recall which one -- |
| 09:51:50 | 11 | Q.   I guess -- |
| 09:51:50 | 12 | A.   -- specifically is this. |
| 09:51:51 | 13 | Q.   Speaking specifically about the conversation where |
| 09:51:54 | 14 | you learned that the larger member would need to build |
| 09:51:57 | 15 | this team and create new policies training and job |
| 09:52:02 | 16 | descriptions. |
| 09:52:02 | 17 | A.   I don't want to guess as to the member, but I can |
| 09:52:06 | 18 | find out and get back with you on that. |
| 09:52:07 | 19 | Q.   And can you tell me when you had the conversation |
| 09:52:09 | 20 | about the need to create this team? |
| 09:52:11 | 21 | A.   I don't know if it was before or after the rule |
| 09:52:14 | 22 | became effective. |
| 09:52:15 | 23 | Q.   Can you tell me if it was before or after the |
| 09:52:17 | 24 | publication of the final rule? |
| 09:52:19 | 25 | A.   I cannot because, again, a lot of these conversations |

09:52:22  1   -- the conversations have been ongoing for months before

09:52:25  2   and after the rule became effective and the changes were

09:52:29  3   minor.

09:52:31  4   Q.   So it could have been between publication of the

09:52:34  5   notice of proposed rule and then, the final rule, correct?

09:52:37  6   A.   Definitely, one of them would have happened before,

09:52:40  7   but, you know, there have been conversations ongoing

09:52:42  8   after, as well.

09:52:44  9   Q.   So I think the answer to my question was yes, that it

09:52:46  10  could have been between the publication of the proposed

09:52:49  11  rule and the publication of the final rule, correct?

09:52:51  12  A.   Correct, but it actually came true because they're

09:52:54  13  telling me this is exactly what they're doing.

09:52:56  14  Q.   When did they tell you that?

09:52:58  15  A.   As late as two days ago, I was having the

09:53:02  16  conversation.  I do recall perfectly was with Golden

09:53:06  17  Corral's, you know, counsel and all of the things that

09:53:09  18  they have to do with IT to be able to try to come into

09:53:12  19  compliance.  And it's not really trying to come into

09:53:15  20  compliance.  As you said, the rule is effective.  I do

09:53:17  21  believe the members are in compliance.  It's being able to

09:53:19  22  defend themselves against a lawsuit and being able to

09:53:22  23  prove that they're in compliance, which becomes very

09:53:24  24  difficult and expensive.

09:53:26  25  Q.   So are you saying that the larger member that you

| | | |
|---|---|---|
| 09:53:28 | 1 | couldn't remember a few questions ago, you now remember is |
| 09:53:31 | 2 | Golden Corral? |
| 09:53:32 | 3 | A.   No.   I said that the one I spoke with two days ago |
| 09:53:34 | 4 | and told me the same thing, I can recall perfectly was |
| 09:53:37 | 5 | Golden Corral's, you know, counsel. |
| 09:53:40 | 6 | Q.   So that's separate from what you're describing in |
| 09:53:43 | 7 | subparagraph D? |
| 09:53:43 | 8 | A.   What I'm saying is that a lot of these conversations |
| 09:53:45 | 9 | and the conversation here, I don't know when this |
| 09:53:47 | 10 | particular conversation happened at this moment.   I will |
| 09:53:50 | 11 | have to go back and look at my records. |
| 09:53:58 | 12 | Q.   Similar question -- |
| 09:53:59 | 13 | A.   And again, there are similar conversations that I had |
| 09:54:01 | 14 | with other members, as well, saying the same thing. |
| 09:54:04 | 15 | Q.   And then, turning to subparagraph E on page 10, |
| 09:54:09 | 16 | similar question.   You note here that your members say you |
| 09:54:12 | 17 | will need to spend money to create new business and |
| 09:54:19 | 18 | staffing, correct? |
| 09:54:20 | 19 | A.   Correct. |
| 09:54:21 | 20 | Q.   Can you identify a specific member that you've had a |
| 09:54:24 | 21 | conversation about staffing with? |
| 09:54:27 | 22 | A.   Again, you know, I have these conversations every |
| 09:54:29 | 23 | day.   I cannot mention one specifically that on that |
| 09:54:35 | 24 | conversation.   But I have plenty of conversations with |
| 09:54:38 | 25 | members that are telling me the same thing with regard to |

09:54:41   1    staffing costs.  If you are changing the structure and

09:54:44   2    you're paying somebody -- for example, you want to bring

09:54:49   3    the servers at 10:30 in morning, instead of 10:00, then

09:54:52   4    you're paying somebody else to do the setup that is a

09:54:55   5    whole different staffing model than what they have right

09:54:58   6    now.

09:54:58   7    Q.  But you can't identify a specific conversation that

09:55:00   8    you've had with a specific member on this topic?

09:55:06   9    A.  I can definitely talk about several.  Again, you

09:55:11   10    know, I talked to Lettuce Entertain You.  I talked to

09:55:15   11    Brinker, I talked to a number.  And then, I talked to

09:55:18   12    Independence or get e-mails from Independence telling me

09:55:20   13    the same thing.

09:55:22   14    Q.  Specifically with respect to the staffing issue?

09:55:25   15    A.  Correct.

09:55:26   16    Q.  And with respect to one of the members that you just

09:55:30   17    identified, can you identify the date on which you had

09:55:32   18    that conversation?

09:55:32   19    A.  I cannot identify the exact date for -- this was done

09:55:37   20    for the declaration before.  I can -- of course, my memory

09:55:42   21    is easier to recall things that happened recently.

09:55:44   22    Q.  Can you identify a specific conversation that has

09:55:48   23    occurred after publication of the final rule?

09:55:50   24    A.  Yes, I can.

09:55:51   25    Q.  Which one's that?

| | | |
|---|---|---|
| 09:55:53 | 1 | A.   I've been getting e-mails for the webinar that we |
| 09:55:55 | 2 | have next week where they are stating exactly this, that |
| 09:55:59 | 3 | they're paying other people not on the tip credit. |
| 09:56:02 | 4 | They're bringing people to do the setup work, and that is |
| 09:56:06 | 5 | different than the process they had before where they had |
| 09:56:10 | 6 | the server or the busser do certain types of work that was |
| 09:56:15 | 7 | within the O*NET description that they were covering under |
| 09:56:17 | 8 | the tip credit. |
| 09:56:18 | 9 | Q.   Can you describe a specific member that has said that |
| 09:56:21 | 10 | to you after publication of the final rule? |
| 09:56:24 | 11 | A.   I will have to look at my e-mails and the |
| 09:56:26 | 12 | registration for next week's webinar.  But yes, I could. |
| 09:56:31 | 13 | I just don't have it right now with me. |
| 09:56:32 | 14 | Q.   You're not able to do so today. |
| 09:56:34 | 15 | A.   I will be able to do it today but not right now. |
| 09:56:41 | 16 | Q.   Turning now to management costs in paragraph F on |
| 09:56:45 | 17 | page 10, you mentioned one chief legal officer who |
| 09:56:49 | 18 | estimates that 10 hours per week of management time will |
| 09:56:52 | 19 | have to be expended to comply with the final rule, |
| 09:56:57 | 20 | correct? |
| 09:56:57 | 21 | A.   Correct. |
| 09:56:57 | 22 | Q.   And which member is that, specifically? |
| 09:56:59 | 23 | A.   I will have to go back and look at my notes but, |
| 09:57:03 | 24 | again, is similar to what they're all saying. |
| 09:57:06 | 25 | Q.   But you can't identify the specific member today? |

09:57:08    1    A.    Not right now.

09:57:09    2    Q.    Can you identify the date on which you had this

09:57:12    3    conversation?

09:57:12    4    A.    Not right now.

09:57:14    5    Q.    Can you -- so it could be at some point between the

09:57:18    6    issuance of the proposed rule and the final rule; isn't

09:57:20    7    that correct?

09:57:21    8    A.    This particular one, it could have been.

09:57:24    9    Q.    And can you say with specificity what's going to --

09:57:27   10    what this member told you management would be doing within

09:57:32   11    that 10 hours?

09:57:32   12    A.    I mean, training alone, because it's continuous and

09:57:36   13    we have a high changing of jobs and staff, it's going to

09:57:44   14    be more than, you know, 10 hours.  It will be like 10

09:57:48   15    hours, not 10 minutes, to train all the managers that have

09:57:50   16    the different shifts at the restaurants.

09:57:52   17    Q.    Well, my question was, can you describe with

09:57:55   18    specificity what this member told you management would be

09:57:58   19    doing during this additional 10 hours?

09:58:01   20    A.    With specificity, I mean, I don't know how specific

09:58:04   21    you want to be, but training alone, and conversations with

09:58:08   22    their staff, and changing the whole structure takes more

09:58:12   23    than 10 minutes.

09:58:15   24    Q.    When you say 10 minutes, you're referring to the

09:58:17   25    estimate that the Department of Labor provided in the

| | | |
|---|---|---|
| 09:58:19 | 1 | rule? |
| 09:58:19 | 2 | A.   Correct. |
| 09:58:20 | 3 | Q.   That was an average, wasn't it? |
| 09:58:22 | 4 | A.   Yeah.  And I don't think in an average, no |
| 09:58:25 | 5 | restaurants -- I mean, for smaller restaurants, it's |
| 09:58:28 | 6 | actually more difficult.  I have an e-mail and, again, I |
| 09:58:31 | 7 | can provide you the name from a restaurant that has 34 |
| 09:58:34 | 8 | employees, and even everything they're doing, like, okay, |
| 09:58:38 | 9 | we don't know if we're in compliance or not.  So I would |
| 09:58:40 | 10 | say for smaller restaurants, it's even more difficult than |
| 09:58:43 | 11 | for larger restaurants. |
| 09:58:44 | 12 | Q.   It's an average across all establishments, though, |
| 09:58:47 | 13 | correct? |
| 09:58:48 | 14 | A.   Yeah, but I don't see anybody taking 10 minutes in |
| 09:58:51 | 15 | training for this regulation.  And I point out that the |
| 09:58:55 | 16 | Small Business Administration office advocacy agree with |
| 09:58:58 | 17 | us that this is way low average for this particular rule. |
| 09:59:02 | 18 | Q.   That group of establishments from which they took the |
| 09:59:04 | 19 | average includes several establishments that do not take a |
| 09:59:07 | 20 | tip credit for any employees, doesn't it? |
| 09:59:09 | 21 | A.   Oh, I don't know.  But, you know, you have to comply |
| 09:59:12 | 22 | with the tip credit.  It has to be establishments that use |
| 09:59:14 | 23 | the tip credit. |
| 09:59:15 | 24 | Q.   You don't know that the group of establishments from |
| 09:59:17 | 25 | which the Department of Labor drew this average includes |

09:59:20  1  several establishments that do not take a tip credit at

09:59:22  2  all?

