**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| RESTAURANT LAW CENTER, a non-profit District of Columbia corporation; and TEXAS RESTAURANT ASSOCIATION, a non-profit Texas corporation,<br><br>         Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF LABOR; HON. MARTIN J. WALSH, Secretary of the United States Department of Labor, in his official capacity; and JESSICA LOOMAN, Acting Administrator of the Department of Labor's Wage and Hour Division, in her official capacity,<br><br>         Defendants. | Civil Action No. 1:21-cv-01106 |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND REQUEST FOR EXPEDITED CONSIDERATION AND ORAL ARGUMENT**

ANGELO I. AMADOR (admitted *pro hac vice*)
RESTAURANT LAW CENTER
2100 L Street, N.W., Suite 700
Washington, D.C.  20036
Tel:  202.331.5913
Fax: 202.973.3952
AAmador@restaurant.org

GRETA RAVITSKY
EPSTEIN, BECKER & GREEN, P.C.
Two Houston Center
909 Fannin, Suite 3838
Houston, Texas  77010
Tel:  713.300.3215
Fax: 713.300.3235
GRavitsky@ebglaw.com

PAUL DECAMP (admitted *pro hac vice*)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com

KATHLEEN BARRETT (admitted *pro hac vice*)
EPSTEIN, BECKER & GREEN, P.C.
227 West Monroe, Suite 3250
Chicago, Illinois 60606
Tel:  312.499.1400
Fax: 312.827.9562
KBarrett@ebglaw.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................ 2

ARGUMENT .................................................................................................................. 7

I.      Plaintiffs Have Standing To Challenge The Dual Jobs Final Rule............................. 7

II.     The Summary Judgment Standard .......................................................................... 8

III.    The 2021 Dual Jobs Final Rule Is Invalid, And Plaintiffs Are Entitled To Summary Judgment. ................................................................................................................ 9

      A.     The *Chevron* Framework ............................................................................ 11

            1.     *Chevron* Step One ...................................................................... 11

            2.     *Chevron* Step Two ...................................................................... 12

      B.     The Final Rule fails at *Chevron* "Step Zero" because the Department did not promulgate the Final Rule within the exercise of the authority it claims Congress granted to it. .................................................................................. 13

      C.     The Final Rule fails *Chevron* Step One. ...................................................... 14

            1.     Congress directly spoke to the issue of tip credit application by defining "tipped employee" using the unambiguous term "engaged in an occupation." ...................................................................... 15

                 a.  Ordinary Meaning .................................................................... 15

                 b.  The statutory definitions and overall structure ............................ 16

                 c.  The FLSA's legislative history .................................................. 17

            2.     The Final Rule impermissibly supplants the statutory definition of "tipped employee" with a different approach based solely on whether specific job duties directly and immediately produce tips. ................ 19

      D.     The Final Rule fails *Chevron* Step Two. ...................................................... 20

            1.     Limiting the tip credit based on whether duties directly and immediately produce tips is not a permissible construction of the FLSA.................................................................................... 21

            2.     The Final Rule is arbitrary and capricious because it is cut from whole cloth................................................................................... 23

                 a.  The Department conducted no fact finding ................................. 23

                 b.  The Department deliberately ignored "the nation's primary source of occupational information"—its own. ...................................... 24

        c.   The Department relied on labor market and employee economic
             circumstances data it acknowledged was outdated. ..................... 26

        d.   The Final Rule is internally inconsistent. .................................... 27

CONCLUSION .............................................................................................................. 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Barr*,
    951 F.3d 275 (5th Cir. 2020) ........................................................................... 13

*Am. Bar Ass'n v. F.T.C.*,
    430 F.3d 457 (D.C. Cir. 2005) ......................................................................... 10

*Barnhart v. Sigmon Coal Co., Inc.*,
    534 U.S. 438 (2002) ......................................................................................... 25

*Chamber of Com. of U.S. v. N.L.R.B.*,
    721 F.3d 152 (4th Cir. 2013) ........................................................................... 10

*Chamber of Commerce v. United States*,
    885 F.3d 360 (5th Cir. 2018) ........................................................................... 20

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
    468 U.S. 837 (1984) ................................................................................*passim*

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
    779 F.3d 258 (5th Cir. 2015) ........................................................... 10, 11, 12

*Girling Health Care, Inc. v. Shalala*,
    85 F.3d 211 (5th Cir. 1996) ............................................................................... 9

*Hasie v. Office of the Comptroller of Currency*,
    No. 5:07-CV-208-C, 2008 WL 4549881 (N.D. Tex. May 9, 2008) ................. 8

*Hertz Corp. v. Friend*,
    559 U.S. 77 (2010) ........................................................................................... 16

*INS v. Cardoza-Fonseca*,
    489 U.S. 421 (1987) ......................................................................................... 12

*Lion Health Servs., Inc. v. Sebelius*,
    635 F.3d 693 (5th Cir. 2011) ............................................................................. 9

*Luminant Generation Co. LLC v. U.S. EPA*,
    714 F.3d 841 (5th Cir. 2013) ............................................................................. 8

*Maralex Res., Inc. v. Barnhardt*,
    913 F.3d 1189 (10th Cir. 2019) ....................................................................... 12

*Marsh v. J. Alexander's LLC*,
905 F.3d 610 (9th Cir. 2018) (en banc) (Ikuta, J., dissenting) ........................................ 21

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ......................................................................................................... 23

*Nevada v. United States Dep't of Labor*,
275 F. Supp. 3d 795 (W.D. Tex. 2017) ........................................................................ 7, 8

*Nevada v. United States Department of Labor*,
218 F. Supp. 3d 520 (W.D. Tex. 2016) .............................................................. *passim*

*Pool Co. v. Cooper*,
274 F.3d 173 (5th Cir. 2001) ........................................................................................ 13

*Shell Offshore Inc. v. Babbitt*,
238 F.3d 622 (5th Cir. 2001) .......................................................................................... 9

*Sierra Club v. U.S. Fish and Wildlife Serv.*,
245 F.3d 434 (5th Cir. 2001) ........................................................................................ 12

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ............................................................................. *passim*

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
566 U.S. 560 (2012) ................................................................................................. 12, 15

*Texas v. Alabama-Coushatta Tribe of Texas*,
918 F.3d 440 (5th Cir. 2019) ........................................................................................ 12

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ......................................................................... 23, 25, 26, 27

*Texas v. United States*,
497 F.3d 491 (5th Cir. 2007) ....................................................................... 11, 12, 20, 22

*United States v. Castro-Gomez*,
365 F. Supp. 3d 801 (W.D. Tex. 2019) (Pitman, J.) ............................................. 10, 13, 21

*United States v. Mead Corp.*,
533 U.S. 218 (2001) ................................................................................................. 13, 14

*Util. Air Regul. Grp. v. E.P.A.*,
573 U.S. 302, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014) ............................................. 20

*Wis. Cent. Ltd. v. United States*,
138 S. Ct. 2067, 201 L. Ed. 2d 490 (2018) .................................................................... 20

**Statutes**

5 U.S.C. § 551 et seq ................................................................................. 8

5 U.S.C. § 706 ..................................................................................... 9, 29

5 U.S.C. § 706(2)(A) .............................................................................. 10

26 U.S.C. § 6053(a) ............................................................................... 18

29 U.S.C. § 203(m)(2)(A) ........................................................................ 2

29 U.S.C. § 203(m)(2)(A)(i) ..................................................................... 2

29 U.S.C. § 203(t) ......................................................................... passim

29 U.S.C. § 206(a)(1)(c) ........................................................................... 2

Pub. L. No. 89-97, 79 Stat. 384-85 ........................................................ 18

