**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| RESTAURANT LAW CENTER, a non-profit District of Columbia corporation, and TEXAS RESTAURANT ASSOCIATION, a non-profit Texas corporation,<br><br>       Plaintiffs<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF LABOR, HON. MARTIN J. WALSH, Secretary of the United States Department of Labor, in his official capacity; and JESSICA LOOMAN, Acting Administrator of the Department of Labor's Wage and Hour Division, in her official capacity,<br><br>       Defendants. | Civil Action No. 1:21-cv-01106 |

**APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EXPEDITED CONSIDERATION AND ORAL ARGUMENT**

Plaintiffs Restaurant Law Center and Texas Restaurant Association (collectively, "Plaintiffs") submit evidence, attached hereto, in support of their Motion for Summary Judgment:

1.      Attached as Exhibit 1 is the Declaration of Emily Knight ("Knight Decl."), which contains the following exhibit:

      EXHIBIT A:  September 2021 National Restaurant Association COVID-19 Restaurant Impact Survey, Texas Survey Results.

2.      Attached as Exhibit 2 is a true and correct printout of the Occupational Information Network ("O*NET") data for the occupation of "Waiters and Waitresses".

3.      Attached as Exhibit 3 is a true and correct printout of the Occupational Information Network ("O*NET") data for the occupation of "Bartender".

4.      Attached as Exhibit 4 is a true and correct copy of the U.S. Small Business Administration's Office of Advocacy ("SBA Office of Advocacy") comments to the proposed rule dated August 20, 2021.

5.      Attached as Exhibit 5 is the Declaration of Angelo Amador ("Amador Decl."), which contains the following exhibit:

>      EXHIBIT A:   September 2021 National Restaurant Association COVID-19 Restaurant Impact Survey.

6.      Attached as Exhibit 6 is the Declaration of Tracy Vaught ("Vaught Decl.").

7.      Attached as Exhibit 7 is a true and correct copy of 2 WEBSTER'S THIRD NEW INT'L DICTIONARY 751 (1961 ed.) ("WEBSTER'S") definitions for "engaged" and "occupation".

8.      Attached as Exhibit 8 is a true and correct copy of THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 473 (1967 ed.) ("RANDOM HOUSE") definitions for "engaged" and "occupation".

9.      Attached as Exhibit 9 is a true and correct copy of BLACK'S LAW DICTIONARY 622 (4th ed. 1957) ("BLACK'S") definitions for "engaged" and "occupation".

Respectfully submitted,

By:  /s/ Paul DeCamp

Angelo I. Amador (admitted *pro hac vice*)
Restaurant Law Center
2100 L Street, N.W., Suite 700
Washington, D.C.  20036
Tel:    202.331.5913
Fax:    202.973.3952
AAmador@restaurant.org

Greta Ravitsky
Epstein Becker & Green, P.C.
Two Houston Center
909 Fannin, Suite 3838
Houston, Texas 77010
Tel:    713.300.3215
Fax:    713.300.3235
GRavitsky@ebglaw.com

Paul DeCamp (admitted *pro hac vice*)
Epstein Becker & Green, P.C.
1227 25th Street, NW, Suite 700
Washington, DC  20037
Tel:    202.861.1819
Fax:    202.861.3571
PDeCamp@ebglaw.com

Kathleen Barrett (admitted *pro hac vice*)
Epstein Becker & Green, P.C.
227 West Monroe Street, Suite 3250
Chicago, Illinois 60606
Tel:    312.499.1400
Fax:    312.827.9562
KBarrett@ebglaw.com

April 22, 2022

# APPENDIX EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| RESTAURANT LAW CENTER, ET AL., | |
| Plaintiffs, | |
| v. | Civil Action No. 21-1106 |
| UNITED STATES DEPARTMENT OF LABOR, ET AL., | |
| Defendants. | |

**DECLARATION OF EMILY WILLIAMS KNIGHT**

I, Dr. Emily Williams Knight, Ed.D., hereby declare and state:

1. I am the President & CEO of the Texas Restaurant Association ("TRA"), the largest hospitality association in Texas. I have held my current position since May of 2019. In that capacity, I oversee all of the TRA's engagement in public affairs and public-policy related matters for the Texas foodservice industry, and I represent the TRA in matters with the National Restaurant Association and the Council of State Restaurant Associations. As such, I have in-depth knowledge of the TRA's operations, its members, and the facts and circumstances set forth herein.

2. I am over the age of 18 years old. All of the facts set forth in this declaration are based on my personal knowledge. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. If called upon to testify as to the facts stated herein as a witness, I could and would competently testify under oath.

3. The TRA is an independent non-profit organization with its own Board of Directors, headquartered at 512 E Riverside Drive, Suite 250, in Austin, Texas. Formed in 1937, the TRA is the leading business association for Texas' $70 billion restaurant and foodservice industry,

which includes approximately 50,000 locations and a workforce of 1.3 million employees throughout Texas (approximately 12% of the state's employment).  The TRA's members include thousands of restaurant owners, operators, and staff throughout Texas.

4.       The TRA's main purpose is to support the Texas restaurant industry and our members in starting, developing, and growing their business.  The TRA accomplishes this objective through numerous channels, including through direct outreach efforts on behalf of our members; by hosting educational and information meetings, seminars, video news segments, newsletters, and webinars; by submitting regulatory comments at the federal, state, and local level; and by helping our members navigate their legal and regulatory obligations. For example, the TRA hosts TRA Marketplace in Texas each year, which is the largest annual foodservice conference in the southwest. TRA Marketplace features speakers, seminars, and panels on the important trends and pressing challenges facing the restaurant industry. TRA Marketplace also gives restaurant operators a chance to experience the newest products and services designed to improve restaurant efficiency.

5.       As President & CEO for the TRA, I serve as the primary spokesperson for the Texas restaurant industry, and I lead and manage the TRA's engagement in public affairs and public-policy-related matters at the state, local, and federal level.  I have been integrally involved in all of the TRA's major legislative and regulatory initiatives, and I am a key liaison with various restaurant industry affiliates in Texas.  Each of the legislative and regulatory initiatives that I manage require significant study, time, attention, and TRA resources to analyze potential effects on the Texas restaurant industry, gather our members' concerns, and ultimately persuade policymakers and the public to support or oppose the measure.  I communicate with TRA employees, as well as Texas-based restaurant owners and operators, on a daily basis about issues of importance in the industry, including industry trends, concerns, best practices, proposed legislation, and legal compliance.  Through

my work with the TRA, I work closely with Texas restaurant owners and operators, and I am deeply familiar with the restaurant industry in general and the Texas restaurant industry in particular. This is typical in my role, and I carefully ensure that we remain attentive and responsive to federal, state, and local developments that will impact TRA members.

6.      Throughout the last twenty months, the majority of the TRA's work has been focused on helping our members survive the COVID-19 pandemic and comply with the ever-changing federal, state, and local regulations and guidelines. For example, the TRA developed online resource centers for restaurants and other foodservice businesses (the "Coronavirus Guidance Resources" and "Texas Restaurant Pandemic Directory"), which TRA staff members continually update with the latest guidance. In addition, over the last twenty months I, along with other TRA staff members, managed two task forces of key chain and independent restaurant and bar owners; created the Texas Restaurant Promise and the Texas Bar Promise; developed and launched the first training, certification, and validation program for restaurants following key safety protocols during the pandemic; and continuously worked with state and local officials to keep restaurants open. Throughout 2021, the TRA has also been integrally involved with state and local legislative initiatives impacting the restaurant industry, and through our work we secured the passage of seven bills that support the Texas restaurant industry's recovery.

7.      I understand that on October 29, 2021, the U.S. Department of Labor, Wage, and Hour Division (the "Department") published the Final Rule on the Tip Regulations Under the Fair Labor Standards Act; Partial Withdrawal (the "Final Rule"), which has the impending effective date of December 28, 2021. I also understand that the Department issued its Notice of Proposed Rulemaking ("NPRM") regarding this regulation on June 23, 2021. I have read the Final Rule and I

have discussed the Final Rule with TRA members, TRA employees, human resources profession-

als, and others in the restaurant industry.  The Final Rule finalizes the Department's amendments

to the dual jobs regulation, which change the Department's prior regulations and create a new stand-

ard for when an employer can take a tip credit.  The Final Rule is the regulation at issue in this case.

8.      In 1966, when Congress amended the FLSA to create the tip credit, as well as before

and since, many occupations in the restaurant industry such as waiters, waitresses, servers, and

bartenders regularly engaged in, and continue to regularly engage in, duties and responsibilities

referred to as "side work."  I am aware of numerous TRA members, including members doing

business within the Western District of Texas, who take a tip credit and employ waiters, waitresses,

servers, bartenders, and other employees who perform varying amounts of side work, thereby di-

rectly subjecting them to the Final Rule.

9.      Both before and after the Department's publication, the Final Rule has consumed a

disproportionate amount of the TRA's time, and my time in particular, because the Final Rule spe-

cifically applies to Texas restaurant employers who take a tip credit.  The TRA has diverted time

and resources as a result of the Final Rule.  I, as well as the TRA's other staff, have spent consid-

erable time addressing member concerns specifically related to the Final Rule's obligations instead

of discussing questions regarding other member business or regulatory concerns, particularly im-

portant during the COVID-19 pandemic.  For example, we dedicated portions of our twice-weekly

email to TRA members to address concerns with the Final Rule in lieu of speaking on other im-

portant topics multiple times before and after the Final Rule was published (including in December

2021, October 2021, July 2021, June 2021, and May 2021).  In addition, on August 3, 2021, Kelsey

Erickson Streufert, TRA's Chief Public Affairs Officer who reports to me, dedicated time to par-

ticipate in the U.S. Small Business Administration's Office of Advocacy Small Business Labor

Roundtable rather than complete other pressing tasks so we could better understand industry concerns with the proposal that has now become the Final Rule. Further, TRA staff who report to me have used valuable time during internal planning meetings to exchange information and ensure staff are prepared to answer TRA member questions about the Final Rule. At the Restaurant Leadership Conference in Phoenix, Arizona, December 7-9, 2021, I personally met with members to explain the Final Rule, and this took time away from networking and other planned business development activities.

10.    I, as well as other TRA's staff who report to me, have also held multiple calls with TRA members to address the concerns arising from the Final Rule.  Specifically, TRA members subject to the Final Rule have informed me that the Final Rule will impose immediate economic harms, including substantial burdens and costs to their businesses, to prepare for and comply with the Final Rule.  Specifically, TRA members who are subject to the Final Rule have informed me that they are concerned about the below significant burdens and additional expenses that they will incur from the Final Rule:

a.    **Regulatory Familiarization Costs**:  I have spoken with numerous TRA members who do not understand the conflicting standards, time limits, and classifications of workers' tasks in the Final Rule.  It is clear that the Final Rule requires more than one hour to read and understand; restaurant operators need the expertise of a wage and hour attorney to understand and comply with the Final Rule.  However, the vast majority of TRA members are small businesses and they do not employ an in-house lawyer on their staff and thus, these members need to expend monies to pay for an attorney to fully understand and comply with the Final Rule.  Working out the

differences between current systems of work classifications and the Final Rule's proposed classifications of tasks, as well as resolving ambiguities and inconsistencies in the Final Rule, will result in substantial costs for TRA members utilizing the tip credit.

b. **Preparation Costs:** TRA members subject to the Final Rule have informed me, and TRA staff who report to me, that to prepare for the Final Rule they need to undertake a cost analysis to mitigate the financial impact of the changes to the tip credit in the Final Rule. This is a time intensive analysis of the tasks performed by employees, the minutes each task is performed, as well as projections of staff for each job position and gross profits. The analysis must be done on a case-by-case basis for every single of the restaurant's impacted tipped employees. Completing this task will require significant work for the restaurant owner, human resources, and managers, which will keep them away from their regular duties. This is especially problematic now, when TRA members are regularly reporting to me that they do not have enough employees to meet their current needs.

c. **Increased Wage Costs**: TRA members subject to the Final Rule have informed me, and TRA staff who report to me, of increased wage and labor costs from the Final Rule. Many of the TRA's restaurant members claiming the tip credit are small businesses, and their profit margins are frequently small; so, the increased labor costs often mean the difference between remaining open and closing. TRA small business members informed me and my staff that, as a result of the Final Rule, they will no longer be able to utilize the tip credit and will need to pay the full minimum wage to many of their employees, which will result in substantial costs that will wipe out their profit margins. For example, I spoke with a TRA member small restaurant owner with 20 tipped workers who work eight hours a day, five days a week, for 40 weeks per year. The tipped workers currently earn a tip wage of $2.13 per hour. The restaurant will not be able to use the tip

credit under the Final Rule and will pay their tipped workers the Texas minimum wage of $7.25 instead of the tipped wage of $2.13. The restaurant will have to spend an extra $163,840 per year, which would drastically decrease the restaurant's profit margin and threatens the restaurant's ability to keep its doors open. I also spoke with a member who reached out to share that they would pay the Texas minimum wage and forgo customer tips because their menu prices would rise with the impact of the Final Rule, and they don't want their customers to carry the burden of higher menu prices and tips. This move will negatively impact restaurant workers' wages.

      d.    **Adjustment Costs**: I have spoken with TRA members regarding the undertakings they have to perform to comply with the Final Rule. TRA members informed me that the adjustment tasks are separate, ongoing undertakings that each result in separate costs, time, and shifts in resources for each restaurant. TRA members subject to the Final Rule need to create policies, procedures, trainings, new job descriptions, and a new technology (that does not exist) to link up time-keeping data with job codes, job tasks, and payroll data to comply with the Final Rule. In addition, TRA members utilizing the tip credit under the Final Rule will also have separate, ongoing, substantial adjustment costs associated with scheduling, categorizing employee tasks, re-assigning duties to non-tipped staff, training their managers and staff to learn about and implement the changes in their workflow, and ongoing monitoring of employees' activity to ensure that employees receiving the tipped wage spend less than 20% of their working time or 30 continuous minutes on certain tasks the Department deems unrelated to their occupation. TRA members confirmed that the adjustment costs for the Final Rule are separate, ongoing tasks that vastly exceed the Department's one-hour estimate per entity. Many TRA small restaurant members have also informed me that the costs required to adjust their restaurant business practices to comply with the

Final Rule will be in the thousands of dollars, which are significant costs that will ultimately lower their profits.

        e.    **Staffing Costs**: I, along with other TRA staff who report to me, have had numerous conversations with TRA members related to the labor shortage issues in Texas that our members are currently experiencing. The lack of available staff increases the difficulty of compliance with this Final Rule and imposes extra costs. Many TRA members have business models in place (that have been in place for generations), that have been built around being able to claim the tip credit provided for in the FLSA. Many of these TRA members, particularly small restaurant owners, do not employ separate staff in positions that only complete "side work" tasks because servers, bartenders, and similar employees regularly engaged in and continue to regularly engage in duties and responsibilities that the Department refers to as "side work" as part of their occupation. For example, many TRA members employ bartenders whose job duties include slicing fruit for drinks, wiping down tables in the bar, cleaning bar glasses, and making special pre-mixes for drinks; the bartenders can choose to perform these duties before or after customers are actually sitting at the bar. However, in order to comply with the Final Rule, TRA members need to expend monies to change their business and staffing models to incorporate the new 20% and 30 minute time limits on these tasks. For example, some TRA members utilizing the tip credit have informed me that they will need to expend additional monies to create a new position, hire a new employee, and onboard and train this staff member to perform tasks that have always been part of their bartender's occupation, to comply with the Final Rule. TRA small restaurant owner members have also informed me that they may have to terminate tip-credit eligible employees due to the financial constraints imposed by the Final Rule. TRA members have also expressed concern to me that they will not be able to fill these new jobs with the current labor shortage, severely restricting their ability to

operate and generate the revenue they need to recover from the economic devastation they experienced as a result of the COVID-19 pandemic.

   f. **Management Costs**:  I, along with other TRA staff members, have spoken with TRA members regarding the management costs and time they have to expend to comply with the Final Rule.  TRA members informed me that their businesses will expend a substantial amount of time and money on management costs to comply with the Final Rule, which grossly exceeds the Department's estimated cost of $376.36 per entity a year or 10 minutes per week.  For example, a TRA restaurant owner member estimated that restaurant managers will need to devote at least 8 hours a week to perform ongoing monitoring of tasks, audits, and correct back pay when tip-credit eligible employees do not clock in and out correctly by job tasks to comply with this Final Rule.  Another TRA member informed me that it will need to expend monies to hire additional managers and human resources professionals to perform these additional compliance duties to comply with the Final Rule.

   g. **Recordkeeping Costs:**  TRA members have informed me of their concerns about the substantial costs they need to incur to create, complete, and maintain new records to prove compliance with the Final Rule.  TRA members have been targets of investigations by the Department and subject to costly litigation, which makes proper recordkeeping a significant concern for TRA members.  TRA members informed me that maintaining some form of records that comply with the Final Rule is imperative to defending the restaurant in any litigation challenging their compliance with the Final Rule.  But, based on my personal knowledge of the restaurant industry and restaurant operations, there is no practical way for a restaurant employer to keep the task-by-task records that the Department's Final Rule would demand to avoid potential liability.

11.    TRA members have informed me that it is an impossible time to add these additional substantial costs and burdens to their business (set forth above) as their operations are just barely surviving from the COVID-19 pandemic financial losses.  I am also personally aware of the COVID-19 pandemic's impact on TRA members and the economic pressure it has placed on our members, which make complying with the Final Rule even more financially devastating for our members who utilize the tip credit.

12.    I have seen first-hand and discussed with TRA members how the ongoing pandemic has financially devastated Texas restaurants.  The steady inflation in food costs, ongoing labor shortages, and supply chain shortages have reversed the restaurant industry's recovery and further placed Texas restaurant owners in a precarious position.  For example, the National Restaurant Association conducted a national survey in September 2021 of restaurant owners.  The state-level data collected from Texas restaurant owners found: 72% of Texas restaurant owners do not have enough employees to support their existing customer demand; 91% of Texas restaurant owners reported that their restaurant experienced a decline in customer demand for indoor on-premises dining in recent weeks because of the delta variant; and 89% of Texas restaurant owners reported that their profit margin is lower now than it was prior to the COVID-19 outbreak.  A true and correct copy of the September 2021 National Restaurant Association COVID-19 Restaurant Impact Survey, Texas Survey Results is attached as **Exhibit A.**  As many TRA member small restaurant owners have informed me, the increase in wages, staff, management, technology, and other compliance costs necessitated by the Final Rule will result in the reduction of jobs or closing of the restaurant altogether due to the financially fragile state of many of our TRA restaurant owner members.

