IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RESTAURANT LAW CENTER *and* TEXAS RESTAURANT ASSOCIATION, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:21-CV-1106-RP |
| UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, *Acting Secretary of the United States Department of Labor, in her official capacity; and* JESSICA LOOMAN, *Acting Administrator of the Department of Labor Wage and Hour Division, in her official capacity*, | § § § § § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court are (1) Plaintiffs Restaurant Law Center ("RLC") and Texas Restaurant

Association's ("TRA") (collectively, "Plaintiffs") Motion for Summary Judgment (Dkt. 36); (2)

Plaintiffs' Motion for a Preliminary Injunction, (Dkt. 12), and (3) Defendants United States

Department of Labor ("DOL"), Hon. Julie A. Su, Acting Secretary of the U.S. Department of

Labor, and Jessica Looman's, Acting Administrator of the Department of Labor's Wage and Hour

Division, in her official capacity, (collectively, "Defendants") Motion for Summary Judgment (Dkt.

38). Having reviewed the record, the parties' briefing, and the relevant law, the Court will deny

Plaintiffs' motions and grant Defendants' motion.

## I. BACKGROUND

As the Court recited in its order denying Plaintiffs' motion for a preliminary injunction (Dkt.

27), this is a challenge to a DOL regulation regarding wages for employees who receive tips as part

of their earnings. Under the Fair Labor Standards Act ("FLSA"), a "tipped employee" is an

"employee engaged in an occupation in which he customarily and regularly receives more than $30 a

month in tips." 29 U.S.C. § 203(t). For such employees, an employer can take a "tip credit" that allows it to offset the employee's wages by the amount of tips, down to $2.13 per hour, so long as the employee's total earnings—wages plus tips—add up to minimum wage. 29 U.S.C. § 203(m)(2)(A). The dispute in this case turns on the meaning of the statutory phrase "engaged in an occupation" and the term "occupation," both of which are used in the definition of "tipped employee" but are undefined in the FLSA.

Tipped employees, such as servers and bartenders, regularly engage in non-tipped work, including cleaning and preparation for service, which may complicate calculation of their wages. (Compl., Dkt. 1 at 18). In 1967—the year after Congress amended the FLSA to include a tip credit—DOL promulgated regulations addressing such situations. *See* 29 C.F.R. § 531.50–60. These rules governed employees working in "dual jobs," where they perform both non-tipped and tipped labor, such as working in maintenance and as a server. The regulation distinguished working two separate jobs, where the tip credit did not apply, from working one job with overlapping duties, where the credit did apply. In the latter category, all of an employee's activities were not required to be "directed toward producing tips." 29 C.F.R. § 531.56(e) (1967–2020).

DOL claims that restaurants can use the tip credit and dual jobs regulation to subsidize non-tipped work and pay employees less across the board. (Dkt. 38-1 at 7). In response to this potential for exploitation, in 1988 DOL issued guidance, known as the 80/20 rule (not promulgated as a regulation), which built on statements in its previous opinion letters.[1] (*Id.* at 7–8; WHD Field Operations Handbook ("FOH") Rev. 563 § 30d00(e)). The guidance allowed a tip credit for time spent on duties related to the tipped occupation, even if those duties were not directly related to tip-generating activities. However, it limited this allowance to up to twenty percent of the employee's

---

[1] *See* WHD Opinion Letter FLSA-895 (Aug. 8, 1979), Dkt. 43 at 5; WHD Opinion Letter WH-502 (Mar. 28, 1980), Dkt. 43 at 6; WHD Opinion Letter FLSA-854 (Dec. 20, 1985); Dkt. 43 at 8.

time. *See* WHD Field Operations Handbook ("FOH") Rev. 563 § 30d00(e). In other words, only up to twenty percent of an employee's work could be in non-tipped activities for the employer to be entitled to take the tip credit for that employee.

The 80/20 guidance remained in place largely undisturbed[2] until 2018. That year, DOL rescinded the rule through new guidance. (Dkt. 38-1 at 13; WHD Opinion Letter FLSA 2018-27 (Nov. 8, 2018), Dkt. 43 at 12; WHD FOH Rev. 767 (Feb. 15, 2019), Dkt. 38-1 at 19). The rescission was "met with near-universal rejection" in court. (Dkt. 38-1 at 14). In 2020, DOL finalized a rule codifying the rescission, but that rule never went into effect. (*Id.* at 14–15; 85 Fed. Reg. 86756 (Dec. 30, 2020)). Instead, DOL withdrew the rule in 2021 and finalized a new rule effectively codifying the 80/20 guidance and adding new protections. (Dkt. 38-1 at 15). It issued a notice of proposed rulemaking on June 23, 2021. 86 Fed. Reg. 32818 (June 23, 2021). After making changes in response to comments from the restaurant industry and others, DOL issued a final rule (the "Rule" or "Final Rule") on October 29, 2021. 86 Fed. Reg. 60114 (Oct. 29, 2021). The Rule went into effect on December 28, 2021. (Dkt. 38-1 at 17).

The Rule has several provisions. First, it clarifies that the tip credit is only available for hours spent working in the tipped occupation. 86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(e)). Second, it codifies the 80/20 guidance and adds a thirty-minute limitation on non-tipped work allowable when taking the tip credit. 86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(f)). Third, it elaborates on who qualifies for the tip credit, stating that an employee is "engaged in a tipped occupation when the employee performs work that is part of the tipped occupation" and "may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation." 86 Fed. Reg. at 60157 (codified at 29 C.F.R. § 531.56(f)(1)). Further, it sets out a three-

---

[2] The guidance was rescinded only once before 2018, for a period of less than three months, from January to March 2009. (Dkt. 38-1 at 13 n.1).

part framework to classify tipped work: (1) work that is part of the tipped occupation and produces tips; (2) work that is part of the tipped occupation and directly supports tip-producing work (subject to the 30-minute rule) though it is not directly tip-producing; and (3) other, non-tipped work that is not subject to the tip credit. *Id.* Finally, the Rule adds examples to illustrate the above. (Dkt. 38-1 at 16–17).