09:59:23  3  A.   I don't know if they consider Microsoft and IBM but,

09:59:27  4  you know, why would they care.

09:59:29  5  Q.   Okay.  And going on the recordkeeping, are you saying

09:59:42  6  that members have said that they need to maintain records

09:59:45  7  to defend against litigation?

09:59:47  8  A.   Absolutely.  Yes.

09:59:48  9  Q.   Can you describe in detail a specific member who has

09:59:53  10  raised this concern with you?

09:59:54  11  A.   I think that's the number-one concern raised by all

09:59:58  12  the members.

09:59:58  13  Q.   Can you identify a specific one?

10:00:00  14  A.   I could identify specific ones if I could look at my

10:00:05  15  e-mails and my notes.

10:00:06  16  Q.   But you can't do so today?

10:00:08  17  A.   No.  I could probably talk about, you know, a couple,

10:00:13  18  the ones that I have talked to at length recently.  Like,

10:00:17  19  you know, Lettuce Entertain You will tell you that as a

10:00:24  20  general counsel that yeah, recordkeeping is impossible to

10:00:26  21  be able to keep track of these kinds of shift from one

10:00:31  22  category to the next.

10:00:33  23  Q.   Can you describe in detail how the recordkeeping

10:00:37  24  requirements under the final rule would be different from

10:00:41  25  recordkeeping requirements prior to the final rule?

| | | |
|---|---|---|
| 10:00:44 | 1 | A.   Yes.  If you're looking at a server and you're |
| 10:00:46 | 2 | looking at all of the tasks that they do versus, for |
| 10:00:50 | 3 | example, the example that the Department of Labor said, |
| 10:00:53 | 4 | mowing the lawn, that is very easy to keep records of |
| 10:00:57 | 5 | that.  You know, one is one job and you're doing your job |
| 10:00:59 | 6 | and the other one is another.  When the recordkeeping |
| 10:01:02 | 7 | would have to include slow times at the restaurant, when |
| 10:01:08 | 8 | you haven't even changed an occupation, you're still doing |
| 10:01:10 | 9 | your duties as a server, that is almost impossible to |
| 10:01:13 | 10 | track. |
| 10:01:14 | 11 |      So they are still trying to figure out if you |
| 10:01:17 | 12 | create a new category, they're still talking to IT to try |
| 10:01:20 | 13 | to figure out if there's a way that you can punch in, |
| 10:01:23 | 14 | punch out.  So it's completely different.  Again, you have |
| 10:01:25 | 15 | three different categories that didn't exist before, and |
| 10:01:28 | 16 | now you have, in addition to the 80/20, you have the 30 |
| 10:01:32 | 17 | minutes that you have to account for, as well. |
| 10:01:33 | 18 | Q.   You mentioned 80/20, restaurants have been subjected |
| 10:01:36 | 19 | to quantitative temporal limits on the amount of related |
| 10:01:39 | 20 | non-tipped duties that servers could perform since the |
| 10:01:42 | 21 | 1980s; isn't that correct? |
| 10:01:43 | 22 | A.   We would disagree with that statement. |
| 10:01:45 | 23 | Q.   Well, in 1988, the Department of Labor issued a |
| 10:01:49 | 24 | opinion letter that said that there was a 20 percent |
| 10:01:54 | 25 | tolerance for related non-tipped duties; isn't that |

10:01:57    1   correct?

10:01:58    2   A.   I cannot -- if you say so.  I'll take your word for

10:02:01    3   it.

10:02:01    4   Q.   There have been several private lawsuits brought

10:02:04    5   against restaurants in which courts have subjected

10:02:09    6   restaurants to the 80/20 rule; isn't that correct?

10:02:12    7   A.   Not all of them.  But yeah, we disagree.  Again, we

10:02:15    8   want to point out, that wasn't a regulation and it doesn't

10:02:19    9   have the force of law.

10:02:19   10   Q.   It was applied in several private lawsuits between

10:02:21   11   the 1980s and today; isn't that correct?

10:02:23   12   A.   It has been rejected by other courts, as well.

10:02:28   13   Q.   I don't think any of those courts is cited in the

10:02:31   14   briefing papers in this case, is it?

10:02:33   15   A.   I didn't know I was testifying on the merits.  I will

10:02:35   16   have to go look at the issue.  I think, you know, I'm

10:02:38   17   testifying as to the irreparable harm, so I don't want to

10:02:41   18   get into 80/20 and the opinion letters and how we feel

10:02:45   19   about it.

10:02:45   20   Q.   I'll discuss that briefly.  You're appearing today as

10:02:48   21   a witness on behalf of the plaintiffs on the issue of

10:02:50   22   irreparable harm, correct?

10:02:51   23   A.   Correct.

10:02:52   24   Q.   And you're also counsel of record in this case,

10:02:54   25   correct?

| | | |
|---|---|---|
| 10:02:54 | 1 | A.   That is correct. |
| 10:02:55 | 2 | Q.   And have you performed any work as counsel of record |
| 10:02:58 | 3 | in preparing the briefing papers on plaintiffs' motion for |
| 10:03:01 | 4 | preliminary injunction? |
| 10:03:02 | 5 | A.   I have reviewed the documents.   That's correct. |
| 10:03:05 | 6 | Q.   So the answer to my question is yes, you have |
| 10:03:07 | 7 | prepared for -- |
| 10:03:09 | 8 | A.   I would say yes.   Yes. |
| 10:03:10 | 9 | Q.   No further questions. |
| 10:03:11 | 10 |           THE COURT:   Any followup? |
| 10:03:12 | 11 |           MR. DECAMP:   No redirect, your Honor. |
| 10:03:13 | 12 |           THE COURT:   Okay.   Thank you.   You may step down. |
| 10:03:15 | 13 |           THE WITNESS:   Thank you. |
| 10:03:24 | 14 |           MR. DECAMP:   Pulling up the next exhibit that we |
| 10:03:26 | 15 | have, which is -- get the number for you here.   It is P-5 |
| 10:03:32 | 16 | for purposes of this exhibit.   It is the declaration of |
| 10:03:36 | 17 | Tracy Vaught.   The original one filed, not the |
| 10:03:38 | 18 | supplemental that has been excluded from the record today, |
| 10:03:42 | 19 | it appears in the record at EFC 12-1, starting at page 73 |
| 10:03:47 | 20 | of the record on that motion.   And we'd just like to point |
| 10:03:52 | 21 | out a few items here. |
| 10:03:53 | 22 |           In this declaration, we have the owner-president |
| 10:03:57 | 23 | of a restaurant group here in Texas and she operates five |
| 10:04:03 | 24 | restaurants.   And what she talks about in the declaration |
| 10:04:07 | 25 | is the harm and the challenge that this regulation |

10:04:10  1  presents.  Of note here, it's important to understand that

10:04:14  2  when we're talking about servers, we're talking about

10:04:17  3  people subject to the tip credit, in many restaurants,

10:04:20  4  including here in paragraph 4, the front of the house

10:04:25  5  employees who receive tips, when you include the tips and

10:04:28  6  their cash wages, they're often among the best paid and,

10:04:31  7  in fact, in this instance, the highest paid employees in

10:04:34  8  the restaurant.

10:04:35  9       Not necessarily highest in terms of direct cash

10:04:38  10  wages from the employer but in terms of total earnings.

10:04:41  11  These are not, in most instances, individuals who are --

10:04:45  12  they're oftentimes depicted as they're making $2.13 an

10:04:49  13  hour or they're making some other wage that is below

10:04:51  14  minimum wage.  But when one factors in the tips that

10:04:53  15  they're earning, in this industry, it tends to be feast or

10:04:57  16  famine.  There are slow periods, there are busy periods,

10:05:01  17  and in the busy periods, an employee can in the course of

10:05:04  18  an hour or two make all the tips for the day; and the rest

10:05:06  19  of that time is typically spent preparing, you know,

10:05:10  20  cleaning up after a meal and getting ready for the next

10:05:12  21  service.

10:05:12  22       So it's important to understand how the flow

10:05:14  23  works and, also, the economic circumstances of these

10:05:17  24  employees.  This employee talks about the harm here.

10:05:21  25  Talks about no longer being able to take a tip credit as a

| | | |
|---|---|---|
| 10:05:25 | 1 | result of the risk that this rule poses.  And so, it's -- |
| 10:05:31 | 2 | they talk about the expense here.  If they stop taking the |
| 10:05:33 | 3 | tip credit, they're going to spend -- and she says this in |
| 10:05:36 | 4 | paragraph 5 -- close to a million dollars extra per year |
| 10:05:39 | 5 | on labor.  That's an immediate harm that is not |
| 10:05:42 | 6 | recoverable if this regulation ultimately is invalidated. |
| 10:05:47 | 7 | They can't get the money back. |
| 10:05:48 | 8 | Talk about the ongoing compliance costs and I'll |
| 10:05:51 | 9 | come to that in a later exhibit.  So what this declaration |
| 10:05:56 | 10 | is talking about here is the challenges just on the ground |
| 10:06:01 | 11 | level of what it means to run a restaurant when you've got |
| 10:06:06 | 12 | your workforce that's dealing with COVID.  You're dealing |
| 10:06:09 | 13 | with all the other challenges that the industry is facing |
| 10:06:11 | 14 | now; and now, on top of that, we add a regulation that |
| 10:06:14 | 15 | forces the company to change how they staff their work, |
| 10:06:18 | 16 | and that imposes significant operational costs and what |
| 10:06:22 | 17 | the business is supposed to do about that. |
| 10:06:24 | 18 | Talk about the food prices that's skyrocketing in |
| 10:06:27 | 19 | paragraph 8, what the job market is like, what has |
| 10:06:29 | 20 | happened to wages and, also, the competition that |
| 10:06:32 | 21 | restaurants today face vis-a-vis grocery stores because |
| 10:06:36 | 22 | people don't have to eat out.  So I'm referring to what |
| 10:06:38 | 23 | she says in paragraph 8, which is up on the screen. |
| 10:06:42 | 24 | So what's happening with these restaurants -- and |
| 10:06:45 | 25 | she details this in the paragraph -- is they're getting |