**Other Authorities**

29 C.F.R. § 531.56(e) ............................................................................... 2

32 Fed. Reg. 13580 .................................................................................. 2

84 Fed. Reg. 53956 .................................................................................. 4

85 Fed. Reg. 86767 .................................................................................. 4

86 Fed. Reg. 11632 .................................................................................. 4

86 Fed. Reg. 15811 .................................................................................. 4

86 Fed. Reg. 32818 .................................................................................. 4

86 Fed. Reg. 60114 ....................................................................... passim

BLACK'S LAW DICTIONARY 622 (4th ed. 1957) ................................. 15, 16

Fed. R. Civ. P. 56(a) ................................................................................ 8

https://www.onetcenter.org/overview.html (emphasis added, last visited Dec.
    16, 2021) ....................................................................................... 24, 25

Oxford English Dictionary Online, Oxford University Press, December 2021,
    Web ...................................................................................................... 15

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 473 (1967 ed.) .................. 15, 16

S. Rep. No. 89-1487 (1966) ................................................................................ 17

S. Rep. No. 93-690 .............................................................................. 16, 17, 19

U.S. Department of Labor, Wage & Hour Division, Field Operations
    Handbook § 30d00(e) (1988) ...................................................................... 3

2 WEBSTER'S THIRD NEW INT'L DICTIONARY 751 (1961 ed.) ........................................ 15, 17

WHD Opinion Letter FLSA2018–27 (Nov. 8, 2018) ............................................................. 3

## INTRODUCTION

Congress specified in the Fair Labor Standards Act that employers may take a tip credit toward the minimum wage with respect to any "tipped employee," whom Congress defined in section 3(t) as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  Over the past 54 years, however, the Department of Labor has—first by subregulatory guidance, and now by regulation—engrafted an entirely different and more demanding standard onto the FLSA.  According to the Final Rule at issue here, unless an employee spends 80% or more of his or her working time actively pursuing tips, the employer *may not* take the tip credit for some or all of that employee's working time.  In addition, the Final Rule bars an employer from taking the tip credit whenever an employee spends more than 30 consecutive minutes not actively pursuing tips.  According to the Final Rule, these principles apply even where the employee spends 100% of his or her working time engaged in tasks that by any measure are a normal part of the employee's occupation.  The Final Rule goes so far as to declare that if a restaurant server spends more than 20% of his or her time waiting for customers to enter the establishment, the employer loses the ability to take the tip credit.

Indeed, the Department's stated justification for the Final Rule—the supposed ambiguity in the statutory terms "occupation" and "engaged in an occupation"—bears no connection to what the Department actually enacted in the Final Rule.  The Final Rule does not even attempt to define an "occupation" or to identify what it means to be "engaged in an occupation," instead turning the statutory scheme on its head by declaring that the whole focus of the analysis hinges on tip-generating tasks, rather than the occupation-based approach called for by the statutory text.  Simply put, the Department has no authority to override the statute that Congress enacted.  The Final Rule is contrary to law, exceeds the Department's regulatory power, and is arbitrary and capricious.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The Fair Labor Standards Act ("FLSA"), enacted by Congress in 1938, generally requires covered employers to pay their employees at least the federal minimum wage (currently $7.25 per hour) for all hours worked.  29 U.S.C. § 206(a)(1)(c)[1].

2.      In 1966, Congress amended the FLSA to allow an employer to satisfy a portion of its minimum wage obligation to a ''tipped employee'' by taking a partial credit, known as a ''tip credit,'' toward the minimum wage based on the amount of tips an employee receives provided that the employer meets certain requirements.  29 U.S.C. § 203(m)(2)(A).  Under section 3(t), a ''tipped employee'' is ''any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.''  *Id.* § 203(t).  An employer that elects to take a tip credit must pay the tipped employee a direct wage of at least $2.13 per hour.  *Id.* § 203(m)(2)(A)(i). The employer may then take a credit against its wage obligation for the difference, up to $5.12 per hour, if the employees' tips are sufficient to fulfill the remainder of the minimum wage.

3.      The following year, in 1967, the Department of Labor first issued the Dual Jobs regulation.  *See* 32 Fed. Reg. 13,580–81.  In implementing the Dual Jobs regulation, the Department recognized that an employee may be employed both in a tipped occupation and in a nontipped occupation, providing that in such a ''dual jobs'' situation, the employee is a ''tipped employee'' for purposes of section 3(t) only while the employee is employed in the tipped occupation, and that an employer may take a tip credit against its minimum wage obligations for only the time the employee spends in that tipped occupation.  *Id.*; 29 C.F.R. § 531.56(e) (1967).

---

[1]      Plaintiffs recognize that the Court is already familiar with the statutory and regulatory background for the challenged regulation from the parties' preliminary injunction briefing and argument.  In the interest of brevity, Plaintiffs will not restate that full history here, but instead will refer the Court to, and will incorporate by reference, the relevant portions of the earlier filings in this case.  *See* Pls.' Compl., ECF 1, ¶¶ 15-77; Pls.' Emergency Mot. For Preliminary Inj., ECF 12, at 8-20 (references are to ECF-generated pagination, not internal document pagination).

4.      In 1988, the Department of Labor's Wage and Hour Division ("WHD") updated its Field Operations Handbook ("FOH") to include an interpretation of the Dual Jobs regulation as applied to employees who perform both tipped and non-tipped duties within a *single* job.  In particular, the FOH stated that the Dual Jobs regulation ''permits the taking of the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e., maintenance and preparatory or closing activities),'' if those duties are ''incidental'' and ''generally assigned'' to tipped employees.  FOH § 30d00(e) (1988).  To illustrate the types of related, non-tip producing duties for which employers could take a tip credit, the FOH listed ''a waiter/waitress, who spends some time cleaning and setting tables, making coffee, and occasionally washing dishes or glasses,'' the same examples included in the Dual Jobs regulation at that time.  However, the FOH states that ''where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties.''  *Id.*

5.      In 2018, the WHD rescinded the 80/20 guidance included in its FOH and issued new sub-regulatory guidance allowing employers to take the tip credit when their employees performed related non-tipped duties provided that those duties are performed contemporaneously with, or for a reasonable time immediately before or after, tipped duties.  *See* WHD Opinion Letter FLSA2018–27 (Nov. 8, 2018).  In doing so, the WHD explained that it would use the Occupational Information Network ("O*NET"), a database of worker attributes and job characteristics and source of descriptive occupational information, to determine whether a tipped employee's non-tipped duties were related to the employee's tipped occupation.  *See id.*

3

6.      In 2020, the Department published a notice of proposed rulemaking ("NPRM"), proposing to codify the Department's 2018 guidance regarding when an employer can continue to take a tip credit for a tipped employee who performs related, nontipped duties.  *See* 84 Fed. Reg. 53,956, 53,963 (Oct. 8, 2019).  The 2020 Final Rule provided, consistent with the Department's 2018 guidance, that ''an employer may take a tip credit for all non-tipped duties an employee performs that meet two requirements.  First, the duties must be related to the employee's tipped occupation; second, the employee must perform the related duties contemporaneously with the tip-producing activities or within a reasonable time immediately before or after the tipped activities.'' *See* 85 Fed. Reg. 86,767.

7.      The 2020 Final Rule was published with an effective date of March 1, 2021.  However, on February 26, 2021, the Department delayed the effective date of the Final Rule until April 30, 2021.  *See* 86 Fed. Reg. 11,632.  The Department subsequently delayed the effective date of the dual jobs portion of the 2020 Final Rule to address the FLSA tip-credit's application to tipped employees who perform tipped and non-tipped duties, until December 31, 2021.  *See* 86 Fed. Reg. 15,812.