13.    The TRA has devoted substantial staff time, money, and effort to informing our members about the Final Rule's requirements, discussing its potential implications, attempting to

clarify compliance requirements, and developing educational programs for TRA members. The time spent on these activities could have been spent on other projects, including advocacy on behalf of restaurants and preparation of training classes for our members.  Specifically, this time could have been spent developing our agenda for the next Texas legislative session and educating the public on opportunities to support their local restaurants.  Instead, I, as well as other TRA staff members who report to me, have had to devote time to addressing questions and problems raised by the Final Rule and its obligations on our members.

14.    Without these obligations, I would be devoting my time and resources to supporting TRA members' efforts to grow their businesses, keeping their doors open during this economically devastating pandemic, as well as to lobbying local lawmakers to adopt policies that help the Texas restaurant industry and its employees.  The Final Rule has significantly hindered my and other TRA staff members' ability to advance these goals, both before and after it was published, and I anticipate that it will continue to do so in the future.

15.    I also expect that this diversion of resources will continue indefinitely, as the Final Rule imposes new obligations on TRA members who utilize the tip credit are subject to the Final Rule.  Furthermore, TRA has received numerous questions from our members regarding the Final Rule's new standard to take a tip credit, including how to differentiate between and track the three categories of work and tasks that the Department deems to fall within (or outside of) its dual jobs regulation.  We expect to continue to have to provide educational and informational services to our members to navigate questions regarding how to monitor and reclassify the types of tasks that their restaurant workers perform, as well as how to change their business models, staffing models, and operations to comply with the Final Rule. For example, if the Final Rule goes into effect, we will

need to stop other work to draft and publish additional guidance to our members, including a webinar we will likely need to plan for and host. These efforts will require significant time away from other tasks during the busy holiday season.

16. No mechanism exists for the TRA and its members to recover the substantial financial costs and expenses that they will incur if the Final Rule takes effect and is later invalidated on the merits during this litigation. The TRA will be forced to spend unbudgeted funds and monies that it would otherwise spend on critical services to its members, which it cannot recover. TRA members utilizing the tip credit will also be forced to spend funds and monies that it would otherwise spend to keep their business alive during this financially devastating pandemic on planning for and complying with the Final Rule. Once additional monies are paid out to plan and comply with the Final Rule, including the additional monies to employees (as well as monies expended to develop new business models, staffing models, trainings, job descriptions, and technology), it cannot be easily recovered (if at all) even if the Final Rule is later invalidated.

17. For all these reasons, I ask the Court to prevent the serious, irreparable harm the Final Rule would immediately inflict on the TRA and our members we serve.

I declare under penalty of perjury and the laws of the United States, including 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 17 day of December 2021 in Dallas, Texas

*Emily Williams Knight*
_____
Dr. Emily Williams Knight, Ed.D.

# EXHIBIT A

● ● ●
(https://twitter.com/txrestassoc) (https://www.facebook.com/TXRestAssoc/) (https://www.youtube.com/user/TXRestaurantA
feature=mhee)

Account/Login
(https://tra.imiscloud.com/TRAMember/Sign_In.aspx)

JOIN NOW
(HTTPS://TXRESTAURANT.ORG/MEMBERSHIP/JOIN-
NOW)

*Search*



*(/)*

*Search*

## Updated Texas Restaurant Promise: Learn More (https://www.txrestaurant.org/texas-restaurant-promise)

Home (/) > News (/news) > New Data Confirms that Texas Restaurants Are Still In a Precarious Position, with Recovery Reversing for Many

## News
### New Data Confirms that Texas Restaurants Are Still In a Precarious Position, with Recovery Reversing for Many

**Austin, TX** (Sep. 30, 2021) – New data released this week confirms that the restaurant industry's recovery has reversed, putting businesses large and small in a precarious position heading into winter.

According to a survey of operators conducted by the National Restaurant Association from September 7-15, 2021, nationally:

- A majority of fullservice and limited-service operators say business conditions are worse now than three months ago;



Sep 30
2021

say their restaurant doesn't have enough employees to support current customer demand;

- Costs are up across the board—91% of operators are paying more for food; 84% have higher labor costs; and 63% are paying higher occupancy costs; and

- Profitability remains down with 85% of operators reported smaller margins than before the pandemic.

State-level data confirms a similarly bleak picture in Texas, where:

- 72% of operators say their restaurant currently does not have enough employees to support its existing customer demand;
- 91% of operators say their restaurant experienced a decline in customer demand for indoor on-premises dining in recent weeks because of the Delta variant; and
- 89% of Texas operators say their profit margin is lower than it was prior to the COVID-19 outbreak.

Adding to restaurants' anxiety is the uncertainty coming from Washington, D.C., where lawmakers are considering several tax increases that would be devastating for small, midsize, and family-owned restaurants in particular. The National Restaurant Association sent a letter to Congress yesterday outlining the latest, troubling data and our concern that tax increases will further undermine restaurants' hard-fought recovery effort.

"The Texas Restaurant Association joins our colleagues at the National level in urging Congress to help, not hurt, restaurants in this critical phase of the pandemic," said Dr. Emily Williams Knight, Ed.D., President & CEO of the Texas Restaurant Association. "Our members have shown incredible grit, determination, and innovation, and they deserve every opportunity to rebuild their business so they can continue to serve their communities for years to come."

Read more about the latest data and our industry's letter to Congress here (https://restaurant.org/restaurants-to-congress-recovery-in-reverse).

**About the Texas Restaurant Association**
Formed in 1937, the Texas Restaurant Association (TRA) serves as the advocate in Texas and the indispensable resource for the foodservice industry. As a leading business association, the TRA represents the state's $70 billion restaurant industry, which is comprised of more than 50,000 locations and a workforce of over 1.3 million employees. Along with the Texas Restaurant Foundation, the workforce development arm of the TRA, the Association proudly continues to protect, advance, and educate a growing industry as the TRA enters its 85th anniversary year.

(https://www.addtoany.com/share#url=https%3A%2F%2Fwww.txrestaurant.org%2Fnews%2Fnew-data-confirms-texas-rest
many&title=New%20Data%20Confirms%20that%20Texas%20Restaurants%20Are%20Still%20In%20a%20Precarious%20Posit

(/#facebook)     (/#twitter)     (/#linkedin)     (/#email)     (/#pinterest)     (/#yummly)

‹ Previous Article (/news/texas-restaurant-association-adds-leading-voices-2022-board-directors)

Next Article › (/news/texas-conference-women-texas-restaurant-association-announce-200000-grants-support-women-owned)

## Comments

### Add new comment
*Use your first and last name as your username.*

Your name

Subject

Comment *

---

**CAPTCHA**

This question is for testing whether or not you are a human visitor and to prevent automated spam submissions.

Math question *

18 + 2 =

**More information?**

SUBMIT

* indicates a required field.

**Follow TRA**

(https://twitter.com/txrestassoc)(https://www.facebook.com/TXRestAssoc/)(https://www.youtube.com/user/TXRest feature=mhee)

(https://twitter.com/txrestassoc)(https://www.facebook.com/TXRestAssoc/)(https://www.youtube.com/user/TXRestaurantAssoc feature=mhee)

(https://txrestaurant.org)

**Download our app:**

( https://mailchi.mp/tramail.org/tramobileapp)

MEMBERSHIP (/WHY-JOIN)

CHAPTERS (/FIND-CHAPTER)

Download our app:  

(
https://texasrestaurantassoc.org/mobileapp)

© 2021 Texas Restaurant Association
P.O. Box 1429, Austin, TX 78767

JOIN NOW (HTTPS://TXRESTAURANT.ORG/MEMBERSHIP/JOIN-NOW)

Contact Us (/about-us/contact-us)    Find Your Local Chapter (/why-join/find-chapter)    Terms of Use (/terms-use)

Privacy Policy (/privacy-policy)    Refund/Return Policy (/refund-return-policy)

Report A Website Problem (https://bugreport.trademarkmedia.com)    Sitemap (/sitemap)

Website by Mighty Citizen (https://www.mightycitizen.com)

# APPENDIX EXHIBIT 2

Case 1:21-cv-01006-RP Document 1-3 Filed 12/03/21 Page 23 of 90

 **O*NET OnLine**

# Details Report for:
## 35-3031.00 - Waiters and Waitresses

Updated 2021

 Bright Outlook

Take orders and serve food and beverages to patrons at tables in dining establishment.

**Sample of reported job titles:** Banquet Server, Buffet Server, Cocktail Server, Food Runner, Food Server, Restaurant Server, Server, Waiter, Waitress, Waitstaff

| View report: | **Summary** | **Details** | **Custom** | ⚡ **Easy Read** | ⚡ **Veterans** | ⚡ **Español** |
|---|---|---|---|---|---|---|

Tasks | Technology Skills | Tools Used | Knowledge | Skills | Abilities | Work Activities | Detailed Work Activities | Work Context | Job Zone | Education | Credentials | Interests | Work Styles | Work Values | Related Occupations | Wages & Employment | Job Openings | Additional Information

## Tasks  Save Table (XLS/CSV)

All 25 displayed (25 important)

| Importance | Category | Task |
|---|---|---|
| 94 | Core | ➕ Take orders from patrons for food or beverages. |
| 94 | Core | ➕ Check with customers to ensure that they are enjoying their meals and take action to correct any problems. |
| 93 | Core | ➕ Check patrons' identification to ensure that they meet minimum age requirements for consumption of alcoholic beverages. |
| 91 | Core | ➕ Collect payments from customers. |
| 90 | Core | ➕ Write patrons' food orders on order slips, memorize orders, or enter orders into computers for transmittal to kitchen staff. |
| 89 | Core | ➕ Prepare checks that itemize and total meal costs and sales taxes. |
| 89 | Core | ➕ Present menus to patrons and answer questions about menu items, making recommendations upon request. |
| 88 | Core | ➕ Remove dishes and glasses from tables or counters and take them to kitchen for cleaning. |
| 87 | Core | ➕ Serve food or beverages to patrons, and prepare or serve specialty dishes at tables as required. |
| 86 | Core | ➕ Clean tables or counters after patrons have finished dining. |
| 86 | Core | ➕ Prepare tables for meals, including setting up items such as linens, silverware, and glassware. |
| 85 | Core | ➕ Explain how various menu items are prepared, describing ingredients and cooking methods. |
| 85 | Core | ➕ Assist host or hostess by answering phones to take reservations or to-go orders, and by greeting, seating, and thanking guests. |
| 84 | Core | ➕ Escort customers to their tables. |
| 84 | Core | ➕ Perform cleaning duties, such as sweeping and mopping floors, vacuuming carpet, tidying up server station, taking out trash, or checking and cleaning bathroom. |
| 82 | Core | ➕ Inform customers of daily specials. |
| 81 | Core | ➕ Prepare hot, cold, and mixed drinks for patrons, and chill bottles of wine. |
| 81 | Core | ➕ Roll silverware, set up food stations, or set up dining areas to prepare for the next shift or |

for large parties.

| | | |
|---|---|---|
| 80 | Core | ❖ Stock service areas with supplies such as coffee, food, tableware, and linens. |
| 80 | Core | ❖ Bring wine selections to tables with appropriate glasses, and pour the wines for customers. |
| 78 | Core | ❖ Fill salt, pepper, sugar, cream, condiment, and napkin containers. |
| 78 | Core | ❖ Describe and recommend wines to customers. |
| 78 | Core | ❖ Perform food preparation duties such as preparing salads, appetizers, and cold dishes, portioning desserts, and brewing coffee. |
| 51 | Core | ❖ Provide guests with information about local areas, including giving directions. |
| 76 | Supplemental | ❖ Garnish and decorate dishes in preparation for serving. |

Find occupations related to multiple tasks

back to top

## Technology Skills   Save Table (XLS/CSV)

All 3 displayed

- ❖ **Instant messaging software** — Blink
- ❖ **Point of sale POS software** — Compris Advanced Manager's Workstation; Hospitality Control Solutions Aloha Point-of-Sale; Intuit QuickBooks Point of Sale; NCR Advanced Checkout Solution (see all 8 examples)
- ❖ **Web page creation and editing software** — Facebook 🔥

🔥 Hot Technology — a technology requirement frequently included in employer job postings.

back to top

## Tools Used   Save Table (XLS/CSV)

All 9 displayed

- ❖ **Bar code reader equipment** — Portable bar code scanners
- ❖ **Cash registers**
- ❖ **Commercial use cutlery** — Carving knives
- ❖ **Magnetic stripe readers and encoders** — Credit card processing machines
- ❖ **Paging controllers** — Alphanumeric paging equipment
- ❖ **Personal digital assistant PDAs or organizers** — Personal digital assistants PDA
- ❖ **Point of sale POS receipt printers** — Point of sale POS printers
- ❖ **Point of sale POS terminal** — Point of sale POS terminals; Point of service workstations
- ❖ **Touch screen monitors**

back to top

## Knowledge   Save Table (XLS/CSV)

10 of 33 displayed (4 important)

| Importance | Knowledge |
|---|---|
| 84 | ❖ **Customer and Personal Service** — Knowledge of principles and processes for providing customer and personal services. This includes customer needs assessment, meeting quality standards for services, and evaluation of customer satisfaction. |
| 69 | ❖ **English Language** — Knowledge of the structure and content of the English language including the meaning and spelling of words, rules of composition, and grammar. |
| 62 | ❖ **Sales and Marketing** — Knowledge of principles and methods for showing, promoting, and selling products or services. This includes marketing strategy and tactics, product demonstration, sales |

techniques, and sales control systems.

56 ▬▬▬ ⊕ **Food Production** — Knowledge of techniques and equipment for planting, growing, and harvesting food products (both plant and animal) for consumption, including storage/handling techniques.

48 ▬▬ ⊕ **Administration and Management** — Knowledge of business and management principles involved in strategic planning, resource allocation, human resources modeling, leadership technique, production methods, and coordination of people and resources.

42 ▬▬ ⊕ **Mathematics** — Knowledge of arithmetic, algebra, geometry, calculus, statistics, and their applications.

40 ▬▬ ⊕ **Personnel and Human Resources** — Knowledge of principles and procedures for personnel recruitment, selection, training, compensation and benefits, labor relations and negotiation, and personnel information systems.

38 ▬▬ ⊕ **Psychology** — Knowledge of human behavior and performance; individual differences in ability, personality, and interests; learning and motivation; psychological research methods; and the assessment and treatment of behavioral and affective disorders.

37 ▬▬ ⊕ **Computers and Electronics** — Knowledge of circuit boards, processors, chips, electronic equipment, and computer hardware and software, including applications and programming.

37 ▬▬ ⊕ **Education and Training** — Knowledge of principles and methods for curriculum and training design, teaching and instruction for individuals and groups, and the measurement of training effects.

back to top

## Skills  Save Table (**XLS**/**CSV**)

⊞ ▭  10 of 35 displayed (6 important)

| Importance | Skill |
| --- | --- |
| 69 ▬▬▬ | ⊕ **Active Listening** — Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times. |
| 66 ▬▬▬ | ⊕ **Service Orientation** — Actively looking for ways to help people. |
| 66 ▬▬▬ | ⊕ **Speaking** — Talking to others to convey information effectively. |
| 63 ▬▬ | ⊕ **Social Perceptiveness** — Being aware of others' reactions and understanding why they react as they do. |
| 53 ▬▬ | ⊕ **Coordination** — Adjusting actions in relation to others' actions. |
| 50 ▬▬ | ⊕ **Monitoring** — Monitoring/Assessing performance of yourself, other individuals, or organizations to make improvements or take corrective action. |
| 47 ▬▬ | ⊕ **Active Learning** — Understanding the implications of new information for both current and future problem-solving and decision-making. |
| 47 ▬▬ | ⊕ **Complex Problem Solving** — Identifying complex problems and reviewing related information to develop and evaluate options and implement solutions. |
| 47 ▬▬ | ⊕ **Critical Thinking** — Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions, or approaches to problems. |
| 47 ▬▬ | ⊕ **Judgment and Decision Making** — Considering the relative costs and benefits of potential actions to choose the most appropriate one. |

back to top

## Abilities  Save Table (**XLS**/**CSV**)

⊞ ▭  10 of 52 displayed (12 important)

| Importance | Ability |
| --- | --- |
| 72 ▬▬ | ⊕ **Oral Comprehension** — The ability to listen to and understand information and ideas presented through spoken words and sentences. |
| 72 ▬▬ | ⊕ **Oral Expression** — The ability to communicate information and ideas in speaking so others will |

understand.

| 66 | ❂ **Speech Clarity** — The ability to speak clearly so others can understand you. |
| 66 | ❂ **Speech Recognition** — The ability to identify and understand the speech of another person. |
| 53 | ❂ **Near Vision** — The ability to see details at close range (within a few feet of the observer). |
| 53 | ❂ **Time Sharing** — The ability to shift back and forth between two or more activities or sources of information (such as speech, sounds, touch, or other sources). |
| 50 | ❂ **Arm-Hand Steadiness** — The ability to keep your hand and arm steady while moving your arm or while holding your arm and hand in one position. |
| 50 | ❂ **Deductive Reasoning** — The ability to apply general rules to specific problems to produce answers that make sense. |
| 50 | ❂ **Problem Sensitivity** — The ability to tell when something is wrong or is likely to go wrong. It does not involve solving the problem, only recognizing that there is a problem. |
| 50 | ❂ **Selective Attention** — The ability to concentrate on a task over a period of time without being distracted. |

back to top

## Work Activities   Save Table (**XLS/CSV**)

➕ 10 of 41 displayed (17 important)

| Importance | Work Activity |
| --- | --- |
| 77 | ❂ **Getting Information** — Observing, receiving, and otherwise obtaining information from all relevant sources. |
| 75 | ❂ **Performing for or Working Directly with the Public** — Performing for people or dealing directly with the public. This includes serving customers in restaurants and stores, and receiving clients or guests. |
| 72 | ❂ **Communicating with Supervisors, Peers, or Subordinates** — Providing information to supervisors, co-workers, and subordinates by telephone, in written form, e-mail, or in person. |
| 68 | ❂ **Establishing and Maintaining Interpersonal Relationships** — Developing constructive and cooperative working relationships with others, and maintaining them over time. |
| 66 | ❂ **Resolving Conflicts and Negotiating with Others** — Handling complaints, settling disputes, and resolving grievances and conflicts, or otherwise negotiating with others. |
| 64 | ❂ **Monitoring Processes, Materials, or Surroundings** — Monitoring and reviewing information from materials, events, or the environment, to detect or assess problems. |
| 62 | ❂ **Assisting and Caring for Others** — Providing personal assistance, medical attention, emotional support, or other personal care to others such as coworkers, customers, or patients. |
| 62 | ❂ **Handling and Moving Objects** — Using hands and arms in handling, installing, positioning, and moving materials, and manipulating things. |
| 62 | ❂ **Identifying Objects, Actions, and Events** — Identifying information by categorizing, estimating, recognizing differences or similarities, and detecting changes in circumstances or events. |
| 60 | ❂ **Performing General Physical Activities** — Performing physical activities that require considerable use of your arms and legs and moving your whole body, such as climbing, lifting, balancing, walking, stooping, and handling materials. |

back to top

## Detailed Work Activities   Save Table (**XLS/CSV**)

 All 19 displayed

- ❂ Take customer orders.
- ❂ Communicate with customers to resolve complaints or ensure satisfaction.
- ❂ Enforce rules or regulations.