On December 3, 2021, Plaintiffs filed this action to permanently enjoin the Rule. (Dkt. 1). On February 22, 2022, the Court denied Plaintiffs' motion for preliminary injunction, finding that Plaintiffs failed to show any irreparable harm. (Mot. Prelim. Inj., Dkt. 12, at 21–22; Order, Dkt. 27). Although the Court noted its skepticism, it did not address the merits of the case because it found that Plaintiffs would not suffer irreparable harm absent a preliminary injunction. (*Id.* at 4 n.3). In particular, the Court noted that Plaintiffs' arguments amounted to "speculative concerns" and "conclusory claims" about compliance costs. (Order, Dkt. 27, at 9). On March 1, 2022, Plaintiffs appealed that Order to the Fifth Circuit Court of Appeals. On April 28, 2023, the Fifth Circuit reversed, finding that "Plaintiffs sufficiently showed irreparable harm in unrecoverable compliance costs . . . ." *Rest. L. Ctr. v. U.S. Dept. of Lab.*, 66 F.4th 593, 595 (5th Cir. 2023). The opinion noted that compliance costs would likely be necessary to track the number of minutes worked on non-tipped labor and that the new 30-minute rule would impose additional monitoring costs. *Id.* at 598–600. The opinion further noted that "business would incur $77 million each year in compliance costs closely mirroring the ones Plaintiffs' members claim." *Id.* at 600. Overall, the Fifth Circuit found that "Plaintiffs have provided sufficient evidence" of irreparable harm and remanded the preliminary injunction back to this Court. *Id.* The opinion noted its confidence that this Court "will proceed expeditiously to consider the remaining prongs of the preliminary injunction analysis." *Id.*

While the preliminary injunction order was on appeal, this case moved forward on the merits. On April 22, 2022, Plaintiffs filed their motion for summary judgment. (Dkt. 36). On May

13, 2022, Defendants filed their own motion for summary judgment. (Dkt. 38). The Court refrained

from resolving the motions pending the Fifth Circuit's opinion. Accordingly, both the cross-motions

for summary judgment and the motion for a preliminary injunction are ripe for review. On June 27,

2023, the Court held a phone conference following entry of the Fifth Circuit's mandate. (Minute

Entry Dkt. 64). Counsel for both parties noted that they would consent to a single order jointly

addressing the preliminary injunction and motions for summary judgment. (*Id.*).

## II. LEGAL STANDARD

### A. Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is

to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050

(5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.

Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden

of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir.

2005).

### B. Summary Judgment

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law.'" *Vann v. City of Southaven*, 884 F.3d 307,

309 (5th Cir. 2018) (citations omitted); *see also* Fed. R. Civ. P. 56(a). "A genuine dispute of material

fact exists when the 'evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'" *Bennett v. Hartford Ins. Co. of Midwest*, 890 F.3d 597, 604 (5th Cir. 2018) (quoting

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, LLC v. Haydel Enter., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs*, 783 F.3d at 536). While the movant must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if it "might affect the outcome of the suit." *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 248).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Jones v. Anderson*, 721 F. App'x 333, 335 (5th Cir. 2018) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Infante v. Law Off. of Joseph Onwuteaka, P.C.*, 735 F. App'x 839, 843 (5th Cir. 2018) (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Wease v. Ocwen Loan Servicing, LLC*, 915 F.3d 987, 992 (5th Cir. 2019).

Additionally, at the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. *See* Fed. R. Civ. P. 56(c); *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *United States v. Renda Marine, Inc.*, 667 F.3d 651, 655 (5th Cir. 2012) (quoting *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003)).

### C. Administrative Procedure Act ("APA")

Under the APA, an agency action cannot be overturned unless the agency's legal conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." 5 U.S.C. § 706(2)(A). This standard is deferential to the agency and does not allow a court "to substitute [its] judgment for that of the agency." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). So long as "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Clean Water Action v. EPA*, 936 F.3d 308 (5th Cir. 2019).

### III. DISCUSSION

This order addresses three pending motions: the preliminary injunction and the cross-motions for summary judgment. At the Court's phone conference following the Fifth Circuit's ruling, counsel for both parties noted that the likelihood of success analysis is effectively identical to the parties' summary judgment motions. Counsel consented to a single order addressing both motions under Fed. R. Civ. P. 65(a)(2). Accordingly, the Court will first address the parties' summary judgment motions and the likelihood of success on the merits. The Court will then briefly address the remaining preliminary injunction factors—balance of equities and the public interest.

Turning to the merits of the suit, Plaintiffs argue that the Rule is invalid, arbitrary, and capricious, and they are therefore entitled to summary judgment. (Dkt. 36).[3] Specifically, Plaintiffs assert the Rule is inconsistent with the plain language of the FLSA, 29 U.S.C. § 203(t), because "its application of the tip credit depends upon whether specific job duties directly and immediately produce tips" rather than "the job as a whole." (*Id.* at 22–23). In their own motion for summary judgment, Defendants disagree, maintaining that the Rule is not contrary to law and that Congress provided DOL with the authority and discretion to promulgate regulations interpreting when an employee is engaged in a tipped occupation in a way that prevents abuse of that provision. (Dkt. 38-1).

In both motions, Plaintiffs challenge the Rule under the two-step framework articulated in *Chevron, USA, Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1984). The *Chevron* framework "is rooted in a background presumption of congressional intent"—if a statute contains a gap to be filled, Congress desired the agency administering the statute, rather than the courts, to resolve this gap. *City of Arlington*, 569 U.S. at 296. At step one, the court must consider "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress has directly spoken on an issue, that settles the matter: "[T]he Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Only if the statutory text is ambiguous can the court proceed to step two, which is to determine whether the agency's construction of the statute is "permissible." *Id.* at 843. If the construction is permissible, it should be upheld. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* "*Chevron* review and arbitrary and capricious review

---

[3] For the sake of convenience, the Court will primarily rely on the parties' cross-motions for summary judgment for citations, rather than the emergency motion for a preliminary injunction.

overlap at the margins," specifically at *Chevron* step two.[4] *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996); *see also Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1038 (10th Cir. 2006).