| | | |
|---|---|---|
| 10:06:47 | 1 | squeezed because their profits are getting cut because |
| 10:06:50 | 2 | they have to deal with either increased compliance costs |
| 10:06:53 | 3 | or increased wage costs, or both, and yet, to try to make |
| 10:06:56 | 4 | that money up by raising menu prices is typically not an |
| 10:07:00 | 5 | option because if they do that, then customers will |
| 10:07:02 | 6 | frequently go elsewhere.  She describes that. |
| 10:07:04 | 7 | THE COURT:  And how many restaurants does she? |
| 10:07:06 | 8 | MR. DECAMP:  Five. |
| 10:07:07 | 9 | THE COURT:  So you're telling me that her |
| 10:07:09 | 10 | increased costs in five restaurants would be a million |
| 10:07:12 | 11 | dollars a year? |
| 10:07:13 | 12 | MR. DECAMP:  That's what she testifies to in this |
| 10:07:15 | 13 | paragraph, yes, your Honor -- or in this declaration -- |
| 10:07:16 | 14 | THE COURT:  Couldn't you hire five people to be |
| 10:07:19 | 15 | present with a pad, keeping track of what people are doing |
| 10:07:23 | 16 | all day, for a million dollars a year in five restaurants? |
| 10:07:26 | 17 | MR. DECAMP:  It's not clear.  I mean, she's |
| 10:07:28 | 18 | basing that million on if she stops taking the tip credit. |
| 10:07:31 | 19 | THE COURT:  Well, but she doesn't have to stop |
| 10:07:33 | 20 | taking the -- she can spend a million dollars over five |
| 10:07:38 | 21 | restaurants complying with this regulation, which, by the |
| 10:07:42 | 22 | way, presumably, she was following the 80/20 guidance all |
| 10:07:47 | 23 | along. |
| 10:07:48 | 24 | MR. DECAMP:  Again, it comes down to the |
| 10:07:49 | 25 | difference between -- |

| 10:07:50 | 1 | THE COURT:  That's just not credible. |

10:07:50  1        THE COURT:  That's just not credible.

10:07:52  2        MR. DECAMP:  It comes down to the difference,

10:07:54  3   your Honor, between complying, in fact, and being able to

10:07:58  4   prove compliance in a way that keeps you out of

10:08:00  5   litigation.

10:08:00  6        THE COURT:  Yeah, well, plaintiffs are going to

10:08:02  7   have to prove noncompliance.  So you're imaging a world

10:08:05  8   where plaintiffs have the ability to prove noncompliance,

10:08:08  9   but restaurants don't have the ability to prove

10:08:10  10  compliance.

10:08:11  11       MR. DECAMP:  Your Honor, it's -- that ignores the

10:08:14  12  reality of wage-and-hour litigation.

10:08:16  13       THE COURT:  Oh, trust me, I have -- I'd say, more

10:08:21  14  than any kind of case that I've tried is FLSA case.  So --

10:08:27  15  FLSA cases.  So I understand that.  I understand the

10:08:29  16  economics of it, too.  I understand that people don't sue

10:08:32  17  restaurants if they don't think they can recover anything

10:08:34  18  from, also, right?

10:08:36  19       MR. DECAMP:  They often do, your Honor.  We see

10:08:39  20  demand letters.  We see complaints filed where the

10:08:41  21  plaintiff's lawyer understands that this company can't

10:08:43  22  afford to go the distance in the case, and so, it's going

10:08:46  23  to exhort a settlement because the alternative that the

10:08:48  24  company faces is bankruptcy.  So we see that every day.

10:08:51  25       And when we're talking about what the burdens are

| 10:08:53 | 1 | in litigation, your Honor's technically correct in terms |
| 10:08:57 | 2 | of the burden of proof.  Of course, it remains the |
| 10:08:59 | 3 | plaintiffs' burden to prove noncompliance.  But the |
| 10:09:02 | 4 | practical reality is that given the ease with which courts |
| 10:09:04 | 5 | certify conditionally collective actions, again, setting |
| 10:09:07 | 6 | aside the Swales decision in the Fifth Circuit, everywhere |
| 10:09:09 | 7 | else in the country that practice it nationwide, those |
| 10:09:12 | 8 | cases routinely get certified with one declaration, two |
| 10:09:15 | 9 | declarations, three declarations, and the employer doesn't |
| 10:09:17 | 10 | get the chance. |
| 10:09:18 | 11 | They'll oftentimes introduce plenty of |
| 10:09:20 | 12 | declarations saying, well, no, that didn't happen to me. |
| 10:09:23 | 13 | I spent only 10 percent of my time on side work.  And the |
| 10:09:26 | 14 | courts typically say that's a merits issue.  We don't deal |
| 10:09:29 | 15 | with that at the first stage of the case.  We'll deal with |
| 10:09:31 | 16 | that on decertification.  You can make these arguments |
| 10:09:33 | 17 | later in the case.  By the time that happens, notice has |
| 10:09:36 | 18 | gone out, people have joined the case, discovery has |
| 10:09:38 | 19 | commenced, and a business that's already on the edge in |
| 10:09:40 | 20 | terms of remaining solvent is now having to pay its |
| 10:09:44 | 21 | lawyers six figures just to stay in the fight in the |
| 10:09:47 | 22 | litigation. |
| 10:09:47 | 23 | It's an impossible burden.  So the insidious part |
| 10:09:53 | 24 | about this regulation, separate and apart of being |
| 10:09:56 | 25 | unlawful and disconnected from the FLSA, is that it forces |

| | |
|---|---|
| 10:09:59 | 1 |
| 10:10:02 | 2 |
| 10:10:05 | 3 |
| 10:10:08 | 4 |
| 10:10:11 | 5 |
| 10:10:15 | 6 |
| 10:10:20 | 7 |
| 10:10:23 | 8 |
| 10:10:27 | 9 |
| 10:10:30 | 10 |
| 10:10:33 | 11 |
| 10:10:35 | 12 |
| 10:10:37 | 13 |
| 10:10:40 | 14 |
| 10:10:44 | 15 |
| 10:10:46 | 16 |
| 10:10:50 | 17 |
| 10:10:54 | 18 |
| 10:10:55 | 19 |
| 10:11:02 | 20 |
| 10:11:06 | 21 |
| 10:11:11 | 22 |
| 10:11:15 | 23 |
| 10:11:18 | 24 |
| 10:11:20 | 25 |

employers into this Hobson's choice of incurring either heightened labor costs by changing how they staff their restaurants, hiring five employees to stand there with pads and monitor people's time, that's an unrecoverable cost.  Or doing away with the tip credit or changing how you otherwise structure your operations, doing that or maintaining records of all this time, which nobody yet knows how to do, the timekeeping systems don't do it, or running the risk and saying, I hope I don't get sued. Understanding that if you do get sued, even if you could win at the end, you can't make it to the end because you're not going to have the resources to be able to fight that litigation.  So it's an unwinnable situation and that's the burden that it puts employers to.

THE COURT:  Problem is that the only example you've given me in this hearing is a totally non-credible example of the burden that a restaurant would have to endure unless you convince me otherwise with five restaurants and it's worth not taking the credit, because she says it would cost $5 million to comply over five -- a million dollars over five restaurants, that's -- you're doing what you're accusing plaintiffs' lawyers of doing, and that is throwing out some kind of, you know, allegation that they're going to have to now litigate all the way -- you want me to enjoin a rule based on something

| | |
|---|---|
| 10:11:25 | 1 |
| 10:11:28 | 2 |
| 10:11:29 | 3 |

that is totally pulled out of the air.

        MR. DECAMP:  Your Honor, the million-dollar

figure was not pulled out of the air, respectfully.  It

was pulled out of the concept of if they don't take the

tip credit, if they forego the tip credit and pay

everybody in the restaurant at least full minimum wage,

the delta between the cash which they're paying now and

the full minimum wage would be that million dollars.

        THE COURT:  But it would be their choice to not

take the credit, and only the economic reason they would

do that is that they believed that it would cost something

like a million dollars to comply.

        MR. DECAMP:  And -- but the reality is, if they

were to take a different approach, if they were to hire

the five employees to stand there and keep the records,

even that, if we're talking about five employees or more

than five employees -- because it would have to be for all

the hours at the restaurant is open and even preopening

and post closing if we're tracking, you know, opening side

work, closing side work, if we're talking about, you know,

hiring five new employees or more to cover these different

sites, seven days a week, we're still talking well into

six figures in the course of --

        THE COURT:  We could make it a law school

question and have those five employees also serving food.

10:12:35  1              MR. DECAMP:  If they're serving food,

10:12:37  2      they're just keeping records --

10:12:37  3              THE COURT:  I'm just kidding.

10:12:38  4              MR. DECAMP:  And I appreciate what your Honor's

10:12:40  5      saying.  I understand that there might be alternatives to

10:12:42  6      foregoing the tip credit.

10:12:43  7              THE COURT:  But I'm also acknowledging their

10:12:45  8      complexity of compliance here.  I don't doubt that.  And I

10:12:48  9      take the point that, you know, especially in an

10:12:52 10      environment where you pivot from tipping to non-tipping

10:12:58 11      roles, I get the burden of compliance.  I just -- the

10:13:02 12      actual evidence in front of me specifically about what the

10:13:08 13      burden would be in a particular -- other than these

10:13:12 14      generalities of, you know -- maybe I can understand by

10:13:16 15      your description that people would have this burden

10:13:19 16      without specific, you know, examples, but this is --

10:13:22 17      that's not a good one.