8.      On June 23, 2021, the Department published the Dual Jobs NPRM in which it proposed to withdraw and repropose the portion of the 2020 Final Rule related to the determination of when a tipped employee is employed in dual jobs.  *See* 86 Fed. Reg. 32,818.

9.      In its 2021 NPRM, the Department proposed to amend the Dual Jobs regulation to use a functional test to determine when an employee is and is not engaged in work related to a tipped occupation.  Under the Department's proposal, an employee is engaged in a tipped occupation under 29 U.S.C. § 203(t) only when the employee either performs work that produces tips or performs work that directly supports the tip-producing work, provided that the directly supporting

4

work is not performed for a substantial amount of time. *See* 86 Fed. Reg. 32,846. According to the Department, an employee is not engaged in the tipped occupation, and thus is not eligible for a tip-credit, when the employee performs work that is not part of the tipped occupation (i.e., work that does not generate tips and does not directly support tip-producing work). *Id.* Under the Department's proposal, work that ''directly supports'' tip-producing work is work that assists a tipped employee to perform the work for which the employee receives tips. *Id.* The proposed regulatory text explained that an employee has performed work that directly supports tip-producing work for a substantial amount of time if the tipped employee's directly supporting work either (1) exceeds, in the aggregate, 20 percent of the employee's hours worked during the workweek or (2) is performed for a continuous period of time exceeding 30 minutes. *Id.* In both scenarios, if a tipped employee spends more than 20 percent of the employee's hours worked during the workweek or more than 30 continuous minutes performing "directly supporting work," the employer cannot take a tip-credit for any time that exceeds the allotted time limitations. The Department further added that ''[a]n employee is engaged in a tipped occupation when the employee performs work that is part of the tipped occupation'' and that ''[a]n employer may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation." *Id.*

10.     The Department received more than 1,860 comments on the proposed rule, including, but not limited to comments in opposition from Plaintiff Restaurant Law Center (RLC), National Restaurant Association, National Federation of Independent Businesses (NFIB), Center for Workplace Compliance, Littler Mendelson's Workplace Policy Institute, the Florida Restaurant and Lodging Association, Hospitality Maine, Missouri Restaurant Association, the Central Florida

Compensation and Benefits Association, the American Hotel and Lodging Association, the National Retail Federation, the National Council of Chain Restaurants, Franchise Business Services, Landry's, Seyfarth Shaw, and the U.S Chamber of Commerce. *See* 86 Fed. Reg. 60,141.

11.     During the Rule's comment period, Plaintiff RLC commented that the Department lacked the authority to place any limits on the amount of nontipped work that a restaurant worker may perform and still be considered to be engaged in a tipped occupation. *See* 86 Fed. Reg. 60,122. RLC further commented that the WHD did not engage in any fact-finding to support its conclusion that certain tasks are either tip-producing, directly supporting, or not part of a tipped occupation. *Id.* at 60,123.

12.     On October 29, 2021, the Department published the Final Rule amending the Dual Jobs regulation, which adopted the 2021 NPRM proposals in full.  The Dual Jobs Final Rule took effect on December 28, 2021. *See* 86 Fed. Reg. 60,114.

13.     The Department acknowledges that the Dual Jobs Final Rule may result in Rule familiarization costs, adjustment costs, and management costs.  Management costs would likely be ongoing costs associated with complying with the rule. *See* 86 Fed. Reg. 60,141.

14.     The Department has calculated that in states that allow employers to receive a tip-credit, there are 470,894 potentially affected establishments. *See* 86 Fed. Reg. 60,141.  The Department acknowledges that employers may incur ongoing management costs because in order to make sure that they can continue to take a tip credit for all hours of an employee's shift, they will have to monitor tipped employees to ensure that they are not spending more than 20 percent of their time on directly supporting work per workweek, or more than 30 minutes continuously performing such duties. *Id.*

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE DUAL JOBS FINAL RULE.

"Standing requires a plaintiff to show the following elements:  (1) an 'injury in fact' that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely the injury will be redressed by a favorable decision.  *Nevada v. United States Dep't of Labor*, 275 F. Supp. 3d 795, 800 (W.D. Tex. 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (hereafter "*Nevada v. DOL II*").  "An association has standing to bring suit on behalf of its members when:  '"(a) its members would otherwise have standing to sue in their own right; (b) the interests at stake are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Both Plaintiffs meet the standing requirements.  *First*, Plaintiffs are national and state trade associations, respectively, representing thousands of employers in Texas and throughout the country with workers customarily and regularly compensated by tips in excess of $30 per month.  *See* Declaration of Emily Knight ("Knight Decl.") ¶¶ 3, 4, 10; Declaration of Angelo Amador ("Amador Decl.") ¶¶ 3, 4, 14, 17, 18; Declaration of Tracy Vaught ("Vaught Decl.") ¶¶ 1, 3-5.[2]  Plaintiffs' members therefore have standing to sue in their own right.  *Second*, Plaintiffs and their members would incur significant payroll, accounting, and legal costs to comply with the Final Rule, and the interests at stake are germane to each Plaintiff's purpose.  *See* Amador Decl. ¶¶ 9-19, 21-22;

---

[2]    Plaintiffs submit their supporting Appendix of Evidence ("Pls.' App.") with this motion. The Declaration of Emily Knight ("Decl. Knight") is contained in Pls' App. as Ex. 1. The Declaration of Angelo Amador ("Decl. Amador") is contained in Pls.' App. as Ex. 5.  The Declaration of Tracy Vaught ("Decl. Vaught") is contained in Pls.' App. as Ex. 6.

Knight Decl. ¶¶ 9, 10, 13-16.  *Third*, the claims assert legal arguments that do not require participation of any individual members of Plaintiffs.  Plaintiffs therefore both have standing.  *See generally Nevada v. DOL II*, 275 F. Supp. 3d at 801.

"A challenge to administrative regulations is fit for review if (1) the questions presented are purely legal ones, (2) the challenged regulations constitute final agency action, and (3) further factual development would not significantly advance the Court's ability to deal with the legal issues presented.  *Nevada v. United States Department of Labor*, 218 F. Supp. 3d 520, 526 (W.D. Tex. 2016) (quoting *Texas v. United States*, 497 F.3d 491, 498-99 (5th Cir. 2007) (cleaned up, and other citation omitted) (hereafter "*Nevada v. DOL I*").  Plaintiffs make only legal arguments; the Final Rule went into effect on December 28, 2021; and the material facts regarding legislative and regulatory history are sufficiently developed to address the Final Rule's legality.  The matter is therefore ripe for review.  *See Nevada v. DOL I*, 218 F. Supp. 3d at 526.

## II.   THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case involving the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA"), "the standard of review is whether the agency decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  *Hasie v. Office of the Comptroller of Currency*, No. 5:07-CV-208-C, 2008 WL 4549881, at *2 (N.D. Tex. May 9, 2008) (quoting 5 U.S.C. § 706(2)(A)) (citations omitted), *aff'd*, 633 F.3d 361 (5th Cir. 2011).  Where a motion for summary judgment requires the court to review an administrative agency's decision, the administrative record provides the complete factual predicate for the court's review.  *See Luminant Generation Co. LLC v. U.S. EPA*, 714 F.3d 841, 850 (5th Cir. 2013).