- Process customer bills or payments.
- Communicate dining or order details to kitchen personnel.
- Present food or beverage information or menus to customers.
- Collect dirty dishes or other tableware.
- Serve food or beverages.
- Cook foods.
- Arrange tables or dining areas.
- Clean food service areas.
- Assist customers with seating arrangements.
- Schedule dining reservations.
- Clean food preparation areas, facilities, or equipment.
- Prepare hot or cold beverages.
- Stock serving stations or dining areas with food or supplies.
- Prepare foods for cooking or serving.
- Add garnishes to food.
- Provide customers with general information or assistance.

Find occupations related to multiple detailed work activities

back to top

## Work Context   Save Table (XLS/CSV)

➕➖   10 of 57 displayed

| Work Context | Percentage of Top Responses |
|---|---|
| ⊕ **Contact With Others** — How much does this job require the worker to be in contact with others (face-to-face, by telephone, or otherwise) in order to perform it? | 89 — Constant contact with others |
| ⊕ **Spend Time Walking and Running** — How much does this job require walking and running? | 82 — Continually or almost continually<br>11 — More than half the time |
| ⊕ **Spend Time Standing** — How much does this job require standing? | 79 — Continually or almost continually<br>13 — More than half the time |
| ⊕ **Indoors, Environmentally Controlled** — How often does this job require working indoors in environmentally controlled conditions? | 73 — Every day<br>13 — Never |
| ⊕ **Physical Proximity** — To what extent does this job require the worker to perform job tasks in close physical proximity to other people? | 34 — Very close (near touching)<br>51 — Moderately close (at arm's length) |
| ⊕ **Face-to-Face Discussions** — How often do you have to have face-to-face discussions with individuals or teams in this job? | 64 — Every day<br>19 — Once a year or more but not every month |
| ⊕ **Importance of Being Exact or Accurate** — How important is being very exact or highly accurate in performing this job? | 40 — Extremely important<br>30 — Very important<br>24 — Important |
| ⊕ **Work With Work Group or Team** — How important is it to work with others in a group or team in this job? | 39 — Extremely important<br>38 — Very important<br>15 — Fairly important |
| ⊕ **Deal With External Customers** — How important is it to | 55 — Extremely important<br>11 — Very important |

work with external customers or the public in this job?

| 13 | | Important |
| 14 | | Not important at all |

○ **Spend Time Making Repetitive Motions** — How much does this job require making repetitive motions?

| 39 | | Continually or almost continually |
| 27 | | More than half the time |
| 24 | | About half the time |

back to top

## Job Zone  Save Table (**XLS**/**CSV**)

**Title** Job Zone Two: Some Preparation Needed

**Education** These occupations usually require a high school diploma.

**Related Experience** Some previous work-related skill, knowledge, or experience is usually needed. For example, a teller would benefit from experience working directly with the public.

**Job Training** Employees in these occupations need anywhere from a few months to one year of working with experienced employees. A recognized apprenticeship program may be associated with these occupations.

**Job Zone Examples** These occupations often involve using your knowledge and skills to help others. Examples include orderlies, counter and rental clerks, customer service representatives, security guards, upholsterers, and tellers.

**SVP Range** (4.0 to < 6.0)

back to top

## Education

| Percentage of Respondents | Education Level Required |
| --- | --- |
| 57 | High school diploma or equivalent ? |
| 28 | Less than high school diploma |
| 7 | Bachelor's degree |

back to top

## Credentials



back to top

## Interests  Save Table (**XLS**/**CSV**)

All 6 displayed (4 important)

| Occupational Interest | Interest |
| --- | --- |
| 78 | ○ **Social** — Social occupations frequently involve working with, communicating with, and teaching people. These occupations often involve helping or providing service to others. |
| 72 | ○ **Enterprising** — Enterprising occupations frequently involve starting up and carrying out projects. These occupations can involve leading people and making many decisions. Sometimes they require risk taking and often deal with business. |
| 67 | ○ **Conventional** — Conventional occupations frequently involve following set procedures and routines. These occupations can include working with data and details more than with ideas. Usually there is a clear line of authority to follow. |
| 56 | ○ **Realistic** — Realistic occupations frequently involve work activities that include practical, hands-on |

Case 1:21-cv-01069-RP Document 14-1 Filed 12/03/21 Page 29 of 90

problems and solutions. They often deal with plants, animals, and real-world materials like wood, tools, and machinery. Many of the occupations require working outside, and do not involve a lot of paperwork or working closely with others.

**22** ⊕ **Artistic** — Artistic occupations frequently involve working with forms, designs and patterns. They often require self-expression and the work can be done without following a clear set of rules.

**0** ⊕ **Investigative** — Investigative occupations frequently involve working with ideas, and require an extensive amount of thinking. These occupations can involve searching for facts and figuring out problems mentally.

back to top

## Work Styles   Save Table (XLS/CSV)

   10 of 16 displayed (14 important)

| Importance | Work Style |
|---|---|
| 81 | ⊕ **Dependability** — Job requires being reliable, responsible, and dependable, and fulfilling obligations. |
| 80 | ⊕ **Attention to Detail** — Job requires being careful about detail and thorough in completing work tasks. |
| 80 | ⊕ **Self-Control** — Job requires maintaining composure, keeping emotions in check, controlling anger, and avoiding aggressive behavior, even in very difficult situations. |
| 78 | ⊕ **Cooperation** — Job requires being pleasant with others on the job and displaying a good-natured, cooperative attitude. |
| 78 | ⊕ **Stress Tolerance** — Job requires accepting criticism and dealing calmly and effectively with high-stress situations. |
| 77 | ⊕ **Social Orientation** — Job requires preferring to work with others rather than alone, and being personally connected with others on the job. |
| 74 | ⊕ **Adaptability/Flexibility** — Job requires being open to change (positive or negative) and to considerable variety in the workplace. |
| 74 | ⊕ **Concern for Others** — Job requires being sensitive to others' needs and feelings and being understanding and helpful on the job. |
| 73 | ⊕ **Initiative** — Job requires a willingness to take on responsibilities and challenges. |
| 73 | ⊕ **Integrity** — Job requires being honest and ethical. |

back to top

## Work Values   Save Table (XLS/CSV)

All 6 displayed (1 important)

| Extent | Work Value |
|---|---|
| 83 | ⊕ **Relationships** — Occupations that satisfy this work value allow employees to provide service to others and work with co-workers in a friendly non-competitive environment. Corresponding needs are Co-workers, Moral Values and Social Service. |
| 39 | ⊕ **Support** — Occupations that satisfy this work value offer supportive management that stands behind employees. Corresponding needs are Company Policies, Supervision: Human Relations and Supervision: Technical. |
| 22 | ⊕ **Achievement** — Occupations that satisfy this work value are results oriented and allow employees to use their strongest abilities, giving them a feeling of accomplishment. Corresponding needs are Ability Utilization and Achievement. |
| 22 | ⊕ **Independence** — Occupations that satisfy this work value allow employees to work on their own and make decisions. Corresponding needs are Creativity, Responsibility and Autonomy. |
| 17 | ⊕ **Recognition** — Occupations that satisfy this work value offer advancement, potential for leadership, and are often considered prestigious. Corresponding needs are Advancement, Authority, Recognition and Social Status. |
| 17 | ⊕ **Working Conditions** — Occupations that satisfy this work value offer job security and good working |

conditions. Corresponding needs are Activity, Compensation, Independence, Security, Variety and Working Conditions.

back to top

## Related Occupations   Save Table (XLS/CSV)

All 9 displayed

| | |
|---|---|
| 35-2011.00 | Cooks, Fast Food |
| 35-2021.00 | Food Preparation Workers |
| 35-3023.00 | Fast Food and Counter Workers |
| 35-3041.00 | Food Servers, Nonrestaurant |
| 35-9011.00 | Dining Room and Cafeteria Attendants and Bartender Helpers |
| 35-9031.00 | Hosts and Hostesses, Restaurant, Lounge, and Coffee Shop   Bright Outlook |
| 39-3031.00 | Ushers, Lobby Attendants, and Ticket Takers |
| 41-2011.00 | Cashiers |
| 53-7065.00 | Stockers and Order Fillers |

back to top

## Wages & Employment Trends

| | |
|---|---|
| **Median wages (2020)** | $11.42 hourly, $23,740 annual |
| **State wages** | Select a State  ▼  Go |
| **Local wages** | ZIP Code:  ___  Go |
| **Employment (2020)** | 2,023,200 employees |
| **Projected growth (2020-2030)** | ▪▪▪▪ Much faster than average (15% or higher) |
| **Projected job openings (2020-2030)** | 470,200 |
| **State trends** | Select a State  ▼  Go |
| **Top industries (2020)** | Accommodation and Food Services (92% employed in this sector) (see all industries) |

Source: Bureau of Labor Statistics 2020 wage data and 2020-2030 employment projections . "Projected growth" represents the estimated change in total employment over the projections period (2020-2030). "Projected job openings" represent openings due to growth and replacement.

back to top

## Job Openings on the Web



back to top

## Sources of Additional Information

All 6 displayed

**Disclaimer:** Sources are listed to provide additional information on related jobs, specialties, and/or industries. Links to non-DOL Internet sites are provided for your convenience and do not constitute an endorsement.

- Court of Master Sommeliers
- Federation of Dining Room Professionals



- [International Council on Hotel, Restaurant, and Institutional Education](#) 🖉
- [National Restaurant Association](#) 🖉
- [Occupational Outlook Handbook: Waiters and waitresses](#) 🖉
- [UNITE HERE](#) 🖉

[back to top](#)

# APPENDIX EXHIBIT 3



# O*NET OnLine

## Details Report for:
## 35-3011.00 - Bartenders

Updated 2021

Bright Outlook

Mix and serve drinks to patrons, directly or through waitstaff.

**Sample of reported job titles:** Banquet Bartender, Bar Captain, Bartender, Mixologist

View report:  **Summary**  | **Details** | **Custom** | 🖨 **Easy Read** | 🖨 **Veterans** | 🖨 **Español**

Tasks | Technology Skills | Tools Used | Knowledge | Skills | Abilities | Work Activities | Detailed Work Activities | Work Context | Job Zone | Education | Credentials | Interests | Work Styles | Work Values | Related Occupations | Wages & Employment | Job Openings | Additional Information

## Tasks   Save Table (XLS/CSV)

All 20 displayed (20 important)

| Importance | Category | Task |
|---|---|---|
| 95 | Core | ➕ Clean glasses, utensils, and bar equipment. |
| 95 | Core | ➕ Collect money for drinks served. |
| 94 | Core | ➕ Balance cash receipts. |
| 94 | Core | ➕ Check identification of customers to verify age requirements for purchase of alcohol. |
| 92 | Core | ➕ Clean bars, work areas, and tables. |
| 91 | Core | ➕ Attempt to limit problems and liability related to customers' excessive drinking by taking steps such as persuading customers to stop drinking, or ordering taxis or other transportation for intoxicated patrons. |
| 90 | Core | ➕ Take beverage orders from serving staff or directly from patrons. |
| 89 | Core | ➕ Serve wine, and bottled or draft beer. |
| 87 | Core | ➕ Plan, organize, and control the operations of a cocktail lounge or bar. |
| 87 | Core | ➕ Stock bar with beer, wine, liquor, and related supplies such as ice, glassware, napkins, or straws. |
| 85 | Core | ➕ Serve snacks or food items to customers seated at the bar. |
| 83 | Core | ➕ Mix ingredients, such as liquor, soda, water, sugar, and bitters, to prepare cocktails and other drinks. |
| 76 | Core | ➕ Slice and pit fruit for garnishing drinks. |
| 71 | Core | ➕ Ask customers who become loud and obnoxious to leave, or physically remove them. |
| 70 | Core | ➕ Arrange bottles and glasses to make attractive displays. |
| 61 | Core | ➕ Create drink recipes. |
| 85 | Supplemental | ➕ Supervise the work of bar staff and other bartenders. |
| 78 | Supplemental | ➕ Order or requisition liquors and supplies. |
| 66 | Supplemental | ➕ Plan bar menus. |
| 53 | Supplemental | ➕ Prepare appetizers such as pickles, cheese, and cold meats. |

Find occupations related to multiple tasks

back to top

## Technology Skills   Save Table (**XLS**/**CSV**)

 All 4 displayed

- ⊕ **Data base user interface and query software** — AZZ CardFile
- ⊕ **Internet browser software** — Web browser software
- ⊕ **Point of sale POS software** — Focus point of sale POS software; Intuit QuickBooks Point of Sale; NCR NeighborhoodPOS; The General Store (see all 7 examples)
- ⊕ **Web page creation and editing software** — Facebook 

 Hot Technology — a technology requirement frequently included in employer job postings.

back to top

## Tools Used   Save Table (**XLS**/**CSV**)

 10 of 22 displayed

- ⊕ **Carbonated beverage dispenser** — Draught foam control devices; Electronic beer line maintenance equipment; Refrigerated liquid recirculation systems; Soda dispensers (see all 5 examples)
- ⊕ **Cocktail shakers or accessories** — 3-piece cocktail shakers; 4-piece cocktail shakers; Pour spouts; Spirit measures (see all 10 examples)
- ⊕ **Commercial use blenders** — Blenders; Mojito machines
- ⊕ **Commercial use cutlery** — Fruit knives; Lime slicers; Olive stuffers
- ⊕ **Commercial use dishwashers** — Glass washers; Upright glass washers
- ⊕ **Commercial use juicers** — Lime squeezers; Professional juicers
- ⊕ **Commercial use strainers** — 4-prong strainers; Cocktail strainers; Hawthorn strainers; Julep strainers (see all 5 examples)
- ⊕ **Ice shaver machines or accessories** — Ice chippers; Ice crushers; Ice flakers
- ⊕ **Non carbonated beverage dispenser** — Beverage machines
- ⊕ **Point of sale POS terminal** — Point of sale POS terminals; Point of service workstations

back to top

## Knowledge   Save Table (**XLS**/**CSV**)

 10 of 33 displayed (6 important)

| Importance | Knowledge |
|---|---|
| 86 | ⊕ **Customer and Personal Service** — Knowledge of principles and processes for providing customer and personal services. This includes customer needs assessment, meeting quality standards for services, and evaluation of customer satisfaction. |
| 66 | ⊕ **English Language** — Knowledge of the structure and content of the English language including the meaning and spelling of words, rules of composition, and grammar. |
| 54 | ⊕ **Education and Training** — Knowledge of principles and methods for curriculum and training design, teaching and instruction for individuals and groups, and the measurement of training effects. |
| 54 | ⊕ **Sales and Marketing** — Knowledge of principles and methods for showing, promoting, and selling products or services. This includes marketing strategy and tactics, product demonstration, sales techniques, and sales control systems. |
| 50 | ⊕ **Administration and Management** — Knowledge of business and management principles involved in strategic planning, resource allocation, human resources modeling, leadership technique, production methods, and coordination of people and resources. |
| 50 | ⊕ **Public Safety and Security** — Knowledge of relevant equipment, policies, procedures, and strategies to promote effective local, state, or national security operations for the protection of people, data, property, and institutions. |
| 49 | ⊕ **Mathematics** — Knowledge of arithmetic, algebra, geometry, calculus, statistics, and their applications. |



**45** ⊕ **Personnel and Human Resources** — Knowledge of principles and procedures for personnel recruitment, selection, training, compensation and benefits, labor relations and negotiation, and personnel information systems.

**42** ⊕ **Law and Government** — Knowledge of laws, legal codes, court procedures, precedents, government regulations, executive orders, agency rules, and the democratic political process.

**37** ⊕ **Food Production** — Knowledge of techniques and equipment for planting, growing, and harvesting food products (both plant and animal) for consumption, including storage/handling techniques.

back to top

## Skills   Save Table (XLS/CSV)

 10 of 35 displayed (13 important)

| Importance | Skill |
|---|---|
| **69** | ⊕ **Active Listening** — Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times. |
| **66** | ⊕ **Service Orientation** — Actively looking for ways to help people. |
| **56** | ⊕ **Social Perceptiveness** — Being aware of others' reactions and understanding why they react as they do. |
| **53** | ⊕ **Coordination** — Adjusting actions in relation to others' actions. |
| **53** | ⊕ **Critical Thinking** — Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions, or approaches to problems. |
| **53** | ⊕ **Persuasion** — Persuading others to change their minds or behavior. |
| **53** | ⊕ **Speaking** — Talking to others to convey information effectively. |
| **50** | ⊕ **Active Learning** — Understanding the implications of new information for both current and future problem-solving and decision-making. |
| **50** | ⊕ **Complex Problem Solving** — Identifying complex problems and reviewing related information to develop and evaluate options and implement solutions. |
| **50** | ⊕ **Instructing** — Teaching others how to do something. |

back to top

## Abilities   Save Table (XLS/CSV)

 10 of 52 displayed (18 important)

| Importance | Ability |
|---|---|
| **72** | ⊕ **Oral Expression** — The ability to communicate information and ideas in speaking so others will understand. |
| **69** | ⊕ **Oral Comprehension** — The ability to listen to and understand information and ideas presented through spoken words and sentences. |
| **56** | ⊕ **Information Ordering** — The ability to arrange things or actions in a certain order or pattern according to a specific rule or set of rules (e.g., patterns of numbers, letters, words, pictures, mathematical operations). |
| **56** | ⊕ **Near Vision** — The ability to see details at close range (within a few feet of the observer). |
| **56** | ⊕ **Speech Recognition** — The ability to identify and understand the speech of another person. |
| **53** | ⊕ **Arm-Hand Steadiness** — The ability to keep your hand and arm steady while moving your arm or while holding your arm and hand in one position. |
| **53** | ⊕ **Manual Dexterity** — The ability to quickly move your hand, your hand together with your arm, or your two hands to grasp, manipulate, or assemble objects. |
| **53** | ⊕ **Speech Clarity** — The ability to speak clearly so others can understand you. |
| **50** | ⊕ **Auditory Attention** — The ability to focus on a single source of sound in the presence of other |

distracting sounds.