### A. Does *Chevron* Apply?

As an initial matter, Plaintiffs argue that the Rule fails at *Chevron* "Step Zero" because DOL did not promulgate the Rule within the exercise of the authority it claims Congress granted it. (Dkt. 36 at 20; Mot. Prelim. Inj., Dkt. 12, at 21–22). Plaintiffs assert that the Final Rule fails to determine, or purport to determine, what it means to be "engaged in an occupation that customarily and regularly receives tips." (*Id.* at 21). Instead, Plaintiffs contend that the Final Rule defines completely different terms— "tipped occupation" and "engaged in a tipped occupation"—but section 3(t) of the FLSA does not contain these terms. (*Id.*). Given this, Plaintiffs argue that DOL acted outside of its claimed delegated authority because Congress only delegated DOL the authority to define "engaged in an occupation." (*Id.*).

DOL responds that it has the authority to regulate tipped employment given the clear statutory language that allows it to do just that. (Dkt. 38-1 at 22). Additionally, DOL contends that Plaintiffs' argument is more properly resolved at *Chevron* step two and not at "Step Zero." (*Id.*). DOL further maintains that its use of the term "tipped occupation" does not supplant the statutory definition with a completely different term and there is no material difference between the two. (*Id.* at 23). Instead, DOL asserts that they are two different grammatical ways of expressing the same general concept—an occupation that involves the regular receipt of tips. (*Id.*).

The Fifth Circuit has instructed that "before leaping into the *Chevron* two-step, [courts] must determine whether the agency construction is of a form that warrants application of the framework

---

[4] Plaintiffs recognize that *Chevron* step two and the APA share the arbitrary and capricious standard, and that analysis under the two proceeds similarly. (Dkt. 36, at 17 n.4). Thus, the Court will consider Plaintiffs' arguments together under its *Chevron* step two analysis as discussed below.

at all." *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 297 (5th Cir. 2022). "The Supreme

Court has instructed federal courts not to reach *Chevron* steps one or two unless the court first

determines 'the agency interpretation claiming deference was promulgated in the exercise of that

authority' to make rules carrying the force of law." *Id.* (quoting *United States v. Mead Corp.*, 533 U.S.

218, 227 (2001)); *see also Dhuka v. Holder*, 716 F.3d 149, 155 (5th Cir. 2013) (noting the "predicate

requirement that the agency have issued its interpretation in a manner that gives it the force of

law"). The Fifth Circuit refers to this threshold inquiry as "*Chevron* step zero." *Id.*; *see Ali v. Barr*, 951

F.3d 275, 279 (5th Cir. 2020). "Generally, formalized pronouncements of broad application, such as

official rulemaking or adjudication, are entitled to *Chevron* deference." *Midship Pipeline Co., L.L.C. v.*

*Fed. Energy Regul. Comm'n*, 45 F.4th 867, 874 (5th Cir. 2022) (citing *Mead Corp.*, 533 U.S. at 229–30).

By contrast, "fact-bound inquir[ies] into the application of a regulation to a particular party" or

"individual, ad hoc determination[s]" are not. *Gordon Plaza*, 25 F.4th at 297–98.

Contrary to Plaintiffs' argument, the Court finds that *Chevron* applies in this case. In 1966,

Congress passed the FLSA amendments concerning tipped employees, explicitly "authoriz[ing the

Secretary of Labor] to promulgate necessary rules, regulations, or orders with regard to [those]

amendments." Pub. L. No. 89-601, § 602, 80 Stat. at 844. In promulgating the Rule at issue in this

case, DOL explicitly cited this authority, among others. 86 Fed. Reg. at 60,157. Given this, it is clear

that Congress "delegated authority to the agency generally to make rules carrying the force of law,"

and that the Rule "was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27. To

the extent Plaintiffs argue that DOL's use of the term "tipped occupation" supplants the FLSA's

statutory definition with a different term, or that the Rule is not based on a permissible construction

of the statute, these arguments are more properly raised at step two of the *Chevron* analysis. The

Rule thus satisfies the *Chevron* "Step Zero" inquiry.

### B. *Chevron* Step One

Plaintiffs next argue that even if DOL had the authority to promulgate the Rule, it fails at Step One because (1) the ordinary meaning of the statutory definition speaks directly to the issues at hand; and (2) the non-statutory definition the Rule creates—"a multi-layered regime under which application of the tip credit depends upon whether specific job duties directly and immediately produce tips"—conflicts with the ordinary meaning of the statutory definition. (Dkt. 36, at 21–22).

In response, DOL contends that although Congress empowered DOL to promulgate regulations implementing the 1966 FLSA amendments regarding tipped employees, Congress did not directly speak to what it means to be "engaged in an occupation" that customarily and regularly receives the threshold amount of tips. (Dkt. 38-1 at 24). Likewise, DOL argues that Congress did not speak in a way that compels DOL "to disregard the actual duties performed by the employee and focus solely on the 'job as a whole.'" (*Id.*).

A statute is ambiguous if "Congress has not addressed 'the precise question at issue,' whether by being 'silent or ambiguous with respect to the specific issue' or by leaving 'a gap for the agency to fill.'" *Helen Mining Co. v. Elliott*, 859 F.3d 226, 234 (3d Cir. 2017) (quoting *Chevron*, 467 U.S. at 843–44). It is also ambiguous if it is susceptible to more than one reasonable interpretation or more than one accepted meaning. *United Servs. Auto Ass'n v. Perry*, 102 F.3d 144, 146 (5th Cir. 1996). In determining whether Congress has unambiguously spoken through a statute, the Court applies all the "traditional tools of construction," including "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron*, 467 U.S. at 843 n.9; *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020). "[W]here a statute's text is clear, courts should not resort to legislative history" and "should not introduce ambiguity through the use of legislative history."

*Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018) (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion)).

### 1. Text

Plaintiffs assert that Congress directly spoke to the issue of tip credit application by defining "tipped employee" using the unambiguous term "engaged in an occupation." (Dkt. 36, at 22). Plaintiffs contend that the plain and ordinary meaning of "engaged in an occupation" focuses on the field of work and the job as a whole, and that nothing about this meaning suggests or indicates a focus on the relative mix of specific tasks within a single job. (*Id.* at 23). Therefore, according to Plaintiffs, the Rule's elimination of the tip credit based on side duties that, by definition, are not the principal duties of the job is inconsistent with the plain and ordinary meaning of "engaged in an occupation."

DOL, on the other hand, maintains that the text of the statute contains ambiguities that the agency is entrusted to clarify through regulation. (Dkt. 38-1, at 24). DOL contends that the ambiguity in the term "engaged in an occupation" requires deference to DOL's regulations setting boundaries on when an employee is "engaged" in the requisite type of "occupation." (*Id.*). Additionally, Defendants assert that the relevant dictionary definitions demonstrate that an "occupation" is not delineated by reference to the title of a "job as a whole," but by the "usual," "principal," or "regular work" or "business" associated with that occupation. (*Id.* at 25–27 (quoting Webster's Third New International Dictionary 1560 (1961); Random House Dictionary of the English Language 996 (1967); Black's Law Dictionary 1230 (4th Ed. 1957)).

The Court agrees with DOL's contentions. The statute refers to an occupation as one in which an employee customarily and regularly receives tips as part of their income. 29 U.S.C. § 203(t). The statute also specifies that an employee is not a "tipped employee" for which an employer can take a tip credit unless the employee is "engaged in" a tipped occupation. *Id.* However, as DOL

persuasively points out, the statute fails to specify the particular work associated with such an occupation. The statute also fails to clarify when such an employee may be considered "engaged in" that work. These gaps in the text of the statute leave DOL the task of working out the details for how to determine what it means to be "engaged in an occupation" where one regularly receives tips. *See, e.g.*, *Long Island Home Care at Home*, 551 U.S. at 167 (finding text of FLSA statute ambiguous and that it "expressly instructs the agency to work out the details of [its] broad definitions"). This task includes looking at the specific work that employees are occupied with and whether that work can be considered part of the tipped occupation. The Court thus finds that the text of the FLSA is ambiguous and does not expressly speak to the issue at hand.

### 2. Structure and Purpose

Plaintiffs further argue that Rule improperly focuses on "engaged in an occupation" without considering the whole statutory definition of "tipped employee"—a person employed in an occupation who "customarily and regularly receives more than $30 a month in tips." (Dkt. 36, at 23). Plaintiffs contend that the Rule erroneously focuses on whether specific job duties directly and immediately produce tips, effectively writing the rest of the text out of the statutory definition. (*Id.* at 23–24).

DOL opposes this argument, stating that the structure and purpose of the FLSA contradicts Plaintiffs' reading of the statute. (Dkt. 38-1, at 27). According to DOL, under Plaintiffs' interpretation, the FLSA would unambiguously entitle a restaurant employer to take a tip credit for any and all work that it instructs an employee labeled as a tipped employee to perform, regardless of whether that work produces tips or directly supports tip-producing work. (*Id.*). DOL maintains that this would undermine a key purpose of the FLSA—to ensure tipped employees who are paid a reduced direct wage receive the value of the tips they earn from tip-producing work, and to forbid employers from appropriating tipped employees' tips for themselves. (*Id.*).

Congress enacted the FLSA "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18, 65 (1945). As mentioned, the tip-credit provision was added to the FLSA in 1966. *See* Fair Labor Standards Act Amendments of 1966, Pub. L. No. 89-601, § 101, 80 Stat. 830, 830 (1966). Pursuant to the FLSA, employers may not rely on a tip credit for tipped employees "unless . . . all tips received by such employee have been retained by the employee," except where the tips have been pooled with other traditionally tipped employees. 29 U.S.C. § 203(m)(2)(A). This provision forbids an employer from using an employee's tips to subsidize work performed by employees in non-tipped occupations when an employer takes a tip credit, thereby paying a reduced wage to an employee engaged in a tipped occupation. Additionally, a 2018 amendment expands these protections, adding that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portions of employees tips, regardless of whether or not the employer takes a tip credit." Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 1201(a), 132 Stat. 348, 1148 (2018) (codified at 29 U.S.C. § 203(m)(2)(B)).

Given the FLSA's purpose and the added amendments, the Court finds that Plaintiffs' binary interpretation could undermine the purpose of the statute by allowing employers to use the tips an employee earns while performing tip-producing work to subsidize direct cash wages paid to that employee when he or she performs non-tip producing work, or work that does not directly support tip-producing work. This interpretation does not support the FLSA's purpose of ensuring that workers who perform non-tipped work receive minimum wage for their duties.

14

### 3. Legislative History

Plaintiffs next assert that the FLSA's legislative history supports their "ordinary meaning" definition because the legislative history: (1) identifies occupations in which employees customarily and regularly receive the requisite amount of tips just like the dictionary definitions; (2) explains that the tip credit provisions were intended to be "sufficiently flexible to permit the continuance of existing practices with respect to tips" and "provide enough flexibility to account for a practice as inconsistent as tipping"; (3) specifically refers to the definition of "tipped employee" and analogizes it to the reporting requirements for tipped employees under the Social Security Act of 1965; and (4) demonstrates that, as cited in the Rule, the meaning of "occupation" reflects an intent for the tip credit analysis to focus on the principal duties performed "over the entire workweek." (Dkt. 36, at 24–26 (citing S. Rep. No. 93-690 at 43; S. Rep. No. 89-1487 (1966), reprinted in 1966 U.S.C.C.A.N. 3002, 3014, 3015; U.S.C.C.A.N. 3014; Pub. L. No. 89-97, 79 Stat. 384-85, codified at 26 U.S.C. § 6053(a))).