10:13:24 18              MR. DECAMP:  All right.  Well, even if your Honor

10:13:26 19      doesn't like that particular example, doesn't find that

10:13:28 20      particular example credible because there might be

10:13:31 21      alternatives that are less expensive than foregoing the

10:13:34 22      tip credit entirely.  I understand your Honor's point

10:13:36 23      there.  If we still accept that under your Honor's -- I

10:13:38 24      won't call it proposal, but the hypothetical that your

10:13:41 25      Honor offered of hiring employees to track the time

| 10:13:44 | 1 | instead of doing away with the tip credit, we still would |
| 10:13:47 | 2 | at least need to recognize that the cost of hiring what |
| 10:13:49 | 3 | may be five or may be ten employees to be in these five |
| 10:13:53 | 4 | restaurants every hour that there are employees -- tipped |
| 10:13:57 | 5 | employees in the restaurants to track that time is a |
| 10:13:59 | 6 | burden that would under any kind of normal wage scenario |
| 10:14:03 | 7 | be into the six figures over the course of a year. |
| 10:14:06 | 8 | And I've gone to the next exhibit, if I may, |
| 10:14:08 | 9 | which is the Department of Labor's final rule.  These are |
| 10:14:12 | 10 | excerpts from this and we have presented this as |
| 10:14:16 | 11 | Plaintiffs' Exhibit 8 for this hearing.  And I think that |
| 10:14:18 | 12 | when we're talking about the costs, the important thing to |
| 10:14:20 | 13 | understand is that we're not making up numbers that the |
| 10:14:23 | 14 | department disagrees with. |
| 10:14:25 | 15 | If we look at paragraph 5 here, the cost summary, |
| 10:14:28 | 16 | the department itself acknowledges that in addition to the |
| 10:14:31 | 17 | first year costs that the industry will have to incur |
| 10:14:35 | 18 | dealing with this rule of over $224 million nationwide, |
| 10:14:40 | 19 | there will be ongoing management costs of $177 million a |
| 10:14:45 | 20 | year.  That's the department's estimate.  We don't agree |
| 10:14:47 | 21 | with that number.  We think the number's low.  But even |
| 10:14:49 | 22 | the department is saying that this is a rule that's going |
| 10:14:52 | 23 | to cost this industry close to $200 million a year just to |
| 10:14:54 | 24 | comply with. |
| 10:14:55 | 25 | THE COURT:  But I mean, all regulation -- FLSA is |

10:15:00  1    probably very expensive to comply with in almost every

10:15:05  2    respect, but that's just the nature of regulation, isn't

10:15:07  3    it?

10:15:08  4            MR. DECAMP:  Sure, but it's also irreparable harm

10:15:10  5    if this regulation is struck.  So again, goes to -- then

10:15:14  6    it's back to the likelihood of success on the merits.

10:15:16  7    This is an unrecoverable cost once the businesses have

10:15:19  8    unvested in this and have dealt with it.  If they've

10:15:22  9    changed their policies, if they've changed their wage

10:15:25  10   practices, that money is gone.  They don't get it back.

10:15:27  11           THE COURT:  Right.

10:15:29  12           MR. DECAMP:  And so, I think that goes into the

10:15:31  13   hopper.  The reality is that to the extent the regulation

10:15:34  14   ultimately is upheld, any of the employees that are at

10:15:36  15   issue here will have their rights under the FLSA and under

10:15:39  16   the regulation to pursue private action.  The Department

10:15:42  17   of Labor could pursue private action.  So it's not --

10:15:45  18   they're not left without a remedy.  We're trying to keep

10:15:47  19   these restaurants alive while this issue works its way

10:15:49  20   through the court.  Respectfully, that's what's at stake.

10:15:55  21           THE COURT:  Sure.  I get it.

10:15:55  22           MR. DECAMP:  We would submit that in light of the

10:15:58  23   arguments we've presented on the invalidity of the

10:16:01  24   regulation and with regard to the harm that this industry

10:16:06  25   would face, that the plaintiffs would face, and the lack

| | | |
|---|---|---|
| 10:16:09 | 1 | of harm to the defendants, that a preliminary injunction |
| 10:16:13 | 2 | is appropriate in this instance, your Honor. |
| 10:16:15 | 3 | THE COURT:  Let me ask you this.  Has this -- has |
| 10:16:18 | 4 | a challenge to this new rule been successful in any court? |
| 10:16:25 | 5 | MR. DECAMP:  There hasn't been a challenge to |
| 10:16:27 | 6 | this rule in any court.  Your Honor, there have been |
| 10:16:29 | 7 | litigations, and I would say the three decisions that are |
| 10:16:31 | 8 | cited most commonly to deal with this, and they appear in |
| 10:16:34 | 9 | the government's brief, are the Fast against Applebee's |
| 10:16:34 | 10 | decision from the Eighth Circuit, the Marsh against J. |
| 10:16:41 | 11 | Alexander's decision from the Ninth Circuit en banc, and |
| 10:16:43 | 12 | then, the Rafferty against Denny's decision from the |
| 10:16:47 | 13 | Eleventh Circuit, very important things to understand |
| 10:16:47 | 14 | about those decisions. |
| 10:16:48 | 15 | In the Fast case, the parties stipulated that the |
| 10:16:52 | 16 | regulation at issue -- and that was the former version of |
| 10:16:55 | 17 | the dual jobs regulation.  They stipulated that regulation |
| 10:16:58 | 18 | was entitled to Chevron deference.  That wasn't at issue; |
| 10:17:01 | 19 | that wasn't a Chevron case.  Fast was a question of |
| 10:17:05 | 20 | whether the department's sub-regulatory guidance, the 1988 |
| 10:17:09 | 21 | version of -- and with respect to counsel, it wasn't an |
| 10:17:12 | 22 | opinion letter.  It was the field operations handbook. |
| 10:17:15 | 23 | The sub-regulatory guidance that the department |
| 10:17:17 | 24 | issued first articulating this 20 percent limitation on at |
| 10:17:22 | 25 | the time, unregulated tasks.  The question was whether |

10:17:24  1  that would get Auer deference or Skidmore deference.

10:17:26  2  That's what was at issue in Fast.  Chevron was not on the

10:17:29  3  table because the defendant didn't argue it.  So the Court

10:17:31  4  focused all of its attention on Auer versus Skidmore and

10:17:36  5  decided on Auer deference.  The problem is, if you accept

10:17:39  6  the premise of the 1967 regulation, the dual jobs

10:17:43  7  regulation, it's already gone too far because it's already

10:17:46  8  strayed from the statutory purpose.

10:17:47  9        So that's one piece of it.  When we look at Marsh

10:17:53  10  against J. Alexander's, that's a very interesting decision

10:17:56  11  because there, the only reason that the Court articulated

10:17:59  12  for applying Chevron deference was because the Ninth

10:18:03  13  Circuit precedent that deemed a challenge to the adoption

10:18:06  14  of the dual jobs regulation untimely under the

10:18:09  15  Administrative Procedure Act.  Under Ninth Circuit case

10:18:12  16  law, the Court said you cannot challenge a notice and

10:18:16  17  comment rule more than six years after it's been put on

10:18:20  18  the books.

10:18:21  19        That's a separate question from whether one can

10:18:23  20  argue that the regulation is entitled to less than full

10:18:25  21  Chevron deference, but the Court didn't see it that way.

10:18:28  22  That is a Ninth Circuit quirk of the law.  The court does

10:18:31  23  not conduct a Chevron analysis in that case other than

10:18:34  24  saying it would not consider the challenge because it

10:18:37  25  deemed it untimely under Ninth Circuit precedent.  Judge

10:18:41  1   Paez's decision, while it said that the verbiage that
10:18:44  2   we've talked about at the outset of the hearing, the
10:18:46  3   occupation and engaged in an occupation were ambiguous,
10:18:50  4   the court didn't then connect and ask the followup
10:18:54  5   question of, well, did the department try to define those
10:18:57  6   terms?  It went straight to, well, there's a dual jobs
10:19:01  7   regulation on the book, there's a field operations
10:19:03  8   handbook, things are ambiguous, seems reasonable to us,
10:19:06  9   let's go forward with it.
10:19:07  10         The partial dissent and the dissent in that case,
10:19:11  11  Judge Graber's dissent does an excellent job of pointing
10:19:14  12  out why -- and Judge Graber's was the partial dissent.
10:19:17  13  Her partial dissent does an excellent job of showing why
10:19:21  14  the dual jobs regulation, the 1967 version doesn't support
10:19:25  15  what the Court was doing with regard to this 20 percent
10:19:28  16  limitation.  She points out that what the 1967 dual jobs
10:19:31  17  regulation really did was, it said okay, if employees are
10:19:36  18  truly involved in two different occupations, in that
10:19:38  19  instance, the hotel maintenance man who also happens to
10:19:41  20  work in the restaurant in a tipped capacity, the
10:19:44  21  department took the position -- and it's questionable
10:19:46  22  whether this is lawful under the FLSA.  It's inconsistent
10:19:49  23  with some of the legislative history.  But the department
10:19:51  24  took the position in that 1967 regulation that an employer
10:19:54  25  could take a tip credit for the time spent in the

10:19:56   1   restaurant occupation but not for time spent as a

10:19:59   2   maintenance person.  And understandable.

10:20:02   3        The regulation went on to state that that is

10:20:05   4   different from a circumstance where a waitress in a

10:20:10   5   restaurant spends part of her time making coffee or doing

10:20:14   6   other side work.  And there was another example that was

10:20:16   7   provided, as well.  What Judge Graber points out is the

10:20:21   8   flaw in the way that the courts have looked at that.  And

10:20:24   9   that includes the Ninth Circuit.  It includes Fast, as

10:20:26   10  well, at that time.  And I think now, we could say it also

10:20:28   11  applies to Rafferty in the Eleventh Circuit.

10:20:31   12       Is the court jumped to the conclusion that

10:20:33   13  because the dual jobs regulation at the time had the

10:20:36   14  concept of, well, an employee who spends some of her time

10:20:39   15  doing these other tasks is not in a dual job situation?

10:20:44   16  The Court conflated that with -- and anything that is more

10:20:47   17  than some of her time on those tasks is necessarily

10:20:51   18  dual-job scenario when that's not what the text of the

10:20:53   19  regulation said.  The regulation didn't purport to say

10:20:55   20  that the only time you don't have a dual job scenario is

10:20:59   21  when the time spent on this what amounts to side work,

10:21:02   22  what we're calling, is less than, quote, some time, less

10:21:06   23  than this amount, the regulation didn't purport to define

10:21:08   24  the outer bounds of what that was.

10:21:10   25       The Ninth Circuit Judge Paez's decision, the

10:21:13  1  majority ruling in the en banc decision in Marsh went

10:21:16  2  straight to the conclusion that anything that is not

10:21:18  3  within that counterexample that was provided is

10:21:22  4  necessarily a dual job scenario.  That's not what the

10:21:25  5  regulation said.  And Judge Graber really points that out

10:21:28  6  that the examples that were provided of a person in a

10:21:30  7  single occupation doing other tasks that don't amount to a

10:21:35  8  dual job situation were simply set up as Swales to

10:21:38  9  distinguish from the true dual jobs situation.  They

10:21:42  10  weren't meant to define in any way as far as an employer

10:21:46  11  could go without crossing the line.