This case presents purely legal questions of statutory authority and administrative law that may be resolved at the summary judgment stage based upon the administrative record before the agency.[3]  *See* 5 U.S.C. § 706.  Plaintiffs' arguments that the Department's new Final Rule has strayed beyond the bounds of the agency's statutory authority and that the Department acted arbitrarily and capriciously present only legal issues that require no discovery or factual development beyond the administrative record.  It is well established in this circuit that summary judgment is the way to resolve these purely legal issues.  *See e.g. Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996) ("We have consistently upheld, without comment, the use of summary judgment as a mechanism for review of agency decisions."); *accord Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 695 (5th Cir. 2011) (affirming summary judgment invalidating HHS regulation capping annual Medicare reimbursements); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 623-24 (5th Cir. 2001) (upholding summary judgment in part and granting summary judgment in full to plaintiffs in APA challenge against Department of the Interior decision regarding calculation of royalty payments).

III.    THE 2021 DUAL JOBS FINAL RULE IS INVALID, AND PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT.

Congress specifically defined "tipped employee" in the FLSA to mean "any employee *engaged in an **occupation** in which he customarily and regularly receives more than $30 a month in tips.*" 29 U.S.C. § 203(t) (emphasis added).  The Final Rule observes that Congress authorized the Department "to promulgate necessary rules, regulations or orders with regard to the" 1966 FLSA amendments that created the tip credit.  Final Rule, 86 Fed. Reg. at 60,121 (citing Public Law 89-601, § 602, 80 Stat. at 844).  The Final Rule observes that "Congress left 'occupation,' and what

---

[3]    Excerpts from the administrative record consisting of comments on the proposed rule previously filed by the SBA, referred to in this Motion, are attached hereto for the convenience of the Court.  *See* Pltfs. App. Ex. 4.

it means to be 'engaged in an occupation,' in section 3(t) undefined." Final Rule, 86 Fed. Reg. at 60,116. The Department therefore believes that "Congress delegated to the Department the authority to determine what it means to be 'engaged in an occupation' that customarily and regularly receives tips." Final Rule, 86 Fed. Reg. at 60, 116.

In other words, the Department believes it is authorized to define terms in the statute simply because Congress did not specifically define those terms. But even "a broad grant of general rulemaking authority does not allow an agency to make amendments to statutory provisions." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 273 (5th Cir. 2015). The Department overlooks a fundamental question: whether the statutory term it wants to [re-]define is clear and unambiguous. *See United States v. Castro-Gomez*, 365 F. Supp. 3d 801, 812 (W.D. Tex. 2019) (Pitman, J.) ("[a]s a general rule of statutory interpretation, a regulatory definition does not displace a statutory definition where the statute is clear and unambiguous"; ruling that unambiguous statutory definition controlled over conflicting regulatory definition). Courts have consistently recognized that the "existence of ambiguity is not enough per se to warrant deference to the agency's interpretation . . . . The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity." *Am. Bar Ass'n v. F.T.C.*, 430 F.3d 457, 469 (D.C. Cir. 2005); *Chamber of Com. of U.S. v. N.L.R.B.*, 721 F.3d 152, 161 (4th Cir. 2013). For all the reasons that follow, the Final Rule is unlawful because it fails the "*Chevron* Two-Step." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1023 (5th Cir. 2019) (vacating final administrative regulation promulgated after full notice and comment because it was unlawful under "the *Chevron* test for reviewing agency interpretations of statutes") (citation omitted); *see generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 468 U.S. 837 (1984).[4]

---

[4]     Plaintiffs also challenge the Final Rule as arbitrary and capricious and unlawful abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). "Because *Chevron* step two and the APA share the 'arbitrary

### A.      The *Chevron* Framework

#### 1.      *Chevron* Step One

> At step one, the court considers whether Congress has directly spoken to
> the precise question at issue.  If Congress has directly spoken on an issue,
> that settles the matter:  the Court, as well as the agency, must give effect to
> the unambiguously expressed intent of Congress.  Only if the statutory text
> is ambiguous can the court proceed to step two, asking whether the agency's
> construction of the statute is permissible.

*Sw. Elec. Power*, 920 F.3d at 1014 (cleaned up, citations omitted).  More simply stated, "[t]he

authority of administrative agencies is constrained by the language of the statute they administer,"

*Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (citation omitted), so "[w]here Con-

gress has established a clear line, the agency cannot go beyond it."  *Contender Farms*, 779 F.3d at

269 (quoting *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013)).  Courts answer the Step

One question of "whether Congress has directly spoken to the precise question at issue" by relying

on "the conventional standards of statutory construction—*i.e.*, text, structure, and the overall stat-

utory scheme[.]"  *Sw. Elec. Power*, 920 F.3d at 1023 (cleaned up, citations omitted).  Courts "are

not to focus myopically on a particular statutory provision in isolation because the meaning—or

ambiguity—of certain words or phrases may only become evidence when placed in context."  *Id.*

at 1023 (cleaned up, citations omitted).

"Canons of statutory interpretation further assist [courts] in assessing the meaning of a

statute" at Step One.  *Contender Farms*, 779 F.3d at 269.  "Several basic considerations guide [the

court's] inquiry under these canons:  (1) we begin with the statute's language; (2) **we give unde-**

**fined words their ordinary, contemporary, and common meaning**; (3) we read the statute's

---

and capricious standard, the APA reflects the principles of *Chevron*, and analysis under the two standards proceeds similarly."  *Sw. Elec. Power*, 920 F.3d at 1028 (cleaned up, citation omitted).  Plaintiffs will augment their analysis explaining why the Final Rule is arbitrary and capricious with their *Chevron* step two arguments below.

words in proper context and consider them based on the statute as whole, and (4) we consider a statute's terms in the light of the statute's purposes." *Contender Farms*, 779 F.3d at 269 (cleaned up, emphasis added, citations omitted). *Accord Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning"); *Nevada v. United States I*, 218 F. Supp. 3d at 529 ("The Court assumes Congress's intent from the plain meaning of a word when the statute does not define the term") (citation omitted); *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, n.4 (10th Cir. 2019) ("At the first step of the *Chevron* analysis, we must give all undefined terms their ordinary meaning") (cleaned up, citation omitted). And "[l]egislative history" is also a "traditional tool of statutory interpretation" to be utilized at Step One. *Contender Farms*, 779 F.3d at 269 (cleaned up, emphasis added, citations omitted).[5]

### 2.   *Chevron* Step Two

Step Two also "compels a judicial evaluation of congressional intent." *Texas v. United States*, 497 F.3d at 506. The court asks whether the regulation "is based on a *permissible* construction of the statute." *Sw. Elec. Power*, 920 F.3d at 1028 (emphasis in original, citation omitted). "While this is a highly deferential standard, an agency interpretation can fail *Chevron* step two if it is contrary to clear congressional intent or frustrates the policy Congress sought to implement." *Sw. Elec. Power*, 920 F.3d at 1028 (cleaned up, citation omitted). For example:

---

[5]     *See also Texas v. Alabama-Coushatta Tribe of Texas*, 918 F.3d 440, 449 (5th Cir. 2019) ("*Chevron* step one . . . requires the reviewing court to apply 'the traditional tools of statutory interpretation'—like the canons and legislative history—to determine whether Congress has spoken to the precise issue") (quoting *Chevron*, 467 U.S. at 843); *Sierra Club v. U.S. Fish and Wildlife Serv.*, 245 F.3d 434, 442 & n.51 (5th Cir. 2001) (finding a regulation's definition "to be facially invalid" because it was inconsistent with the Endangered Species Act, observing that "[t]he legislative history of the ESA affirms the inconsistency of [the regulation] with the statute," and noting that in *INS v. Cardoza-Fonseca*, 489 U.S. 421, 449 (1987), the Supreme Court affirmed "that legislative history may be consulting in determining the Congressional intent under the first step of *Chevron* analysis").

> In the process of considering a regulation in relation to specific factual sit-
> uations, a court may conclude the regulation is inconsistent with the statu-
> tory language or is an unreasonable implementation of it.  In those instances,
> the regulation will not control.