50  ● **Deductive Reasoning** — The ability to apply general rules to specific problems to produce answers that make sense.

back to top

## Work Activities   Save Table (XLS/CSV)

 10 of 41 displayed (28 important)

| Importance | Work Activity |
|---|---|
| 77 | ● **Performing for or Working Directly with the Public** — Performing for people or dealing directly with the public. This includes serving customers in restaurants and stores, and receiving clients or guests. |
| 75 | ● **Establishing and Maintaining Interpersonal Relationships** — Developing constructive and cooperative working relationships with others, and maintaining them over time. |
| 69 | ● **Estimating the Quantifiable Characteristics of Products, Events, or Information** — Estimating sizes, distances, and quantities; or determining time, costs, resources, or materials needed to perform a work activity. |
| 69 | ● **Getting Information** — Observing, receiving, and otherwise obtaining information from all relevant sources. |
| 67 | ● **Training and Teaching Others** — Identifying the educational needs of others, developing formal educational or training programs or classes, and teaching or instructing others. |
| 66 | ● **Handling and Moving Objects** — Using hands and arms in handling, installing, positioning, and moving materials, and manipulating things. |
| 66 | ● **Inspecting Equipment, Structures, or Materials** — Inspecting equipment, structures, or materials to identify the cause of errors or other problems or defects. |
| 65 | ● **Judging the Qualities of Objects, Services, or People** — Assessing the value, importance, or quality of things or people. |
| 64 | ● **Monitoring and Controlling Resources** — Monitoring and controlling resources and overseeing the spending of money. |
| 62 | ● **Communicating with Supervisors, Peers, or Subordinates** — Providing information to supervisors, co-workers, and subordinates by telephone, in written form, e-mail, or in person. |

back to top

## Detailed Work Activities   Save Table (XLS/CSV)

All 18 displayed

- ● Clean tableware.
- ● Process customer bills or payments.
- ● Enforce rules or regulations.
- ● Balance receipts.
- ● Clean food service areas.
- ● Communicate with customers to resolve complaints or ensure satisfaction.
- ● Take customer orders.
- ● Serve food or beverages.
- ● Manage food service operations or parts of operations.
- ● Stock serving stations or dining areas with food or supplies.
- ● Coordinate activities of food service staff.
- ● Mix ingredients.
- ● Order materials, supplies, or equipment.
- ● Prepare foods for cooking or serving.

- Arrange tables or dining areas.
- Plan menu options.
- Create new recipes or food presentations.
- Cook foods.

Find occupations related to multiple detailed work activities

back to top

## Work Context  Save Table (XLS/CSV)

 10 of 57 displayed

| Work Context | Percentage of Top Responses |
|---|---|
| **Contact With Others** — How much does this job require the worker to be in contact with others (face-to-face, by telephone, or otherwise) in order to perform it? | 92 Constant contact with others |
| **Spend Time Standing** — How much does this job require standing? | 79 Continually or almost continually<br>22 About half the time |
| **Deal With External Customers** — How important is it to work with external customers or the public in this job? | 56 Extremely important<br>33 Very important |
| **Face-to-Face Discussions** — How often do you have to have face-to-face discussions with individuals or teams in this job? | 62 Every day<br>17 Once a week or more but not every day |
| **Physical Proximity** — To what extent does this job require the worker to perform job tasks in close physical proximity to other people? | 37 Very close (near touching)<br>47 Moderately close (at arm's length)<br>12 Slightly close (e.g., shared office) |
| **Freedom to Make Decisions** — How much decision making freedom, without supervision, does the job offer? | 41 A lot of freedom<br>36 Some freedom<br>16 Very little freedom |
| **Indoors, Environmentally Controlled** — How often does this job require working indoors in environmentally controlled conditions? | 73 Every day<br>25 Never |
| **Deal With Unpleasant or Angry People** — How frequently does the worker have to deal with unpleasant, angry, or discourteous individuals as part of the job requirements? | 40 Every day<br>28 Once a week or more but not every day<br>18 Once a month or more but not every week<br>14 Once a year or more but not every month |
| **Importance of Being Exact or Accurate** — How important is being very exact or highly accurate in performing this job? | 35 Extremely important<br>34 Very important<br>13 Important<br>17 Fairly important |
| **Spend Time Making Repetitive Motions** — How much does this job require making repetitive motions? | 44 Continually or almost continually<br>19 More than half the time<br>11 About half the time<br>19 Less than half the time |

back to top

## Job Zone  Save Table (XLS/CSV)

**Title**  Job Zone Two: Some Preparation Needed

**Education**  These occupations usually require a high school diploma.

Case 1:21-cv-01-00GRP Document 1871 Filed 04/02/21 Page 38 of 90

| | |
|---|---|
| **Related Experience** | Some previous work-related skill, knowledge, or experience is usually needed. For example, a teller would benefit from experience working directly with the public. |
| **Job Training** | Employees in these occupations need anywhere from a few months to one year of working with experienced employees. A recognized apprenticeship program may be associated with these occupations. |
| **Job Zone Examples** | These occupations often involve using your knowledge and skills to help others. Examples include orderlies, counter and rental clerks, customer service representatives, security guards, upholsterers, and tellers. |
| **SVP Range** | (4.0 to < 6.0) |

back to top

## Education

| Percentage of Respondents | Education Level Required |
|---|---|
| 43 | High school diploma or equivalent ? |
| 37 | Less than high school diploma |
| 16 | Some college, no degree |

back to top

## Credentials



Find Training    Find Certifications    Find Licenses    APPRENTICESHIP.GOV

back to top

## Interests    Save Table (XLS/CSV)

All 6 displayed (3 important)

| Occupational Interest | Interest |
|---|---|
| 78 | ⊕ **Conventional** — Conventional occupations frequently involve following set procedures and routines. These occupations can include working with data and details more than with ideas. Usually there is a clear line of authority to follow. |
| 78 | ⊕ **Enterprising** — Enterprising occupations frequently involve starting up and carrying out projects. These occupations can involve leading people and making many decisions. Sometimes they require risk taking and often deal with business. |
| 56 | ⊕ **Realistic** — Realistic occupations frequently involve work activities that include practical, hands-on problems and solutions. They often deal with plants, animals, and real-world materials like wood, tools, and machinery. Many of the occupations require working outside, and do not involve a lot of paperwork or working closely with others. |
| 45 | ⊕ **Social** — Social occupations frequently involve working with, communicating with, and teaching people. These occupations often involve helping or providing service to others. |
| 17 | ⊕ **Artistic** — Artistic occupations frequently involve working with forms, designs and patterns. They often require self-expression and the work can be done without following a clear set of rules. |
| 6 | ⊕ **Investigative** — Investigative occupations frequently involve working with ideas, and require an extensive amount of thinking. These occupations can involve searching for facts and figuring out problems mentally. |

back to top

## Work Styles    Save Table (XLS/CSV)

10 of 16 displayed (16 important)

| Importance | Work Style |
|---|---|
| 90 | ◯ **Dependability** — Job requires being reliable, responsible, and dependable, and fulfilling obligations. |
| 90 | ◯ **Self-Control** — Job requires maintaining composure, keeping emotions in check, controlling anger, and avoiding aggressive behavior, even in very difficult situations. |
| 84 | ◯ **Integrity** — Job requires being honest and ethical. |
| 82 | ◯ **Attention to Detail** — Job requires being careful about detail and thorough in completing work tasks. |
| 78 | ◯ **Cooperation** — Job requires being pleasant with others on the job and displaying a good-natured, cooperative attitude. |
| 77 | ◯ **Social Orientation** — Job requires preferring to work with others rather than alone, and being personally connected with others on the job. |
| 75 | ◯ **Stress Tolerance** — Job requires accepting criticism and dealing calmly and effectively with high-stress situations. |
| 74 | ◯ **Concern for Others** — Job requires being sensitive to others' needs and feelings and being understanding and helpful on the job. |
| 71 | ◯ **Adaptability/Flexibility** — Job requires being open to change (positive or negative) and to considerable variety in the workplace. |
| 69 | ◯ **Independence** — Job requires developing one's own ways of doing things, guiding oneself with little or no supervision, and depending on oneself to get things done. |

back to top

## Work Values   Save Table (XLS/CSV)

All 6 displayed (2 important)

| Extent | Work Value |
|---|---|
| 72 | ◯ **Relationships** — Occupations that satisfy this work value allow employees to provide service to others and work with co-workers in a friendly non-competitive environment. Corresponding needs are Co-workers, Moral Values and Social Service. |
| 50 | ◯ **Independence** — Occupations that satisfy this work value allow employees to work on their own and make decisions. Corresponding needs are Creativity, Responsibility and Autonomy. |
| 39 | ◯ **Support** — Occupations that satisfy this work value offer supportive management that stands behind employees. Corresponding needs are Company Policies, Supervision: Human Relations and Supervision: Technical. |
| 28 | ◯ **Recognition** — Occupations that satisfy this work value offer advancement, potential for leadership, and are often considered prestigious. Corresponding needs are Advancement, Authority, Recognition and Social Status. |
| 22 | ◯ **Achievement** — Occupations that satisfy this work value are results oriented and allow employees to use their strongest abilities, giving them a feeling of accomplishment. Corresponding needs are Ability Utilization and Achievement. |
| 22 | ◯ **Working Conditions** — Occupations that satisfy this work value offer job security and good working conditions. Corresponding needs are Activity, Compensation, Independence, Security, Variety and Working Conditions. |

back to top

## Related Occupations   Save Table (XLS/CSV)

All 10 displayed

35-3023.00   Fast Food and Counter Workers ☀

39-3011.00   Gambling Dealers ☀

39-3012.00   Gambling and Sports Book Writers and Runners ☀

41-1011.00   First-Line Supervisors of Retail Sales Workers ☀

| 41-2012.00 | Gambling Change Persons and Booth Cashiers  ☀ Bright Outlook |
| 41-2031.00 | Retail Salespersons ☀ |
| 43-3041.00 | Gambling Cage Workers ☀ |
| 43-4081.00 | Hotel, Motel, and Resort Desk Clerks ☀ |
| 51-3011.00 | Bakers |
| 51-3021.00 | Butchers and Meat Cutters |

back to top

## Wages & Employment Trends

| | |
| --- | --- |
| **Median wages (2020)** | $12.00 hourly, $24,960 annual |
| **State wages** | Select a State ▾  Go |
| **Local wages** | ZIP Code:  Go |
| **Employment (2020)** | 492,300 employees |
| **Projected growth (2020-2030)** | ▬▬▬▬ Much faster than average (15% or higher) |
| **Projected job openings (2020-2030)** | 111,300 |
| **State trends** | Select a State ▾  Go |
| **Top industries (2020)** | Accommodation and Food Services (80% employed in this sector) (see all industries) |

Source: Bureau of Labor Statistics 2020 wage data ⬚ and 2020-2030 employment projections ⬚. "Projected growth" represents the estimated change in total employment over the projections period (2020-2030). "Projected job openings" represent openings due to growth and replacement.

back to top

## Job Openings on the Web

 Find Jobs

back to top

## Sources of Additional Information

⬭ All 6 displayed

**Disclaimer:** Sources are listed to provide additional information on related jobs, specialties, and/or industries. Links to non-DOL Internet sites are provided for your convenience and do not constitute an endorsement.

- National Restaurant Association ⬚
- Occupational Outlook Handbook: Bartenders ⬚
- Service Employees International Union ⬚
- TIPS ⬚
- UNITE HERE ⬚
- United States Bartenders' Guild ⬚

back to top

# APPENDIX EXHIBIT 4



U.S. SMALL BUSINESS ADMINISTRATION
OFFICE OF ADVOCACY
REGULATION • RESEARCH • OUTREACH

August 20, 2021

VIA ELECTRONIC SUBMISSION

The Honorable Martin J. Walsh
Secretary
U.S. Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

Amy DeBisschop
Director
Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Room S-3502
Washington, DC 20210

Re: Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 32818

Dear Secretary Walsh and Ms. DeBisschop:

The U.S. Small Business Administration's Office of Advocacy (Advocacy) submits the following comments to the Department of Labor's Wage and Hour Division (DOL) on its proposed rule, which adds restrictions to the use of the tip credit under the Fair Labor Standards Act (FLSA).[1]

Advocacy is concerned that the DOL's certification that the rule will not have a significant economic impact on a substantial number of small entities lacks an adequate factual basis. DOL

---

[1] Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 32818 (June 23, 2021) (hereinafter "2021 Proposed Rule").

409 3rd Street SW / MC 3110 / Washington, DC 20416
Ph 202-205-6533 / advocacy.sba.gov



improperly certified this proposed rule because it omitted some and underestimated other compliance costs of this rule for small employers.   Small businesses have told Advocacy that the proposed rule will be costly and burdensome to implement in their busy restaurants, hotels, nail salons and other workplaces, as it will require businesses to track their workers' tasks minute to minute to utilize the tip credit wage.  Small businesses have commented that these new restrictions for the use of the tip credit are complex and unworkable for small operations, who are already facing staff shortages and are just recovering from pandemic losses.

Advocacy recommends that DOL prepare and make available for public comment an Initial Regulatory Flexibility Analysis (IRFA) that adequately assesses the small business compliance costs from this regulation and includes consideration of significant alternatives that would accomplish the objectives of the regulation while minimizing the economic impacts to small entities.

## I.      Background

### A.  The Office of Advocacy

Congress established Advocacy under Pub. L. 94-305 to represent the views of small entities before Federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA); as such the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration.  The Regulatory Flexibility Act (RFA),[2] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[3] gives small entities a voice in the rulemaking process.  For all rules that are expected to have a significant economic impact on a substantial number of small entities, the RFA requires federal agencies to assess the impact of the proposed rule on small entities and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[4] The agency must include, in any explanation or discussion accompanying the final rule's publication in the *Federal Register*, the agency's response to these written comments submitted by Advocacy on the proposed rule, unless the agency certifies that the public interest is not served by doing so.[5]

Advocacy's comments are consistent with Congressional intent underlying the RFA, that "[w]hen adopting regulations to protect the health, safety, and economic welfare of the nation, federal agencies should seek to achieve statutory goals as effectively and efficiently as possible without imposing unnecessary burdens on the public." [6]

---

[2] 5 U.S.C. §601 et seq.

[3] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. §601 et seq.).

[4] Small Business Jobs Act of 2010 (PL. 111-240) §1601.

[5] *Id.*

[6] 5 U.S.C. Sec. 601 note.

## B. The Proposed Rule

The FLSA generally requires employers to pay employees at least the federal minimum wage, which is currently $7.25 per hour.[7]  Section 3(m) of the FLSA allows an employer that meets certain requirements to count a limited amount of the tips earned by tipped employees as a credit towards its federal minimum wage obligation, known as a tip credit.[8]

DOL has issued various guidance documents and rulemakings for over 30 years to deal with the "dual jobs" provision of the tip credit under the FLSA, seeking to address a situation where a tipped employee performs multiple jobs.  The FLSA discusses one situation where an individual works in two occupations, as a maintenance man performing non-tipped work in a hotel while also serving as a waiter performing tipped work.  This is distinguished from a situation where a worker performs multiple tasks in one occupation, such as tip-producing work and work related to tip-producing work. This is a situation where a "waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses."[9]

In 1988, DOL released sub-regulatory guidance (often referred to as the 80/20 guidance) which explained "that an employer could continue to take a tip credit for the time an employee spent performing duties that are related to the employee's tipped occupation but that do not produce tips, but only if that time did not exceed 20 percent of the employee's workweek."[10]  In 2018, DOL released guidance rescinding the 80/20 guidance.   In 2018 and 2019, the Department issued new sub-regulatory guidance "providing that the department would no longer prohibit an employer from taking a tip credit for the time a tipped employee performs related, non-tipped duties, as long as those duties are performed contemporaneously with, or a reasonable time immediately after, tipped duties."[11]  On December 30, 2020, DOL published the 2020 Tip final rule incorporating this guidance, and it stated that it would also use the Occupational Information Network (O*Net) to determine whether a tipped employee's duties are related to their tipped occupation.[12] In the December 2020 final rule, DOL explained that the 80/20 guidance "has proved difficult to enforce and resulted in widespread compliance issues; it has also generated extensive, costly litigation." [13]  In 2021, DOL released multiple rulemakings extending the effective date of this final rule.[14]

---

[7] 29 U.S.C. § 206 (a)(1).

[8] *See* 29 U.S.C. § 203(m)(2)(a).

[9] 29 U.S.C. § 531.56 (e).

[10] *See* WHD Field Operations Handbook (FOH) 30d00(e), Revision 563 (Dec. 9, 1988).

[11] *See* WHD Opinion Letter FLSA 2018-27 (Nov. 8, 2018); Field Assistance Bulletin (FAB) 2019-2 (Feb. 15, 2019); FOH 30d00(f) (2018-2019 guidance).

[12] Tip Regulations Under the Fair Labor Standards Act (FLSA); 85 Fed. Reg. 86771 (June 23, 2021) (hereinafter "2020 Tip Final Rule").

[13] *See* 2020 Tip Final Rule, at 85 Fed. Reg. at 86761.

[14] *See* 86 Fed. Reg. 11632, 86 Fed. Reg. 15811, 86 Fed. Reg. 22597.

On June 23, 2021, DOL released a proposed rule that rescinds the "dual jobs" portion of the 2020 Tip Final Rule; and adopts a new version of the prior 80/20 guidance, with an additional restriction of a 30-minute limit.[15] The new "dual jobs" provision in this proposed rule states that an "employee is engaged in a tipped occupation when they either perform work that produces tips or perform work that directly supports the tip-producing work, provided that the directly supporting work is not performed for a substantial amount of time." The proposal provides examples of tasks that are considered tip-producing work, directly supporting tip-producing work and non-tipped work. "Substantial amount of time" is defined as work that: 1) exceeds 20 percent of the hours worked during the employee's workweek or 2) any continuous period of time that exceeds 30 minutes.