In response, DOL asserts that there is nothing in the FLSA's legislative history which indicates an intent to treat tipped employees the same, despite their various un-tipped duties and the time spent on those un-tipped duties. (Dkt. 38-1, at 29–31). DOL also contends that Plaintiffs have taken the statements in the Senate reports accompanying the FLSA's amendments out of context, and that the sentiments expressed in the report are antiquated. (*Id.* at 29–30).

In 1966, the Senate Report accompanying the FLSA amendments for that year states that "the tip provisions are sufficiently flexible to permit the continuance of existing practices with respect to tips." S. Rep. No. 89-1487, at 12–13. Contrary to Plaintiffs' argument, however, the committee referenced this flexibility in "existing practices" in regard to the actual handling of tips once they are received, and not in deciding whether the tip credit applies. In fact, the very next few sentences of the Report refer to pooling and other arrangement of tips once they are received,

noting among others that where tips are required to be turned over to an employer to be treated as gross receipts, the employer must pay a minimum wage.[5] *See id.* Thus, Plaintiffs appear to have taken the statement out of context. The Senate Report then cites several other relevant examples, but does not denote flexibility in the payment of a reduced wage for work that is not part of a tipped occupation, as Plaintiffs suggest. *See id.* Instead, the Report, as cited by Plaintiffs, refers to flexibility for employees to receive minimum wage from an employer during times where they do not receive sufficient tips to equal or exceed the minimum wage. *See id.*

As also cited by Plaintiffs, the same Senate Report for the 1966 amendments describes a "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips." S. Rep. No. 89-1487, at 12. The Report then states that "[t]his is analogous to the reporting requirements for a tipped employee under the provision of the Social Security Act of 1965." *Id.* Despite Plaintiffs' contention, the Court does not interpret this provision to mean that employees with particular job titles must always be deemed to be engaged in a tipped occupation regardless of the type of work they perform. Instead, the reference to the Social Security Act simply recognizes that the $20 monthly minimum tip threshold is the same as that of the $20 monthly minimum threshold for reportable cash tips in the Social Security Act. *Compare* Pub. L. No. 89-601, § 101(b), 80 Stat. 830, 830 (1966) (codified as amended at 29 U.S.C. § 203(t)), *with* Act of July 30, 1965, Pub. L. No. 89-97, § 313, 79 Stat. 286, 382 (1965) (codified at 42 U.S.C. § 409(a)(10)(B)).

Likewise, the legislative history behind the 1974 amendments does not support Plaintiffs' argument. Plaintiffs contend that the Senate Report defines "occupation" in terms of "the

---

[5] Notably, and highlighting the difficulty in Plaintiffs' "flexibility" argument, the 2018 amendment now prohibits this practice by forbidding employers to keep employees' tips regardless of whether the employer takes a tip credit. *See* Pub. L. No. 115-141, § 1201, 132 Stat. 348, 1148 (2018) (codified at 29 U.S.C. § 203(m)(2)(B)).

employee's activities over the entire workweek," thus supporting their contention that the FLSA allows employers to take a tip credit as long as the employees' job duties add up to tip-producing work over an entire week. *See* S. Rep. No. 93-690, at 43. The Senate Report states that "[i]n establishments where the employee performs a variety of different jobs, the employee's status as one who 'customarily and regularly receives tips' will be determined on the basis of the employee's activities over the entire workweek." *Id.* This statement, however, directly follows the committee's previous sentences describing which employees may participate in a traditional tip pool, and how employers may determine which employee is a tipped employee for purposes of the tip credit, but does not appear to stand for the proposition argued by Plaintiffs. *Id.* Furthermore, the legislation accompanying the 1974 Report did not make any changes to section 203(t). And the Report explicitly recognized "the ethical question involved in crediting tips toward the minimum wage," emphasizing that tipped employees "should have stronger protection to ensure the fair operation" of the tip credit provision. *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 622 (9th Cir. 2018) (quoting S. Rep. No. 93-690, at 42–43).

The Court finds that, upon review, the plain language and legislative history do not support Plaintiffs' argument that the statute is unambiguous. Instead, the Court concludes that "Congress has crafted an ambiguous statute and tasked DOL with implementing the ambiguous provisions," and the Court "must defer to the agency's regulation so long as it is not arbitrary, capricious, or manifestly contrary to the statute." *Marsh*, 905 F.3d at 622 (quoting *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 876 (8th Cir. 2011)).

## C. *Chevron* Step Two

Because the Court has concluded that the statute is "silent or ambiguous" regarding the treatment of employees who make over $30 a month in tips, but who also participate in non-tipped duties or multiple occupations, the Court must now consider whether DOL's promulgation of the

Rule is based on a permissible construction of the FLSA. *Chevron*, 467 U.S. at 843. "If [DOL's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," a court will not disturb that choice "unless it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382–83 (1961)); *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131 (1985) (*Chevron* step two entails evaluation of agency action "in light of the language, policies and legislative history of the Act."). An agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court must make a "searching and careful review" to determine whether an agency action was arbitrary and capricious, but "the ultimate standard of review is a narrow one." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

First, Plaintiffs maintain that even if the statute is ambiguous, the Rule fails at *Chevron* Step Two because its approach to the tip credit is not a permissible interpretation of the FLSA given that it is contrary to clear congressional intent. (Dkt. 36, at 27). Plaintiffs contend that limiting the tip credit based on whether an employee's duties directly and immediately produce tips is not a permissible construction of the FLSA. (*Id.* at 28). Additionally, Plaintiffs assert that DOL conducted no fact-finding in promulgating the Rule, ignored the fact that side work is "part and parcel" of some tipped occupations like waiters and bartenders, and relied on labor market and employee economic circumstances data that it acknowledged were outdated. (*Id.* at 30–33). Finally, Plaintiffs argue the Rule is internally inconsistent. (*Id.* at 34).