10:21:47  12       And that's why in Judge Graber's opinion -- and

10:21:51  13  it's not as though she, you know, bought in entirely to

10:21:54  14  what the defendants were saying.  She agreed with the

10:21:56  15  plaintiffs on part of the claim on the issue of unrelated

10:21:59  16  duties, what now would be considered duties that don't

10:22:03  17  relate to the occupation.  It is roughly analogous to, but

10:22:08  18  not equivalent to, the third category of time that we see

10:22:09  19  under the current final rule.  She agreed with the

10:22:12  20  plaintiffs that the department could regulate that time

10:22:16  21  and say that an employer could not -- to bring it to this

10:22:19  22  example in the scenario where the employee spends a day

10:22:23  23  out mowing the lawn, she would say no, you can't take a

10:22:27  24  tip credit for that time.  That has nothing to do with

10:22:28  25  being a server.  But on this 20 percent thing, that

| | | |
|---|---|---|
| 10:22:33 | 1 | standard that was in the old 80/20 rule and that now |
| 10:22:36 | 2 | emerges in a different way in the final rule here, she |
| 10:22:39 | 3 | said that's just -- that doesn't flow from the dual jobs |
| 10:22:42 | 4 | regulation. |
| 10:22:43 | 5 | And we see the same flaw in Fast.  It was the |
| 10:22:46 | 6 | same issue of the courts jumped straight from the |
| 10:22:50 | 7 | department talks about some time or occasionally in the |
| 10:22:54 | 8 | regulation to okay, now we get to impose a temporal limit |
| 10:22:57 | 9 | and we get to define it and we use 20 percent in other |
| 10:22:59 | 10 | contexts that have nothing to do with this, but 20 |
| 10:23:02 | 11 | percent's a good benchmark, and so, let's go straight to |
| 10:23:04 | 12 | that.  But that's not what the dual jobs regulation |
| 10:23:08 | 13 | originally said. |
| 10:23:09 | 14 | And then, when we come to Rafferty's, there's |
| 10:23:11 | 15 | also not a Chevron analysis there.  Rafferty is also |
| 10:23:16 | 16 | primarily an issue of whether the department's 2018 |
| 10:23:20 | 17 | backtracking on the whole issue of dual jobs -- and as the |
| 10:23:23 | 18 | Court may or may not know, the Restaurant Law Center sued |
| 10:23:27 | 19 | the Department of Labor about that time in this court, and |
| 10:23:30 | 20 | the department agreed as a result of that litigation to |
| 10:23:33 | 21 | withdraw the dual jobs regulation.  There was a |
| 10:23:38 | 22 | settlement.  We agreed.  The case went away and the |
| 10:23:41 | 23 | department as part of that -- resolving that case withdrew |
| 10:23:44 | 24 | its dual jobs regulation -- its dual jobs sub-regulatory |
| 10:23:49 | 25 | guidance and abandoned the whole 20 percent concept. |

| | | |
|---|---|---|
| 10:23:52 | 1 | The question before the Court in Rafferty's -- or |
| 10:23:56 | 2 | in Rafferty against Denny's, I'm sorry, in the Eleventh |
| 10:23:59 | 3 | Circuit was whether the department -- whether the action |
| 10:24:02 | 4 | the department took in 2018 rescinding the 20 percent |
| 10:24:07 | 5 | rule, the old 20 percent would be entitled to deference |
| 10:24:10 | 6 | under either Auer or Skidmore, and the court rejected, |
| 10:24:15 | 7 | declined to give deference to what the department did in |
| 10:24:17 | 8 | 2018. |
| 10:24:18 | 9 | But again, the policy considerations, the reasons |
| 10:24:21 | 10 | that the Court articulated for rejecting that were very |
| 10:24:26 | 11 | much questionable, including, among other things, buying |
| 10:24:28 | 12 | into the argument that the department makes now and cites |
| 10:24:30 | 13 | that language from Rafferty's, I believe in the briefing, |
| 10:24:33 | 14 | certainly in the final rule, for the proposition that |
| 10:24:37 | 15 | tipped employees should be pretty much continuously |
| 10:24:39 | 16 | earning tips, and that it's a problem if a tipped employee |
| 10:24:43 | 17 | has really any meaningful increment of time where they're |
| 10:24:46 | 18 | not able to earn tips. |
| 10:24:47 | 19 | And that comes back to the point I made at the |
| 10:24:49 | 20 | outset, which is that's not what the FLSA says.  The FLSA, |
| 10:24:52 | 21 | which allows an employee to earn just $7.50 a week on |
| 10:24:56 | 22 | average in tips qualifies for being a tipped employee.  If |
| 10:25:02 | 23 | all you need is $7.50 a week in tips to be a tipped |
| 10:25:07 | 24 | employee, then there's a whole lot of time that Congress |
| 10:25:09 | 25 | understood and restaurant operators would tell you that a |

| | | |
|---|---|---|
| 10:25:12 | 1 | tipped employee could be spending on activities that don't |
| 10:25:14 | 2 | generate tips and yet, still qualify the employee for |
| 10:25:18 | 3 | being a tipped employee.  So Rafferty's, I think, goes |
| 10:25:22 | 4 | down the same rabbit hole the department's going down now, |
| 10:25:25 | 5 | which is focusing myopically on tips and not on |
| 10:25:29 | 6 | occupations, not on the language of the statute and what |
| 10:25:32 | 7 | Congress said in Section 3(t) as well as Section 3(m) of |
| 10:25:36 | 8 | the FLSA. |
| 10:25:36 | 9 | So the department's correct that there are three |
| 10:25:41 | 10 | cases that at least have supported the old version, the |
| 10:25:46 | 11 | old 80/20 rule.  We have not seen any cases that have |
| 10:25:49 | 12 | ruled on this rule, which is different from 80/20.  In |
| 10:25:53 | 13 | some ways, there are similarities.  But none of those |
| 10:26:02 | 14 | courts really grappled with the core issue here, which is, |
| 10:26:06 | 15 | did the department in regulating -- or in dealing with the |
| 10:26:11 | 16 | asserted ambiguity in the statute, did they regulate in a |
| 10:26:15 | 17 | way that addressed that ambiguity, or did they go off in a |
| 10:26:17 | 18 | different direction?  The argument I made at the outset of |
| 10:26:20 | 19 | today's hearing. |
| 10:26:20 | 20 | So we would argue that neither Fast nor Marsh nor |
| 10:26:25 | 21 | Rafferty's really lends the government much support here. |
| 10:26:31 | 22 | And I don't think, frankly, that the Fifth Circuit would |
| 10:26:32 | 23 | give those decisions much weight either in terms of how |
| 10:26:34 | 24 | the court approaches looking at agency authority and |
| 10:26:38 | 25 | holding agencies to acting within the authority that the |

10:26:43  1  statute confers.  And within that authority, great, but

10:26:46  2  you exceed, it's going to be struck.  And that's what the

10:26:49  3  department did here, respectfully, your Honor.

10:26:50  4          THE COURT:  Thank you very much.  That's very

10:26:52  5  helpful.

10:26:53  6          Mr. Walker.

10:26:54  7          MR. WALKER:  Thank you, your Honor.

10:27:00  8          The restaurant industry in this case is asking

10:27:03  9  the Court to adopt an interpretation of the Fair Labor

10:27:06  10  Standards Act that would undo nearly four decades of

10:27:10  11  important worker protections for tipped employees.  Since

10:27:13  12  1979, the Department of Labor has prohibited employers

10:27:17  13  from taking a tip credit for work that is not part of a

10:27:20  14  tipped employee's tipped occupation.  And since the 1980s,

10:27:24  15  the Department of Labor and numerous courts have placed

10:27:27  16  quantitative temporal limits on the amount of non-tipped

10:27:31  17  but related duties that tipped employees may perform

10:27:34  18  before their employers have to start paying them a full

10:27:38  19  minimum cash wage.

10:27:39  20          Plaintiffs would have this court interpret the

10:27:42  21  statute in a way that would render these long-standing and

10:27:45  22  crucial protections suddenly unlawful, and they are not

10:27:50  23  bashful about that.  And opposing counsel, my friend's

10:27:52  24  presentation, he goes all the way back and criticizes the

10:27:55  25  Department of Labor's regulations, dating as far as back

10:27:57  1    as 1979 and 1988.  But the statute does not compel their

10:28:03  2    reading.

10:28:03  3          And though this is a very hotly litigated area

10:28:07  4    between private employers and employees, they are unable

10:28:10  5    to identify even a single case that adopts their reading

10:28:14  6    of the statute.  Indeed, as our brief shows and to the

10:28:18  7    contrary in case after case, these quantitative temporal

10:28:22  8    limits that the Department of Labor has placed on

10:28:24  9    non-tipped-related duties have been upheld by courts: and

10:28:28  10   that's in Fast and Marsh and Rafferty, in particular, but

10:28:31  11   also numerous district courts.

10:28:33  12         Now, plaintiff tries to distinguish Marsh

10:28:36  13   Rafferty and Fast because they do, in fact, largely

10:28:40  14   concern an interpretation of the regulation, but in each

10:28:43  15   of those cases, they do directly confront the statute.

10:28:48  16   Indeed, the plaintiffs in Fast made arguments very similar

10:28:51  17   to the plaintiffs here that the word "occupation" in the

10:28:54  18   statute implies some kind of broad analysis of the mere

10:28:58  19   label that attaches to a tipped employee, rather than the

10:29:03  20   actual duties that that employee is performing.  And the

10:29:05  21   Fast court rejected that.

10:29:06  22         And we've distinguished in footnote 4, on page

10:29:08  23   28, we specifically quote language from each of those

10:29:10  24   three cases that shows that they are all dealing

10:29:12  25   specifically with the statute, and they find that

10:29:15  1   quantitative temporal limits that the Department of Labor

10:29:17  2   has imposed to be appropriate under the statute.

10:29:20  3        And that makes good sense under the statute.  I

10:29:24  4   mean, there can really be no dispute that at Chevron step

10:29:28  5   zero, the Department of Labor has the authority here to

10:29:30  6   promulgate regulations in this area.  The 1966 amendments

10:29:34  7   that added the tipped provisions to the Fair Labor

10:29:38  8   Standards Act say that explicitly.  They provide the

10:29:40  9   Department of Labor the authority to promulgate

10:29:43  10  regulations in this area.

10:29:44  11       So the question then is whether or not those

10:29:46  12  regulations are consistent with the language of the

10:29:49  13  statute.  And the key language of the statute here is

10:29:52  14  "engaged in an occupation."  A tipped employee is defined

10:29:56  15  as a tipped employee when they are engaged in an

10:29:59  16  occupation in which the employee receives the threshold

10:30:01  17  amount of tips.