*Castro-Gomez*, 365 F. Supp. 3d at 812-13 (quoting *United States v. Haggar Apparel Co.*, 526 U.S.

380, 392 (1999)).  "Agency action that is arbitrary, capricious, or manifestly contrary to the statute

also fails step two."  *Sw. Elec. Power*, 920 F.3d at 1028 (cleaned up, citation omitted).

**B.**      **The Final Rule fails at *Chevron* "Step Zero" because the Department did not promulgate the Final Rule within the exercise of the authority it claims Congress granted to it.**

As an initial matter, this Court must determine whether the FLSA even authorizes the De-

partment to have promulgated the Final Rule at all, which is sometimes referred to as the "*Chevron*

Step Zero" inquiry.  *See Ali v. Barr*, 951 F.3d 275, 278-79 (5th Cir. 2020) ("*Chevron* Step Zero is

the initial inquiry whether the *Chevron* framework applies at all") (cleaned up, citing *United States*

*v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), other citation omitted).  As relevant here, *Mead*

imposes two requirements:  (1) Congress must have delegated authority to promulgate the Final

Rule, and (2) the Final Rule must have been "promulgated in the exercise of that authority."  *Mead*,

533 U.S. at 226-27; *see Pool Co. v. Cooper*, 274 F.3d 173, 177 n.3 (5th Cir. 2001) (noting that

*Mead* imposes both requirements).  The second requirement is applicable here, because it high-

lights that a regulation promulgated outside Congress's delegated authority is unlawful.  *E.g.*, *Ne-*

*vada v. United States I*, 218 F. Supp. 3d at 530 ("With the Final Rule, the Department exceeds its

delegated authority and ignores Congress's intent. . . . Consequently, the Final Rule . . . is unlaw-

ful").[6]

---

[6]      The Court made this statement in the context of analyzing *Chevron* Step One, but the point applies equally to the second *Mead* requirement where, as here, the agency promulgates a regulation entirely outside its delegated authority.

The Final Rule contends that Congress, by leaving the terms "occupation" and "engaged in an occupation" undefined, "delegated the Department the authority to determine what it means to be 'engaged in an occupation' that customarily and regularly receives tips." 86 Fed. Reg. at 60,114. Plaintiffs do not concede this claimed delegation, but need not debate it now, because the Final Rule does not in fact determine, or even purport to determine, what it means to be "engaged in an occupation that customarily and regularly receives tips." Rather, and to the contrary, the Final Rule explains that it defines a completely different term:

> The final rule amends § 531.56 to define when an employee is performing the work of a ***tipped occupation***, and is therefore ***engaged in a tipped occupation*** for purposes of section 3(t) of the FLSA.

86 Fed. Reg. at 60,115 (emphasis added). **But section 3(t) of the FLSA does not contain the terms "tipped occupation" or "engaged in a tipped occupation."** The Final Rule is thus a *non sequitur*, because the end result (defining the term "tipped occupation") does not logically follow its premise (Congress delegated the Department authority to define "engaged in an occupation"). *A fortiori*, the Final Rule is unlawful because the Department acted outside of its claimed delegated authority in promulgating it. *Mead*, 533 U.S. at 226-27; *Nevada v. United States I*, 218 F. Supp. 3d at 530.

**C.     The Final Rule fails *Chevron* Step One.**

Even if the Department had authority to promulgate the Final Rule, it founders at Step One because (1) the ordinary meaning of the statutory definition speaks directly to the issue at hand, and (2) the non-statutory definition the Final Rule creates—a multi-layered regime under which

14

application of the tip credit depends upon whether specific job duties directly and immediately produce tips—conflicts with the ordinary meaning of the statutory definition.

> 1.   **Congress directly spoke to the issue of tip credit application by defining "tipped employee" using the unambiguous term "engaged in an occupation."**

> a.   **Ordinary Meaning**

The ordinary meaning of the term "engaged in an occupation" is clear and unambiguous. The Supreme Court refers to dictionaries in use around the time Congress enacted the statute at issue to determine the ordinary meaning of undefined terms. *Taniguchi*, 566 U.S. at 566-569 (engaging in a "survey of the relevant dictionaries" to determine "ordinary or common meaning" of an undefined statutory term). Dictionaries contemporaneous with the tip credit's 1966 statutory enactment are consistent in defining "engaged" and "occupation":

- "Engaged" means "occupied; employed";[7] "busy or occupied; involved";[8] and "to employ or involve one's self."[9]

- "Occupation" means "the principal business of one's life: a craft, trade, profession, or other means of earning a living: employment; vocation <his occupation is farming> . . .";[10] "one's usual or principal work or

---

[7]   2 WEBSTER'S THIRD NEW INT'L DICTIONARY 751 (1961 ed.) ("WEBSTER'S").  Copies of the cited WEBSTER'S definitions are contained in Pls.' App. at Ex. 7.

[8]   THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 473 (1967 ed.) ("RANDOM HOUSE").  Copies of the cited RANDOM HOUSE definitions are contained in Pls.' App. at Ex. 8.

[9]   BLACK'S LAW DICTIONARY 622 (4th ed. 1957) ("BLACK'S").  Copies of the cited BLACK'S definitions are contained in Pls.' App. at Ex. 9.

[10]   WEBSTER'S at 1560; *accord* "Occupation," Oxford English Dictionary Online, Oxford University Press, December 2021, Web. ("A particular action or course of action in which a person is engaged, esp. habitually; a particular job or profession; a particular pursuit or activity").

business, esp. as a means of earning a living:  *his occupation was dentistry*";[11] and "Vocation.  That which principally takes up one's time, thought, and energies, especially, one's regular business or employment; also, whatever one follows as the means of making a livelihood."[12]

Occupied.  Employed.  Principal business.  Principal work.  Profession.  Whatever one follows as the means of making a livelihood.  All exemplified by:  "Her occupation is [fill in the blank]—Waiter . . . Waitress . . . Server . . . Counterman . . . Busboy . . . Bartender."  The plain and ordinary meaning of "engaged in an occupation" focuses on the field of work and the job as a whole.  Nothing about the plain and ordinary meaning of "engaged in an occupation" suggests or indicates a focus on the relative mix of specific tasks within a job, much less elimination of the tip credit based on side duties that by definition are not the principal duties of the job.[13]

### b.   The statutory definitions and overall structure

The Final Rule myopically—and, thus, improperly—focuses on "engaged in an occupation" without considering the whole of the statutory definition of "tipped employee":  "any employed in an occupation *in which he customarily and regularly receives more than $30 a month in tips*."  The Final Rule's erroneous focus on whether specific job duties directly and immediately

---

[11]   RANDOM HOUSE at 996 (italics in original).

[12]   BLACK'S at 1230.

[13]   Putting an even finer point on the point, "principal" means "main, prominent" or "leading."  *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (quoting 12 Oxford English Dictionary 495 (2d ed. 1989)).  By choosing the word "occupation," Congress intended for the tip credit to apply when the employee's main, prominent, or leading work customarily and regularly resulted in the requisite amount of monthly tip income.  *See* S. Rep. No. 93-690 at 43 ("In establishments where the employee performs a variety of different jobs, the employee's status as one who 'customarily and regularly receives tips' will be determined on the basis of the employee's activities over the entire workweek").  The Final Rule turns Congressional intent on its head by *eliminating* the tip credit based on duties the Department characterizes as *not* directly and immediately producing tips—*i.e.*, *not* the employee's principal, main, prominent, or leading duties.

produce tips or not effectively writes the rest of the text out of the statutory definition.  This is illustrated by applying the statutory definition to the question it is designed to answer—whether the tip credit applies to a particular employee:  Does Employee X engage in an occupation—*e.g.*, waiter or waitress or server or counterman or busboy or bartender—in which he or she customarily and regularly receives the requisite amount of tips per month?  The answer is binary: it's either "Yes" or "No."  The statute does not call for, permit, or in any way support the answer the Final Rule demands, which amounts to the following:

> Yes, but only if the employee's duties produce tips, and even then only if the employee does not perform duties more than 20% of the time that merely support the duties that directly produce tips, and not for any time over 30 minutes if the employee performs those supporting duties for 30 consecutive minutes at any time during the week, and absolutely not for any time spend on duties the Department has decreed are not worthy of the tip credit.