## II.    Advocacy is Concerned that the Proposed Rule Will Have a Significant Economic Impact on a Substantial Number of Small Businesses; DOL Should Revise Its Cost Estimates and Produce an Initial Regulatory Flexibility Analysis with Regulatory Alternatives

The Regulatory Flexibility Act (RFA) requires that regulatory agencies either certify that a proposed regulation will not have a significant economic impact on a substantial number of small entities or prepare an Initial Regulatory Flexibility Analysis (IRFA) to accompany every proposed rule.[16] If an agency certifies the rule, it must provide a statement providing a factual basis for this certification.   An agency's certification is subject to judicial review.[17]

A proper IRFA must describe the impact of the proposed rule on small entities and contain the following information:  (1) a description of the reasons why the agency's action is being considered; (2) a succinct statement of the objectives of, and the legal basis for, the proposed rule; (3) a description of small entities to which the rule will apply; (4) a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule; and (5) an identification, to the extent practicable, of all relevant federal rules that may duplicate, overlap, or conflict with the proposed rule.[18]

Agencies must present significant alternatives for regulatory relief as part of an IRFA as required by § 603(a). At a minimum, the agency should consider: (1) the establishment of different compliance or reporting requirements for small entities; (2) clarification, consolidation, or simplification of compliance and reporting requirements for small entities; (3) use of performance rather than design standards; and (4) exemption for certain or all small entities from coverage of the rule, in whole or in part.[19]

Advocacy is concerned that the DOL's certification lacks an adequate factual basis.  DOL's certification is improper because the agency omitted some and underestimated other compliance

---

[15] *See* 2021 Proposed Rule, 86 Fed. Reg. 32818.

[16] 5 U.S.C. § 603, 605.

[17] 5 U.S.C. § 611.

[18] 5 U.S.C. § 603.

[19] *Id.*

costs of this rule.  DOL must complete an IRFA to reassess and update their estimates to fully reflect the economic impact of this rule on small entities and consider significant regulatory alternatives.  DOL should also consider significant alternatives proposed by stakeholders whose comments are published on the proposed rule's public docket.

DOL's examination of these higher cost burdens and significant regulatory alternatives will hopefully lead the agency to adopt an alternative that will accomplish the stated objectives of applicable statutes while minimizing the proposed rule's economic impact on small entities.

According to the Census Bureau's Statistics of U.S. Businesses, a vast majority of businesses in industries that utilize the tip credit provision are small businesses, including over 98 percent of restaurants and drinking places and nail salons, and 83 percent of hotels.[20]  Advocacy held a virtual Small Business Roundtable with participation by DOL officials to obtain public feedback on this rule, attended by over 75 small businesses representatives from 21 states and one territory.  This roundtable included representatives from small restaurants, small hotels, bars, catering companies, passenger vessel operators, and the beauty industry.  The following comments are reflective of the issues raised in this roundtable and in subsequent conversations.

### A.      DOL Should Assess Changes to Wage Costs in an IRFA

The Department's RFA analysis provides this estimate:

> The Year 1 per-entity cost for small employers is $477.56, which is the regulatory familiarization cost of $50.60 (1 hour of time), plus the adjustment cost of $50.60 (1 hour of time), plus the management cost of $376.36 (10 minutes per week).  For each subsequent year, costs only consist of the management cost.[21]

Advocacy believes that DOL's certification is flawed because it fails to estimate small business compliance costs for increased wages under this regulation. DOL has omitted these employer wage costs that are listed in another section of the rule: "the Department believes that this proposed rule would result in transfers from employers to employees, but at a fraction of the upper bound of transfers [$714 million]."[22]   DOL must analyze these compliance costs in an IRFA for this rule.  Small businesses at Advocacy's Roundtable detailed potential wage costs from this rule, such as not being able to utilize the tip credit at all and paying the full minimum wage, extra wage costs from the 30-minute increments of non-tipped work, and extra staffing needed to cover non-tipped wages.   Small businesses were also concerned that the onerous requirements in the proposed rule will result in employers not being able to utilize the tip credit.

---

[20] SBA Size Standards, at 13 C.F.R. § 121.201 (2017).  Restaurants include Full-Service Restaurants, Limited Service Restaurants, Snack and Nonalcoholic Beverage Bars, and Drinking Places.

[21] *See* 2021 Proposed Rule, at 86 Fed. Reg. at 32839. (Regulatory Flexibility Act Section).

[22] 2021 Proposed Rule, 86 Fed. Reg. at 32838.

Switching tipped employees into minimum wage employees may also result in both reduced income for employees and costs to the employer.

For example, Advocacy spoke to a passenger vessel operator in Kentucky with 35 tipped workers. This business stated that they will not be able to use the tip credit under this proposed rule and will pay their tipped workers the Kentucky minimum wage of $7.25 instead of the tipped wage of $2.13. This will cost the business over $286,000 in one year. In another example, a restaurant owner in Maine with 58 tipped workers (40 waiters and 18 bartenders) believes that they may have two possible options under this proposed rule. In one scenario, the tipped workers will spend two hours a day on non-tipped work; the business will spend almost $150,000 a year to pay for these hours. In another scenario, the tipped workers will make the Maine minimum wage of $12.15 for every hour they work instead of the tipped wage; the business will spend over $500,000 a year to cover the difference.[23]

### B. DOL Has Underestimated the Costs of Regulatory Familiarization

Advocacy believes that DOL underestimates the regulatory familiarization costs of this rule, which is the direct cost for the small business to review and understand this new regulation.[24] The proposed rule is complex, and most small businesses do not have human resources staff or in-house attorneys to help understand these regulations. Advocacy recommends that DOL take into consideration the full small business compliance cost for familiarization in an IRFA. Small business owners during Advocacy's roundtable on this rule reaffirmed that more time would be needed than the hour estimated to read and become familiarized with the rule.

Small businesses at Advocacy's Roundtable were particularly concerned about the rigidity of DOL's three classifications of workers' tasks—*tipped* work, work that *directly supports* tipped work and *non-tipped* work. These categories do not represent the reality of busy environments such as a restaurant. The proposed rule lists a waiter's only tip-related task as waiting on tables. Other work that directly supports tipped work that would have to be limited (to less than 20 percent and under 30 minutes) are cleaning tables, preparing for new customers, folding napkins, preparing silverware, and garnishing plates. A representative from the National Retail Federation commented that it would take the level of understanding of a wage and hour attorney to understand how to categorize these tasks correctly, but the agency expects small businesses

---

[23] In the Kentucky example, a passenger vessel operator has 35 staff members who work 8 hours a day, 5 days a week, 40 weeks per year. They currently earn a tip wage of $2.13 per hour but under the new regulation would earn $7.25 per hour; the restaurant will have to spend an extra $286,720 a year. The Maine restaurant has 58 tipped staff members who work 7 hours per day, 5 days a week, 50 weeks per year; 40 are waiters who make $6.08 per hour and 18 are bartenders who make $9 per hour. Paying each minimum wage for 2 hours each day would increase wage costs by $149,750 per year: [40 waiters * ($12.15 minimum wage - $6.08 tipped wage) + 18 bartenders * ($12.15 minimum wage - $9 tipped wage)] * 2 hours * 5 days * 50 weeks. Increasing this from 2 to 7 hours per day leads to an increase of $524,125.

[24] *See* 2021 Proposed Rule, at 86 Fed. Reg. at 32840.

and their staff to make these determinations and track these activities throughout their hectic workday.

One owner of a small passenger vessel with dinner service stated that "all hands were on deck" when a waitress or bartender comes in for their busy shift, as everything they do is part of customer service and part of their tip-making income. Employees trying to classify these tasks in real time may take away from providing customers the best experience possible, which may decrease their tips.

Small businesses also point out that there are employees who perform tipped work and directly supporting tipped work simultaneously, such as a bartender serving drinks and cleaning and stocking the bar area. Restaurant operators also point out that DOL is providing inconsistent guidance between different occupations such as waiter, bartender, and busser; some tasks such as cleaning tables and preparing food and garnishes can be considered a tipped job, directly supporting tipped work, or a non-tipped job depending on the employee's job type. Working out the differences between current systems of work classifications and DOL's proposed classifications, as well as resolving ambiguities and inconsistencies in the rule and guidance from DOL, will cost well in excess of the estimate provided by DOL.

`     **C.     DOL Should Revise Its Estimate of Adjustment Costs**

To utilize the tip credit, employers will have to monitor employees' activity to ensure that at least 80 percent of a worker's duties are tipped duties, and no more than 20 percent of the duties are directly supporting tipped duties, and that employees spend no more than 30 minutes at a time performing these duties. DOL lists these adjustment tasks that it believes businesses can complete in one hour in its preamble: changing schedules to minimize extra wage costs, categorizing and tracking employee tasks, re-assigning duties to non-tipped staff, adjusting payroll software to account for these changes and training their managers and staff to learn about the changes and how to implement them. Small businesses at Advocacy's roundtable have commented that the cost to adjust their business practices will be in the thousands of dollars. Advocacy recommends that DOL reassess their estimates for these costs.

Small businesses have told Advocacy that this type of minute-to-minute tracking is onerous and not realistic in such businesses as restaurants, bars, hair salons and nail salons. The National Federation of Independent Business commented that "small businesses need flexibility in using their relatively small number of employees, including tipped employees, to accomplish the work that makes the business a success."[25] Small restaurants commented that a typical workday there may include a wave of customers, followed by a slowdown. It is difficult to imagine how a busy waiter or bartender would be able to track how many minutes they were waiting on customers vs. wiping off tables or a myriad of other tasks. As DOL noted in its preamble, small businesses

---

[25] Comment letter from the National Federation of Independent Business to the U.S. Department of Labor (July 21, 2021).

would have to provide many hours of training to their managers and staff to learn about and implement these changes to their workflow.

A wage and hour attorney at the roundtable commented that this rule does not provide certainty or clarity, but just adds extra burdens and liability. She noted that only larger employers can purchase sophisticated time-keeping software programs that costs thousands of dollars to differentiate these tasks, but even this would not be a perfect system because employees would still have punch in and punch out of this system.

A representative for the National Restaurant Association commented that larger restaurants have more staff to change schedules and re-assign duties to non-tipped staff, but a smaller restaurant has less staff and has fewer staffing options to adapt and adjust to these rule changes. A representative from the Virginia Beach Restaurant Association, that represents 150 restaurants, stated that restaurants are current facing major staffing issues and many restaurants have cut days and hours of service. This lack of available staff increases the difficulty of compliance with this regulation and imposes extra costs. Small business also commented that this was a difficult time to add these additional costs and burdens, as their operations were just surviving from pandemic financial losses.

### D.  DOL Should Revise Its Estimate of Management Costs

Advocacy believes that DOL underestimates the costs for small businesses in management costs at $376.36 per entity a year or 10 minutes per week. The agency also states that this management cost will be incurred for each subsequent year. Advocacy believes that the cost is much higher than estimated and recommends that DOL analyze these costs in an IRFA. As noted above, the proposed rule states that to take a tip credit, managers will have to make sure that their tipped employees are not spending more than 20 percent of their time on directly supporting work per workweek or more than 30 minutes continuously performing such duties. The analysis states that "the Department does not believe that these costs will be substantial, because if employers are able to make upfront adjustments to scheduling, there is no need for ongoing monitoring."[26]

Due to the lack of adequate staffing, it may be difficult for managers at small establishments to have a fixed staff schedule and they may have to make schedules every week and perform ongoing monitoring of staff schedules. A roundtable participant stated that while it may be possible to set aside 30 minutes at the beginning or end of a shift for non-tipped work with adequate or extra staffing, it will be hard to control or monitor the other hours of the day to minimize costs. Small restaurants stated that these restrictions would also affect the level of customer service at their restaurant, if their employees were constantly limited in the tasks they could perform to help their customers. An HR manager for a restaurant group estimated at least 15 hours a week for restaurant managers to comply with this regulation. She commented, "The majority of our costs would be spent in auditing, correcting and backpay when servers and utility

---

[26] *See* 2021 Proposed Rule, at 86 Fed. Reg. at 32833.

staff do not clock in and out correctly by job task. This would open us up to litigation and fines quickly."

## III.    Conclusion

Advocacy is concerned that the DOL's certification lacks an adequate factual basis. DOL's certification is improper because the agency omitted some and underestimated other compliance costs of this rule. DOL must complete an Initial Regulatory Flexibility Analysis (IRFA) to reassess and update their estimates to fully reflect the economic impact of this rule on small entities and consider significant regulatory alternatives. Small businesses have told Advocacy that it will be difficult and confusing for employers and employees to make minute-to-minute determinations and track job tasks in busy restaurants, hotels, nail salons and other workplaces. DOL's examination of these higher cost burdens and significant regulatory alternatives will hopefully lead the agency of adopting an alternative that accomplish the stated objectives of applicable statutes while minimizing the proposed rule's economic impact on small entities.

If you have any questions or require additional information, please contact me or Assistant Chief Counsel Janis Reyes at (202) 619-0312 or by email at Janis.Reyes@sba.gov.

Sincerely,

//s//
Major L. Clark, III
Acting Chief Counsel
Office of Advocacy
U.S. Small Business Administration

//s//
Janis C. Reyes
Assistant Chief Counsel
Office of Advocacy
U.S. Small Business Administration

Copy to:      Sharon Block, Acting Administrator
              Office of Information and Regulatory Affairs
              Office of Management and Budget

# APPENDIX EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| RESTAURANT LAW CENTER, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, ET AL., <br><br> Defendants. | Civil Action No. 21-1106 |

## DECLARATION OF ANGELO AMADOR

I, Angelo Amador, hereby declare and state:

1.      I am currently employed by the Restaurant Law Center ("RLC") as Executive Director, an independent 501(c)(6) affiliated with the National Restaurant Association.  I have held my current position since RLC's official incorporation on September 30, 2016.[1]  In that capacity, I lead and manage all of RLC's engagement in public affairs and public-policy related matters at the federal, state, and local level.  As such, I have in-depth knowledge of the operations of the RLC, its members, and the facts and circumstances set forth herein.

2.      I am over the age of 18 years old.  All of the facts set forth in this declaration are based on my personal knowledge.  I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.  If called upon to testify as to the facts stated herein as a witness, I could and would competently testify under oath.

---

[1] Certificate of Incorporation issued by the Government of the District of Columbia, Department of Consumer and Regulatory Affairs, Corporations Division.

3.      The RLC was officially established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States.  While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC.  As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 14.7 million employees, or approximately 10% of the workforce in the United States.  RLC's members include more than 500,000 restaurant businesses located across the United States.

4.      The RLC's main purpose is to support the restaurant industry and our 500,000 plus restaurant members in starting, developing, and growing their business.  RLC accomplishes this objective through numerous channels, including through direct outreach efforts on behalf of our members, by hosting educational and informational meetings, conferences, seminars, and webinars, by submitting regulatory comments at the federal, state, and local level, and by helping our members navigate their legal and regulatory obligations.

5.      As Executive Director for RLC, I serve as its primary spokesperson on behalf of the industry and I lead and manage the RLC's engagement in public affairs and public-policy-related matters at the federal, state, and local level, including Texas.  I have been integrally involved in RLC's legislative and regulatory initiatives, and I am a key liaison with various restaurant industry affiliates.  Each of the legislative and regulatory initiatives that I manage require significant study, time, attention, and RLC resources in order to analyze its effects on the industry, hear our members' concerns, and ultimately persuade legislators and the public to support or oppose that measure.

6.      During the last twenty months, a great deal of the work of the RLC has been to help restaurants cope with the COVID-19 pandemic and the barrage of ever-changing federal, state, and local regulations and guidelines.  To demonstrate the scope of the efforts I manage, earlier in 2021 RLC co-produced and disseminated a Restaurant Industry State Vaccine Tracker looking at each state's distribution plan with particular attention as to where restaurant workers were in the vaccination queue and the employer responsibilities to expedite the process.  We also produced and distributed official return to work guidelines for food service establishments, updated at least twice a week, looking at federal, state, and local requirements.

7.      In addition, the RLC conducts frequent webinars to assist our members with compliance issues and, here again, the last twenty months has seen us concentrating on the impact of the COVID-19 pandemic.  Some of the most recent webinars in which I have participated included "Wage and Hour Considerations for Reopening Your Restaurant" in June 2021 and "Serving Up OSHA Compliance: How to Operate Safely in the Pandemic" in April 2021.

8.      As Executive Director for RLC, I also communicate with RLC's members on a daily basis about issues of importance in the industry, including industry trends, concerns, best practices, proposed legislation, and compliance with rules and regulations.  Through my work with RLC, I work closely with restaurants, and I am deeply familiar with the restaurant industry in general and the Texas restaurant industry in particular.  This is typical in my role, and along with my colleague, I carefully ensure that we remain attentive and responsive to these developments nationwide.

9.      However, over the last six months one regulatory initiative by the U.S. Department of Labor, Wage and Hour Division (the "Department") has consumed a very significant portion  of my time and some weeks it has consumed the vast majority of my (and my subordinate's) time: the

Tip Regulations Under the Fair Labor Standards Act; Partial Withdrawal (the "Tip Regulations"). The Department issued its Notice of Proposed Rulemaking ("NPRM") regarding the Tip Regulations on June 23, 2021 and then published the Final Rule on October 28, 2021 (the "Final Rule"). I have read the NPRM and Final Rule. The Final Rule finalizes the Department's amendments to the dual jobs regulation, which change the Department's prior regulations and create a new standard for when an employer can take a tip credit. The Final Rule is the regulation at issue in this case.

10. Both before and after the Department's publication, the Final Rule has consumed a disproportionate amount of the RLC's time, and my time in particular, because the Final Rule specifically applies to restaurant employers who take a tip credit. I am aware of numerous national restaurant chains and small business owners that would be subject to the Final Rule, including members of the RLC and the Texas Restaurant Association.

11. Both before and after the Department's publication of the Final Rule, I have spent considerable time addressing member concerns specifically related to the Final Rule's obligations instead of discussing questions regarding other jurisdictions or other member business or regulatory concerns, particularly important during the COVID-19 pandemic. For example, during the last two RLC Board of Directors meetings on September 23, 2021 and on November 3, 2021, I addressed numerous questions related to the Final Rule in lieu of speaking on several other important topics.

12. Similarly, on July 11-13, 2021, I traveled to San Antonio, Texas to speak with our Texas members at the Texas Restaurant Association's Marketplace Conference. While we had planned to discuss a variety of topics regarding our members' concerns about their businesses and the regulatory environment, like immigration and business interruption insurance during COVID-19, the Final Rule came up numerous times. The RLC was required to truncate its coverage of other topics in order to address the Final Rule.

13.     I have held multiple calls with members to address the concerns arising from the Final Rule.  Our RLC members have informed me that they are concerned the Final Rule will impose a significant burden and expense on restaurant employers who are subject to the Final Rule.  Specifically, RLC members have informed me that they are concerned about the substantial increased wage costs, regulatory familiarization costs, preparation costs, adjustment costs, staffing costs, business management costs, and recordkeeping costs to prepare for and comply with the Final Rule (which are described further below).  One specific call during which I remember discussing these topics took place on August 3, 2021.  The call on August 3, 2021, was hosted by the Small Business Administration Office of Advocacy and I co-presented with Jessica Looman, Principal Deputy Administrator, Wage and Hour Division, U.S. Department of Labor.  Several member restaurants and State Restaurant Associations participated in that call.