In response, DOL argues that the Rule is based on a permissible construction of the statute because it provides content to the ambiguity contained in the phrase "engaged in an occupation" in which one regularly receives tips. (Dkt. 38-1, at 31). Additionally, DOL contends that the Rule is not arbitrary and capricious and that it acted well within its discretion in its promulgation. (*Id.* at 35).

Upon careful review, the Court finds that the Rule is a permissible construction of the FLSA, and that it is neither arbitrary nor capricious. The Rule's purposes include "ensur[ing] that workers do not receive a reduced direct cash wage when they are not engaged in a tipped occupation," and addressing "the practical concerns of employers" in complying with the Rule's requirements. 86 Fed. Reg. at 60,126. The Rule accomplishes these purposes by adopting a "functional test" to determine when an employee may be considered engaged in a tipped occupation. Additionally, the Rule applies to all manner of tipped occupations and allows more flexibility to classify new or different duties as they arise. The Rule thus "protect[s] tipped employees, while also provid[ing] clarity and flexibility to address the variable situations that arise in tipped occupations." *Id.* at 60,115.

Regarding Plaintiffs' argument that DOL failed to conduct any fact-finding in promulgating the Rule, this argument is unfounded. The Fifth Circuit has recognized that "[a]n agency need not make findings of fact in the conventional sense in a Section 553 proceeding." *Superior Oil Co. v. Fed. Energy Regul. Comm'n*, 563 F.2d 191, 200 (5th Cir. 1977); *see also Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299, 303 (5th Cir. 1976) ("When promulgating a rule, an agency is not required to abide by the same stringent requirements of fact findings and supporting reasons which apply to adjudication." (citation omitted)). Instead, the agency action must "bear[] a rational relationship to the statutory purposes" and "there [must be] substantial evidence in the record to support it." *Mercy Hosp. of Laredo v. Heckler*, 777 F.2d 1028, 1031 (5th Cir. 1985). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be

upheld." *Texas Oil & Gas Ass'n v. United States Envtl. Prot. Agency*, 161 F.3d 923, 934 (5th Cir. 1998)

(citing *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983)). The Rule

has met these requirements as detailed in its preamble, which contains explanations  demonstrating

rational bases for DOL's policy choices in enacting the Rule. *See* 86 Fed. Reg. at 60,126.

Plaintiffs further criticize DOL's failure to use its own O*NET Program,[6] which DOL

sponsors and maintains as the "nation's primary source of occupational information." (Dkt. 36 at

31). Plaintiffs argue that DOL should have relied on O*NET's definitive list of tasks in determining

when someone is "engaged in an occupation" in which one receives tips as part of his or her

income. (*Id*). However, as DOL points out, O*NET "only reflects what tipped employees are

required to do [for] their employers, not the tasks that actually make up part of their tipped

occupation, and is consequently not a helpful tool to use in determining whether an employee is

engaged in their tipped occupation." 86 Fed. Reg. at 60,127. This concern has been expressed by

several courts in response to the 2018 opinion letter which replaced the longstanding 80/20

guidance and relied on O*NET to define what duties are sufficiently related. For instance, the

Eleventh Circuit noted that this reliance "creates a risk that unlawful practices will become

entrenched in high-violation industries by setting up a fox-guarding-the-henhouse situation: simply

by requiring tipped employees to perform untipped duties—whether those duties are, in fact, related

or not to their tipped duties—employers effectively render the untipped duties 'related.'" *Rafferty v.

Denny's, Inc.*, 13 F. 4th 1166, 1185 (11th Cir. 2021); *see also O'Neal v. Denn-Ohio, LLC*, No. 3:19-CV-

280, 2020 WL 210801, at *7 (N.D. Ohio Jan. 14, 2020) ("If employers assign tipped employees

duties traditionally performed by non-tipped employees, the O*NET definitions will reflect this and

the protections established by the dual jobs regulation will erode. An interpretation of the dual jobs

---

[6] The O*NET Program provides for each occupation a "fixed list of duties that tipped employees are required by their employers to perform as part of their work." 86 Fed. Reg. at 60,127; *see* https://www.onetonline.org (last visited May 9, 2023).

regulation that would allow employers to re-write the regulation without going through the normal rule-making process cannot be a reasonable one."). Here, DOL has adequately and rationally explained its choice in adopting a functional test as promulgated in the Rule over the use of O*NET, thus surviving an arbitrary and capricious review.

Plaintiffs also take aim at DOL's reliance on economic data from 2018 and 2019, prior to the COVID-19 pandemic, to evaluate the anticipated costs of the Rule on those affected. (Dkt. 36, at 33). Because the pandemic changed the labor market and economic situation for tipped employees, Plaintiffs argue that DOL's reliance on out-of-date data for its costs estimates constitutes a reliance "on factors which Congress has not intended it to consider." (*Id.* (citing *Texas v. Envtl. Prot. Agency*, 829 F.3d 405, 425 (5th Cir. 2016)). Plaintiffs also note the Small Business Administration's ("SBA") Office of Advocacy's comments criticizing DOL for underestimating compliance costs for small employers in its notice of proposed rulemaking. (Dkt. 36, at 33). Plaintiffs contend that DOL ignored these comments in favor of outdated pre-pandemic data. (*Id.* at 33–34).

DOL responds that it acted within its discretion in choosing not to use pandemic-year cost data that would reflect changes in wages associated with the pandemic. (Dkt. 38-1 at 38). Instead, DOL contends that it conducted a retrospective evaluation of changes in tipped-employee wages following the 2018 and 2019 guidance withdrawing the 80/20 guidance in order "to account for potential changes in the opposite direction following the tip rule's reinstatement of a modified version of 80/20 guidance." (*Id.* (citing 86 Fed. Reg. at 60,143–44)). The Court finds this explanation reasonable and sound. The Fifth Circuit has noted that "courts afford agencies considerable discretion in conducting 'the complex . . . economic analysis typical in the regulation promulgation process." *Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 452 (5th Cir. 2021) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)).