10:30:02  18       And what the statute does not say is how the

10:30:05  19  Department of Labor is to ascertain when an employee is

10:30:09  20  engaged in such an occupation.  And so, relying on its

10:30:12  21  explicit authority under the tip provision amendments, the

10:30:16  22  Department of Labor in a sort of classic case promulgates

10:30:20  23  regulations that permit it to effectuate the provisions of

10:30:25  24  this statute.  And the Department of Labor has done so

10:30:27  25  reasonably here by taking a duties-based inquiry, looking

| | | |
|---|---|---|
| 10:30:32 | 1 | at the actual duties that a tipped employee is performing |
| 10:30:36 | 2 | to determine whether or not they are engaged in a tipped |
| 10:30:39 | 3 | occupation.  And that makes perfect sense. |
| 10:30:41 | 4 | And I think even plaintiffs and much of their |
| 10:30:43 | 5 | argument acknowledge that there has to be some examination |
| 10:30:46 | 6 | of the duties that a tipped employee is performing to |
| 10:30:49 | 7 | determine whether or not they are engaged in a tipped |
| 10:30:51 | 8 | occupation.  They mentioned that, of course, an employee |
| 10:30:55 | 9 | who's mowing the lawn would never be determined to be |
| 10:30:57 | 10 | engaged in a tipped occupation, but that requires the |
| 10:31:00 | 11 | Department of Labor to do exactly what it's doing here: |
| 10:31:03 | 12 | To look at the duties that are being to perform, |
| 10:31:06 | 13 | categorize the duties that are being to perform, to |
| 10:31:09 | 14 | determine whether or not an employee performing those |
| 10:31:11 | 15 | duties is engaged in a tipped occupation. |
| 10:31:13 | 16 | Plaintiffs touting of the O*NET listing of duties |
| 10:31:16 | 17 | is much the same -- establishes, I think, much the same |
| 10:31:18 | 18 | concession.  There has to be some examination of the |
| 10:31:20 | 19 | duties that a tipped employee is performing in order for |
| 10:31:23 | 20 | the Department of Labor to effectuate this provision of |
| 10:31:26 | 21 | the statute and determine whether or not they are engaged |
| 10:31:28 | 22 | in the tipped occupation. |
| 10:31:29 | 23 | So the question, then, is whether or not the test |
| 10:31:31 | 24 | that the Department of Labor has employed in order to do |
| 10:31:34 | 25 | that is one that is rational.  And that's the standard of |

10:31:38  1  State Farm.  It's not a high one.  It's whether or not the

10:31:40  2  agency has articulated a rational explanation for the test

10:31:44  3  that is imposed.  And it's important here to look at the

10:31:47  4  context of the test the Department of Labor is using.

10:31:50  5  It's not inventing the set of whole cloth.  What it's

10:31:53  6  determining to do, the full context sort of this

10:31:56  7  rulemaking is, it's looking at the rulemaking that was

10:31:58  8  finalized in 2020, but never went into effect, and making

10:32:02  9  changes to that.

10:32:02  10       So the Department of Labor found that the

10:32:05  11  rulemaking that went into effect in 2020 which rescinded

10:32:09  12  that 80/20 test that had been imposed up to that day -- or

10:32:13  13  prior to the 2018-2019 withdrawal of the guidance.

10:32:18  14       THE COURT:  Can you tell me what guidance in that

10:32:22  15  context means?  What -- you know, it was in a, you know,

10:32:28  16  book or a -- you know, what does guidance mean within the

10:32:31  17  context of the Department of Labor practice?

10:32:34  18       MR. WALKER:  Sure, your Honor.  So a lot of this

10:32:36  19  guidance is based on the dual jobs rule that was issued in

10:32:40  20  1967.  And so, in many years following that, restaurants

10:32:45  21  would write to the Department of Labor, the Wage and Hour

10:32:47  22  Division for guidance on how to apply that provision.  So

10:32:51  23  we have the opinion letters that were issued in that

10:32:53  24  context in 1979, 1985 and 1986, I believe.  1980 and 1985.

10:33:05  25  And those are responding to specific inquiries from

10:33:07   1   restaurants as to how we apply this dual jobs regulation.

10:33:09   2            And then, in 1988, the Department of Labor

10:33:15   3   updated a handbook which sort of established the specific

10:33:19   4   20 percent threshold.

10:33:20   5            THE COURT:  What's the legal effect of guidance

10:33:22   6   in a handbook?

10:33:24   7            MR. WALKER:  I'm sorry?

10:33:24   8            THE COURT:  What's the legal effect of guidance

10:33:26   9   or a statement in a handbook?

10:33:28  10            MR. WALKER:  Well, that's been the subject of

10:33:30  11   much litigation leading up to this final rule.  Courts

10:33:34  12   have continuously upheld that as an appropriate

10:33:37  13   interpretation of the dual jobs regulation as it was

10:33:43  14   promulgated in 1967.

10:33:45  15            THE COURT:  Is there a principle in

10:33:47  16   administrative law in which if a statute has been applied

10:33:53  17   by an agency in a particular way for an extended period of

10:33:58  18   time, that congressional failure to clarify is in some

10:34:03  19   sense -- it ratifies in some sense the agency's

10:34:11  20   application of the statute, if you understand what I'm

10:34:13  21   saying.

10:34:13  22            MR. WALKER:  Yes, I think so, your Honor.  I

10:34:15  23   think certainly that is a typical inquiry that courts look

10:34:17  24   at.  I don't have a citation for you up the top of my

10:34:20  25   head.  But certainly whether or not a regulatory approach

10:34:23   1   is longstanding is certainly something that courts look at

10:34:26   2   when deciding whether or not a particular regulatory

10:34:29   3   approach is contrary to that statute.

10:34:30   4            THE COURT:  Because presumably, Congress -- if

10:34:33   5   Congress thought that it was a gross misapplication of

10:34:38   6   congressional intent, they would have the ability over a

10:34:42   7   period of 30 years to clarify that in the statute, right?

10:34:47   8            MR. WALKER:  That's precisely right, your Honor.

10:34:49   9   In the tip -- and the Fair Labor Standards Act has been

10:34:53   10  amended numerous times since the department took this

10:34:55   11  approach.  It was amended as recently -- the specific tip

10:34:59   12  provisions were amended as recently as, I believe, 2011, I

10:35:05   13  believe.  But it was in the past 2010.  These are

10:35:08   14  provisions that are looked at by Congress continuously,

10:35:10   15  amended continuously.  And so, certainly if Congress

10:35:14   16  disagreed with the Department of Labor's approach here, it

10:35:17   17  has had ample opportunity in one of these amendments to

10:35:20   18  change them.

10:35:21   19           But so going back to the context for this rule,

10:35:23   20  what they were doing was looking at the 2020 rule.  And

10:35:25   21  what the 2020 rule did was specifically jettison any kind

10:35:28   22  of temporal limitation on non-tipped but related duties

10:35:32   23  and replaced that with the test that said we're going to

10:35:34   24  look at whether or not the duties are performed

10:35:38   25  contemporaneously with or within a reasonable time of

10:35:41  1   tipped duties.

10:35:42  2         And so, what the Department of Labor was doing in

10:35:45  3   this final rule was saying that test we don't think is

10:35:47  4   sufficiently clear.  That test has all the problems that

10:35:50  5   the restaurant industry say this test has.  It's unclear,

10:35:53  6   it's difficult to apply.  And so, what the Department of

10:35:56  7   Labor did was come up with a -- it doesn't sufficiently

10:35:59  8   protect workers because it allows restaurants to assign a

10:36:02  9   tipped employee and this is what happens.  A tipped

10:36:05  10  employee makes 2.13 an hour and the whole theory of these

10:36:10  11  provisions is that they are earning tips to boost that up

10:36:14  12  to at least the minimum wage.

10:36:16  13        So what they -- when restaurants assign them to

10:36:19  14  clean the bathroom, vacuum the floors after the restaurant

10:36:22  15  is closed, you know, polish silverware before the

10:36:28  16  restaurant opens, they are paying them 2.13 an hour to

10:36:32  17  perform that work, and the employee has no opportunity to

10:36:34  18  earn tips during that time.  What the restaurant is

10:36:36  19  effectively doing is taking the tips that the employee's

10:36:40  20  going to earn an hour later, during their actual tipped

10:36:43  21  employment, and subsidizing a dramatically reduced wage to

10:36:48  22  that employee during those non-tipped hours.

10:36:50  23        And this 2.13 is a dramatically reduced wage from

10:36:54  24  the federal minimum wage of 7.25 an hour.  And that 2.13

10:36:58  25  has actually been locked in place since 1991.  Even as the

10:37:02   1   federal minimum wage continues to rise in the ensuing

10:37:04   2   years, that 2.13 has been locked in place since that time.

10:37:09   3   So it is a dramatically reduced wage.

10:37:11   4          And what the Department of Labor found was that

10:37:13   5   test was difficult to apply and didn't appropriately

10:37:17   6   protect workers.  So what they came up with was a

10:37:19   7   functional test, a functional approach, which looks at --

10:37:23   8   as plaintiffs described it, they categorized different --

10:37:27   9   they have different categories of tasks that are easily

10:37:30   10  defined and which new duties can easily be inserted into

10:37:35   11  that sort of framework.  And the department determined

10:37:38   12  this is preferable to the kind of approach that plaintiffs

10:37:41   13  advocate where you simply list a bunch of job duties for a

10:37:45   14  specific occupation.

10:37:46   15         Number one, there are a lot of tipped

10:37:48   16  occupations.  That would be very difficult to do.  Those

10:37:50   17  lists do not evolve and adapt to new circumstances.  One

10:37:55   18  example of this, your Honor, is that -- this is noted in

10:37:58   19  the preamble to the final rule.  More recently, during the

10:38:01   20  pandemic, servers had been performing more of their work

10:38:04   21  rather than waiting tables, filling to-go orders, taking

10:38:08   22  orders over the phone and taking orders out to cars.

10:38:11   23         Now, they receive a tip for that in many

10:38:14   24  instances.  And so, this new category of tests permits

10:38:18   25  that sort of type work to fall easily within this

10:38:22  1  framework.  And a simple listing of job duties would not

10:38:24  2  evolve sufficiently to capture that kind of work.  And

10:38:27  3  here, in this particular instance, it's to the benefit of

10:38:30  4  employers because what the department has concluded is

10:38:33  5  that is tipped work for which an employer can take a tip

10:38:35  6  credit, and that might not be captured in a simple list of

10:38:38  7  job duties that was put together prior to the pandemic and

10:38:42  8  prior to that becoming a common practice.