### c.        The FLSA's legislative history

The legislative history supports the foregoing ordinary meaning analysis in multiple ways.

*First*, as the Department itself recognizes, the legislative history identifies occupations in which employees customarily and regularly receive the requisite amount of tips just like the dictionary definitions do: in their ordinary, colloquial sense.  *Compare* "his occupation is farming" (WEBSTER'S at 1560)," *with* "employees who customarily and regularly receive tips—*e.g*, waiters, bellhops, waitresses, countermen, busboys, service bartenders, etc."  S. Rep. No. 93-690 at 43 (quoted in Final Rule, 86 Fed. Reg. at 60,116).

*Second*, the legislative history explains that the tip credit provisions were intended to be "sufficiently flexible to ***permit the continuance of existing practices*** with respect to tips," and "provide enough flexibility to account for ***a practice as inconsistent as tipping***."  S. Rep. No. 89-1487 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3002, 3014, 3015 (emphasis added).  This supports an understanding that the tip credit would apply to tipped employees based on their existing duties

within their jobs, which has always included side work.  Nothing in any of the tip credit legislative history suggests a congressional intent to allow the tip credit for only certain duties, disallow the tip credit for certain side work duties if performed more than 20% of the workweek or for 30 continuous minutes, and disallow the tip credit for yet other side work duties.

*Third*, the legislative history specifically refers to the definition of "tipped employee," and analogizes it to the reporting requirements for tipped employees under the Social Security Act of 1965:

> A 'tipped' employee is defined in the bill as any employee engaged an occupation in which he customarily and regularly receives more than $20 a month in tips.  *This is analogous to the reporting requirements for a tipped employee under the provision of the Social Security Act of 1965.*

S. Rep. No. 89-1487 at 1966 U.S.C.C.A.N. 3014 (emphasis added).  Those Social Security Act reporting requirements require every employees who receive tips in a calendar month to report them:

> Reports by Employees.  Every employee who, in the course of his employment by an employer, receives in any calendar month tips which are wages (as defined in section 3121(a) or section 3401(a)) shall report all such tips in one or more written statements furnished to his employer on or before the 10th day following such month.  Such statements shall be furnished by the employee under such regulations, at such other times before such 10th day, in such form and manner, as may be prescribed by the Secretary or his delegate.

Pub. L. No. 89-97, 79 Stat. 384-85, codified at 26 U.S.C. § 6053(a).  Again, the inquiry is binary: the employee either received tips in a calendar month, and thus has to report them, or the employee did not.  The reporting requirements do not permit, much less require, consideration of how much time the employee spent on job duties that produced tips, or supported the production of tips, or did not produce tips.  By specifically analogizing the "tipped employee" definition to this reporting

18

requirement, the legislative history demonstrates congressional intent for the "tipped employee" definition to be interpreted in the same way.

*Fourth*, as noted above, the legislative history cited in the Final Rule demonstrates, consistent with the meaning of "occupation," an intent for the tip credit analysis to focus on the principal duties performed "over the entire workweek." S. Rep. No. 93-690 at 43 ("In establishments where the employee performs a variety of different jobs, the employee's status as one who 'customarily and regularly receives tips' will be determined on the basis of the employee's activities over the entire workweek"). Thus, when someone employed in an occupation the Department acknowledges qualifies for the tip credit—waiter, counterman, service bartender—principally performs the duties of a waiter, counterman or service bartender over the entire workweek, that person is a "tipped employee" to which the tip credit applies. The Final Rule creates a conflicting and directly opposing analysis eliminating the tip credit based on side work duties that are by definition not the principal duties engaged in over the workweek.[14]

> 2. **The Final Rule impermissibly supplants the statutory definition of "tipped employee" with a different approach based solely on whether specific job duties directly and immediately produce tips.**

For all the reasons explained above, the Final Rule's approach to the tip credit—limiting the tip credit based on whether duties directly and immediately produce tips—directly conflicts with the approach required by the ordinary meaning of the statutory definition of "tipped employee." It should not be surprising that the Final Rule imposes a completely different and conflicting regulatory regime, given that the Final Rule is based its definitions of a term ("tipped

---

[14] The Final Rule expresses concern for alleged situations in which an employer nominally titles an employee a "server" but forces that employee to clean floors, windows, and bathrooms all day. No one would dispute that an employee assigned to clean floors, windows and bathrooms all day is not tipped employee. The 1967 dual jobs regulation is sufficient to address this situation, and litigation discovery would expose the server title as a pretext. The Final Rule is not necessary to solve that alleged problem.

occupation") that does not appear in the statute. But conflict it plainly does, so the Final Rule fails *Chevron* Step One and is unlawful. *E.g.*, *Sw. Elec. Power*, 920 F.3d at 1025-28 (regulation failed Step One because it "contravenes the plain text and structure of the [statute]"); *Chamber of Commerce v. United States*, 885 F.3d 360, 379 (5th Cir. 2018) (Department regulation failed Step One because it "conflicts with the plain text" and "is inconsistent with the entirety of ERISA's [statutory] definition"); *Nevada v. United States I*, 218 F. Supp. at 530-31 & n.5 (noting that the "Fifth Circuit and the Supreme Court routinely strike down agency interpretations that clearly exceed a permissible interpretation based on the plain language of the statute," and ruling that a Department FLSA regulation "does not meet *Chevron* Step One and is unlawful" because it was "[d]irectly in conflict with Congress's intent"); *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 325–26, 134 S. Ct. 2427, 2445, 189 L. Ed. 2d 372 (2014) ("[an] agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."); *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2073, 201 L. Ed. 2d 490 (2018) (the Department cannot rewrite a statute "under the banner of speculation about Congress might have intended.").

### D.    The Final Rule fails *Chevron* Step Two.

"The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Texas v. United States*, 497 F.3d at 506 (quoting *Chevron*, 467 U.S. at 843 n.9). Regulations thus fail at Step Two if "it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 506 (quoting *Chevron*, 467 U.S. at 845). Even if "engaged in an occupation" could be found ambiguous, the Final Rule's approach to the tip credit is not a permissible interpretation of the FLSA because it is contrary to clear congressional intent.

### 1.    Limiting the tip credit based on whether duties directly and immediately produce tips is not a permissible construction of the FLSA.

*Nevada v. United States* is instructive.  The Department's Final Rule there raised the minimum salary threshold for FLSA's executive, administrative, and professional exemptions to such a degree that it effectively supplanted the duties test Congress provided in the statute.  *Nevada v. United States I*, 218 F. Supp. 3d at 531 ("this significant increase to the salary level creates essentially a de facto salary-only test").  But "Congress did not intend salary to categorically exclude an employee with EAP duties from the exemption."  *Id*.  Consequently, the Final Rule failed *Chevron* Step Two because it was "contrary to the statutory text and Congress's intent."  *Id*.