14.     I also remember specifically discussing these topics with members before and after the call on August 3, 2021, as many of our members wanted to understand the rule before submitting regulatory comments on the NPRM.  In the end, of the 1,865 total comments submitted, 1,456 were submitted by restaurant advocates—about 78% of all comments—generally reiterating the issues outlined in this Declaration.

15.     The RLC has devoted substantial staff time, money, and effort to informing our members about the Final Rule's requirements, discussing its potential implications, attempting to clarify compliance requirements, and developing educational programs for RLC members.  We have been required to shift advocacy efforts and other resources at the RLC in order to oppose the Final Rule with which we and our members disagree.

16.     A direct consequence of having to devote time, money, and other resources to combating the effects of the Final Rule is that we have been unable to advocate as effectively as planned

for policies in other jurisdictions that we and our members believe would help their businesses. For example, I have been unable to attend meetings and provide strategic advice to members regarding our opposition to a New York bill that limits data sharing by food service establishments and food delivery applications. In another example, I was unable to get involved in opposing local natural gas bans in California and provide strategic advice to members in other jurisdictions facing similar issues regarding our opposition to such bans. Instead, I have had to devote myself to addressing questions and problems raised by the Final Rule and its obligations on our members and downgrade the priority level of other issues to deal with the Final Rule.

17.     I expect that this diversion of resources will continue indefinitely, as the Final Rule not only imposes new obligations on our Texas members, but all members who currently take a tip credit throughout the nation. Furthermore, we have received questions from our members regarding the Final Rule's new standard to apply in order to take a tip credit, including how to differentiate between and track the three categories of work and tasks that the Department deems to fall within (or outside of) its dual jobs regulation. We expect to continue to have to provide educational and informational services to our members to navigate questions regarding how to monitor and reclassify the types of tasks that restaurant workers perform, as well as how to change their business models, staffing models, and operations to comply with the Final Rule.

18.     Without these obligations, I would be devoting my time and resources to supporting our members' efforts to grow their businesses, keeping their doors open during an economically devastating pandemic, as well as to lobbying local lawmakers in other jurisdictions to adopt policies that help the restaurant industry and its employees. The Final Rule has significantly hindered my ability to advance these goals, both before and after it was published, and I anticipate that it will continue to do so in the future.

19. The Final Rule will impose significant burden and expense on RLC members who take a tip credit and thus, are subject to the Final Rule. RLC members have informed me that they are concerned about the immediate economic harm, including the substantial costs to their businesses, experienced by this Final Rule. Specifically, RLC members who are subject to the Final Rule have informed me that they are concerned about the significant burdens and additional expenses outlined below that they will incur:

a. **Regulatory Familiarization Costs**: The Final Rule is complex and most RLC small restaurant members do not have human resources staff or in-house attorneys to help understand and comply with the Final Rule, particularly with the impending December 28, 2021 effective date. I confirmed with RLC members subject to the Final Rule that this rule requires more than one hour (per entity) to read and become familiarized with the Final Rule. Instead, it takes the level of understanding of a wage and hour attorney to understand how to categorize the Final Rule's three classifications of workers' tasks—tipped work, work that directly supports tipped work, and non-tipped work. The Final Rule also provides inconsistent guidance between different occupations such as waiter, bartenders, and busser; some tasks such as cleaning tables and preparing food and garnishes can be considered a tipped job, directly supporting tipped work, or a non-tipped job depending on the employee's job type. Working out the differences between current systems of work classifications and the Final Rule's proposed classifications of tasks as well as resolving ambiguities and inconsistencies in the Final Rule will result in substantial costs for RLC members subject to the tip credit.

b. **Preparation Costs:** In order to mitigate the potential financial impact of the changes to the tip credit in the Final Rule, RLC members subject to the Final Rule must deter-

mine whether it would be more cost effective to not utilize the tip credit at all or pay the full minimum wage to these employees, the extra wage costs from the 30-minute increments of non-tipped work, and the extra staffing needed to cover non-tipped wages.  This is a time intensive analysis of the tasks performed by these employees, the minutes each task is performed, as well as projections of staff for each job position and gross profits.  The analysis must be done on a case-by-case basis for every single of the restaurant's impacted tipped employee.  Completing the task will require significant work for the restaurant owner, human resources, and managers, which will keep them away from their regular duties.  Due to the individualized nature of the cost analysis, the cost of this effort in either lost productivity or actual additional expenses cannot be fully accounted for, but it is anticipated to be substantial.

        c.     **Increased Wage Costs**:  RLC members subject to the Final Rule have informed me of increased wage costs from the Final Rule.  RLC small business members informed me that that as a result of the Final Rule, they will no longer be able to utilize the tip credit as they do not have the resources to track and keep records of time spent by tipped workers from one task to the next in each of the three new categories and will, therefore, need to pay the full minimum wage to these employees.  Switching tipped employees into minimum wage employees will result in substantial costs to RLC restaurant members currently taking a tip credit.  For example, I spoke with an RLC member and small restaurant owner in Virginia and made the cost calculation of switching 35 tipped employees working eight hours shifts, five days a week, for 50 weeks per year. The tipped workers would currently earn a tip wage of $2.13 per hour.  The restaurant will not be able to use the tip credit under the Final Rule and will pay their tipped workers the Virginia minimum wage of $7.25 instead of the tipped wage of $2.13.  The restaurant will have to spend an extra $286,720 per year—eating at an already thin profit.

d. **Adjustment Costs**: I have spoken with RLC members regarding the laborious undertakings they have to perform to comply with the Final Rule. RLC members confirmed that the adjustments costs for the Final Rule vastly exceed the Department's one-hour estimate per entity. The adjustment tasks are separate undertakings that each result in separate costs, time, and shifts in resources for each restaurant. For example, a larger restaurant member informed me that the restaurant needs to shift a tremendous amount of resources in order to build a team comprised of employees from the information technology department, human resources department, payroll department, legal department, and operations department to rapidly work to create policies, procedures, trainings, new job descriptions, and a new software (that does not exist) to marry time keeping data with job codes, job tasks, and payroll data. Even a sophisticated time-keeping software program, which costs thousands of dollars to purchase, would not be a perfect system because employees would still have to punch in and punch out of this system when changing between tasks.

RLC members utilizing the tip credit under the Final Rule will also have separate, ongoing, substantial adjustment costs associated with scheduling (to minimize extra wage costs), categorizing employee tasks and re-assigning duties to non-tipped staff (as restaurants continually change menu items), training their managers and staff to learn about and implement the changes in their workflow, and ongoing monitoring of employees' activity (to ensure that employees receiving the tipped wage spend less than 20% of their working time or 30 continuous minutes on certain tasks the Department deems unrelated to their occupation). Many small restaurant members have informed me that the costs required to adjust their restaurant business practices to comply with the Final Rule will be in the thousands of dollars, which are significant costs that will ultimately lower their profits, as small restaurant members do not have excess money available to shift to cover these costs.

e. **Staffing Costs**: I have received numerous calls from RLC members related to the major labor shortage issues that our members are currently experiencing. The lack of available staff increases the difficulty of compliance with this Final Rule and imposes extra costs. RLC members subject to the Final Rule have informed me that they will need to expend additional monies to develop new business and staffing models, which include expenses to hire, on-board, and train extra staff needed to comply with the Final Rule (for example, some RLC members may hire additional employees in utility positions that receive the full minimum wage). RLC small business members have also informed me that they may have to terminate employees presently in tipped positions due to the financial constraints imposed by the Final Rule.

f. **Management Costs**: I have spoken with RLC members regarding the management costs and time they have to expend to comply with the Final Rule. RLC members informed me that their businesses will expend a substantial amount of time and money on management costs to comply with the Final Rule, which grossly exceeds the Department's estimated cost of $376.36 per entity a year or 10 minutes per week. For example, a Chief Legal Officer for a RLC restaurant group member estimated at least 10 hours—not 10 minutes, as estimated by the Department—a week for restaurant managers to comply with this Final Rule. Another RLC member informed me that it will need to expend monies to hire additional managers to perform ongoing monitoring of tasks, audits, and correct back pay when servers, bartenders, and bussers do not clock in and out correctly by job tasks to comply with the Final Rule.

g. **Recordkeeping Costs:** I have also discussed RLC members' concerns about the substantial costs they need to incur to create, complete, and maintain new records to prove compliance with the Final Rule. RLC members informed me that maintaining records that comply with the Final Rule is imperative to defending the restaurant in any litigation challenging their

compliance with the Final Rule.  I remember specifically discussing this topic with an RLC member on November 3, 2021.

20.     RLC members have informed me during phone calls and meetings that the Final Rule's financial damage to their businesses is compounded by the COVID-19 pandemic.  I have seen first-hand and discussed with RLC members how the coronavirus pandemic has financially devastated the restaurant industry.  The ongoing labor shortages, inflation increasing the price of food, and supply chain shortages have further dismantled the restaurant industry's fragile recovery from the pandemic-induced shutdowns and forced restaurants to continually adjust to find ways to preserve an acceptable profit margin.  For example, the National Restaurant Association conducted a survey in September 2021 of 4,000 restaurant owners, which found that 85% of restaurant owners reported that their profit margin is lower than it was prior to the pandemic; 95% of restaurant operators reported that their restaurant experienced food or beverage supply delays or shortages during the past three months; 91% of restaurant owners reported that their total food costs are higher than they were prior to the pandemic; 84% of restaurant owners reported that their total labor costs are higher than they were prior to the pandemic; 78% of restaurant owners reported that their restaurants currently do not have enough employees; and 63% of restaurant owners reported their sales volume in August 2021 was lower than it was in August 2019.  A true and correct copy of the September 2021 National Restaurant Association COVID-19 Restaurant Impact Survey is attached as **Exhibit A**.

21.     RLC members have informed me that it is an impossible time to add these additional substantial costs and burdens to their business, chronicled above, as their operations are just barely surviving from pandemic financial losses.  As many small restaurant owners and RLC members have informed me, the increase in wages, staff, management, technology, and other compliance

costs necessitated by the Final Rule will result in the reduction of jobs or closing of the restaurant altogether.

22.     No mechanism exists for the RLC and its members to recover the substantial financial costs and expenses that they will incur if the Final Rule takes effect and is later invalidated on the merits during this litigation.  The RLC will be forced to spend unbudgeted funds and monies that would otherwise be spent on critical services to its members.  RLC members will also be forced to spend funds and monies that it would otherwise spend to keep their doors open during an economically devastating pandemic on planning for and complying with the Final Rule.  Once additional monies are paid out to plan and comply with the Final Rule, including the additional monies to employees, it cannot be easily recovered (if at all) even if the Final Rule is later invalidated.

23.     For all these reasons, I ask the Court to prevent the serious, irreparable harm the Final Rule would immediately inflict on RLC and the members we serve.

I declare under penalty of perjury and the laws of the United States, including 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 9th day of December 2021 in the County of Stafford, Commonwealth of Virginia.

_____
Angelo Amador

# EXHIBIT A



**COVID-19 Restaurant Impact Survey VIII**

Key Findings – September 2021

## Key Findings

To assess the ongoing economic impact of the coronavirus pandemic, the National Restaurant Association Research Group conducted a survey of 4,000 restaurant operators September 7-15, 2021. This report contains the key findings of the survey.

### Business conditions remain challenging

- Although restaurant sales improved from the early months of the pandemic, business conditions remain far from normal for many restaurants. Overall, 56% of restaurant operators say their total sales volume in August 2021 was higher than it was in August 2020. Only 23% of operators reported a same-store sales decline between August 2020 and August 2021.

- However, when compared with August 2019 pre-pandemic levels, a majority of operators say their sales were lower in August 2021. 63% of operators say their sales volume in August 2021 was lower than it was in August 2019. Only 24% reported higher sales compared with August 2019.

  ➤ A majority of both fullservice operators (67%) and limited-service operators (60%) say their August 2021 sales were lower than their August 2019 sales.

**Restaurant operators' reporting of same-store sales in August 2021 compared to 2019 and 2020 levels**

| Restaurant segment | Percent of operators reporting higher sales in August 2021 | Percent of operators reporting lower sales in August 2021 | Percent of operators reporting sales about the same in August 2021 |
|---|---|---|---|
| **August 2021 vs August 2020** | | | |
| **All Restaurants** | 56% | 23% | 21% |
| Fullservice segment | 60% | 22% | 18% |
| Limited-service segment | 52% | 25% | 23% |
| **August 2021 vs August 2019** | | | |
| **All Restaurants** | 24% | 63% | 13% |
| Fullservice segment | 21% | 67% | 12% |
| Limited-service segment | 26% | 60% | 14% |

Note: Limited-service includes quickservice, fast casual and coffee/snack concepts.

- Business conditions deteriorated in recent months, according to most restaurant operators. 58% of operators say business conditions for their restaurant are worse now than they were 3 months ago. Only 9% say business conditions improved during the last 3 months.

  ➤ A majority of both fullservice operators (60%) and limited-service operators (55%) say business conditions for their restaurant are worse now than they were 3 months ago.

## Many restaurants still not at full capacity

- Business conditions remain challenging for many restaurants because they are not yet operating at full on-premises capacity. Overall, 44% of operators say their restaurant is <u>not</u> currently open at full capacity for indoor on-premises dining.

    - ➢ 40% of fullservice operators and 49% of limited-service operators say their restaurant is <u>not</u> currently open at full capacity for indoor on-premises dining.

- Among restaurant operators that are not open at the maximum indoor capacity that is currently allowed in their jurisdiction, 71% say it is because they do not have enough employees to adequately staff the restaurant.

    - ➢ A lack of adequate staffing was the most common reason given by both fullservice operators (81%) and limited-service operators (61%) that are not currently open at the maximum capacity allowed in their jurisdiction.

### Reasons given why restaurants are not currently open at the maximum indoor capacity allowed

| Reason | All restaurants | Fullservice segment | Limited-service segment |
|---|---|---|---|
| Not enough employees to adequately staff the restaurant | 71% | 81% | 61% |
| Too soon from a public health perspective | 29% | 24% | 34% |
| Uncertainty about future lockdowns or restrictions | 26% | 24% | 28% |
| Not enough customers to justify reopening | 21% | 21% | 20% |

Base: Restaurant operators that are not open at the maximum indoor capacity that is currently allowed in their jurisdiction.
Notes: Limited-service includes quickservice, fast casual and coffee/snack concepts. Multiple responses were allowed.

## Delta variant dampened indoor dining

- The delta variant negatively impacted the restaurant industry in recent weeks, according to most restaurant operators. Overall, 78% of operators say their restaurant experienced a decline in customer demand for indoor on-premises dining in recent weeks, as a result of the increase in coronavirus cases due to the delta variant.

    - ➢ A strong majority of both fullservice operators (81%) and limited-service operators (75%) say the delta variant led to a decrease in customer demand for indoor on-premises dining.

## Restaurant operators do not expect a rapid improvement

- Restaurant operators are not particularly bullish about improving business conditions in the coming months. Only 16% of operators expect their average sales during the next 3 months (September – November) will be higher than they were in August 2021. 55% think their average sales will be lower during the next 3 months, while 29% expect their sales will be about the same as they were in August 2021.

    - ➢ A majority of both fullservice operators (57%) and limited-service operators (53%) think their average sales during the next 3 months will be lower than they were in August 2021.

- Looking further down the road, most restaurant operators do not expect a return to normal business conditions any time soon. 23% of operators think it will be 7-12 months before business

conditions return to normal for their restaurant, while 44% think it will be more than a year. An additional 19% of operators say business conditions will <u>never</u> return to normal for their restaurant.

## Nearly 4 in 5 restaurants are understaffed

- Although the industry added back many of the jobs lost during the pandemic, a majority of restaurants remain understaffed. 78% of operators say their restaurant currently does <u>not</u> have enough employees to support its existing customer demand.

    - ➢ A solid majority of both fullservice operators (81%) and limited-service operators (75%) say their restaurant does not have enough employees to meet customer demand.

- For most restaurants, staffing is significantly below necessary levels. Among restaurants that are currently understaffed, 83% of operators say their restaurant is more than 10% below necessary staffing levels. 39% of operators are currently more than 20% below necessary staffing levels.

    - ➢ 37% of fullservice operators say their restaurant is currently more than 20% below necessary staffing levels.

    - ➢ 43% of limited-service operators say their restaurant is more than 20% below required staffing levels.

### Operators' reporting of how understaffed their restaurant is

| Restaurant segment | 1% to 5% below necessary levels | 6% to 10% below necessary levels | 11% to 15% below necessary levels | 16% to 20% below necessary levels | More than 20% below necessary levels |
|---|---|---|---|---|---|
| **All Restaurants** | **3%** | **14%** | **20%** | **24%** | **39%** |
| Fullservice segment | 3% | 14% | 21% | 25% | 37% |
| Limited-service segment | 2% | 14% | 19% | 23% | 43% |

Base: Restaurants that currently do not have enough employees to support their existing customer demand.
Note: Limited-service includes quickservice, fast casual and coffee/snack concepts.

- As a result of being understaffed, 68% of operators say their restaurant reduced hours of operation during the last 3 months. 46% of operators cut back on menu items, while 45% closed their restaurant on days that it would normally be open. 44% say they reduced seating capacity as a result of being understaffed. A majority of understaffed fullservice operators took each of these 4 actions during the last 3 months.

### Actions taken by restaurants during the last 3 months, as a result of being understaffed

| Restaurant segment | Reduce hours of operation on days that it is open | Reduce number of items on the menu | Close on days that it would normally be open | Reduce seating capacity |
|---|---|---|---|---|
| **All Restaurants** | **68%** | **46%** | **45%** | **44%** |
| Fullservice segment | 68% | 57% | 52% | 57% |
| Limited-service segment | 67% | 34% | 39% | 30% |

Base: Restaurants that currently do not have enough employees to support their existing customer demand.
Notes: Limited-service includes quickservice, fast casual and coffee/snack concepts. Multiple responses were allowed.

**Food supply challenges impacted most restaurants**

- 95% of restaurant operators say their restaurant experienced supply delays or shortages of key food or beverage items during the past 3 months.

  - ➢ A strong majority of both fullservice operators (96%) and limited-service operators (94%) reported supply delays or shortages during the past 3 months.

- For many restaurants, these supply challenges impacted menu offerings. Among operators that experienced supply delays or shortages during the past 3 months, 75% say they made changes to their menu offerings as a result.

  - ➢ 81% of fullservice operators and 69% of limited-service operators say their restaurant changed menu offerings as a result of food supply delays or shortages.

**Costs are up**

- Food, labor and occupancy costs are the largest line items for restaurants – combining to account for roughly 70 cents of every dollar of sales during normal times. For the vast majority of restaurant operators, these 3 categories are making up a larger share of sales than they did before the pandemic.