Regarding Plaintiffs' argument that DOL failed to consider the SBA's Office of Advocacy comments, DOL contends that it made substantive adjustments to the content of the Rule to alleviate the SBA's Office of Advocacy's concerns. (Dkt. 38-1, at 39). Namely, it clarified that its definition of tip-producing work is intended to be broadly construed, providing examples, amending the definition, and modifying the application of the 30-minute limitation to make it easier to comply. (*Id.*). Given this explanation, the Court finds that DOL did not ignore the SBA Office of Advocacy's comments and concerns, and that DOL considered them in promulgating the final Rule.

Plaintiffs lastly argue that the Rule is internally inconsistent because: (1) it improperly treats table bussers and service bartenders as engaging in tip-producing work although bussers generally do not provide customer service in the same way as bartenders; and (2) it treats the "same duties" differently "depending on context" such as when a bartender grabs a particular beer from the back stockroom for a customer versus when the bartender retrieves a case of beer from the back stockroom to restock the beer, or when a server cleans a spill for a customer versus wiping the table between customers. (Dkt. 36, at 34–36).

In response, DOL contends the Rule is not inconsistent, and cites the Rule wherein it recognizes that bussers and bartenders "receive tips from other tipped employees such as servers because they are supporting their customer service, tip-producing work." (Dkt. 38-1 at 40 (citing 86 Fed. Reg. at 60,128 n.28)). DOL argues this is a reasoned explanation that is supported by the undisputed nature of the work that bussers and service bartenders perform and how they receive tips. The Court agrees with DOL's contention.

Likewise, the Court concurs in DOL's argument that in defining what it means to be "engaged in a tipped occupation," it is reasonable to treat "service to customers for which the tipped employee receives tips" differently from duties that are performed "in preparation for serving customers" for which employees do not receive tips. (*See* Dkt. 38-1 at 41 (quoting 86 Fed. Reg. at

60,128)). In this way, when a bartender retrieves a requested beer from the back storeroom at the request of a customer sitting at the bar, or when a server wipes down a spill on a customer's table, the employee is thus performing a task directly for a customer for which he or she will receive a tip. This work may be classified according to the Rule as "tip-producing." In contrast, when an employee performs work that does not produce tips, but directly supports customer service, such as retrieving beer from the stockroom to stock the bar or when a server cleans a table between customers, these tasks are properly categorized as "direct supporting" according to the Rule. Contrary to Plaintiffs' contention, the distinction in the tasks is not arbitrary.

Upon consideration and in conclusion, the Court finds that DOL's promulgation of the Rule readily "conform[s] to minimal standards of rationality." *Texas Oil & Gas Ass'n*, 161 F.3d at 934. The Rule's explanation of "engaged" in an "occupation" that regularly receives tips, supports the statutory structure of the FLSA and is consistent with the tip-related modification of the term "occupation." This modification includes performance of work that is part of the tipped occupation, including tip-producing work that provides services to customers for which the employee receives tips, as well as work that directly supports tip-producing work, if it does not exceed a certain amount of time. Thus, the Court concludes that DOL's decision was a permissible construction of the FLSA, and is not arbitrary and capricious; therefore, the Rule will be upheld by this Court.

### D. Major Questions Doctrine

Before concluding, the Court must address the major questions doctrine as it relates to this case.[7] After briefing was fully complete on the pending summary judgment motions, Plaintiffs filed

---

[7] Indeed, the major questions doctrine may be considered a threshold question to a *Chevron* analysis. *See Wash. All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164, 204 at n.11 (D.C. Cir. 2022) ("After oral argument, the Supreme Court decided *West Virginia v. EPA*, 142 S. Ct. 2587, 213 L.Ed.2d 896 (2022). The implication of that decision is that the major questions inquiry appears to be a threshold question to *Chevron* analysis.").

supplemental briefing in reaction to the Supreme Court's recent ruling in *West Virginia v. Envtl. Prot. Agency*, 142 S. Ct. 2587 (2022). (Dkt. 47). Plaintiffs urge the Court to consider that this case presents a "major question" because the Rule seeks to regulate "a significant portion of the American economy," requires "billions of dollars in spending by private persons or entities," and seeks to "intrud[e] into an area that is the particular domain of state law." (*Id.* (quoting *West Virginia v. EPA*, 142 S. Ct. at 2621 (Gorsuch, J., concurring)). Plaintiffs contend that the Rule affects close to 500,000 different workplaces across the country, imposing more than two billion dollars on familiarization and compliance costs. (*Id.* at 2). Additionally, Plaintiffs argue that there is no general federal law on the performance of restaurant dining room work or customer-facing work in other industries, and that such areas should be a matter of state law. (*Id.*). Plaintiffs thus assert that the Rule involves a major question and lacks clear congressional authorization. (*Id.*). As such, Plaintiffs maintain the Rule is unlawful. (*Id.*).

The Court disagrees and concludes that this case does not trigger the major questions doctrine as discussed in *West Virginia v. EPA*. In that case, the Supreme Court had occasion to consider whether a certain portion of the Clean Air Act gave the EPA the authority to require, by regulation, energy generators to shift from higher-to lower-emitting generation. *West Virginia v. EPA*, 142 S.Ct. at 2616. The Supreme Court relied on "[1] the 'history and the breadth of the authority that [the EPA] ha[d] asserted[;]' . . . [2] the 'economic and political significance' of that assertion," *id.* at 2608 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)); and [3] the principle that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s],'" *id.* at 2609 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). The Supreme Court determined that the case was a "major questions case," *id.* at 2610, requiring the government to "point to 'clear congressional authorization'" of the regulatory action, *id.* at 2614 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S.

302, 324 (2014)). The Court ultimately held that, because the relevant section of the Clean Air Act did not "clear[ly] delegat[e]" to the EPA the authority to force generation shifting, *id.* at 2616, the EPA thus lacked the statutory authority to issue the generation-shifting regulation, *id.* at 2615–16.