10:38:44  9        I will note, too, that what the employers

10:38:52  10  advocate, too, is that they criticize the Department of

10:38:55  11  Labor for not conducting a survey of current restaurant

10:38:58  12  practices or looking at the O*NET.  And what the O*NET

10:39:01  13  does is simply report what employees are telling the

10:39:06  14  Department of Labor that their employers are currently

10:39:08  15  requiring them to do.  So this is not necessarily what is

10:39:12  16  part of a tipped occupation.  It's just what employees are

10:39:16  17  currently being required to do by their employers.

10:39:18  18        And what plaintiffs' position essentially boils

10:39:21  19  down to is that our rule is arbitrary because it doesn't

10:39:25  20  take a look at current practices of the regulated industry

10:39:29  21  and say that those practices are lawful in the final rule.

10:39:33  22  And unfortunately, for regulated parties, that's just not

10:39:36  23  the way government regulations work.  We don't have to

10:39:38  24  endorse whatever the status quo is.

10:39:40  25        The Department of Labor here has rashly

| | | |
|---|---|---|
| 10:39:43 | 1 | determined that certain work is not part of the tipped |
| 10:39:47 | 2 | occupation, and some of that work is work that restaurants |
| 10:39:49 | 3 | are currently requiring employees to perform.  And it is |
| 10:39:54 | 4 | not arbitrary for the Department of Labor to say that some |
| 10:39:58 | 5 | current practices are unlawful.  Regulations do not |
| 10:40:03 | 6 | necessarily have to be simply descriptive of the practices |
| 10:40:06 | 7 | of the regulated industry in order to be nonarbitrary. |
| 10:40:11 | 8 | I'll also note that the Department of Labor has |
| 10:40:16 | 9 | made significant changes to this rule between the notice |
| 10:40:18 | 10 | of proposed rulemaking and the publication of the final |
| 10:40:21 | 11 | rule in response to a lot of employer comments that they |
| 10:40:24 | 12 | found it was unworkable.  They clarified the definition of |
| 10:40:28 | 13 | what a tip-producing work is. |
| 10:40:32 | 14 | So a lot of the employers and employer groups |
| 10:40:39 | 15 | commented that they found, you know, employees are going |
| 10:40:43 | 16 | immediately back and forth over the course of seconds |
| 10:40:44 | 17 | during table service between what they perceive to be |
| 10:40:49 | 18 | directly supporting work and tip-producing work.  And what |
| 10:40:52 | 19 | the Department of Labor clarified in the final rule is |
| 10:40:54 | 20 | that tip-producing work is meant to be construed broadly |
| 10:40:57 | 21 | to encompass all the work that employee performs as part |
| 10:41:03 | 22 | of customer service for which that employee receives tips. |
| 10:41:06 | 23 | It also provided several other examples as part of the |
| 10:41:09 | 24 | final rule that make clear when certain employees are |
| 10:41:13 | 25 | engaged in tip-producing work and when they are not. |

| | | |
|---|---|---|
| 10:41:16 | 1 | Plaintiffs point to specifically the situation of |
| 10:41:19 | 2 | bussers and service bartenders and note that, you know, |
| 10:41:22 | 3 | there are instances where a busser performs work that they |
| 10:41:25 | 4 | would be regarded as a tipped employee during that work, |
| 10:41:28 | 5 | but maybe a server would not.  I mean, the key difference |
| 10:41:31 | 6 | here is, these are not the same situation being treated |
| 10:41:34 | 7 | differently.  They are decidedly different situations |
| 10:41:37 | 8 | because a server's work is customer service in different |
| 10:41:43 | 9 | circumstances than a busser's work would be considered |
| 10:41:45 | 10 | customer service. |
| 10:41:45 | 11 | A busser is undeniably regarded as a tipped |
| 10:41:50 | 12 | employee, but the specific type of tipped work that they |
| 10:41:52 | 13 | perform is work that is essentially done through the |
| 10:41:55 | 14 | server.  They get their tips through the server for work |
| 10:41:58 | 15 | that they perform.  And so, the department treats them |
| 10:42:00 | 16 | differently because they are decidedly different context. |
| 10:42:04 | 17 | They are tipped employees that operates very differently |
| 10:42:06 | 18 | from a server.  And key to this, though, is plaintiffs |
| 10:42:09 | 19 | don't deny that though this is -- the work is different |
| 10:42:12 | 20 | depending on the context.  The final rule makes it very |
| 10:42:15 | 21 | clear how it's going to apply to servers and how it's |
| 10:42:19 | 22 | going to apply to bussers and service bartenders. |
| 10:42:23 | 23 | There's no sort of like confusion there because |
| 10:42:28 | 24 | the final rule makes very clear that when a busser busses |
| 10:42:30 | 25 | a table, they get a tip through the server for that work, |

10:42:33  1   and they are considered a tipped employee during that

10:42:35  2   time, and the employer may take a tip credit for that

10:42:38  3   work.

10:42:45  4          I want to spend some time, also, on the harm.

10:42:50  5   And I think the declarations before the Court as well as

10:42:53  6   the testimony today are just extremely vague on the type

10:42:56  7   of harm that's being performed.  There's no sort of

10:42:58  8   detailed description of specific restaurants, specific

10:43:02  9   efforts, specifically planned efforts that are going to be

10:43:05  10  undertaken.  The only restaurant owner who has submitted a

10:43:08  11  declaration to the Court is Ms. Vaught.  And that is the

10:43:12  12  declaration that plaintiffs were looking at and that they

10:43:14  13  had highlighted on the screen.

10:43:16  14         Critically what that declaration says is the

10:43:18  15  whole cost as plaintiff acknowledges, the whole cost

10:43:22  16  described in that declaration is the cost of the employer

10:43:24  17  completely foregoing the tip credit altogether.  And what

10:43:27  18  that declaration says is that would be our cost if, quote,

10:43:30  19  if we were to forego the tip credit.  But there's no

10:43:33  20  detailed description in that declaration that that

10:43:37  21  employer actually will forego the tip credit or why the

10:43:40  22  final rule compels them to forego the tip credit.  And the

10:43:43  23  type of harm that would justify a preliminary injunction

10:43:48  24  has to be certain, it has to be great, it has to be

10:43:50  25  imminent.  And nothing in that declaration establishes

10:43:53  1  that the harm described is any of those three things.

10:43:56  2  It's merely speculative.

10:43:57  3      I'd also just sort of like to note that, you

10:44:05  4  know, a lot of the harm that plaintiffs raised and that

10:44:09  5  Mr. Amador testified about are -- is sort of this vague

10:44:13  6  concerns that were being received after the publication of

10:44:16  7  the proposed rule.  But it was a fundamental change in the

10:44:20  8  final rule where the department addressed employer

10:44:24  9  concerns about some of these issues by ensuring that it

10:44:28  10  was clear that the definition of tip-producing work is to

10:44:32  11  be construed broadly.  It encompasses all of the work that

10:44:36  12  a server performs, that a bartender performs as part of

10:44:39  13  their customer service for which they receive tips, and

10:44:41  14  provides more examples for each profession and for new

10:44:46  15  professions in order to make that clear.

10:44:51  16      And given those changes and given the structure

10:44:54  17  of the rule, these sort of concern in this representation

10:44:58  18  that there would have to be some kind of new

10:45:01  19  minute-by-minute monitoring of every employee's activities

10:45:06  20  is really unfunded.  This is a rule that can be complied

10:45:09  21  with with upfront changes to how schedules are put

10:45:13  22  together and the work to which employees are assigned.

10:45:16  23  And that's going to require some work to comply with

10:45:19  24  certainly, but the harm that the plaintiffs described is

10:45:21  25  really not supported by the nature of this final rule.

10:45:25  1          And, indeed, prior to this final rule, during the
10:45:27  2     many decades in which employers were being subjected to
10:45:31  3     the 80/20 rule, which was, again, a quantitative temporal
10:45:36  4     limitation on the amount of time that employees could be
10:45:38  5     subjected to to perform non-tip-producing work or related
10:45:42  6     duties before the employer had to start paying them
10:45:45  7     minimum wage, the Restaurant Law Center and plaintiffs'
10:45:50  8     litigation counsel put out guidance for how restaurants
10:45:52  9     could comply with these quantitative temporal limits; and
10:45:56  10    what they suggested is precisely what we're saying they
10:45:58  11    can do to comply with this rule.  Structuring of tasks,
10:46:03  12    having employers clock in -- if you want to have an
10:46:06  13    employee perform a significant amount of non-tip-related
10:46:09  14    duties at the beginning of a shift, either limit those
10:46:11  15    duties to the temporal limitations placed by the rule or
10:46:13  16    have them clock in at the minimum wage prior to the shift
10:46:16  17    beginning, perform those duties and then, clock into the
10:46:20  18    tipped duty.
10:46:21  19          This is guidance that they put out in May of
10:46:24  20    2021, before this final rule was even proposed to the
10:46:29  21    industry.  Your Honor has any questions?
10:46:33  22          THE COURT:  No.  Thank you very much.
10:46:37  23          MR. DECAMP:  Your Honor, just to briefly address
10:46:38  24    a few of the points that were made here.
10:46:40  25          THE COURT:  Sure.

| | | |
|---|---|---|
| 10:46:42 | 1 | MR. DECAMP:  First, with regard to your Honor's |
| 10:46:43 | 2 | question about inferences to be drawn from legislative |
| 10:46:48 | 3 | inaction in the face of an agency regulatory or |
| 10:46:52 | 4 | sub-regulatory position, I think it's worth noting that |
| 10:46:55 | 5 | nobody knew about this sub-regulatory issue, the field |
| 10:47:00 | 6 | operations handbook, the 1988 sub-regulatory articulation |
| 10:47:04 | 7 | of DOL that they had issued this 20 percent standard for |
| 10:47:07 | 8 | the first time.  People didn't know about it at the time. |
| 10:47:11 | 9 | It was not widely publicized.  The field operations |
| 10:47:14 | 10 | handbook was, in fact, not a public document at that time. |
| 10:47:17 | 11 | This provision was not publicly available.  It didn't get |
| 10:47:20 | 12 | into the public record until the '90s. |
| 10:47:22 | 13 | I ran the Wage and Hour Division at the |
| 10:47:24 | 14 | Department of Labor for a period of time.  I had been at |
| 10:47:25 | 15 | the department about two years before I ever heard of this |
| 10:47:29 | 16 | rule.  It is not something that was widely known.  People |
| 10:47:31 | 17 | didn't really first hear about it until about 2007, when I |
| 10:47:35 | 18 | believe it was the Eastern District of Missouri, if I've |
| 10:47:38 | 19 | got the court correct -- it might have been a different |
| 10:47:40 | 20 | court.  I believe that was the court.  The district court |
| 10:47:43 | 21 | in Fast against Applebee's, when that decision came down, |
| 10:47:48 | 22 | that's when people first got attention to this issue.  To |
| 10:47:52 | 23 | be clear, Congress didn't know about this issue.  It |
| 10:47:55 | 24 | wasn't front and center top of mind for an extended period |
| 10:47:58 | 25 | of time and Congress thought this is fine. |

10:48:00  1          It first hit the public's attention in -- I

10:48:03  2  believe it was 2007 when the district court decision came

10:48:06  3  out.  After that and since then and pretty much

10:48:08  4  continuously since then, this has been a matter that's

10:48:11  5  been in litigation, actively fought in court after court.

10:48:14  6  So it's understandable that Congress wouldn't necessarily

10:48:18  7  want to step in while the matter is playing out in the

10:48:20  8  courts.  Obviously Congress has a lot on its mind, and

10:48:24  9  over the past 10 years or so, 15 years, has had more on

10:48:27  10  its mind than in today's legislative environment, getting

10:48:29  11  60 votes on something, on anything, particularly involving

10:48:33  12  the Fair Labor Standards Acts, is a real challenge.

10:48:35  13          So I don't think there's a lot of inference that

10:48:38  14  can be drawn from the fact that Congress in the 15 years

10:48:40  15  or so, 14, 15 years since this dual jobs issue, this 20

10:48:45  16  percent issue first hit national prominence, I don't think

10:48:49  17  that there's a lot of conclusion that could be drawn from

10:48:51  18  that.  It's not the same as 40 years of consistent agency

10:48:53  19  practice, well known, Congress knew about it, acquiesced

10:48:56  20  in it.  That's very different scenario there.

10:48:58  21          With regard to the statement that these tipped

10:49:01  22  employees make 2.13 an hour, that is true with regard to

10:49:05  23  their cash wage, but they also have to make at least then

10:49:10  24  a corresponding average of 5.12 an hour in tips in order

10:49:14  25  to get to the minimum wage.  There is no tipped employee

10:49:17  1  that at the end of this process ends up with less money in

10:49:22  2  their hand than an employee who was not a tipped employee

10:49:24  3  who received an hourly wage equal to the minimum wage.

10:49:27  4  They are equivalently situated from a tax standpoint, from

10:49:32  5  a wage standpoint, all of it.

10:49:33  6       So these are not 2.13-an-hour employees.  These

10:49:37  7  are employees who are receiving earnings, wages under the

10:49:39  8  FLSA and earnings under the Internal Revenue Code that are

10:49:44  9  equal to or greater than the earnings that minimum wage

10:49:48  10  employees receive.

10:49:48  11       With regard to the agency's consistent practice,

10:49:51  12  it's not as simple as the agency maintaining a position

10:49:54  13  consistently since 1988.  That is just not the case.  In

10:49:58  14  2009, the department issued an opinion letter, withdrew it

10:50:03  15  upon a change of administration, but issued an opinion

10:50:06  16  letter in 2009 withdrawing the 20 percent guidance.  So

10:50:10  17  the agency has moved back and forth.  And then, again, in

10:50:12  18  2018 and 2019 and 2020, the department clearly took a

10:50:19  19  position that was contrary to this 20 percent rule.

10:50:21  20       So it's not as though it's maintained a

10:50:23  21  monolithic, specific, consistent policy throughout.  There

10:50:27  22  were periods of time, stretches of time where yes, it had

10:50:29  23  a single view on the 20 percent rule, and then, there were

10:50:31  24  periods of time when it did not.  Now, the six or so weeks

10:50:34  25  in 2009, some courts have dismissed that and said, well,

10:50:37  1   that was just a blip.  But the two or three years when the

10:50:39  2   department during the previous administration actively

10:50:44  3   rescinded and worked to get rid of the sub-regulatory

10:50:48  4   guidance and then, embody that position in a final rule,

10:50:52  5   that was an extended period of time where the department

10:50:55  6   said this is not the law.  So it's not as simple as a

10:50:59  7   straightforward, single unitary agency position.

10:51:04  8          With regard to O*NET, even if one takes the

10:51:06  9   position that the Department of Labor is not required to

10:51:11  10  accept as given whatever the current practices of the

10:51:14  11  industry are because industries can go out of compliance,

10:51:17  12  industries can do things and, therefore, O*NET somehow

10:51:20  13  gives employers the ability to kind of pole positions in

10:51:24  14  directions they shouldn't.

10:51:25  15         That might be fine, but the department also never

10:51:29  16  considered any historical data either.  Never considered

10:51:31  17  any of the data regarding how did these jobs function in

10:51:35  18  1966, when Congress first enacted the tip credit?  What

10:51:39  19  was Congress' understanding of what it means to be a

10:51:42  20  server, a waiter, a busser, a service bartender?  What did

10:51:48  21  Congress mean by those terms when it said in the

10:51:51  22  legislative history in '66 and '74 that these are roles

10:51:54  23  that should be tipped, that we regard as tipped

10:51:57  24  employment.

10:51:57  25         So even if one gives the department some leeway

10:52:02  1  to not defer completely to current industry practice, the

10:52:07  2  fact is, they never considered any historical practice.

10:52:10  3  They just made it up and said, you know, in our review,

10:52:14  4  making salads is the work of chefs, and then, doubled down

10:52:17  5  on it and cited that in every decision since leading to

10:52:21  6  the sub-regulatory guidance articulating 80/20, and then,

10:52:25  7  leading eventually through a meandering path to the

10:52:29  8  current final rule, but without any actual view of what

10:52:32  9  the facts are.

10:52:33  10         Instead, what we end up with is this extra

10:52:36  11  statutory concept of a tipped occupation, which is not the

10:52:38  12  language in the statute.  In the statute, it's not about

10:52:41  13  tipped occupations.  It's about tipped employees engaged

10:52:44  14  in an occupation.  An occupation that may have a

10:52:47  15  relatively low amount of tips, $30 a month.  That's not a

10:52:50  16  lot of tips.

10:52:51  17         There's nothing in the structure of the FLSA --

10:52:52  18  and I don't mean to repeat what I said before.  I'll wrap

10:52:55  19  up quickly here.  There's nothing in the text of the FLSA

10:52:57  20  or the structure of the FLSA suggesting there's anything

10:52:59  21  inequitable about having a tipped employee spending a

10:53:03  22  considerable amount of time on tasks that don't

10:53:06  23  necessarily generate tips as long as they're earning

10:53:09  24  enough in tips to meet that standard of $30 a month, and

10:53:13  25  if there's any gap in the amount of tips that is being

| | | |
|---|---|---|
| 10:53:16 | 1 | topped up so that employee is not harmed, not in any worse |
| 10:53:20 | 2 | position than a non-tipped employee earning full minimum |
| 10:53:24 | 3 | wage. |
| 10:53:24 | 4 | That's all this is about.  It's not meant to be |
| 10:53:26 | 5 | some kind of deep existential analysis of when is a server |
| 10:53:30 | 6 | not a server, when is a server who's sitting there waiting |
| 10:53:33 | 7 | for a customer but not getting a customer really a tipped |
| 10:53:35 | 8 | employee or not.  The department says they're in a |
| 10:53:37 | 9 | different occupation.  They don't say what occupation, but |
| 10:53:39 | 10 | it's not a tipped occupation.  But that's not what |
| 10:53:42 | 11 | Congress said.  That's not what the statute said.  And |
| 10:53:45 | 12 | there are obviously many other examples we talked about |
| 10:53:48 | 13 | today. |
| 10:53:48 | 14 | Congress has just gone on a frolic -- the |
| 10:53:52 | 15 | department has gone on a frolic and detour here with this |
| 10:53:54 | 16 | rulemaking.  It's not tethered to the statute and it is |
| 10:53:58 | 17 | not entitled to any deference, and it fails the Chevron |
| 10:54:01 | 18 | analysis. |
| 10:54:01 | 19 | THE COURT:  Thank you.  This has been very |
| 10:54:02 | 20 | helpful.  I appreciate so much your insights today.  And |
| 10:54:08 | 21 | I'm going to review your filings and in light of the |
| 10:54:14 | 22 | arguments you've made today, and I'll take this under |
| 10:54:16 | 23 | advisement and we'll get something out forthwith. |
| 10:54:19 | 24 | MR. DECAMP:  Thank you, your Honor. |
| 10:54:20 | 25 | THE COURT:  Anything else I can do for you today? |

| | | |
|---|---|---|
| 10:54:22 | 1 | MR. DECAMP:  No thank you, your Honor. |
| 10:54:24 | 2 | THE COURT:  All right.  Are we good? |
| 10:54:26 | 3 | MR. WALKER:  I'm good, your Honor.  Thank you. |
| 10:54:27 | 4 | THE COURT:  All right.  Thank you very much.  And |
| 10:54:29 | 5 | those of you who are traveling, safe travels. |
| | 6 | (Proceedings concluded.) |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1                          * * * * * *

2

3   UNITED STATES DISTRICT COURT  )

4   WESTERN DISTRICT OF TEXAS)

5

6     I, LILY I. REZNIK, Certified Realtime Reporter,

7   Registered Merit Reporter, in my capacity as Official

8   Court Reporter of the United States District Court,

9   Western District of Texas, do certify that the foregoing

10  is a correct transcript from the record of proceedings in

11  the above-entitled matter.

12    I certify that the transcript fees and format comply

13  with those prescribed by the Court and Judicial Conference

14  of the United States.

15    WITNESS MY OFFICIAL HAND this the 26th day of February,

16  2022.

17                          *Lily Iva Reznik*

18                          ~~~~~~~~~~~~~~~~~~~~~~~~
                            *LILY I. REZNIK, CRR, RMR*
19                          *Official Court Reporter*
                            *United States District Court*
20                          *Austin Division*
                            *501 West 5th Street,*
21                          *Suite 4153*
                            *Austin, Texas 78701*
22                          *(512)391-8792*
                            *SOT Certification No. 4481*
23                          *Expires:  1-31-23*

24

25