Just so here.  As explained above, the statutory term "'occupation' does not mean how often a person performs a task.'"  *Marsh v. J. Alexander's LLC*, 905 F.3d 610 (9th Cir. 2018) (en banc) (Ikuta, J., dissenting) (quoting Webster's Third New Int'l Dictionary 1560 (3d ed. 2002)).  Accordingly, under the statutory definition of "tipped employee":

> [I]f the employer has hired a person for one job (such as a waitress or counterman), but that job includes a range of tasks not necessarily directed towards producing tips, the person is still considered a tipped employee engaged in a single job so long as the person 'customarily and regularly receives at least $30 a month in tips.

*Marsh*, 905 F.3d at 645 (Ikuta, J., dissenting).  The Final Rule, in contrast, bases the tip credit analysis *entirely* on whether tasks and duties directly and immediately produce tips.  That is "a completely different approach to the tip credit."  *Id*. at 641 (same).  Agencies are not authorized to take approaches completely different from what Congress chose—particularly where, as here, Congress specifically enacted its approach in a statutory definition.  *Castro-Gomez*, 365 F. Supp. 3d at 812 ("a regulatory definition does not displace a statutory definition when the statute is clear and unambiguous").  "[B]ecause it is contrary to the statutory text and Congress's intent," *Nevada v. United States I*, 218 F. Supp. 3d at 531, the Final Rule's tip credit approach is "not one that

Congress would have sanctioned," and consequently fails *Chevron* Step Two. *Texas v. United States*, 497 F.3d at 506 (quoting *Chevron*, 467 U.S. at 845).

In light of the very low monthly threshold to qualify as a "tipped employee," Congress could *not* have intended that the tip credit be fully available *only* when employees devote 80% or more of their working time to the active pursuit of tips, or where they spend no more than 30 consecutive minutes not actively pursuing tips. Under section 3(t) of the FLSA, a worker can be a tipped employee with recurring tips of just $30 a month, which amounts to roughly $7.50 per week. For a typical restaurant employee who works 25 hours per week, that amounts to an average of just 30 cents per hour in tips. A full-time employee working 40 hours per week for four weeks per month would need an average of less than 19 cents per hour in tips to qualify as a tipped employee. Thus, under the statute that Congress enacted, an employee qualifies as a tipped employee with just *five instances* of a 15% tip on a $10 check—a sandwich and a cup of coffee in most parts of the country—*over the course of an entire week*. At many restaurants, employees typically receive $7.50 or more in tips from a single table, such as a 20% tip on a $40 check, which amounts to $8. The amount of tip-producing activity it takes to generate $30 per month in tips can, in many restaurants, happen within an hour or two. If Congress meant for the tip credit to be available only where employees spend the vast majority of their working time actively pursuing tips, then the minimum monthly threshold would have been much higher than $30.

Nor does the FLSA provide any support for the Final Rule's position that the employer loses the tip credit any time a restaurant is slow. It is common knowledge, and Congress was obviously aware, that sometimes restaurants are busy while other times they are not. There are peaks in customer volume, often coinciding with typical breakfast, lunch, and dinner times, as well as slow times that often occur at the off-peak portions of the day. Under the Final Rule, a restaurant

server who works a four-hour shift and does nothing except serve customers for three of those hours and spend the other hour waiting for more customers to arrive (i.e., performing no side work at all) would cease to be a tipped employee.  Indeed, depending on the exact configuration of when the slow periods occurred, the restaurant could, in the Defendants' view, be required to pay full minimum wage for as much as one hour of that time.  That result is utterly detached from anything Congress prescribed in the FLSA, and Defendants have no authority to impose this requirement on restaurants and other businesses.

### 2.    The Final Rule is arbitrary and capricious because it is cut from whole cloth.

As noted above in footnote 4, arbitrary and capricious agency action in violation of the APA necessary fails at *Chevron* Step Two.  Numerous different types of failings render agency action arbitrary and capricious:  "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Texas v. EPA*, 829 F.3d 405, 425 (5th Cir. 2016) (citations omitted).  The following factors render the Final Rule arbitrary and capricious under this standard.

### a.    The Department conducted no fact finding

*First*, the Final Rule is arbitrary and capricious, and thus fails Chevron step two, because the Department fails the reasoned-decision-making requirement of the APA.  As the Supreme Court stated in *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983), "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  The Department here conducted no fact-finding whatsoever

to either determine the scope of the supposed problem, or to determine the real-world duties of the occupations Congress and the Department have historically recognized as qualifying for the tip credit. The Final Rule demonstrates that the Department accepted at face value the stories told by employee and employee-side commenters, and discounted and/or ignored employer-side commenters, without any fact finding to determine how these occupations actually operate in the real world. The Department therefore entirely failed to consider an important aspect of the problem, namely, (a) whether the supposed problem actually exists, and (b) the factual basis of and background for the supposed problem. Consequently, the Department's answer to the unknown purported problem is necessarily just baseless *ipse dixit*.

### b. The Department deliberately ignored "the nation's primary source of occupational information"—its own.

The Department's failure to engage in any fact-finding is particularly inexcusable here, because the pertinent wheel has already been invented. The Department itself sponsors and maintains "the nation's primary source of occupational information": its O*NET Program.[15] The Department acknowledges, as it must, that the O*NET provides for each occupation a "fixed list of duties that tipped employees are required by their employers to perform as part of their work." Final Rule, 86 Fed. Reg. at 60, 127. There is no dispute that the list of duties for Waiter and Waitress and Bartender contain numerous side work duties that do not directly and immediately produce tips. *See* Pls.' App. Exs. 2 & 3; *see also* ECF No. 1, ¶¶ 41-57. Consequently, there is no dispute that these side work duties are part and parcel of those occupations. The Department just doesn't like the fact that employees qualifying for the tip credit under the statutory definition of "tipped employee" engage in side work. The Department thus candidly acknowledges that the

---

[15]    *See* https://www.onetcenter.org/overview.html (emphasis added, last visited Dec. 16, 2021), and *see generally* ECF No. 1, ¶¶ 41-57 and Pls.' App. Exs. 2 & 3.

Final Rule's "tipped occupation" definition and its tip-producing-or-not test is specifically designed to carve side work out of the tip credit.  *See* 86 Fed. Reg. at 60,127 ("Rather, the final rule creates a functional test to measure whether a tipped employee is engaged in their tipped occupation . . . .").  But as explained above, carving side work out of application of the tip credit is contrary to the statutory definition of "tipped employee" and Congressional intent.

Further, and tellingly, the Department acknowledges that it developed its new "tipped occupation" tip-producing-or-not test and guidelines to specifically assign FLSA liability based on an employee's specific job duties throughout a day.  86 Fed. Reg. at 60,127 (observing that "O*NET was not created to identify an employer's legal obligations under the FLSA"—the natural corollary of which is that the Final Rule *is* created to do so).  "Congress, however, did not delegate authority to the [Department] to develop new guidelines or to assign liability in a manner inconsistent with the statute."  *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 562 (2002).  The Department's deliberate decisions to ignore its own real-world data showing that "tipped employees" as the FLSA defines them engage in side work, and to carve those side work duties out in order to impose FLSA liability, render the Final Rule arbitrary and capricious.[16]

---

[16]    The Final Rule refers to criticism of the O*NET data based on the potential for manipulation.  Specifically, the Department appears to accept as plausible speculating that reliance on O*NET data might result in employers coordinating among themselves to assign tipped employees duties like washing windows to such an extent that nationwide O*NET data would one day reflect that the principal duty of a server is washing windows.  This is absurd.  *First*, there is no suggestion by anyone that employers have successfully manipulated the O*NET data to this point, so there is no reason to believe the O*NET data the Department refused to consider is anything but the "valid data" the Department represents it to be.  *See* https://www.onetcenter.org/overview.html (emphasis added, last visited Dec. 16, 2021).  *Second*, the suggestion that employers across industries could somehow act in concert to the degree that would be required to artificially manipulate the O*NET data for specific individual occupations is, in the absence of any factual evidence suggesting that were possible, a paradigm example of something "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Texas*, 829 F.3d at 425.

c.     **The Department relied on labor market and employee economic circumstances data it acknowledged was outdated.**

The Final Rule acknowledges that the Department is required to evaluate the costs of the Final Rule on those affected, by analyzing the relevant labor market and economic situation for tipped employees.  And the Department did analyze the Final Rule's potential effects regarding the relevant labor market and economic situation for tipped employees.  But the Final Rule relied on pre-COVID-19 pandemic data from 2018 and 2019.  86 Fed. Reg. at 60,150 ("The Department notes that this [cost] analysis relies on data from 2018 and 2019, which is prior to the COVID-19 pandemic").  And the Department further acknowledged the patently obvious:  the COVID-19 pandemic dramatically changed the labor market and economic situation for tipped employees.  *Id*. *A fortiori*, the Department's reliance on out-of-date data for its cost estimates represents reliance "on factors which Congress has not intended it to consider."  *Texas v. EPA*, 829 F.3d at 425.

A separate federal agency, the SBA Office of Advocacy, emphasized the impact of the Department's failing in this regard.  *See* Pls.' App. Ex. 4 at 1 (SBA's comment to the proposed Final Rule, expressing the "concern[] that the DOL's certification that the rule will not have a significant economic impact on a substantial number of small entities **lacks an adequate factual basis**." (emphasis added).)  The SBA Office of Advocacy observed that, "DOL improperly certified this proposed rule because it **omitted some and underestimated other compliance costs of this rule** for small employers."  *Id*. at 1-2 (emphasis added).  Specifically, the SBA Office of Advocacy detailed its concerns, focusing on several areas, including assessing changes to wage costs, the costs of regulatory familiarization, adjustment costs, and management costs.  *Id*. at 4-9. The SBA Office of Advocacy therefore "believes that DOL's certification is flawed because it **fails to estimate small business compliance for increased wages under this regulation**."  *Id*. at 5 (emphasis added).  And the SBA Office of Advocacy comments also relay the comments of

small businesses with regard to the financial impact the Final Rule would have on small businesses with tipped employees from nail salons to hotels and, of course, restaurants, particularly given the continuation of the COVID-19 pandemic:

> Small businesses have commented that these new restrictions for the use of the tip credit are complex and unworkable for small operations, who are already facing staff shortages and are just recovering from pandemic losses.
>
>                           ***
>
> Small businesses also commented that this was a difficult time to add these additional costs and burdens, as their operations were just surviving from pandemic financial losses.

*Id*. at 2, 8.  The Final Rule ignored these concerns, apparently in favor of the outdated pre-pandemic data Congress would never have intended for the Department to consider.  *Texas*, 829 F.3d at 425.

### d.    The Final Rule is internally inconsistent.

Given that the Final Rule ignores real-world realities and costs, it should not be surprising that it is so internally inconsistent as to render its artificial distinctions so unworkable as to be implausible.  Two examples illustrate the point.

*First*, the Department recognizes that "busboy," also referred to as busser, and "service bartender," are occupations that "have long been considered to be occupations that customarily and regularly receive tips" and therefore have long fallen under the statutory definition of "tipped employee" and qualified for the tip credit.  *See* 86 Fed. Reg. at 60,129 n. 30.  Bussers and service bartenders, however, do not engage in any of the direct customer servicing work the Final Rule's test would consider to directly and immediately produce tips.  After all, bussers and service bartenders generally do not interact with customers at all.  *See* 86 Fed. Reg. at 60, 128.  This puts the

Department in a quandary:  how to fit occupations which "have long been considered" as qualify-ing for the tip credit within the Final Rule's new liability test that now categorically excludes them?  The Department's only solution is to fall back on the *ipse dixit* favored by parents of small children:  "Because I said so":

> To the extent that this is true under the revised test, this categorization of tasks merely reflects the unique nature of some tipped employees' tip-pro-ducing work, such as bussers and service bartenders, who receive tips from other tipped employees such as servers because they are supporting their customer, service, tip producing work.

86 Fed. Reg. at 60,128 n.28.  In other words, the Department is going to allow bussers and service bartenders to remain tipped employees, even though their duties fail the Final Rule's "tipped oc-cupation" definition, because they have always been considered "tipped employees" under the statutory definition.  A regulation that creates a test and then applies that test inconsistently to those affected is the very definition of arbitrary and capricious.

*Second*, under the Final Rule's test the very same duties might automatically qualify for the tip credit, or might not, depending on context.  The Final Rule explains that a bartender who retrieves "a particular beer from the storeroom at the request of a customer sitting at the bar, is performing tip-producing work," but a "bartender who retrieves a case of beer" from the same storeroom is only performing "directly supporting work," the minutes of which must be tracked to comply with the 20% limitation for such work.  *See* 86 Fed. Reg. at 60,128.  But the bartender in both examples is indisputably performing the duties of the bartender occupation.  The Final Rule also suggests that a server wiping down a table to clean a customer's spill would be "tip-producing work," but wiping down that same table in between customers would not.  *Id.*  Again, the same duty, and again, that duty is indisputably the duty of a server.  Further, in an apparent attempt to remain consistent with the 1967 dual jobs regulation example, the Final Rule categorizes "toasting

28

bread" as ***not*** "food preparation" for purposes of the Final Rule.  *See* 86 Fed. Reg. at 60,131.  This is just more semantic gymnastics so the Department can arbitrarily categorize certain duties as "tip-producing," rather than "directly supporting" based on nothing more than the Department's whim.

In sum, the Final Rule is not the product of reasoned decision-making.  The Final Rule is the product of agency legislating, which conflicts with the plain language of the statute and Congressional intent to boot.  The Final Rule fails *Chevron* Step Two because it is not a permissible interpretation of the statutory definition of "tipped employee."

## CONCLUSION

For these reasons, the Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment, hold the 2021 Dual Jobs Final Rule unlawful, and vacate and set aside the Final Rule under 5 U.S.C. § 706.

Respectfully submitted,

By:  /s/ Paul DeCamp

| | |
|---|---|
| ANGELO I. AMADOR (admitted *pro hac vice*) | PAUL DECAMP (admitted *pro hac vice*) |
| RESTAURANT LAW CENTER | EPSTEIN, BECKER & GREEN, P.C. |
| 2100 L Street, N.W., Suite 700 | 1227 25th Street, N.W., Suite 700 |
| Washington, D.C.  20036 | Washington, D.C.  20037 |
| Tel:  202.331.5913 | Tel:  202.861.1819 |
| Fax: 202.973.3952 | Fax: 202.861.3571 |
| AAmador@restaurant.org | PDeCamp@ebglaw.com |
| | |
| GRETA RAVITSKY | KATHLEEN BARRETT (admitted *pro hac vice*) |
| EPSTEIN, BECKER & GREEN, P.C. | EPSTEIN, BECKER & GREEN, P.C. |
| Two Houston Center | 227 West Monroe, Suite 3250 |
| 909 Fannin, Suite 3838 | Chicago, Illinois 60606 |
| Houston, Texas 77010 | Tel:  312.499.1400 |
| Tel:  713.300.3215 | Fax: 312.827.9562 |
| Fax: 713.300.3235 | KBarrett@ebglaw.com |
| GRavitsky@ebglaw.com | |

*Counsel for Plaintiffs*

April 22, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users.

/s/ Paul DeCamp