  - ➢ 91% of operators say their total food costs (as a percent of sales) are higher than they were prior to the COVID-19 outbreak. Only 3% say their food costs make up a smaller proportion of sales.

  - ➢ 84% of operators say their total labor costs (as a percent of sales) are higher than they were prior to the COVID-19 outbreak. Only 7% of operators say their labor costs declined as a percent of sales.

  - ➢ 63% of operators say their total occupancy costs are higher than they were prior to the COVID-19 outbreak. Only 5% say their total occupancy costs are lower.

**Profitability is down**

- For a solid majority of restaurant operators, profitability is down from pre-pandemic levels. 85% of operators say their profit margin is lower than it was prior to the COVID-19 outbreak. Only 5% of operators say their profit margin is higher.

- Most operators also reported a deterioration of profitability during the last few months. 65% of operators say their restaurant is less profitable now than it was 3 months ago. Only 6% of operators say their restaurant is more profitable now than it was 3 months ago.

# APPENDIX EXHIBIT 6

DocuSign Envelope ID: E6G5ACC9-3E99-41A3-9139-A18028630D29

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

RESTAURANT LAW CENTER, ET AL.,

      Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF LABOR, ET
AL.,

      Defendants.

Civil Action No. 21-1106

### DECLARATION OF TRACY VAUGHT

I, Tracy Vaught, hereby declare and state:

1.      I am the president of H-Town Restaurant Group, which is a restaurant group that owns and operates five restaurants located in Texas.  I am also a member of the Texas Restaurant Association.  As the president of H-Town Restaurant Group, I oversee the finances, staffing, and operations of our restaurants.

2.      I am over the age of 18 years old.  All of the facts set forth in this declaration are based on my personal knowledge. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.  If called upon to testify as to the facts stated herein as a witness, I could and would competently testify under oath.

3.      I understand that the Department of Labor published a Final Rule that makes huge changes to the tip credit, which I am very concerned about as my restaurant group currently takes a tip credit for certain tipped employees at our restaurants.  I understand that the Final Rule goes into effect on December 28, 2021 and the Final Rule is the regulation at issue in this case.

DocuSign Envelope ID: E6G5ACC9-3E99-41A3-9139-A18038630029

4.      For many years, our restaurants have been taking a tip credit, which is provided for in the FLSA, for certain employees, including our waiters and waitresses.  While taking the tip credit, our waiters and waitresses have still been the highest paid job in the restaurant.  However, as explained further below, the Final Rule completely changes our ability to take a tip credit, which changes everything for our restaurants.

5.      The Final Rule creates immediate harms, including huge burdens and costs to our restaurants, to prepare for and comply with the Final Rule.  For example, because of the Final Rule, our restaurant group may not be able to take the tip credit at all, as it is impossible to comply with the Final Rule and keep track of exactly how much time our tipped employees spend on different tasks throughout a shift (as our tipped employees are constantly shifting back and forth between many tasks as they perform their job).  If our restaurant group no longer takes a tip credit, we will spend close to one million dollars extra per year on labor, which drastically decreases our restaurants' profit margins and threatens the ability to keep all of our doors open and staff employed. Once our restaurant group spends these monies, we cannot get the million dollars back.

6.      We will also need to consult with our attorney, accountants, and POS system administrator to further figure out how or if it is even possible to comply with the Final Rule.  This is a big burden and financial hit on not just my restaurant group, but all restaurateurs who take a tip credit. Jeopardizing our livelihoods as restaurants by making it so difficult and costly to prepare for these new tip credit regulations is just a really big, impossible struggle for us that will cause undue hardship to our businesses.

7.      The Final Rule also has ongoing compliance costs that will hit our businesses really hard right now. The last thing any restaurant wants right now is to be sucked into litigation. Res-

DocuSign Envelope ID: E6C5ACC9-3F99-41A3-9130-A18028630929

taurant owners, like my restaurant group, are law-abiding persons and just want to run a good business for the public to enjoy.  Because the Final Rule is full of so many traps that restaurants will need to side step, we will need to constantly stay vigilant and monitor compliance.  We also need to spend time and money to change our business models and staffing models, which have been in place for many years, to find a way to comply with the Final Rule. This is not an easy task, but one that will require more time, resources, and money that are simply not available.  The costs required to make these drastic changes to our restaurants' business practices to comply with the Final Rule will be in the thousands of dollars, which again will just lower our profits.

8.      It is also an impossible time to add these additional substantial costs and burdens to my restaurant group and our restaurants, as our operations are just barely recovering from the COVID-19 pandemic financial losses. Right now food prices are sky rocketing, the job market is very tight, wages have also gone way up, and restaurants have increased competition with grocery stores' prices. In addition, going to restaurants is optional; it is not a service that everyone needs. When prices move up beyond a certain level, people will stop coming to restaurants, as they can cook at home or buy prepared goods at the grocery store. We are price sensitive and prices are our competitive advantage. To stay viable, we need to control menu prices. Prices have been pushed up steeply recently due to labor shortages, the subsequent hike in wages, and higher prices for goods and services due to shortages. Further increases in our menu prices, which are the result of the increased costs from this Final Rule, will endanger our industry.

9.      The COVID-19 pandemic has also financially devastated Texas restaurants, and has lasted long enough for people to make new patterns. Specifically, people don't want to go back to the office, so this kills restaurant lunches, and our profits.  Adding the challenges and costs to comply with the Final Rule is simply not possible right now for my restaurant group and many

other restaurants to take on. Running our restaurants out of business, which is what the Final Rule is doing, does not help our employees, but only hurts their chances of even staying employed right now. Restaurants are just trying to survive right now and this Final Rule and its costly, completely confusing, impossible changes to the tip credit, kills our chances of survival.

10. Complying with the Final Rule not only results in substantial costs to our restaurants, but it will also takes away our ability to compete with our competitors. For example, grocery stores' prepared foods are a new source of competition for restaurants that started entering the market in the past five years; but the grocery stores exploded and gained a lot of ground on restaurants during the pandemic. To take on the massive financial hit caused by the Final Rule, restaurants will need to find ways to make up for these costs, including increasing menu prices. This will take away our ability to compete with the grocery stores' prepared foods prices. Taking away our ability to compete with the prices of other businesses, right now in this pandemic-stricken environment, is a harm that our restaurants will not be able to recover from.

11. For all these reasons, I ask the Court to prevent the serious, irreparable harm the Final Rule would immediately inflict on my restaurant group and our restaurants.

12. I have not been pressured or coerced in any way to provide this declaration, nor have I been offered any benefit or reward for doing so. I attest to the facts in this declaration voluntarily.

I declare under penalty of perjury and the laws of the United States, including 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 16th day of December 2021 in Houston, Texas

*Tracy*
_____
Tracy Vaught

# APPENDIX EXHIBIT 7

New YORK LAW INSTITUTE
LIBRARY

MAR 14 1961

120 BROADWAY - N.Y.C.



# Webster's

# Third

# New International

# Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED



Reference
Copy
DO NOT TAKE FROM
LIBRARY

*A Merriam-Webster*

REG. U. S. PAT. OFF.

*Utilizing all the experience and resources of more than
one hundred years of Merriam-Webster dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph.D.

AND

THE MERRIAM-WEBSTER

EDITORIAL STAFF

VOLUME I

2 VOL



G. & C. MERRIAM COMPANY, *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

COPYRIGHT © 1961 BY G. & C. MERRIAM CO.

PREVIOUS EDITIONS
COPYRIGHT © 1909, 1913, 1923, 1924, 1926, 1927, 1930, 1934, 1950, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.

PHILIPPINES COPYRIGHT 1961 BY G. & C. MERRIAM CO.
PREVIOUS EDITIONS PHILIPPINES COPYRIGHT 1950, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.
PREVIOUS EDITION COPYRIGHT 1925 IN PHILIPPINE ISLANDS
BY G. & C. MERRIAM CO.

ALL RIGHTS RESERVED
UNDER INTERNATIONAL AND PAN-AMERICAN COPYRIGHT CONVENTIONS
BY G. & C. MERRIAM CO.

*All rights reserved*

MADE IN THE U. S. A.

R. R. DONNELLEY & SONS COMPANY, THE LAKESIDE PRESS, CHICAGO, ILL., U. S. A.
COMPOSITORS
H. O. HOUGHTON AND COMPANY, THE RIVERSIDE PRESS, CAMBRIDGE, MASS., U. S. A.
PRINTERS AND BINDERS

2

Case 1:21-cv-01106-RP Document 127-1 Filed 04/22/2022 Page 77 of 90

# Webster's

## Third

# New International

# Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED

### *A Merriam-Webster*

REG. U. S. PAT. OFF.

*Utilizing all the experience and resources of more than
one hundred years of Merriam-Webster dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph. D.

AND

THE MERRIAM-WEBSTER
EDITORIAL STAFF

VOLUME II



NEW YORK LAW INSTITUTE
LIBRARY

MAR 14 1967

120 BROADWAY - N. Y. C.

Reference
Copy

DO NOT TAKE FROM
LIBRARY

G. & C. MERRIAM COMPANY, *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

COPYRIGHT © 1961 BY G. & C. MERRIAM CO.

PREVIOUS EDITIONS
COPYRIGHT © 1909, 1913, 1923, 1924, 1926, 1927, 1930, 1934, 1950, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.


PHILIPPINES COPYRIGHT 1961 BY G. & C. MERRIAM CO.
PREVIOUS EDITIONS PHILIPPINES COPYRIGHT 1930, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.
PREVIOUS EDITION COPYRIGHT 1925 IN PHILIPPINE ISLANDS
BY G. & C. MERRIAM CO.


ALL RIGHTS RESERVED
UNDER INTERNATIONAL AND PAN-AMERICAN COPYRIGHT CONVENTIONS
BY G. & C. MERRIAM CO.


*All rights reserved*

MADE IN THE U. S. A.

R. R. DONNELLEY & SONS COMPANY, THE LAKESIDE PRESS, CHICAGO, ILL., U. S. A.
COMPOSITORS
H. O. HOUGHTON AND COMPANY, THE RIVERSIDE PRESS, CAMBRIDGE, MASS., U. S. A.
PRINTERS AND BINDERS

1560

# APPENDIX EXHIBIT 8

# THE
# RANDOM
# HOUSE
# DICTIONARY
## of the
# ENGLISH
# LANGUAGE

**JESS STEIN**
Editor in Chief

**LAURENCE URDANG**
Managing Editor



RANDOM HOUSE / NEW YORK

© Copyright, 1967, 1966 by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions

PUBLISHED IN NEW YORK BY RANDOM HOUSE, INC.
AND SIMULTANEOUSLY IN TORONTO BY RANDOM HOUSE OF CANADA LIMITED

*The Random House Dictionary of the English Language* and its abbreviations *RHD* and *RHDEL* are trademarks of Random House, Inc.

a. s/mm-n

Library of Congress Catalog Card Number: 67-12237

Entered words which we have reason to believe constitute trademarks have been designated as such.
However, neither the presence nor the absence of such designation should be regarded as affecting the legal status of any trademark.

*The Concise French Dictionary*, edited by Francesca L. V. Langbaum, Copyright, 1954, by Random House, Inc.

*The Concise Spanish Dictionary*, edited by Donald F. Solá, Copyright, 1954, by Random House, Inc.

*The Concise Italian Dictionary*, edited by Robert A. Hall, Jr., © Copyright, 1957, by Random House, Inc.

*The Concise German Dictionary*, edited by Jenni Karding Moulton, © Copyright, 1959, by Random House, Inc.

*Major Dates in World History*, edited by Charles D. Lieber and Anne Dyer Murphy, © Copyright, 1964, by Random House, Inc.

Entire contents of the *Atlas* and the index to the maps, © Copyright, 1966, by C. S. Hammond & Company.

*Chart of Periodic Table of the Elements*, © Copyright, 1964, by E. H. Sargent & Co.

*Table of Common Proofreader's Marks*, Copyright, 1950, © 1956, by Alfred A. Knopf, Inc.

Manufactured in the United States of America

Case 1:21-cv-01015-JLH   Document 117-1   Filed 04/22/21   Page 84 of 93

energy

## energy level

473

## English iris

as palm, sound, etc. [< L *obtū(sus)* dulled (pp. of *obtundĕre*), equiv. to *ob-* ob- + *-tūsus* beat + *-e*] —**ob·tuse′ly,** adv. —**ob·tuse′ness,** n.

—**Syn. 3.** unfeeling, tactless, insensitive; blunt, imperceptive, unobservant, gauche, boorish; slow, dim.

**ob·verse** (adj., v. ob vûrs′; n. ob′vûrs), adj. 1. turned toward or facing the observer. 2. corresponding to something else as a counterpart; forming a counterpart. —n. 3. the side of a coin, medal, etc., that bears the principal design (opposed to *reverse*). 2. the front or principal surface of anything. 3. a counterpart. —**ob·verse′ly,** adv.

**ob·vert** (ob vûrt′), v.t. 1. to turn (something) so as to present a different surface. 2. *Logic.* to change (a proposition) by obversion. —**ob·vert′er,** n.

**ob·vi·ate** (ob′vē āt′), v.t., **-at·ed, -at·ing.** to prevent or do away with by effective measures; render unnecessary. —**ob·vi·a′tion,** n. —**ob′vi·a′tor,** n.

**ob·vi·ous** (ob′vē əs), adj. 1. easily seen, recognized, or understood; open to view or knowledge; an obvious mistake. 2. *Obs.* being or standing in the way. [< L *obvius* in the way, equiv. to *ob-* ob- + *vi(a)* way + *-ous*] —**ob′vi·ous·ly,** adv. —**ob′vi·ous·ness,** n.

**oc·a·ri·na** (ok′ə rē′nə), n. a simple musical wind instrument egg-shaped, with a mouthpiece and finger holes. Also called *sweet potato.* [< It.]

**OC,** *Philately.* original cover.

**O.C.,** 1. *Archit.* on center. See center (def. 17). 2. the word cited. [< L *opere citāto*]

**oc·ca·sion** (ə kā′zhən), n. 1. a particular time, esp. as marked by certain circumstances or occurrences: on one occasion. 2. a special or important time, event, ceremony, or celebration: a festive occasion. 3. a convenient or favorable time, opportunity, or juncture. 4. the immediate cause of something. 5. ground; reason; necessity. —v.t. 6. to give occasion or cause for; bring about. [< L *occāsiō(n-)*] —**oc·ca′sion·er,** n.

**oc·ca·sion·al** (ə kā′zhə nl), adj. 1. occurring or appearing at irregular intervals; now and then. 2. intended for supplementary use when necessary: an occasional chair. 3. pertaining to, made for, or actuated by a special occasion: occasional verses. 4. acting or serving for the occasion or on particular occasions. 5. serving as the occasion or incidental cause. —**oc·ca′sion·al·ly,** adv.

**oc·ca·sion·al·ism** (ə kā′zhə nl iz′əm), n. *Philos.* the doctrine that all apparent interaction between mind and body is to be explained by the supposition that God takes an act of the will as the occasion of producing a corresponding condition of the body. —**oc·ca′sion·al·ist,** n. —**oc·ca′sion·al·is′tic,** adj.

**oc·ci·dent** (ok′si dənt), n. 1. (usually cap.) of or pertaining to, or characteristic of the Occident or the West. 2. a native or inhabitant of the Occident. [ME < L *occidentālis*] western, equiv. to *occident-* occident- + *-ālis* -al] —**Oc′ci·den′tal·ly,** adv.

**oc·ci·den·tal** (ok′si den′tl), adj. 1. (usually cap.) of, pertaining to, or characteristic of the Occident, or the West; the countries of Europe and America. —n. 2. (cap.) a native or inhabitant of the Occident. [ME < L *occident(em)* + *-al*]

**oc·ci·den·tal·ism** (ok′si den′tl iz′əm), n. *Often, Occi.* the civilization and culture of the Occident. —**Oc′ci·den′tal·ist,** n.

**Oc·ci·den·tal·ize** (ok′si den′tl īz′), v.t., **-ized, -iz·ing.** to make Occidental. [OCCIDENTAL + -IZE]

**oc·cip·i·tal** (ok sip′i tl), adj. *Anat.* pertaining to, or situated near the occiput or the occipital bone. —n. 2. an occipital bone. [< ML *occipit(em)*, equiv. to *occiput* occiput + *-al*]

**occipital bone,** *Anat.* the most posterior lobe of the skull, behind the parietal and temporal bones.

**oc·ci·put** (ok′sə put′, -pət), n. *Anat.* the back part of the head or skull. [< L, equiv. to *ob-* ob- + *-ciput,* comb. form of *caput* head]

**oc·clude** (ə klōōd′), v., **-clud·ed, -clud·ing.** —v.t. 1. to close, shut, or stop up (a passage, opening, etc.). 2. to shut in, out, or off. 3. *Physical Chem.* (of certain metals and other solids) to incorporate (gases and other foreign substances) as by absorption or adsorption. —v.i. 4. *Dentistry.* to shut or close with the cusps of the opposing teeth fitting together. 5. *Meteorol.* to form an occluded front. [< L *occlūdere* (to) shut up, close up, equiv. to *ob-* ob- + *claudere* to shut] —**oc·clud′ent,** adj., n.

**oc·clud·ed front,** *Meteorol.* a composite front formed when a cold front overtakes a warm front and forces it aloft.

**oc·clu·sion** (ə klōō′zhən), n. 1. the act or state of occluding or the state of being occluded. 2. *Meteorol.* the occluding of air from a region, esp. by the action of a cold front. 3. *Dentistry.* the fitting together of the teeth of the lower jaw with the upper jaw. —**oc·clu′sive,** adj.

**oc·cult** (ə kult′, ok′ult), adj. 1. of or pertaining to magic, astrology, or any system claiming use or knowledge of secret or supernatural powers or agencies. 2. beyond the range of ordinary knowledge; mysterious. 3. secret; disclosed or communicated only to the initiated. 4. hidden from view; concealed. —n. 5. the supernatural or supernatural agencies and affairs considered as a whole (usually prec. by the). —v.t. 6. to block or shut off (an object) from view; hide. —v.i. 7. to become hidden or shut off from view. [< L *occult(us)* (pp. of *occulĕre* to hide), equiv. to *ob-* ob- + *-cul-* + *-tus*] —**oc·cult′ly,** adv. —**oc·cult′ness,** n.

**oc·cul·ta·tion** (ok′əl tā′shən), n. 1. *Astron.* the passage of one celestial body in front of another, thus hiding the other from view, as the moon coming between an observer and a star or planet. 2. the state of being hidden from view. 3. *Astrol.* the disappearance of a planet or star below the horizon.

**oc·cult·ism** (ə kult′iz əm, ok′ul-), n. belief in or study of the action or influence of supernatural or supernormal powers. —**oc·cult′ist,** n.

**oc·cu·pan·cy** (ok′yə pən sē), n., pl. **-cies.** 1. the act, state, or condition of being or becoming a tenant or of living in or occupying premises. 2. the act of taking possession, as of a property. 3. the term during which one is an occupant.

**oc·cu·pant** (ok′yə pənt), n. 1. a person who or that which occupies. 2. a tenant of a house, estate, office, etc. 3. one who takes possession, as the first occupier of unclaimed land. —**oc′cu·pant·ship′,** n.

**oc·cu·pa·tion** (ok′yə pā′shən), n. 1. a person's usual or principal work or business, esp. as a means of earning a living; vocation. 2. any activity in which a person is engaged. 3. possession, settlement, or use of land or property. 4. the act of occupying. 5. the state of being occupied. 6. the holding or possession of a place. 7. the tenure or control of an area of territory. 8. the term of such holding or control. —**oc′cu·pa′tion·al,** adj. —**oc′cu·pa′tion·al·ly,** adv.

**occupational disease,** a disease caused by factors arising from one's occupation. Also called *industrial disease.*

**occupational hazard,** a danger or hazard to health or life resulting from the conditions of hazards of a particular occupation.

**occupational therapy,** therapy by means of productive or creative activity. —**occupational therapist.**

**Oc·cu·pa·tion Day,** July 25, a holiday celebrated in Puerto Rico to mark the anniversary of the landing of American troops in 1898.

**oc·cu·py** (ok′yə pī′), v.t., **-pied, -py·ing.** 1. to take up or fill (space, time, etc.). 2. to engage or employ the mind, energy, or attention of. 3. to be a resident or tenant of; dwell in. 4. to hold (a position, office, etc.), 5. to take possession and control of (a place), as by military invasion. 6. to hold (a position, office, etc.), as an incumbent. [< L *occupāre*] —**oc′cu·pi′er,** n.

**oc·cult bal·ance,** asymmetrical balance of visual elements in an artistic composition.

**oc·cu·lt,** (ə kult′), 1. the act or beacon having a light occulted (concealed) at regular intervals.

**oc·cult·ism,** of certain secret, mysterious, or supernatural agencies.

**O·ce·a′ni·a** (ō′shē an′ē ə), n. the islands of the central and S Pacific, including Melanesia, Micronesia, and Polynesia, and sometimes Malaysia, Australia, and New Zealand. —**O′ce·a′ni·an,** adj., n.

**o·ce·an·ic** (ō′shē an′ik), adj. 1. of or pertaining to the ocean. 2. (cap.) of or pertaining to Oceania or its people.

**o·cean** (ō′shən), n. 1. the vast body of salt water that covers almost three fourths of the earth's surface. 2. any of the geographical divisions of this body. 3. a great quantity or expanse. [ME < L *oceanus* < Gk *ōkeanós*]

**o·cean·ar·i·um** (ō′shə nâr′ē əm), n., pl. **-ar·i·ums, -ar·i·a.** a large saltwater aquarium for marine life.

**o·cean·go·ing** (ō′shən gō′ing), adj. designed for travel on the ocean.

**O·ce·an·i·a,** See **Oceania.**

**O·ce·a′nid** (ō sē′ə nid, ō shē′-), n., pl. **O·ce·an·i·des.** *Gk. Myth.* any of the ocean nymphs, the daughters of Oceanus and Tethys.

**o·cean·ic,** See **oceanic.**

**O·ce·a′nus** (ō sē′ə nəs), n. *Gk. Myth.* a Titan, a sea god, the son of Uranus and Gaea.

**o·ce·lot** (ō′sə lot′, os′ə-), n. a spotted cat, *Felis pardalis,* ranging from Texas through South America.

**o·cher** (ō′kər), n. any of a class of natural earths, mixtures of hydrated oxide of iron with various earthy materials, ranging in color from pale yellow to orange and red, used as pigments. Also, esp. Brit., **o·chre.** [< L *ochra* < Gk *ōchrā*] —**o·cher·ous,** adj.

**o·cher·ous** (ō′kər əs), adj. of or like ocher; yellowish or reddish.

**ocellated turkey,** a wild turkey, *Agriocharis ocellata,* of Central America, having green, blue, reddish, and bronze feathers like spots on the tail.

**o·cel·la·tion** (os′ə lā′shən), n. the condition of being marked with ocelli.

**o·cel·lus** (ō sel′əs), n., pl. **o·cel·li.** 1. a simple eye common to many invertebrates. 2. an eyelike spot, as on a peacock's feather.

**o·ce·lot** (ō′sə lot′, os′ə-), n. a spotted cat, *Felis pardalis.*

**och·er,** See **ocher.**

# APPENDIX EXHIBIT 9

# BLACK'S
# LAW DICTIONARY

Definitions of the Terms and Phrases of
American and English Jurisprudence,
Ancient and Modern
with
Guide to Pronunciation

By

### HENRY CAMPBELL BLACK, M. A.

Author of Treatises on Judgments, Tax Titles, Intoxicating Liquors,
Bankruptcy, Mortgages, Constitutional Law, Interpretation
of Laws, Rescission and Cancellation of Contracts, Etc.

### FOURTH EDITION

By
### THE PUBLISHER'S EDITORIAL STAFF

ST. PAUL, MINN.
WEST PUBLISHING CO.
1951

COPYRIGHT, 1891
BY
WEST PUBLISHING CO.

COPYRIGHT, 1910
BY
WEST PUBLISHING CO.

COPYRIGHT, 1933
BY
WEST PUBLISHING CO.

COPYRIGHT, 1951
BY
WEST PUBLISHING CO.
(Fourth Edition)

COPYRIGHT, 1957
BY
WEST PUBLISHING CO.
(Fourth Edition with Guide to Pronunciation)

Black's Law Dictionary 4th Ed.

into execution; to cause to take effect. Glover v. American Mortgage Corporation, Tex.Civ.App., 94 S.W.2d 1235, 1236.

**ENFRANCHISE.** To make free; to incorporate a man in a society or body politic.

**ENFRANCHISEMENT.** The act of making free; giving a franchise or freedom to; investiture with privileges or capacities of freedom, or municipal or political liberty. Admission to the freedom of a city; admission to political rights, and particularly the right of suffrage. Anciently, the acquisition of freedom by a villein from his lord.

The word is now used principally either of the manumission of slaves, (*q. v.,*) of giving to a borough or other constituency a right to return a member or members to parliament, or of the conversion of copyhold into freehold. Mozley & Whiteley.

**ENFRANCHISEMENT OF COPYHOLDS.** In English law. The conversion of copyhold into freehold tenure, by a conveyance of the fee-simple of the property from the lord of the manor to the copyholder, or by a release from the lord of all seigniorial rights, etc., which destroys the customary descent, and also all rights and privileges annexed to the copyholder's estate. 1 Watk. Copyh. 362; 2 Steph. Comm. 51.

**ENGAGE.** To employ or involve one's self; to take part in; to embark on. State ex rel. Kusie v. Weber, 72 N.D. 705, 10 N.W.2d 741, 745. It imports more than a single act or transaction or an occasional participation. Head v. New York Life Ins. Co., C.C.A.Okl., 43 F.2d 517, 519; Lee v. Guardian Life Ins. of America, 46 N.Y.S.2d 241, 246, 187 Misc. 221.

"Engage" means to take part in or be employed in and denotes more than a single act or single transaction while "participate" means simply to take or have a part or share in, and may apply equally to a single act or many acts. Lawyers Lloyds of Texas v. Webb, Tex.Civ.App., 150 S.W.2d 181, 184.

**ENGAGED IN AVIATION.** See Aviation.

**ENGAGED IN COMMERCE.** To be "engaged in commerce" an employee must be actually engaged in the movement of commerce or the services he performs must be so closely related thereto as to be for all practical purposes an essential part thereof; McLeod v. Threlkeld, Tex., 63 S.Ct. 1248, 1251, 1252, 319 U.S. 491, 87 L.Ed. 1538; Boutell v. Walling, C.C.A.Mich., 148 F.2d 329, 331.

**ENGAGED IN EMPLOYMENT.** To be rendering service for employer under terms of employment, and is more than being merely hired to commence work. Walling v. Consumers Co., C.C.A.Ill., 149 F.2d 626, 629.

**ENGAGEMENT.** In French law. A contract. The obligation arising from a *quasi* contract. The terms "obligation" and "engagement" are said to be synonymous, (17 Toullier, no. 1;) but the Code seems specially to apply the term "engagement" to those obligations which the law imposes on a man without the intervention of any contract, either on the part of the obligor or the obligee, (article 1370.) An engagement to do or omit to do something amounts to a promise. Rue v. Rue, 21 N.J.Law, 369.

In English practice. The term has been appropriated to denote a contract entered into by a married woman with the intention of binding or charging her separate estate, or, with stricter accuracy, a promise which in the case of a person *sui juris* would be a contract, but in the case of a married woman is not a contract, because she cannot bind herself personally, even in equity. Her engagements, therefor, merely operate as dispositions or appointments *pro tanto* of her separate estate. Sweet.

Under statute rendering national bank stockholders liable to assessment in order to discharge an "engagement" of the bank, the quoted word includes all pecuniary liabilities and obligations of the bank. Oppenheimer v. Harriman Nat. Bank & Trust Co. of City of New York, N.Y., 57 S.Ct. 719, 723, 301 U.S. 206, 81 L.Ed. 1042.

**ENGENDER.** To cause, to bring about, to excite, to occasion, to call forth. Lacy v. State, 30 Okl. Cr. 273, 236 P. 53, 54.

**ENGINE.** This is said to be a word of very general signification; and, when used in an act, its meaning must be sought out from the act itself, and the language which surrounds it, and also from other acts *in pari materia*, in which it occurs. Abbott, J., 6 Maule & S. 192. In a large sense, it applies to all utensils and tools which afford the means of carrying on a trade. But in a more limited sense it means a thing of considerable dimensions, of a fixed or permanent nature, analogous to an erection or building. Id. 182. And see Lefler v. Forsberg, 1 App.D.C. 41; Brown v. Benson, 101 Ga. 753, 29 S.E. 215.

Within Employers' Liability Law, § 1, par. 2, subd. (a), an "engine" is an ingenious or skillful contrivance used to effect a purpose, and is often synonymous with the word "machine;" machinery being any combination of mechanical means designed to work together so as to effect a given end. Haddad v. Commercial Motor Truck Co., 146 La. 897, 84 So. 197, 198, 9 A.L.R. 1380.

Machine by which power is applied to the doing of work, particularly one that converts some motive energy, especially heat, into mechanical power. Chrysler Corporation v. Trott, Cust. & Pat.App., 83 F.2d 302, 310.

## Compound Compressed Air Engine

An engine in which the compressed air is first used in a high pressure cylinder, that is, in a cylinder of relatively small diameter, and after driving the piston connected therewith, instead of being permitted to escape, is conveyed to a low pressure cylinder, that is, to a cylinder of larger diameter, where it still has sufficient expansive force to drive another piston. This operation may again be repeated in a third cylinder or the air

he permitted to es Porter Co. v. Bald 219 F. 226, 229.

**ENGINEER.** One a calling or profes Employers' Liabili dent & Casualty I land, C.C.A.Ohio, ages or runs any s an engine driver. C.A.Ill., 111 F.2d 1

**ENGINEERING.** mechanical proper to man in structu Liability Assur. C ualty Ins. Co. of Ohio, 134 F.2d 56

**ENGLESHIRE.** for the preservat man was killed, liable to be ame that the person k proof was called " 4 Bl. Comm. 195;

**ENGLETERRE.**

**ENGLISH INFOR** proceeding in the of revenue.

**ENGLISH MARR** to the place wher it may refer to th parties between w where the union Prob. Div. 51.

**ENGRAVING.** material incised like, from which The term may a generally restric works connected the reproduction tography. Ameri Ill.App. 309, 44 N

**ENGROSS.** To c ment in a fair, large, fair hand,

In old criminal commodity on the and sell again at

**ENGROSSER.** C parchment in a

One who purch modity in order sell them again

**ENGROSSING.** to one's possessi of corn, or other them again. I commodity, with

Fidelity & Casualty Co. of New York, 202 Mo.App. 319, 215 S.W. 496, 498.

Under statute respecting adverse possession, the term was synonymous with "actual possession," as distinguished from "constructive possession." Hart v. All Persons, 26 Cal.App. 664, 148 P. 236, 240.

See Occupation; Occupy.

**In International law.** The taking possession of a newly discovered or conquered country with the intention of holding and ruling it.

**OCCUPANT.** Person having possessory rights, who can control what goes on on premises. United States v. Fox, C.C.A.N.Y., 60 F.2d 685, 688.

One who takes the first possession of a thing of which there is no owner.

One who occupies and takes possession, one who has the actual use, possession or control of a thing. Lechler v. Chapin, 12 Nev. 65; Wittkop v. Garner, 4 N.J.Misc. 234, 132 A. 339, 340.

In a special sense, one who takes possession of lands held *pur autre vie*, after the death of the tenant, and during the life of the *cestui que vie*.

**Common occupant.** See *general occupant*, below.

**General occupant.** At common law where a man was tenant *pur autre vie*, or had an estate granted to himself only (without mentioning his heirs) for the life of another man, and died without alienation during the life of *cestui que vie*, or him by whose life it was holden, he that could first enter on the land might lawfully retain the possession, so long as *cestui que vie* lived, by right of occupancy, and was hence termed a "general" or common "occupant." 1 Steph.Comm. 415.

**Special occupant.** A person having a special right to enter upon and occupy lands granted *pur autre vie*, on the death of the tenant, and during the life of *cestui que vie*.

Where the grant is to a man *and his heirs* during the life of *cestui que vie*, the *heir*, succeeds as special occupant, having a special exclusive right by the terms of the original grant. 2 Bl.Comm. 259; 1 Steph.Comm. 416.

In the United States the statute provisions of the different states vary considerably upon this subject. In New York and New Jersey, special occupancy is abolished. Virginia, and probably Maryland, follow the English statutes. In Massachusetts and other states, where the real and personal estates of intestates are distributed in the same way and manner, the question does not seem to be material. 4 Kent 27.

**OCCUPANTIS FIUNT DERELICTA.** Things abandoned become the property of the (first) occupant. Taylor v. The Cato, 1 Pet.Adm. 53, Fed. Cas.No.13,786.

**OCCUPARE.** Lat. In the civil law, to seize or take possession of; to enter upon a vacant possession; to take possession before another. Calvin.

**OCCUPATILE.** That which has been left by the right owner, and is now possessed by another.

**OCCUPATIO.** "The advisedly taking possession of that which is at the moment the property of no man, with a view of acquiring property in it for yourself." Maine, Anc.L. 245. The advised assumption of physical possession. Id. 256. See Occupancy.

**OCCUPATION.** Possession. Sweet; Kinneer v. Southwestern Mut. Fire Ass'n, 118 Pa.Super. 312, 179 A. 800. Where a person exercises physical control over land. Lancaster County Bank v. Marshel, 130 Neb. 141, 264 N.W. 470, 475. Control; tenure; use.

"Occupation" of a dwelling house means living in it. The use for which premises are intended should be considered in determining what is meant by the word "unoccupied" as contained in a policy. Hoover v. Mercantile Town Mut. Ins. Co., 93 Mo.App. 111, 69 S.W. 42. As used in a fire insurance policy the word *unoccupied*, is not synonymous with *vacant*, but is that condition where no one has the actual use or possession of the thing or property in question. Yost v. Ins. Co., 38 Pa.Super.Ct. 594; Hardiman v. Fire Ass'n, 212 Pa. 383, 61 A. 990.

A putting out of a man's freehold in time of war. Co.Litt. s. 412.

**Actual occupation.** An open, visible occupancy as distinguished from the constructive one which follows the legal title. Cutting v. Patterson, 82 Minn. 375, 85 N.W. 172; People v. Ambrecht, 11 Abb.Prac., N.Y., 97; Bennett v. Burton, 44 Iowa 550.

**Vocation.** That which principally takes up one's time, thought, and energies; especially, one's regular business or employment; also whatever one follows as the means of making a livelihood. Dorrell v. Norida Land & Timber Co., 53 Idaho, 793, 27 P.2d 960; Texas Co. v. Amos, 77 Fla. 327, 81 So. 471, 472; Childers v. Brown, 81 Or. 1, 158 P. 166, 168, Ann.Cas.1918D, 170. Particular business, profession, trade, or calling which engages individual's time and efforts, employment in which one regularly engages or vocation of his life. Harris v. Southern Carbon Co., La.App., 162 So. 430, 434; Evans v. Woodman Acc. Ass'n, 171 P. 643, 644, 102 Kan. 556, L.R.A.1918D, 122; Industrial Commission of Ohio v. Roth, 120 N.E. 172, 173, 98 Ohio St. 34, 6 A.L.R. 1463.

**OCCUPATION TAX.** A tax imposed upon an occupation or the prosecution of a business, trade, or profession; not a tax on property, or even the capital employed in the business, but an excise tax on the business itself; to be distinguished from a "license tax," which is a fee or exaction for the privilege of engaging in the business, not for its prosecution. Adler v. Whitbeck, 44 Ohio St. 539, 9 N.E. 672; Appeal of Banger, 109 Pa. 95; Pullman Palace Car Co. v. State, 64 Tex. 274, 53 Am. Rep. 758.

**OCCUPATIONAL.** Of or pertaining to an occupation, trade or work. Morgan v. Equitable Life Assur. Soc. of U. S., La.App., 22 So.2d 595, 597.

**OCCUPATIONAL DISEASE.** Disease gradually contracted in usual and ordinary course of employment, because thereof, and incidental thereto. Travelers Ins. Co. v. Lancaster, Tex.Civ.App., 71 S.W.2d 318, 319.

OCCUP
ordinary
unusual
eral Life
693, 694.

OCCUPA
pation o

OCCUPA
that lay
or tenen

OCCUPI
enjoyme

A tena
the occu
a servan
officii;
72.

OCCUPY
to hold
to posse
v. Rosel
tual use
Sill, 11

The te
according
imply tha
without i
cessation
Washingt
608, 612;
180 S.W.
stead, it
may som
Warden,

See C

OCCUPY
right un
he has
to be h
191, 192

OCCUPY
viding f
pant an
true ow
ments i
the land
Jones v
C.C.A. 1

OCCUR
with; t
fall in
Petty, 1
begin.
59.

OCCUR
incident
without
Mercha
98 S.W.

OCEAN
that po
the bod