Given the Supreme Court's ruling in *West Virginia v. EPA*, the major questions doctrine applies if an agency claims the power to make decisions of vast "economic and political significance." *Id.* at 2607–14. However, it is unclear what exactly constitutes "vast economic significance." Still, courts have generally considered an agency action to be of vast economic significance if it requires "billions of dollars in spending." *King v. Burwell*, 576 U.S. 473, 485 (2015). For example, the Supreme Court in *Alabama Association of Realtors v. Department of Health & Hum. Services* determined that an economic impact of $50 billion was of vast economic significance. 141 S. Ct. 2485, 2489 (2021). Similarly, the Fifth Circuit in *BST Holdings, L.L.C. v. OSHA* held that $3 billion in compliance costs was enough to trigger the major-questions doctrine. 17 F. 4th 604, 617 (5th Cir. 2021). Here, DOL has pointed out that the average annual cost of the Rule in this case is $183.6 million—far less than the billions considered in the cited cases. *See* 86 Fed. Reg. 60,114 (Oct. 29, 2021). Given this, the Court finds that the Rule does not have vast economic significance as considered in *West Virginia v. EPA*.

Furthermore, the Rule cannot be said to "substantially restructure" the market or invoke any "newfound power"; nor does it rely on a "rarely used" or "ancillary provision" of the law. *See West Virginia v. EPA*, 142 S.Ct at 2610. Instead, the Rule restores previous guidance on the limitations of nontipped work, as well as work supporting tipped work. This guidance relied on the same authority the Rule relies on in its promulgation, and which has governed the industry for decades. Indeed, DOL has been interpreting the tip credit provision of the FLSA, as well as its other provisions, for decades. The Supreme Court has referred to the major questions doctrine as a common sense rule, and unlike in *West Virginia v. EPA*, the common sense interpretation of the Rule in this case clearly

granted authority to DOL to promulgate the Rule. *See West Virginia v. EPA*, 142 S. Ct. at 2609 (referring to "common sense as to the manner in which Congress [would have been] likely to delegate such power" (internal quotations omitted)). In other words, the Rule is not an exercise of "power beyond what Congress could have reasonably understood to have granted." *Id.* at 2609. As such, the Court concludes the Rule at issue in this case is not subject to the major questions doctrine.

Because the Court concludes DOL's decision was a permissible construction of the FLSA and is not arbitrary and capricious, the Rule will be upheld by this Court. Therefore, the Court does not find that Plaintiffs have shown success on the merits, and will deny the motion for a preliminary injunction. The Court will also deny Plaintiffs' Motion for Summary Judgment (Dkt. 36), and grant Defendants' Motion for Summary Judgment (Dkt. 38).

### E. Remaining Preliminary Injunction Factors

Although a failure to show likelihood of success on the merits is grounds alone for denial of a preliminary injunction, the Court will address the two remaining Rule 65 factors pursuant to the Fifth Circuit's mandate to "proceed expeditiously to consider the remaining prongs of the preliminary injunction analysis." *Rest. L. Ctr*, 66 F.4th at 600.

As Plaintiffs seek a preliminary injunction against the government, the balance of equities and public interest largely blend together. Ultimately, both tip in DOL's favor. In evaluating a motion for preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542, (1987). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982).

Here, the Fifth Circuit has already found that Plaintiffs will suffer irreparable harm because their compliance costs are nonrecoverable. *Rest. L. Ctr*, 66 F.4th at 595. But the fact that compliance costs may be irreparable does not mean those costs automatically outweigh the harm that the requested injunctive relief would pose to the government or the public. As DOL argues, restaurants must already monitor the amount of time employees spend on non-tipped labor under the 80/20 rule, and the new 30-minute rule does not impose a new form of monitoring. (Def's Resp., Dkt. 20, at 40–41). Plaintiffs argue in response that the new categories of non-tipped work will add to the costs, but do not provide an estimate of this additional monitoring. In other words, while the Rule altogether may require substantial monitoring costs, it is not clear that the Rule imposes significantly greater costs than restaurants incurred under the preexisting guidance.

Moreover, 18 months have passed since the parties filed their briefs on the preliminary injunction. (*See* Mot. Prelim. Inj., Dkt 12 (filed Dec. 20, 2021); Def's Resp., Dkt. 20 (filed Jan. 20, 2022)). The Rule took effect on December 28, 2021 and has remained in place. Restaurants and DOL have complied with the Rule since that time. And as Plaintiffs point out, while there are ongoing management costs, the most significant compliance costs associated with the Rule were familiarization and adjustment costs, which have now already been incurred. (Pls.' Reply, Dkt. 23, at 9–10). Granting an emergency motion to rescind the Rule now cannot undo these costs, and may very well force restaurants to incur additional costs adjusting to the policy that takes its place.

Finally, Plaintiffs' compliance costs do not outweigh the substantial harm that DOL may endure from essentially starting from scratch on a rule that serves to codify long-standing guidance. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce." *Nat'l Propane Gas Ass'n v. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008). This is especially true where the rule largely codifies guidance that has existed without congressional modification since 1988 and has

been cited by several other circuit courts. *See Fast*, 638 F.3d at 879–81; *Rafferty*, 13 F.4th at 1179; *Marsh*, 905 F.3d 625. Therefore, even if Plaintiffs showed a likelihood of success on the merits, neither the balance of equities nor the public interest would support a nationwide preliminary injunction. *See Marsh*, 905 F.3d at 625 ("DOL's interpretation is consistent with nearly four decades of interpretive guidance and with the statute and the regulation itself.").

**V. CONCLUSION**

Because the Court concludes DOL's decision was a permissible construction of the FLSA and is not arbitrary and capricious, the Rule will be upheld by this Court. Therefore, the Court will **DENY** Plaintiffs' Motion for Summary Judgment, (Dkt. 36), **DENY** Plaintiffs' Motion for a Preliminary Injunction, (Dkt. 12), and **GRANT** Defendants' Motion for Summary Judgment (Dkt. 38).

The Court will enter final judgment in a separate order.

**SIGNED** on July 6, 2023.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE